**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NANCY RONCATI DOWDEN, ) | |
| ) | |
| Plaintiff, Pro Se ) | **VERIFIED COMPLAINT** |
| ) | **AND JURY DEMAND** |
| v. ) | |
| ) | Case Number: |
| ) | |
| DEUTSCHE BANK NATIONAL TRUST COMPANY, ) | |
| as Trustee for American Home Mortgage Assets Trust ) | |
| 2007-1 Mortgage-Backed Pass-Through Certificates, ) | |
| Series 2007-1; MCCARTER & ENGLISH LLP; ) | |
| HINSHAW & CULBERTSON LLP; ) | |
| BROCK & SCOTT, PLLC; ADAM M. SWANSON, ) | |
| individually; BHANUKA Y. MAHABAMUNUGE, ) | |
| individually; GEOFFREY K. MILNE, individually; ) | |
| AARON A. FREDERICKS, individually; JEFFREY ) | |
| MARKS KNICKERBOCKER, individually; ) | |
| CHRISTOPHER BROWN, individually; BROWN ) | |
| LAW LLC; CONNECTICUT JUDICIAL BRANCH; ) | |
| THE HONORABLE JOHN REGAN, in his official ) | |
| capacity for prospective declaratory and injunctive relief; ) | |
| PETER D. KEANE, in his official capacity as ADA ) | |
| case-management official for the Connecticut ) | |
| Appellate and Supreme Court system, as applicable; and ) | |
| JOHN DOES 1–20, ) | |
| ) | |
| Defendants. ) | |

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, EQUITABLE, STATUTORY,**
**COMPENSATORY, TREBLE, PUNITIVE, RESTITUTIONARY, AND OTHER RELIEF**

This is an emergency federal ADA-access, court-access case, and continuing exclusion case. Plaintiff does not seek federal review of ordinary state-court rulings. Plaintiff seeks emergency prospective and status-preserving relief before Defendants convert an exclusion-produced liability posture into irreversible and irreparable consequences before any court

adjudicates the threshold federal question whether that posture may be used after Plaintiff was denied Title II ADA access and due-process participation.

Plaintiff also brings independent federal and state claims that were not pleaded in the state foreclosure action and that arise from separate conduct, separate injuries, and separate defendants. Those claims include ADA and Rehabilitation Act access violations, constitutional court-access and due-process violations, ADA interference and retaliation, RICO, ECOA, CUTPA, defamation, fraud/concealment, abuse-of-process-type misconduct, civil conspiracy, elder-financial-exploitation-related injury, attorney misconduct, public-docket correction/sealing relief, restitution, disgorgement, damages, punitive damages where permitted, and other relief available at law or equity.

The length and detail of this Complaint are part of Plaintiff's requested ADA access. Plaintiff cannot safely present this record through live, real-time adversarial oral participation. Written presentation is the only medically safe way for her to be heard.

The exclusion sequence began on November 5, 2025 when Defendant Deutsche Bank and its counsel publicly attacked Plaintiff's disability candor, interfered with her existing ADA accommodations, destabilized or induced the collapse of her counsel protection, and obtained a sudden dispositive hearing. Plaintiff immediately filed emergency requests for reinstatement of accommodations, stay, continuance, medical-record protection, correction of the record, and time to obtain counsel. The court proceeded anyway.

On November 17, 2025, Deutsche Bank was permitted to argue facts, standing, note possession, agency, limitations, rescission, unconscionability, and the alleged absence of evidence. Plaintiff was excluded from participation. She was medically unable to participate safely without accommodation, lacked effective counsel protection, sought continuation of the existing ADA

2

accommodation, and was muted, barred, or functionally silenced. Deutsche Bank was permitted full argument and post-hearing supplementation without Plaintiff receiving an equivalent ADA-compliant opportunity to oppose, test, or respond.

The injury has already occurred. Title II makes exclusion from participation the injury. The continuing emergency is that Defendants now seek to use the exclusion-produced, non-adversarial, post-hearing-supplemented liability posture as a weapon before the federal exclusion/access issue is adjudicated.

The merits have not been tested through a fair, accessible, adversarial process. Plaintiff's defenses and evidence exposed predatory origination, criminal broker/YSP misconduct, fabricated stated income, phantom cash-out proceeds, negative amortization, subrogation predecessor liability, defective assignment and standing proof, Deutsche Bank's institutional DOJ/RMBS knowledge, and equity stripping. Those facts occurred during a period in which Plaintiff was the victim of documented predatory financial abuse, concealed mortgage misconduct, and exploitation unknown to her at the time and not meaningfully exposed until later revealed in litigation. Plaintiff's documentary evidence of these facts was ignored, never tested in an accessible adversarial process, and never addressed before Deutsche Bank's version was accepted as the operative record-- while Plaintiff was excluded, denied the benefit of her existing ADA accommodation protection, and deprived of participation in the process.

The disability/candor attack was not incidental—it was global and served a distinct purpose. Deutsche Bank and its counsel combined a false disability-and-candor narrative with a false "mortgage professional" identity narrative to portray Plaintiff as universally dishonest before the court. That public credibility destruction followed Plaintiff into the appellate and Supreme

3

Court access process, where emergency ADA-related filings were rejected, returned, or procedurally disposed of without adjudication of the federal access question.

Some facts pleaded in this Complaint provide context, causation, motive, injury, recoupment, equitable background, and proof of Defendants' use of the exclusion-produced liability posture. They do not reduce this case to an appeal of the ruling obtained through denial of ADA-access and due process. Plaintiff alleges that Defendants' conduct did not merely threaten one foreclosure judgment; it continued, concealed, ratified, and monetized a serial predatory-refinance and equity-stripping chain that damaged Plaintiff's real-estate portfolio.

The estimated portfolio loss is pleaded as property injury, restitutionary loss, disgorgement injury, elder-financial-exploitation injury, CUTPA ascertainable loss, fraud/concealment damage, abuse-of-process damage, civil-conspiracy damage, and, where applicable, RICO injury to business or property.

## I.  NATURE OF THE ACTION

1. Defendants created and now seek to enforce a liability posture, the ("Challenged Liability Posture"), that was never meaningfully tested. Plaintiff's defenses, counterclaims, recoupment claims, ADA-access objections, standing challenges, fraud evidence, and institutional-knowledge evidence were not tested on a record reflecting what both sides actually argued. The dispositive posture was created after Plaintiff's ADA accommodations were denied, her attorney abandoned her days before summary judgment after dissipating her $30,000 retainer, Defendants publicly attacked her disability candor, Deutsche Bank received post-hearing evidentiary supplementation, and Plaintiff was

4

prohibited from being heard on the merits, denied protection of the existing ADA pause, denied a meaningful opportunity to oppose liability and denied any fair opportunity to test or respond to Deutsche Bank's post-hearing evidentiary supplementation. The resulting "unopposed" record was not a merits-tested adjudication; it was the product of exclusion, interference, and procedural asymmetry.

2. Plaintiff Nancy Roncati Dowden is an eighty-eight-year-old disabled homeowner with documented medical disabilities, including long-COVID-related impairment, cognitive limitations, visual and auditory limitations, and medical fragility. In June and November 2025, Plaintiff's operative ADA-access need was protection from proceedings requiring the mental engagement necessary to oppose summary judgment and participate in complex litigation tasks without accommodation. Plaintiff's disability did not mean she lacked intelligence, understanding, memory, credibility, or the ability to direct written strategy; it meant the court system was required to provide meaningful access in a medically safe form.

3. Plaintiff sought ADA accommodations from the Connecticut Judicial Branch, including continuation of the existing ADA pause, stays or continuances of participation-dependent proceedings, time to obtain counsel protection, and protection from procedures requiring mental engagement she could not safely or meaningfully perform without accommodation. Those accommodations were initially granted but not meaningfully honored once Deutsche Bank and its lawyers weaponized Plaintiff's disability record against her, accused her publicly of lacking candor about her disabilities, used New Jersey protective-relief certifications in a materially false way, and induced or exploited the court's treatment of Plaintiff's disability as a credibility problem rather than a federally protected access issue.

4. The foreclosure plaintiff, Defendant Deutsche Bank National Trust Company, as Trustee for American Home Mortgage Assets Trust 2007-1 Mortgage-Backed Pass-Through Certificates, Series 2007-1 ("Deutsche Bank"), was not pursuing a simple default on a conventional mortgage. It was enforcing a toxic securitized mortgage instrument embedded in a predatory refinance chain involving American Home Mortgage, WaMu, GreenPoint, a $39,162 lender-paid yield spread premium paid to a mortgage broker who had already pleaded guilty to federal bank fraud, a defective or impossible trust-transfer theory, a 2021 assignment into a 2007 securitized trust, and a post-hearing affidavit patch submitted only after Plaintiff was barred from meaningful participation. Plaintiff paid for approximately fifteen years and paid more than the original principal, yet Deutsche Bank seeks to treat the transaction as an ordinary default rather than the predatory equity-stripping instrument that ballooned through negative amortization, fees, interest, and foreclosure-enforcement machinery.

5. This is not a case of isolated institutional error. Deutsche Bank acquired the loan at issue in November 2021 — four years after it had already acknowledged to the United States Department of Justice, in a $7.2 billion resolution, that it securitized loans of exactly this character with knowledge or reckless disregard of their fraudulent origination, through trusts that included this loan's trust by name. Deutsche Bank made a conscious and informed decision to continue acquiring and enforcing loans bearing the exact characteristics it had already admitted were frequently fraudulent, and used and intentionally interfered with the ADA rights of a disabled elderly litigant to achieve that result.

6. Plaintiff does not bring this action as a stale challenge to a 2006 loan transaction that she knowingly understood at the time. At the time when the mortgage chain was created, Plaintiff was an active target and victim of predatory abuse, financial grooming, forged-instrument misconduct, mail and document control, and concealed identity misuse when the mortgage chain was created. Plaintiff did not know that she was being abused, and could not through reasonable diligence have known, the true nature of that misconduct.

7. Plaintiff first discovered she had been victimized in 2018, when she discovered that a $1.133 million mortgage had been forged and recorded against her New Jersey property. Through New Jersey litigation to discharge that mortgage as fraudulent, Plaintiff then learned that the forged New Jersey mortgage was only the tip of the iceberg: the same period involved extensive predatory financial abuse including multiple forgeries, fabricated loan information, IRS tax fraud, concealment and diversion of her mail, a criminally compromised and unlicensed broker, a lender-paid yield spread premium, phantom cash-out proceeds, and a toxic refinance chain later enforced by Deutsche Bank through a 2021 assignment into a 2007 securitized trust. Later foreclosure discovery, an official IRS investigation, and Deutsche Bank's own foreclosure filings, revealed that the mortgage fraud was not an isolated event, but the visible edge of a broader pattern of financial exploitation.

8. This is not speculation. The New Jersey court already determined that the $1.133 million mortgage recorded against Plaintiff's New Jersey property was not signed by Plaintiff, was not known to Plaintiff, and declared it void. Plaintiff also obtained an official Internal Revenue Service identity-theft and fraud investigation finding that she is the victim of identity theft and fraud concerning false tax filings. Those adjudicated and official findings

are the factual gateway to this Complaint: they show that Plaintiff did not merely later regret mortgage transactions; she discovered, beginning in 2018 and continuing through later litigation and official records, that she had been the victim of a broader financial-exploitation and identity-misuse scheme. The case remains ongoing and involves additional fraud and forgery issues.

9. Accordingly, the age of the 2006 instrument does not defeat this Complaint at the pleading stage. Plaintiff alleges delayed discovery, fraudulent concealment, equitable tolling, continuing use of a fraud-tainted instrument, a 2021 assignment and acquisition by Deutsche Bank, 2022–2026 foreclosure-enforcement misconduct, and 2025–2026 ADA-interference and access-to-courts misconduct. The Complaint challenges not merely the historical origination of a loan, but Defendants' recent and continuing use of concealed predatory-origination facts, fabricated professional-identity narratives, defective standing materials, disability-candor defamation, post-hearing evidentiary patching, and ADA-inaccessible state-court procedure to convert an elderly disabled victim's inability to participate into foreclosure leverage.

10. Plaintiff was led to believe she was entering lawful, conventional refinance transactions that would protect her home and preserve her equity. That was false. Plaintiff was not a sophisticated mortgage professional, was not knowingly structuring complex securitized debt, and was not knowingly consenting to negative amortization, fabricated income, lender-paid broker steering, phantom cash-out proceeds, or equity stripping. Plaintiff alleges that Conrad Roncati and James Shallo controlled the flow of documents, mail, closing information, and representations to her, and that the instrument Deutsche Bank now seeks to enforce functioned as a subprime, negative-amortization, equity-stripping product

8

in which payments did not reduce the debt in any ordinary amortizing sense, unpaid interest was capitalized, principal increased, and foreclosure became the predictable endpoint of the structure rather than the result of ordinary borrower default.

11. Deutsche Bank knew, or had reason to know, that Plaintiff's defenses exposed institutional liability far beyond an ordinary foreclosure. After Plaintiff filed special defenses and counterclaims raising predatory origination, securitization defects, Shallo/YSP broker misconduct, WaMu/subrogation predecessor liability, fraudulent standing, and equity-stripping claims, Deutsche Bank escalated its representation to three major law firms: McCarter & English LLP, ("McCarter") Hinshaw & Culbertson LLP, ("Hinshaw") and Brock & Scott, PLLC ("Brock"). Deutsche Bank's litigation escalation was Plaintiff's first indication that her defenses and counterclaims had exposed something larger than an ordinary residential foreclosure.

12. Plaintiff does not allege that the hiring of additional counsel, standing alone, is unlawful. The timing and scale of Deutsche Bank's response are pleaded as record facts, not speculation. Plaintiff alleges that the public docket shows an institutional response disproportionate to a routine residential foreclosure and consistent with an effort to protect something larger than an ordinary foreclosure judgment.

13. That escalation matters. This was not a routine residential foreclosure handled by one foreclosure firm against a represented borrower. Deutsche Bank is an international financial institution, that retained three institutional law firms, with multiple individual attorneys and complex-litigation capacity, pressing dispositive relief against an elderly disabled homeowner through exploitation of and interference with her federally protected ADA access. Plaintiff alleges that the timing, scale, and nature of that litigation response

9

are probative of the institutional importance of the defenses Plaintiff had raised and of Defendant's motive to prevent meaningful testing of the trust, standing, chain-of-title, origination, possession, servicing and enforcement defects identified in this Complaint.

14. Plaintiff alleges Deutsche Bank's techniques reflected an effort to protect a larger exposure than just her home: the enforcement value of a challenged RMBS trust asset and to prevent meaningful testing of the trust, standing, chain-of-title, origination, and enforcement defects. Plaintiff alleges that this record sequence supports discovery into Deutsche Bank and its counsel actions to prevent meaningful testing of the trust, standing, chain-of-title, origination, possession, servicing, and enforcement defects Plaintiff had identified.

15. Plaintiff alleges that Deutsche Bank's escalation to three law firms is also probative of consciousness of its exposure and that Deutsche Bank's litigation conduct itself confirms that this was not a routine residential default. If Deutsche Bank possessed clean standing, clean note-possession proof, a conventional enforceable mortgage, a reliable trust-transfer chain, and no material institutional exposure, it would not have needed to engage three major law firms, deploy multiple individual attorneys, rely on a disability/candor attack, invert protective-relief certifications, use a false "mortgage professional" narrative, obtain post-hearing evidentiary supplementation, and press toward strict foreclosure before Plaintiff received an ADA-compliant opportunity to be heard. Plaintiff alleges that those choices are additionally probative of improper collateral purpose, and an effort to obtain foreclosure leverage by discrediting and disabling Plaintiff rather than by fairly adjudicating the merits.

16. Plaintiff did not learn of Deutsche Bank's 2017 settlement with the United States Department of Justice, or of the institutional admissions contained in it, until after Brown

abandoned her representation and she was forced to research and litigate this matter herself. That Plaintiff — an 88-year-old disabled litigant with no legal training, acting without counsel — was able to discover institutional admissions of the precise misconduct alleged in this Complaint, admissions her own retained counsel never raised in over two years of representation, is itself probative of the adequacy of that representation and is addressed further in the counts against Brown below. Deutsche Bank, by contrast, already possessed this information — it concerned Deutsche Bank's own conduct and Deutsche Bank's own settlement with the United States government — and never disclosed it to the state court, to Plaintiff, or to Plaintiff's then-counsel at any point during this litigation, despite its direct relevance to the predatory-origination defenses Plaintiff had raised since 2023. Plaintiff alleges that Deutsche Bank's silence was not oversight. It was concealment of institutional knowledge directly material to the validity of the very claim it was prosecuting.

17. The DOJ/RMBS materials are material because they are not abstract background. Deutsche Bank's own settlement materials, including Annex 3, identify American Home Mortgage Assets Trust 2007-1, the same trust Deutsche Bank invokes in this foreclosure action. The accompanying Statement of Facts described RMBS conduct involving false representations, material omissions, knowing securitization of defective mortgages, concealment of critical loan-quality information, and investor disclosures that misrepresented borrower ability to repay, underwriting compliance, second-lien risk, appraisal reliability, and collateral quality. Plaintiff alleges that Deutsche Bank's continued enforcement of the AHM 2007-1 instrument through the Connecticut foreclosure action repeated the same essential pattern in a judicial forum: material defects in the mortgage chain were concealed or minimized, defective-loan and trust-transfer issues were not

disclosed fairly, the borrower's ability-to-repay and predatory-origination facts were mischaracterized, and court process was used to convert a fraud-tainted RMBS asset into enforceable foreclosure leverage.

18. The securitization history supplies notice, motive, pattern, and context; the actionable misconduct is Defendants' enforcement of this specific defective mortgage chain through false, incomplete, or untested documents and through ADA-exclusion tactics that prevented Plaintiff from testing standing, authority, possession, assignment, debt, servicing, setoff, recoupment, and enforceability before strict-foreclosure consequences could attach. Instead of litigating Plaintiff's defenses through a fair, accessible, adversarial process, Deutsche Bank and its counsel used disability-based procedural attack as a litigation weapon.

19. In particular, Deutsche Bank's counsel filed a public opposition that accused Plaintiff of lack of candor regarding her disability and accommodation needs. That accusation was false, misleading, and materially inverted the record.

20. Plaintiff had submitted medical documentation and had sought ADA accommodations. The New Jersey certifications Deutsche Bank used against Plaintiff were lawyer-drafted protective-relief filings submitted to prevent compelled deposition and live adversarial testimony because Plaintiff lacked the medical engagement necessary for that process. They were not evidence that Plaintiff could safely perform the high-cognitive-load work of opposing summary judgment in Connecticut or participating live in foreclosure proceedings.

21. The defamatory disability/candor narrative was not a faceless institutional act. Plaintiff alleges that Defendants Adam M. Swanson, Bhanuka Y. Mahabamunuge, Geoffrey K.

12

Milne, and Aaron A. Fredericks personally signed, filed, joined, served, authorized, relied upon, or republished the false disability/candor narrative on behalf of their firms and Deutsche Bank.

22. That public-docket attack inflicted reputational, dignitary, medical, litigation, and access injury. It also interfered with Plaintiff's exercise of ADA rights by transforming protected accommodation activity into purported evidence of dishonesty.

23. Plaintiff's own counsel, Defendant Christopher Brown and Brown Law LLC, then deepened the injury. Brown possessed Plaintiff's medical information, knew Plaintiff remained medically unable to perform the high-load tasks required to oppose summary judgment, and had accepted a $30,000 flat-fee retainer intended to carry Plaintiff through trial. Days before the dispositive hearing, Brown withdrew or abandoned his opposition, moved to withdraw, ceased meaningful protection of Plaintiff, and publicly adopted or amplified the bank's defamatory narrative by accusing his own disabled client of being untruthful.

24. Brown's conduct left Plaintiff unrepresented at the critical stage, while Deutsche Bank had three institutional law firms arrayed against her.

25. On November 5, 2025, Deutsche Bank's counsel filed papers asserting that Plaintiff was a "seasoned mortgage professional" and that she lacked candor regarding her disability, notwithstanding the Yale Neurology documentation already before the court. This filing did not merely advance Deutsche Bank's litigation position — it set in motion the sequence described below.

26. On November 10, 2025, Brown told Plaintiff he would withdraw from the representation on neutral terms, characterizing any withdrawal as resulting from a breakdown in

13

communication. Plaintiff relied on that representation. The following day — four days before the dispositive hearing — Brown filed a motion to withdraw that did the opposite of what he had promised: it adopted Deutsche Bank's November 5 characterization and stated that Plaintiff had "not been truthful with the court," a characterization Brown made while in possession of the Yale Neurology records establishing the disability Deutsche Bank's filing had attacked.

27. On November 14, 2025, without Plaintiff's authorization, Brown filed a brief in opposition to summary judgment that omitted the defenses Plaintiff had specifically directed him to raise. Upon learning of its content and the absence of her authorization, Plaintiff directed that it be withdrawn, and it was withdrawn the following day. As of withdrawal, there was no operative opposition to summary judgment on the record.

28. Brown's withdrawal and abandonment of Plaintiff's defenses did not arise in isolation — they followed directly from, and were a foreseeable response to, Deutsche Bank's November 5 filing. Brown's conduct is independently actionable, as set forth below, and is pled as an additional, not alternative, source of liability. Deutsche Bank's November 5 filing set in motion the sequence that produced the empty record at the November 17 hearing: it provoked Brown's response, Brown's response left Plaintiff unrepresented, and that absence of representation is what Deutsche Bank then used to obtain summary judgment as "unopposed." Deutsche Bank, the law-firm Defendants, and Brown each contributed, through their own conduct, to a single injury — the empty record at the dispositive hearing — and each is liable for the share of that injury their own conduct produced.

14

29. The state trial court then proceeded with summary judgment proceedings that should not have occurred under the operative ADA-access circumstances. Plaintiff was denied the opportunity to be heard.

30. On November 17, 2025, the trial court conducted a summary-judgment hearing while Plaintiff was medically unable to participate meaningfully, unrepresented, seeking time to retain counsel, and seeking accommodation. The court muted, barred, or functionally silenced Plaintiff, allowed Deutsche Bank to argue, and permitted Deutsche Bank additional time after the hearing to supplement its standing proof.

31. Plaintiff was not heard on the merits. She was denied protection of the existing ADA pause, denied meaningful time to obtain counsel, denied a meaningful opportunity to oppose liability, denied an opportunity to identify disputed facts and exhibits, denied an opportunity to test Deutsche Bank's factual assertions, and denied any fair opportunity to respond to Deutsche Bank's post-hearing standing materials before liability was entered.

32. The resulting record was not an ordinary adverse record. It was a manufactured empty record.

33. The trial court then entered summary judgment against Plaintiff on December 1, 2025 by treating the record as if Plaintiff had failed to oppose, although the court process itself had denied, bypassed, or failed to provide the existing ADA pause, accommodation protection, counsel-protective time, and meaningful merits access necessary for Plaintiff to oppose liability.

34. The trial court also entered contradictory summary-judgment relief on two separate summary-judgment motions, including a motion directed to an earlier pleading that had been superseded or rendered moot by amendment. Plaintiff alleges that this created an

15

internally defective liability posture that cannot constitutionally or lawfully serve as the predicate for strict foreclosure.

35. The access breakdown continued after summary judgment. On February 25, 2026, while strict-foreclosure consequences remained pending, the trial court denied Plaintiff's request for an ADA stay and mandatory accommodation for written proceedings on the ground that it "would cause a fundamental alteration of our process" while also stating that there was "no right to immediate appellate review" and that any challenge could be raised only in an appeal from final judgment.

36. That same day, the court issued a "FINAL" continuance order requiring all parties to appear and warning that failure to appear "shall result in an immediate judgment," despite Plaintiff's treating-provider restrictions against live, real-time adversarial participation that posed a serious risk to her.

37. Plaintiff sought emergency appellate and Supreme Court relief. Those efforts did not produce an adjudication of the threshold federal ADA-access question.

38. Instead, appellate gatekeeping and filing practices compounded the injury. Plaintiff alleges that Appellate/Supreme Court ADA contact and case-management conduct, including conduct by Defendant Peter D. Keane, rejected, redirected, docketed, or mishandled disability-related filings despite Plaintiff's ADA limitations and despite prior accommodation guidance allowing disability-related filings under nonstandard categories such as "Other Document."

39. Plaintiff further alleges that the same appellate access barrier occurred on June 26, 2026, after Respondent relied on an erroneous citation in Plaintiff's reconsideration/en banc motion. Plaintiff filed a narrow Notice of Correction of Citation in MOT SC 250398 to

16

prevent confusion and to identify the correct Connecticut authorities. The e-filing system generated a filing confirmation at 12:22 p.m. for Document No. 595405-OTHER DOCUMENT, but the Office of the Appellate Clerk returned the filing at 12:27:34 p.m., stating: "No provision in the Practice Book for filing this item." The return prevented Plaintiff from correcting a citation error that Respondent had affirmatively used against her, while Respondent's objection remained on the docket.

40. Plaintiff further alleges that Defendant Keane was identified as the ADA contact for the Supreme/Appellate Court/State Library, that Plaintiff submitted private ADA communications to the appellate/Supreme Court ADA process for accommodation purposes, and that at least one private ADA communication was placed on the public docket without Plaintiff's authorization.

41. The ADA accommodation process is supposed to be the access gateway, not a public-exposure trap. Public docketing of private ADA communications chilled Plaintiff's ability to seek accommodation candidly, compounded the false public narrative that she was dishonest about disability, exposed disability-access communications to adverse parties and the public, and made the ADA process itself unsafe.

42. Plaintiff now faces imminent strict foreclosure consequences based on a state-court liability posture produced through disability exclusion, fiduciary abandonment, public disability defamation, post-hearing evidentiary patching, asymmetric access, and unadjudicated federal rights.

43. Plaintiff's access injury is not merely that an adverse ruling entered. The injury is exclusion itself. Plaintiff was excluded from meaningful participation in the adjudicative process that fixed a liability posture against her. That exclusion destroyed the procedural

opportunity to oppose summary judgment, test Deutsche Bank's standing proof, present defenses and counterclaims, respond to post-hearing supplementation, preserve an adversarial record, and prevent the foreclosure case from being converted into an "unopposed" liability posture.

44. Plaintiff has not yet lost title through strict foreclosure. The present injury is that the state-court process has already fixed a foreclosure liability posture against Plaintiff through proceedings in which Plaintiff was denied meaningful disability-accessible participation. The strict-foreclosure injury is imminent because Deutsche Bank seeks to convert that access-denied liability posture into strict-foreclosure relief, including law days, title consequences, loss of possession, and loss of home equity.

45. Plaintiff seeks prospective, emergency, declaratory, injunctive, equitable, statutory, compensatory, punitive, treble, restitutionary, and other relief for independent federal and state-law violations that produced and continue to weaponize the Challenged Liability Posture. This federal action does not ask this Court to act as a routine appellate tribunal over an ordinary state foreclosure ruling.

46. Plaintiff seeks, among other relief, an immediate order preserving the status quo; enjoining Defendants from relying on, enforcing, advancing, using, recording, executing upon, or converting the Challenged Liability Posture before the federal access injury is fully adjudicated; declaring that Plaintiff's federal rights were violated; sealing or correcting unauthorized public docketing of private ADA communications; correcting or retracting public disability/candor defamation; awarding compensatory damages, consequential damages, statutory damages, treble damages, punitive damages, restitution, disgorgement, attorney's fees, costs, interest, and all other relief available by law or equity.

47. Plaintiff also seeks compensatory damages for the access injury that has already occurred: the loss of meaningful participation in the summary-judgment process, the loss of the opportunity to oppose liability in an ADA-compliant manner, the loss of adversarial testing of Deutsche Bank's standing and foreclosure proof, the loss of the opportunity to present and preserve defenses, counterclaims, recoupment, setoff, and evidentiary objections, and the creation of an "unopposed" foreclosure liability posture through disability-based exclusion. To the extent strict foreclosure proceeds before meaningful access is restored, Plaintiff seeks compensatory damages for the additional property, equity, possession, litigation, and consequential economic losses caused by converting the access-denied liability posture into foreclosure enforcement.

48. Plaintiff further alleges that this written federal Complaint is her primary ADA-access mechanism and her only safe, medically permissible means of presenting the full factual, legal, disability-access, foreclosure-fraud, and emergency-relief record to a court. Plaintiff's disabilities prevent her from safely presenting these matters through live oral advocacy, real-time adversarial questioning, or high-cognitive-load proceedings. The detail in this Complaint is therefore not excess, delay, or obstruction. It is the accommodation required for Plaintiff to be heard at all. The need for written access reflects disability-related limits on medically safe participation; Plaintiff understands and directs the claims pleaded and seeks only a medically safe format for meaningful access. Any attempt to penalize, discount, strike, or weaponize the written detail necessary for Plaintiff's access would reproduce the very disability-based exclusion challenged in this action.

## II. PRELIMINARY STATEMENT

49. This case is, first, a federal disability-access and court-access case. Defendants did not merely oppose Plaintiff's foreclosure defenses. They destroyed the credibility of an eighty-eight-year-old disabled litigant by publicly branding her as dishonest about her documented disability and ADA accommodation needs, then used that destroyed credibility to convert an inaccessible foreclosure record into an "unopposed" liability posture.

50. Plaintiff had already sought and received ADA protection because her documented medical condition prevented the mental engagement required for participation-dependent proceedings, including summary-judgment opposition and other complex litigation tasks. The operative access problem in November 2025 was not ordinary inconvenience, delay, or preference. It was that Plaintiff could not safely or meaningfully perform the mental-engagement tasks required to oppose dispositive relief without accommodation.

51. Deutsche Bank and its counsel then weaponized Plaintiff's disability record. On November 5, 2025, they filed papers accusing Plaintiff of lack of candor regarding her disability and accommodation needs. The accusation was false, misleading, and materially inverted the record. The New Jersey certifications Deutsche Bank cited were lawyer-drafted protective filings submitted to prevent compelled deposition and live adversarial testimony because Plaintiff lacked the medical engagement necessary for that process. They were not evidence that Plaintiff could safely oppose summary judgment in Connecticut or proceed without the existing ADA pause.

52. The disability/candor attack was not a side issue. It was the mechanism that made the rest of the foreclosure narrative work. Once Plaintiff was publicly branded as dishonest about her medical condition and ADA need, Deutsche Bank's broader narrative was accepted as

20

if it were undisputed, while Plaintiff's written evidence was discounted, ignored, or procedurally unreachable.

53. The credibility injury was global. Deutsche Bank's disability/candor attack combined with its false "mortgage professional," "mortgage consultant," "seasoned mortgage professional," and ratification narrative to portray Plaintiff as dishonest about disability, sophisticated enough to have knowingly accepted predatory loan terms, and procedurally responsible for an empty record that existed because she had been disabled out of meaningful participation.

54. Plaintiff alleges that this combined credibility attack was false. Plaintiff was not a sophisticated mortgage professional knowingly structuring complex securitized debt, negative-amortization products, lender-paid broker steering, phantom cash-out proceeds, or equity-stripping transactions. No true mortgage professional would knowingly place her own multimillion-dollar real-estate portfolio into serial toxic refinances and equity-stripping loans that could never amortize in her favor.

55. The purpose of the credibility attack was to prevent the merits from being tested. Plaintiff's foreclosure defenses exposed predatory origination, Shallo/YSP broker misconduct, fabricated stated income, phantom cash-out proceeds, negative amortization, WaMu/subrogation predecessor liability, defective assignment and standing proof, Deutsche Bank's institutional DOJ/RMBS knowledge, and equity stripping. Those facts threatened Deutsche Bank's enforcement position. Defendants responded by attacking Plaintiff's credibility and ADA access rather than allowing a fair, accessible adjudication of the merits.

56. Deutsche Bank treated the case as institutionally significant. After Plaintiff raised defenses and counterclaims exposing YSP broker misconduct, predatory origination, Shallo misconduct, WaMu/subrogation issues, securitization defects, defective standing, and equity stripping, Deutsche Bank did not treat the matter as a simple default. It escalated to three major law firms: Brock & Scott, PLLC, Hinshaw & Culbertson LLP, and McCarter & English LLP.

57. Plaintiff alleges that this escalation is evidence of consciousness of exposure and a strategy to contain institutional risk. If Deutsche Bank possessed clean standing, clean note-possession proof, a conventional enforceable mortgage, and no material institutional exposure, it would not have needed three institutional law firms, a public disability/candor attack, a false professional-identity narrative, post-hearing evidentiary patching, and strict-foreclosure pressure against an elderly disabled homeowner.

58. Brown then completed the access collapse. Plaintiff had paid Brown a $30,000 flat-fee retainer intended to carry the case through trial. Brown possessed Plaintiff's medical information and knew Plaintiff remained medically unable to perform the mental engagement required to oppose summary judgment and participate safely in the dispositive process. Yet days before the summary-judgment hearing, Brown withdrew or abandoned his opposition, moved to withdraw, failed to protect Plaintiff's ADA rights, and publicly characterized his own disabled client as untruthful.

59. Brown's conduct fused with Deutsche Bank's disability/candor attack and left Plaintiff unrepresented or functionally unprotected at the exact moment when three institutional law firms were pressing for judgment.

60. On November 17, 2025, the state trial court conducted a liability-only summary-judgment hearing that should not have proceeded under the operative ADA-access circumstances. Plaintiff was under an existing ADA pause for proceedings requiring mental engagement, was seeking time to obtain counsel protection, was asking for accommodation, and was muted, barred, or functionally silenced before she was heard on the merits.

61. Deutsche Bank, by contrast, was allowed to argue. Attorney Geoffrey Milne presented Deutsche Bank's merits narrative, including assertions that Plaintiff had filed no evidence, that her defenses and counterclaims were time-barred, that there was no agency, no proof of unconscionability, and that Plaintiff had knowledge of the loan terms and rescission rights. Plaintiff alleges those assertions were materially false or misleading because they ignored and contradicted documents, pleadings, exhibits, and written submissions already before the court concerning predatory origination, Shallo/YSP misconduct, fabricated income, phantom cash-out proceeds, agency and predecessor-liability issues, unconscionability, standing defects, and the need to preserve the existing ADA pause and provide meaningful ADA-compliant access before liability could be entered.

62. The same hearing also produced the standing defect that Deutsche Bank later used to complete the liability posture. Attorney Milne requested two weeks to file a supplemental affidavit concerning possession of the original note, and Attorney Jeffrey Marks Knickerbocker represented that his office had possessed the original note since 2022. The court accepted that representation, did not require production of the note, and gave Deutsche Bank two weeks to supplement. What followed was not an affidavit from Knickerbocker or his office, but a Texas-based servicer affidavit that did not match the custody representation that secured the extension.

23

63. Plaintiff was not given comparable time, comparable access, comparable counsel protection, comparable protection of her existing ADA pause, or any comparable opportunity to oppose liability, identify disputed facts, test Deutsche Bank's proof, or respond to Deutsche Bank's post-hearing standing materials. The resulting summary judgment was not an adjudication after fair adversarial testing. It was a product of procedural asymmetry, disability exclusion, counsel abandonment, credibility destruction, and a one-sided record manufactured by the process itself.

64. The access breakdown continued after summary judgment. The trial court denied Plaintiff's ADA-based requests for written access and overlength written opposition, rejected her motion to open without meaningful consideration of the attached facts and exhibits, and continued to allow the foreclosure posture to move toward strict foreclosure. Plaintiff alleges that those denials did not reflect neutral merits adjudication; they reflected the tainted credibility posture Defendants had created and the court process had accepted.

65. The appellate process did not cure the defect. Plaintiff's emergency attempts to obtain supervisory, appellate, and Supreme Court intervention were rejected or dismissed on procedural, supervisory, filing-category, or Frimberger-type grounds without adjudication of the federal ADA-access, ADA-interference, due-process, fraud, RICO, CUTPA, defamation, or access-to-courts claims pleaded here. Mentioning facts in emergency filings did not convert them into pleaded trial-level causes of action, did not open discovery, did not provide an ADA-compliant merits proceeding, and did not result in adjudication of Plaintiff's federal claims.

66. The June 26, 2026 return of Plaintiff's Notice of Correction of Citation further illustrates the problem. Plaintiff was permitted to receive Respondent's objection relying on the

24

citation error, but her narrow attempt to correct the record was returned within minutes on the ground that there was "No provision in the Practice Book for filing this item." The result was an appellate-access trap: the system allowed the citation error to be used against Plaintiff but refused to accept Plaintiff's correction of that error. Because the appellate process refused the narrow correction notice, Plaintiff was forced to consider or prepare a more burdensome formal motion process to correct a simple citation issue, imposing additional medical access burdens that the accommodation process was supposed to prevent.

67. Worse, the appellate ADA process itself became unsafe when private ADA communications were placed on the public docket without authorization. The ADA accommodation process is supposed to be the access gateway, not a public-exposure trap. Public docketing of private ADA communications chilled Plaintiff's ability to seek accommodation candidly, compounded the false public narrative that she was dishonest about disability, and made the ADA process itself unsafe.

68. Plaintiff therefore comes to federal court because the state process has not adjudicated, remedied, or safely processed the threshold federal question: whether an elderly disabled litigant can be publicly branded as dishonest about disability, abandoned by counsel, muted or functionally silenced, stripped of the practical benefit of her existing ADA pause, prohibited from being heard on the merits, denied an opportunity to test post-hearing proof, and then stripped of her home through strict foreclosure on a liability posture created without meaningful ADA-compliant access.

69. Plaintiff therefore alleges that returning her to the same state-court pipeline without neutral reassignment, a clean written-first ADA protocol, correction or sealing of the

disability/candor record, and protection against use of the Challenged Liability Posture would not restore meaningful access. It would return her to a process already infected by the credibility destruction Defendants created.

70. The foreclosure facts matter because they explain motive, causation, injury, and relief. Deutsche Bank claims the right to enforce the final instrument in a fraud-tainted mortgage chain as trustee for a 2007 securitized trust. Plaintiff alleges serious standing, trust-transfer, note-possession, debt-calculation, and predecessor-liability defects, including a 2021 assignment into a long-closed 2007 trust, reliance on WaMu/subrogation predecessor theories, missing competent wet-ink note-possession proof at inception, and a post-hearing servicer affidavit submitted only after Plaintiff had been denied meaningful access to oppose.

71. Deutsche Bank cannot invoke WaMu/subrogation/predecessor status as a sword to foreclose while disclaiming the GreenPoint, WaMu, American Home Mortgage, Shallo, YSP, predatory-refinance, negative-amortization, and equity-stripping misconduct embedded in the same chain. Plaintiff alleges that Deutsche Bank acquired and enforced this instrument with institutional knowledge, including knowledge arising from its own 2017 settlement with the United States Department of Justice concerning fraudulent mortgage-origination practices, stated-income red flags, elderly fixed-income borrower risk, and the AHM 2007-1 trust.

72. This federal action does not ask this Court to act as a routine appellate tribunal over an ordinary state foreclosure ruling. Plaintiff seeks prospective, emergency, declaratory, injunctive, equitable, statutory, compensatory, punitive, treble, restitutionary, and other

relief for independent federal and state-law violations that produced and continue to weaponize the Challenged Liability Posture.

73. Plaintiff seeks, among other relief, an order preserving the status quo; enjoining Defendants from using the Challenged Liability Posture to obtain strict foreclosure, law days, title transfer, possession transfer, ejectment, or foreclosure-completion consequences; requiring meaningful ADA-compliant access before any foreclosure consequences are imposed; declaring that Plaintiff's federal rights were violated; sealing or correcting unauthorized public docketing of private ADA communications; correcting or retracting public disability/candor defamation; awarding damages, restitution, disgorgement, statutory damages, treble damages, punitive damages against non-governmental Defendants where permitted, costs, interest, and all other relief available by law or equity.

74. This pleading is organized to avoid shotgun-pleading confusion. The factual allegations are presented chronologically and by defendant conduct. The counts that follow identify the specific defendant or defendant group against whom each count is asserted, the specific conduct supporting that count, and the legal theory under which relief is sought. Plaintiff's claims arise from a connected course of conduct, but they are not asserted indiscriminately against every defendant. Each count incorporates only the factual allegations necessary to that count and should be read against the specific defendants named in that count.

## III. JURISDICTION, VENUE, STANDING, AND BASIS FOR FEDERAL RELIEF

75. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134; the ADA anti-retaliation/interference provision, 42 U.S.C. § 12203; 42 U.S.C. § 1983; the Due Process Clause of the Fourteenth Amendment; the

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; and other federal statutes and constitutional provisions. To the extent emergency relief affects ongoing state proceedings, Plaintiff seeks only narrowly, tailored relief necessary to prevent irreversible foreclosure consequences before this Court can adjudicate Plaintiff's federal ADA-access, ADA-interference, and due-process claims, and only to the extent permitted by statutory or equitable authority including the Anti-Injunction Act, Title II, § 1983, Ex parte Young prospective-relief principles, and any applicable exception to the Anti-Injunction Act.

76. This Court has supplemental jurisdiction over Plaintiff's related Connecticut common-law and statutory claims under 28 U.S.C. § 1367 because those claims arise from the same case or controversy, including the same foreclosure enforcement scheme, disability-access breakdown, defamatory public filings, fiduciary abandonment, predatory mortgage chain, and imminent strict-foreclosure injury.

77. This Court has jurisdiction to award declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202, Federal Rules of Civil Procedure 57 and 65, and the Court's equitable authority.

78. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in Connecticut; the state foreclosure action is pending in Connecticut; Plaintiff's home is located in Connecticut; Plaintiff sought ADA access to Connecticut courts; Defendants directed relevant conduct into Connecticut; and the threatened strict foreclosure injury will occur in Connecticut.

79. Venue is also proper because the Connecticut Judicial Branch, state-court proceedings, appellate proceedings, and relevant foreclosure enforcement acts occurred in this District.

80. Plaintiff seeks emergency and prospective relief before title vests or law-day/strict-foreclosure consequences make the federal access injury impossible to remedy. Plaintiff does not ask this Court to sit as an appellate court over the correctness of a legitimate adversarial foreclosure judgment. Plaintiff alleges that no such legitimate adversarial judgment exists. The state-court liability posture Deutsche Bank seeks to enforce was characterized as "unopposed" only because Plaintiff was excluded from meaningful participation, denied the operative benefit of her ADA accommodation pause, medically unable to participate safely, unrepresented at the dispositive stage, prohibited from being heard on the merits, denied protection of the existing ADA pause, denied meaningful counsel-protective time, denied a meaningful opportunity to oppose liability, and denied any fair opportunity to test or respond to Deutsche Bank's post-hearing standing materials. Plaintiff therefore asks this Court to preserve the status quo and prevent Defendants from converting a disability-excluded, non-adversarial, post-hearing-supplemented liability posture — produced through independent ADA interference, denial of meaningful access, and fraud-based litigation conduct — into irreversible title transfer before Plaintiff receives a meaningful adjudication of the threshold federal access, interference, and due-process violations pleaded in this Complaint. Plaintiff does not seek an ordinary appeal of a final state-court judgment, nor does she reassert foreclosure counterclaims. The counts in this Federal Complaint are independent federal and state-law claims for damages and equitable relief arising from fraud, disability discrimination, and constitutional violations committed by the defendants prior to, and outside of, the state court's substantive adjudication. The conduct was not adjudicated as counterclaims in the foreclosure action and includes: disability-access denial, ADA interference, public misuse of protected accommodation

29

material, defamatory disability/candor and professional-identity attacks, unauthorized public docketing of private ADA communications, fiduciary abandonment by counsel, foreclosure-enforcement fraud, concealment of DOJ/RMBS and standing defects, post-hearing evidentiary patching, abuse of process, civil RICO, CUTPA, restitutionary misconduct, and use of the Challenged Liability Posture to obtain strict-foreclosure leverage.

81. The prospective relief requested is limited to preserving the federal court's ability to adjudicate Plaintiff's federal access-to-courts, ADA-interference, and due-process claims before irreversible foreclosure consequences attach. Plaintiff seeks to prevent Defendants from using the Challenged Liability Posture as an enforcement weapon while this Court determines whether that posture may be used after Plaintiff was excluded from meaningful participation through disability exclusion, ADA interference, denial of the operative benefit of existing accommodations, post-hearing evidentiary supplementation without equivalent response access, and procedural asymmetry. Plaintiff does not seek a federal merits appeal of a valid adversarial foreclosure judgment; she seeks prospective federal relief from ongoing use of a state-court posture produced without the federally required access that had to exist before foreclosure consequences could lawfully be imposed.

82. To the extent any Defendant asserts Rooker-Feldman, abstention, comity, finality, preclusion, litigation privilege, or immunity defenses, Plaintiff alleges that those doctrines do not bar this action for three independent reasons. First, at the time Plaintiff sought emergency federal relief, no judgment of strict foreclosure, law days, title vesting, possession transfer, or final foreclosure enforcement consequence had been completed. In any event, the jurisdictional basis for this action does not depend solely on the absence of

a final strict-foreclosure judgment. Plaintiff's claims arise from independent and ongoing ADA-access, due-process, interference, retaliation, fraud, and enforcement misconduct. Second, Plaintiff's injuries are not limited to injury caused by an adverse state-court liability judgment; they arise from independent misconduct, including ongoing ADA interference, disability-based exclusion, public misuse of accommodation material, unauthorized public docketing of private ADA communications, fiduciary abandonment, foreclosure-enforcement fraud, concealment, and post-hearing evidentiary patching, all of which depend upon and continue to exploit a liability posture produced without meaningful ADA-compliant access. Third, no state court has provided a full, fair, ADA-compliant, adversarial adjudication of the federal access, interference, and due-process claims pleaded in this Federal Complaint.

83. If, before this Court can act, a state court or appellate order enters, directs, accelerates, or enables a judgment of strict foreclosure, law days, title vesting, possession transfer, or other foreclosure enforcement consequence, Plaintiff alleges that such event does not moot or defeat this federal action. It confirms the irreparable federal access injury pleaded here. Plaintiff does not challenge such an event as an ordinary appellate error or ask this Court to sit in review of the merits of a state foreclosure judgment. Any such event would be the enforcement consequence of the same ongoing ADA-access, due-process, and disability-exclusion violations pleaded in this Complaint: a liability posture produced while Plaintiff was medically unable to participate safely, denied a written-first accommodation, functionally silenced or excluded from meaningful adversarial participation, deprived of an equivalent opportunity to respond to post-hearing materials, and then barred from meaningful appellate access before irreversible property consequences attached.

84. Rooker-Feldman, preclusion, abstention, comity, and finality doctrines do not permit Defendants to create a jurisdictional trap in which Plaintiff is first denied appellate review because strict foreclosure has not yet entered, and then denied federal access because strict foreclosure is later entered before any court adjudicates the threshold ADA-access question. The federal injury is not merely the existence of an adverse foreclosure ruling. The federal injury is Defendants' ongoing use and enforcement of a disability-excluded, non-adversarial, post-hearing-supplemented liability posture to obtain irreversible foreclosure consequences without any prior meaningful ADA-compliant adjudication of Plaintiff's access, interference, and due-process claims.

85. Accordingly, Plaintiff seeks prospective and preservative relief directed to the ongoing enforcement and consequences of the challenged process, including preservation or restoration of the status quo necessary for this Court to adjudicate the independent federal claims pleaded here. Plaintiff does not ask this Court to decide the amount of the mortgage debt, adjudicate the merits of foreclosure liability as a state-law appellate matter, or substitute itself for the Connecticut appellate courts. Plaintiff asks this Court to prevent Defendants from using an inaccessible process as the mechanism for irreversible title loss before the federal access claims can be heard.

86. The same rule applies if the Connecticut Supreme Court, Appellate Court, trial court, clerk's office, or any ADA case-management or filing official denies, returns, refuses, redirects, fails to docket, procedurally disposes of, or otherwise prevents consideration of Plaintiff's emergency ADA-access filings, citation correction, reconsideration/en banc request, stay request, or written-first accommodation request before strict-foreclosure consequences attach. Plaintiff pleads any such post-filing or immediately pre-filing event

as additional evidence of the same ongoing access injury and enforcement sequence, not as a separate invitation for ordinary appellate review. The injury is the denial of meaningful ADA-compliant access while the foreclosure machinery continues moving toward irreversible consequences.

87. If strict foreclosure, law days, title vesting, possession transfer, ejectment, sale, debt finalization, valuation determination, appraisal ruling, or other foreclosure-completion consequence occurs before this Court can act, Plaintiff seeks all additional non-duplicative damages and equitable relief caused by that escalation, including loss of home equity, loss of possession, loss of homestead value, loss of litigation and settlement leverage, loss of the value of defenses, counterclaims, recoupment, setoff, valuation objections, appraisal challenges, debt objections, law-day arguments, and any other case-value or property-value injury caused by converting the Challenged Liability Posture into foreclosure enforcement before meaningful ADA-compliant access is restored. Plaintiff will supplement or amend under Rule 15(d) or Rule 15(a), if necessary, to plead the exact date, order, amount, valuation, title, possession, or enforcement consequence once it occurs. This Complaint gives notice now that those losses are claimed as foreseeable enforcement damages from the access-denial sequence already pleaded.

88. Connecticut foreclosure pleading practice does not transform this broader federal action into a forfeited compulsory counterclaim. Plaintiff, through Brown, did plead foreclosure defenses and counterclaims concerning undue influence, Shallo/YSP broker misconduct, phantom cash-out proceeds, negative amortization, unclean hands, fraudulent nondisclosure, unconscionability, voidness, and quiet-title-type relief. Those pleadings raised similar foreclosure-related facts, but they did not plead this federal action's complete

actor structure, complete injury structure, or complete legal theory. They did not provide, and could not fairly provide, a full vehicle for ADA-access claims against the Judicial Branch and state-court access officials; ADA interference and retaliation claims based on the public disability/candor attack; RICO and CUTPA claims against a multi-actor foreclosure-enforcement enterprise; fiduciary-abandonment claims against former counsel; public-docket and reputational injuries; or restitutionary portfolio-wide property injuries caused by the broader mortgage-origination, acquisition, securitization, concealment, and enforcement scheme.

89. Nor does *U.S. Bank National Ass'n v. Blowers* bar this action. *Blowers* confirms that mortgagee misconduct connected to enforcement may be relevant in foreclosure; it does not hold that a disabled foreclosure defendant forfeits separate federal civil-rights, ADA-interference, RICO, CUTPA, fiduciary, defamation, public-docket, restitution, or portfolio-damages claims against additional actors by failing to obtain a full adjudication of those claims inside an inaccessible foreclosure proceeding. The foreclosure-related allegations pleaded here supply context, causation, motive, recoupment, equitable background, and proof of injury. They do not exhaust the broader federal claims, parties, duties, injuries, or remedies pleaded here, particularly where Plaintiff did not discover Deutsche Bank's 2017 DOJ/AHM 2007-1 admissions until approximately two months before filing this action and after Brown had abandoned the representation.

90. Plaintiff further alleges that the state foreclosure proceedings remain ongoing as to strict-foreclosure consequences, title transfer, possession, and enforcement leverage, and that Plaintiff seeks prospective and preservative federal relief before irreversible foreclosure consequences attach. Plaintiff also seeks damages, restitution, disgorgement, punitive

damages against non-governmental Defendants where permitted, statutory relief, sealing/correction relief, and declaratory relief for independent misconduct that exists regardless of whether any state-court foreclosure ruling was legally correct or incorrect.

91. Defendants may not manufacture or exploit a foreclosure liability record through disability exclusion, public ADA-related defamation, counsel abandonment, post-hearing standing supplementation, asymmetric access, and lack of meaningful ADA-compliant participation, and then invoke jurisdictional or abstention doctrines to prevent any federal court from deciding whether that record may lawfully be used to extinguish Plaintiff's home.

92. Plaintiff further alleges that no state court has provided a full, fair, ADA-compliant, adversarial adjudication of the threshold federal question presented here: whether a foreclosure liability posture may lawfully be used to extinguish Plaintiff's home when that posture was created while Plaintiff was excluded from meaningful participation, denied effective ADA access, deprived of counsel protection at the dispositive stage, prohibited from being heard on the merits, denied protection of the existing ADA pause, and denied a fair opportunity to oppose, test, or respond to Deutsche Bank. Because the challenged injuries arise from independent misconduct and from the Defendants' ongoing use of the Challenged Liability Posture, Plaintiff seeks federal relief to prevent continued use of that record and to obtain damages, restitution, disgorgement, sealing/correction relief, punitive relief against non-governmental Defendants where permitted, and equitable relief for independent misconduct.

93. Plaintiff alleges that complete relief can be accorded among the existing parties to this action without joinder of any additional party. The claims asserted rest on each named

Defendant's own knowing conduct — including acquisition, ratification, enforcement, and litigation misconduct — independent of and not requiring adjudication of any non-party's personal liability. No absent party claims an interest in the subject of this action that would be impaired by proceeding without them, and their absence creates no risk of multiple or inconsistent obligations for the existing parties.

94. Plaintiff has standing to bring each claim asserted in this Complaint. Plaintiff has already suffered concrete, particularized, and actual injury sufficient to satisfy Article III in her own right, independent of any future event: the approximately $1.15 million extracted under the instrument at issue, the reputational and dignitary harm from the public disability/candor attack, the medical aggravation documented throughout this Complaint, the loss of counsel protection at the dispositive stage, and the denial of meaningful ADA-compliant access to the courts are each completed, concrete injuries that have already occurred, fairly traceable to Defendants' conduct, and redressable by the damages and declaratory relief this Complaint seeks. This action is therefore ripe for adjudication regardless of whether strict foreclosure ever enters; Plaintiff does not ask this Court to resolve a hypothetical or speculative future dispute. The threatened loss of Plaintiff's home through strict foreclosure is the separate and additional basis for Article III standing, ripeness, irreparable harm, and prospective injunctive relief, including the relief sought in Counts IV and V, because a motion for strict foreclosure remains pending and capable of being relisted at any time. Plaintiff also seeks damages, restitution, disgorgement, sealing/correction relief, declaratory relief, and other remedies for completed injuries that have already occurred and do not depend on strict foreclosure entering.

36

95. Plaintiff's damages theories likewise do not depend on a completed strict-foreclosure judgment. Existing damages include completed access injury, reputational injury, medical aggravation, fiduciary injury, out-of-pocket and restitutionary losses, and loss of the opportunity to litigate and preserve defenses through a meaningful ADA-compliant process. If foreclosure enforcement proceeds before federal relief, those existing damages expand to include the incremental property, equity, possession, case-value, and consequential losses caused by enforcement of the Challenged Liability Posture. Plaintiff pleads those damages in the alternative and cumulatively, subject to proof and avoidance of double recovery.

96. Plaintiff pleads these claims and remedies in the alternative and cumulatively to the fullest extent permitted by law. The same course of conduct produced multiple legally distinct injuries: mortgage-chain property injury, portfolio-wide equity loss, ADA-access injury, public-docket injury, reputational injury, fiduciary injury, statutory injury, and restitutionary/disgorgement injury. If any single count, statutory theory, remedy, defendant category, or measure of damages is narrowed, dismissed, stayed, reserved, or limited, the factual allegations supporting that theory remain operative evidence of knowledge, notice, motive, causation, concealment, damages, equitable defenses, recoupment, setoff, unjust enrichment, disgorgement, and relief under all surviving counts. Plaintiff does not seek duplicative recovery for the same injury, but she does seek every non-duplicative legal, equitable, statutory, restitutionary, punitive, treble, and declaratory remedy supported by the facts and permitted by law.

## IV. PARTIES

### A. Plaintiff

97. Plaintiff Nancy Roncati Dowden is an eighty-eight-year-old homeowner and resident of Connecticut.

98. Plaintiff owns or has owned the Connecticut residential property at issue in the foreclosure action captioned Deutsche Bank National Trust Company, as Trustee for American Home Mortgage Assets Trust 2007-1 Mortgage-Backed Pass-Through Certificates, Series 2007-1 v. Nancy Roncati Dowden, Superior Court, Judicial District of Fairfield at Bridgeport, Docket No. FBT-CV-23-6120421-S.

99. Plaintiff is a qualified individual with disabilities within the meaning of the Americans with Disabilities Act.

100. Plaintiff has documented cognitive, visual, auditory, and medical impairments, including long-COVID-related impairment and medical fragility, that substantially limit major life activities and materially affect her ability to participate in live, adversarial, high-cognitive-load legal proceedings.

101. Plaintiff's disabilities affect the manner, timing, stamina, communication format, and medical safety of her participation in litigation. They do not negate her ability to understand her own claims, direct her litigation, evaluate her own interests, or present sophisticated written arguments when given medically safe access. Plaintiff seeks accommodations necessary for her to present her own claims, evidence, and legal positions in a meaningful and medically safe form.

102. Plaintiff sought accommodations from the Connecticut Judicial Branch, including continuation of the existing ADA pause, stays or continuances of participation-dependent

38

proceedings, time to obtain counsel protection, protection from live adversarial proceedings she could not safely perform, and, as her medical condition later evolved, written-first access for future proceedings.

103.     Plaintiff's disability does not mean she has no rights, no defenses, no credibility, or no property interest. It means the court system was required to provide meaningful access.

104.     Plaintiff brings this action to protect her home, vindicate her federal rights, obtain redress for disability-based access denial and interference, obtain damages for defamation and fiduciary betrayal, obtain restitution and disgorgement for predatory and fraudulent mortgage enforcement, and prevent strict foreclosure based on the Challenged Liability Posture.

**B. Deutsche Bank**

105.     Defendant Deutsche Bank National Trust Company, as Trustee for American Home Mortgage Assets Trust 2007-1 Mortgage-Backed Pass-Through Certificates, Series 2007-1, is the named plaintiff in the Connecticut foreclosure action.

106.     Deutsche Bank claims to act as trustee for a 2007 securitized trust and claims the right to enforce the mortgage and note against Plaintiff's Connecticut home.

107.     Plaintiff alleges that Deutsche Bank's claimed enforcement rights are defective, void, voidable, equitably barred, fraud-tainted, or subject to restitution, disgorgement, offset, recoupment, and other defenses arising from the origination chain, securitization defects, trust-transfer defects, predecessor-liability defects, WaMu/subrogation admissions, Shallo/YSP broker misconduct, DOJ/RMBS concealment, and foreclosure-enforcement misconduct.

108.    Deutsche Bank is sued for, among other things, ADA interference, fraud, fraudulent concealment, civil RICO, RICO conspiracy, CUTPA, unjust enrichment, restitution, disgorgement, declaratory relief, injunctive relief, punitive damages, and all other relief supported by law and proof.

## C. McCarter & English LLP

109.    Defendant McCarter & English LLP is a law firm that represented Deutsche Bank in the foreclosure proceedings.

110.    Plaintiff alleges that McCarter participated in foreclosure enforcement, summary-judgment strategy, public-docket filings, disability/candor accusations, and litigation conduct that interfered with Plaintiff's ADA access and caused reputational, dignitary, litigation, and economic harm.

111.    McCarter is sued for its own conduct and under principles of agency, respondeat superior, vicarious liability, conspiracy, aiding and abetting, joint participation, and other applicable doctrines.

## D. Hinshaw & Culbertson LLP

112.    Defendant Hinshaw & Culbertson LLP is a law firm that represented Deutsche Bank in the foreclosure proceedings.

113.    Plaintiff alleges that Hinshaw participated in foreclosure enforcement, summary-judgment strategy, public-docket filings, disability/candor accusations, and litigation conduct that interfered with Plaintiff's ADA access and caused reputational, dignitary, litigation, and economic harm.

114.    Hinshaw is sued for its own conduct and under principles of agency, respondeat superior, vicarious liability, conspiracy, aiding and abetting, joint participation, and other applicable doctrines.

## E. Brock & Scott, PLLC

115.    Defendant Brock & Scott, PLLC is a law firm that represented Deutsche Bank in the foreclosure proceedings.

116.    Plaintiff alleges that Brock & Scott participated in Deutsche Bank's foreclosure enforcement and related litigation conduct, including the prosecution of the foreclosure action after Plaintiff's defenses exposed serious institutional risk.

117.    Brock & Scott is sued for its own conduct and under principles of agency, respondeat superior, vicarious liability, conspiracy, aiding and abetting, joint participation, and other applicable doctrines to the extent supported by proof.

## F. Individual Deutsche Attorney Defendants

118.    Defendant Adam M. Swanson is an attorney who represented Deutsche Bank and/or appeared in connection with the foreclosure action.

119.    Plaintiff alleges that Swanson personally signed, filed, joined, authorized, served, relied upon, or republished public-docket filings that advanced the false disability/candor narrative and interfered with Plaintiff's ADA-protected access.

120.    Defendant Bhanuka Y. Mahabamunuge is an attorney who represented Deutsche Bank and/or appeared in connection with the foreclosure action.

121. Plaintiff alleges that Mahabamunuge personally signed, filed, joined, authorized, served, relied upon, or republished public-docket filings that advanced the false disability/candor narrative and interfered with Plaintiff's ADA-protected access.

122. Defendant Geoffrey K. Milne is an attorney who represented Deutsche Bank and/or appeared in connection with the foreclosure action.

123. Plaintiff alleges that Milne personally signed, filed, joined, authorized, served, relied upon, or republished public-docket filings that advanced the false disability/candor narrative and interfered with Plaintiff's ADA-protected access.

124. Defendant Aaron A. Fredericks is an attorney who represented Deutsche Bank and/or appeared in connection with the foreclosure action.

125. Plaintiff alleges that Fredericks personally signed, filed, joined, authorized, served, relied upon, or republished public-docket filings that advanced the false disability/candor narrative and interfered with Plaintiff's ADA-protected access.

126. Defendant Jeffrey Marks Knickerbocker is an attorney with Brock & Scott, PLLC who appeared in connection with the foreclosure action. Plaintiff alleges that on November 17, 2025, Knickerbocker personally represented to the trial court that his office had held physical possession of the original note since 2022, in order to secure a two-week extension in lieu of producing the note for inspection.

127. Plaintiff alleges that the proof Deutsche Bank ultimately submitted within that two-week period did not come from Knickerbocker, his office, or anyone with the custodial history he had described, and that Knickerbocker's representation was the basis on which the trial court declined to require production at the hearing.

128.     The individual attorney defendants are sued individually for their own acts. Plaintiff also alleges that their firms and Deutsche Bank are liable for those acts performed within the scope of representation, agency, employment, authorization, ratification, conspiracy, aiding and abetting, joint participation, or other applicable doctrines.

129.     Plaintiff alleges that these attorneys are responsible not merely because they worked for law firms, but because they personally participated in the publication, advocacy, filing, certification, service, authorization, or republication of the disability/candor attack and other litigation conduct at issue.

## G. Christopher Brown and Brown Law LLC

130.     Defendant Christopher Brown is an attorney who represented Plaintiff in the Connecticut foreclosure action during the critical period leading to summary judgment.

131.     Defendant Brown Law LLC is Brown's law firm.

132.     Plaintiff alleges that Brown accepted a $30,000 flat-fee retainer intended to carry Plaintiff through trial or through substantial foreclosure defense work, possessed Plaintiff's medical information, knew Plaintiff was medically unable to perform high-cognitive-load litigation tasks, and knew Plaintiff was the primary witness to many facts underlying her defenses and counterclaims.

133.     Plaintiff alleges that Brown nevertheless abandoned, undermined, or withdrew from Plaintiff at the critical stage; failed to protect her ADA rights; withdrew or failed to maintain opposition to summary judgment; moved to withdraw days before the dispositive hearing; adopted or amplified Deutsche Bank's false disability/candor narrative; and left Plaintiff unrepresented against three institutional law firms.

134.    Brown and Brown Law LLC are sued for legal malpractice, breach of fiduciary duty, breach of contract, unjust enrichment, defamation, negligent and/or intentional misconduct as applicable, and all other claims supported by law and proof.

## H. Connecticut Judicial Branch

135.    Defendant Connecticut Judicial Branch is a public entity within the meaning of Title II of the Americans with Disabilities Act.

136.    The Connecticut Judicial Branch operates the state trial courts, appellate courts, Supreme Court administrative filing systems, ADA accommodation processes, and related judicial services, programs, and activities.

137.    Plaintiff alleges that the Judicial Branch denied her meaningful access to its services, programs, and activities by failing to provide effective ADA accommodations, permitting disability-based exclusion from participation-dependent proceedings, allowing private ADA communications to be publicly docketed without authorization, failing to provide safe and confidential ADA procedures, allowing inaccessible hearings and asymmetrical proceedings to continue, and failing to ensure that Plaintiff had a meaningful opportunity to be heard before foreclosure consequences attached.

138.    Plaintiff seeks damages, declaratory relief, injunctive relief, prospective relief, sealing/correction relief, and all other relief available under Title II and related law.

## I. Judge John Regan

139.    Defendant Hon. John Regan is sued in his official capacity for prospective declaratory and injunctive relief only.

44

140.    Plaintiff does not seek damages from Judge Regan for judicial acts in this complaint.

141.    Plaintiff alleges that Judge Regan's conduct is central factual evidence of the Judicial Branch access violation, including denial or failure to meaningfully implement accommodations, proceeding with summary judgment despite Plaintiff's disability and requests for protection, muting or functionally silencing Plaintiff, allowing Deutsche Bank to argue and supplement while Plaintiff was prohibited from being heard on the merits and lacked comparable access, permitting asymmetric proceedings, and entering contradictory summary-judgment relief that included a motion rendered moot or superseded by amendment.

142.    Plaintiff seeks prospective relief preventing ongoing use of the Challenged Liability Posture and requiring meaningful ADA-compliant access before any strict-foreclosure consequences are imposed.

## J. Peter D. Keane

143.    Defendant Peter D. Keane is identified by the Connecticut Judicial Branch as an ADA contact and/or official associated with the Supreme/Appellate Court/State Library access process.

144.    Plaintiff alleges that Keane had personal involvement in appellate ADA/access processing, filing gatekeeping, rejection or mishandling of disability-related filings, and/or public docketing of private ADA communications.

145.    Plaintiff alleges that Keane personally identified himself to Plaintiff as the ADA coordinator/contact for the Connecticut Appellate Court and Supreme Court process while also acting as case manager for Plaintiff's appellate filings. Plaintiff alleges that this dual

role made the ADA-access process structurally non-neutral because the same official channel responsible for disability access was also functionally involved in filing gatekeeping, rejection, return, redirection, docket labeling, and public exposure of disability-access communications in the same appellate matters.

146.    Plaintiff submitted private disability-access communications to the appellate/Supreme Court ADA process for accommodation purposes. Plaintiff did not authorize those private communications to be docketed publicly.

147.    Plaintiff alleges that Keane or those acting under his authority, direction, supervision, or administrative process placed at least one private ADA communication on the public docket without authorization, thereby exposing disability-access communications to adverse parties and the public and chilling Plaintiff's ability to seek further accommodations.

148.    Plaintiff sues Keane in his official capacity for prospective, declaratory, sealing, correction, and access-related relief arising from appellate/Supreme Court ADA-processing and public-docket practices. Plaintiff does not seek damages from Keane for judicial acts or for conduct protected by judicial, quasi-judicial, sovereign, or qualified immunity. Plaintiff identifies Keane's conduct as factual evidence of the Judicial Branch's ADA-access failures and seeks only such relief against him as is permitted by law.

## K. John Doe Defendants

149.    Defendants John Does 1–20 are persons or entities whose identities are not yet fully known but who participated in, authorized, ratified, aided, abetted, concealed, or benefited from the conduct alleged herein.

150.    John Doe Defendants may include servicers, trustees, document custodians, foreclosure processors, law-firm personnel, Judicial Branch personnel, docketing personnel, ADA-processing personnel, and other actors involved in the mortgage chain, foreclosure enforcement, disability-access denial, public docketing of private ADA communications, post-hearing evidentiary patching, or concealment of material facts.

151.    Plaintiff will seek leave to amend to identify Doe Defendants when their identities are confirmed through discovery.

## V. FACTUAL ALLEGATIONS

### A. The Foreclosure Is Not a Simple Default Case

152.    Deutsche Bank and its counsel have attempted to characterize the underlying foreclosure as a routine residential default. That characterization is false.

153.    This case arises from a decades-long predatory mortgage and refinance chain involving serial refinances, toxic loan structures, lender-paid broker compensation, concealed securitization defects, predecessor misconduct, a claimed 2021 assignment into a 2007 securitized trust, post-hearing evidentiary patching, and the use of disability exclusion to obtain foreclosure liability without meaningful adversarial testing.

154.    Plaintiff alleges that the foreclosure instrument being enforced by Deutsche Bank is the final product of a poisoned chain, not a clean enforceable obligation.

155.    Plaintiff further alleges that Deutsche Bank's own litigation choices confirm that it understood the case presented exposure far beyond ordinary default.

47

156.    After Plaintiff filed special defenses and counterclaims raising predatory origination, lender-paid broker inducement, Shallo misconduct, WaMu/subrogation issues, securitization defects, defective standing, and equity-stripping claims, Deutsche Bank escalated to three major law firms: McCarter & English LLP, Hinshaw & Culbertson LLP, and Brock & Scott, PLLC.

157.    Plaintiff alleges that Deutsche Bank did so because it knew Plaintiff's defenses threatened institutional liability and exposed defects in Deutsche Bank's claimed enforcement rights.

158.    Plaintiff alleges that the timing and scale of Deutsche Bank's legal escalation are evidence of consciousness of exposure. Deutsche Bank did not simply assign one local foreclosure firm to prosecute an ordinary residential default. After Plaintiff pleaded defenses and counterclaims exposing Shallo/YSP misconduct, predatory origination, defective standing, securitization defects, WaMu/subrogation predecessor liability, DOJ/RMBS concealment, and equity stripping, Deutsche Bank deployed three major law firms with national or multi-state capacity.

159.    Plaintiff alleges that Deutsche Bank escalated because it knew the case exposed more than a missed-payment issue. It knew or had reason to know about the yield-spread-premium issue, predatory origination, defective chain of title, the DOJ/RMBS settlement materials it had not disclosed, and the weakness of its primary standing theory, later reflected by its effort to rely on WaMu/subrogation or predecessor-equity theories rather than a clean commencement-standing record.

160.    Plaintiff further alleges that the amount Deutsche Bank claims as owed has grown substantially during the pendency of this litigation. At the time this action commenced in

December 2022, Deutsche Bank's complaint alleged a debt of approximately $725,000. By January 2026, Deutsche Bank's own filings claimed a debt in excess of $1.17 million on the same instrument — an increase of several hundred thousand dollars over three years of litigation, attributable to the negative-amortization structure's continued capitalization of unpaid interest and the daily interest extraction described herein, not to any new funds advanced to Plaintiff. Plaintiff alleges that Deutsche Bank's three-year delay in advancing its dormant strict-foreclosure motion, described above, allowed this figure to grow substantially before Deutsche Bank ultimately sought to enforce it, compounding the harm caused by the access-denial process with the ongoing financial extraction the delay itself enabled.

161.    Instead of litigating those defenses through a fair and accessible process, Deutsche Bank and its counsel pursued a strategy of containment: attack Plaintiff's disability credibility, exploit her medical inability to participate, rely on counsel abandonment, obtain an empty-record summary judgment, and then press toward strict foreclosure before the federal access and fraud issues could be adjudicated.

162.    Plaintiff does not plead RICO as a substitute for ordinary foreclosure defenses or as a personal-injury claim. Plaintiff pleads RICO because Defendants used repeated interstate mail, wire, electronic-filing, service, affidavit, and foreclosure communications to advance a coordinated scheme to enforce a defective and fraud-tainted mortgage chain, conceal material standing and predecessor-liability defects, weaponize Plaintiff's disability record, manufacture an empty foreclosure record, and obtain property and money through strict-foreclosure leverage.

49

**B. Plaintiff's Mortgage Chain Was Poisoned by Predatory Origination, Broker Misconduct, and Equity Stripping**

163.     Plaintiff alleges that the mortgage chain leading to Deutsche Bank's claimed foreclosure rights was infected from inception by predatory lending, fraudulent inducement, lender-side misconduct, broker steering, and concealed material facts.

164.     Plaintiff owned valuable real-estate assets and had substantial equity.

165.     Beginning years before the Deutsche foreclosure, Plaintiff was drawn into a sequence of mortgage transactions that extracted equity rather than preserving it.

166.     The loan file Deutsche Bank acquired in 2021 contains a stated-income application, dated November 3, 2006, from a refinance originated through American Brokers Conduit — the wholesale origination channel of American Home Mortgage, the originator of the trust Deutsche Bank now claims to administer. That application represents Plaintiff's monthly income as $50,000 — $600,000 annually. Plaintiff was, at the time, a retiree with no such income. Plaintiff never reported this figure, never approved it, and never saw it until it surfaced in this litigation; Conrad Roncati controlled the flow of mail and closing documents during this period, and Plaintiff never received the complete closing packets that would have revealed it. This is not a latent defect requiring forensic discovery to uncover. It is facially apparent on the document itself: a $50,000 monthly income representation for an elderly retiree is not a number that could have been generated from any information Plaintiff provided. It is a number the loan needed in order to be approved — and the yield spread premium described above was the price of producing it.

167.     Deutsche Bank cannot claim the protections of a good-faith purchaser or holder in due course as to this instrument. A facially impossible income figure in the loan file is not a hidden defect that a 2021 acquirer could have missed through reasonable diligence — it

is the kind of red flag that defeats any claim of acquisition without notice. Whatever due diligence Deutsche Bank performed before its 2021 acquisition either identified this defect, in which case Deutsche Bank acquired the instrument with actual knowledge of the fraud embedded in it, or failed to identify a defect apparent on the face of the document it chose to acquire, in which case Deutsche Bank acquired the instrument with, at minimum, constructive notice.

168.     Plaintiff raised these facts — the fabricated $50,000 monthly income, its origin in the November 3, 2006 American Brokers Conduit refinance, and its consequences for the validity of the instrument Deutsche Bank now seeks to enforce — in the state foreclosure proceeding. The state court's summary judgment was entered without adjudicating these facts, for the same reasons alleged throughout this Complaint: Plaintiff was unrepresented, under an existing ADA pause for proceedings requiring mental engagement, functionally silenced at the hearing, and prohibited from being heard on the merits before the liability posture was entered. Plaintiff does not ask this Court to revisit a state-court determination of these facts. No state court has determined them. Plaintiff asks this Court to recognize that they were never adjudicated, and that the liability posture Deutsche Bank now seeks to enforce was produced without any adversarial testing of them.

169.     Plaintiff alleges that the November 3, 2006 instrument, procured through a fabricated income figure that Plaintiff never provided, reviewed, or approved, is void ab initio as the product of fraud in the factum, and that Deutsche Bank's claimed rights under it are a legal nullity. Plaintiff pleads this in the alternative to, and not in place of, her allegations that the transaction was procured through fraud in the inducement, predatory

lending, and the broker misconduct alleged herein, for which any claimed debt remains subject to recoupment, setoff, restitution, and disgorgement.

170.    The November 3, 2006 American Brokers Conduit refinance also failed for want of consideration as to a specific, quantifiable portion of the principal. According to Deutsche Bank's own records, that transaction purported to provide Plaintiff a cash-out disbursement of $93,479.79. Plaintiff never received these funds. That amount was diverted by Shallo and Conrad Roncati, yet it was capitalized into the principal balance on which Deutsche Bank has collected, and continues to seek, interest for nearly twenty years. A borrower cannot be bound to repay, with interest, money she never received. To the extent the $93,479.79 represents the difference between the principal Deutsche Bank claims and the principal actually disbursed to Plaintiff, that portion of the instrument is void for failure of consideration, independent of and in addition to the fraud-in-factum and fraud-in-the-inducement theories alleged above.

171.    Plaintiff did not seek out these refinance transactions. Conrad Roncati and James Shallo solicited and incited them, representing to Plaintiff that they were "miracle mortgages" and subsequently repeated refinances across Plaintiff's three properties, executed annually over a period of years to "correct" bank "errors" on the paperwork regarding the rate of interest. Plaintiff relied on those representations.

172.    Plaintiff had no knowledge that these transactions involved a $39,162 lender-paid yield spread premium to Shallo, no knowledge that the loans were structured as negative-amortization instruments in which her payments did not reduce principal, and no knowledge that the "miracle" Conrad and Shallo described was, in substance, a mechanism for extracting equity from her properties rather than preserving it.

173.     Plaintiff's reliance on Conrad and Shallo's representations, rather than any independent sophistication or informed consent, is what led to the execution of the transactions in this chain.

174.     These allegations are not new to this litigation.  Plaintiff has raised the same "miracle mortgage" inducement scheme in pleadings filed in ongoing New Jersey litigation against Conrad Roncati commenced in 2018 and continuing years before Deutsche Bank's foreclosure action escalated to its current posture.

175.     Plaintiff further alleges that she cannot confirm the documents she executed in connection with this transaction are the same documents now relied upon by Deutsche Bank. Conrad Roncati and Shallo controlled the closing process for these transactions, and Plaintiff was not provided copies of the closing packets. Plaintiff has therefore never been able to compare what she signed against what was recorded or against the instrument Deutsche Bank now seeks to enforce. This possibility is not speculative: the same individual — Conrad Roncati— is responsible for a separately forged $1.133 million mortgage recorded against Plaintiff's New Jersey property, with seventeen additional forged instruments at issue. In that litigation, the New Jersey court entered partial summary judgment determining that the $1.133 million mortgage was not signed by Plaintiff, was not known to Plaintiff, and was void. That ruling is not a mere allegation of fraud. It is judicial confirmation that, during the same broader period of financial control and document manipulation alleged here, a mortgage instrument bearing Plaintiff's purported obligation was created and recorded without her signature or knowledge.

176.     James Shallo had already pleaded guilty to federal bank fraud—on October 29, 2003, before the refinances at issue in this chain. Nonetheless, the lender in the 2006

53

transaction at issue, paid Shallo a $39,161.50 Yield Spread Premium to place Plaintiff into the instrument Deutsche Bank now seeks to enforce. A lender that pays a $39,161.50 five-figure premium to a criminal broker to steer an elderly borrower into a loan cannot disclaim responsibility for the conduct it compensated.

177.    Shallo's use of falsified loan documentation was not limited to Plaintiff's transactions. In a related federal prosecution arising from the same period, a co-conspirator's sentencing memorandum identifies Shallo by name as one of the mortgage brokers relied upon in a scheme in which false documents were submitted to secure mortgage loans for investment properties including at least one loan involving a fraudulent title. On the record, Shallo's practice of fabricating loan documentation to secure financing was established and recurring, not an isolated occurrence confined to Plaintiff's loan.

178.    Deutsche Bank's repeated failure to produce the original wet-ink note — already alleged herein as a standing defect — also forecloses Plaintiff's ability to rule out that the instrument Deutsche Bank holds, if any, differs from what Plaintiff actually executed.

179.    Plaintiff alleges that, to the extent the instrument Deutsche Bank seeks to enforce was substituted, altered, or differs from what Plaintiff actually signed, it is void ab initio as a product of fraud in the factum, and Deutsche Bank's claimed rights under it are a legal nullity.

180.    Plaintiff pleads this in the alternative to, and not in place of, her allegations that the transaction — even as she believes she executed it — was procured through fraud in the inducement, predatory lending, and the other misconduct alleged herein, for which any claimed debt remains subject to recoupment, setoff, restitution, and disgorgement.

181.     This is not merely Shallo's misconduct, attributable to him alone. The $39,162.50 Yield Spread Premium was paid by the originating lender — American Home Mortgage or its predecessor — to Shallo, in exchange for placing Plaintiff into this loan.

182.     A lender that compensates a broker for steering a borrower into a particular loan product has, at minimum, created a financial relationship in which the broker acted for the lender's benefit and at the lender's direction with respect to that placement.

183.     Plaintiff alleges that Shallo was acting as the lender's agent for purposes of this transaction, and that Deutsche Bank — which claims enforcement rights derived through that same lender's chain — is bound by the consequences of that relationship. To the extent Deutsche Bank disclaims any agency relationship between itself, its predecessors, and Shallo, that disclaimer does not resolve the issue at the pleading stage; it places the existence and scope of the relationship in dispute, on a record the lender's own payment to Shallo helped create.

184.     The lender's decision to compensate Shallo for this placement is itself evidence of the lender's own misconduct. Shallo had already pleaded guilty to federal bank-fraud charges on October 29, 2003. He was unlicensed, operating his mortgage-broker activity through All American Consulting Services, Ltd., a New York entity that was not itself a licensed mortgage brokerage. He remained free on bail, awaiting sentencing throughout the entire 2004-2006 period in which he originated the refinance cycle described above and was paid the yield spread premium for doing so. He was not sentenced until March 9, 2010 when he was ordered to pay $146,454.66 in restitution.

185.    A lender that compensates, with a five-figure premium, a broker who is at that moment out on bail for federal bank fraud, to place an elderly borrower into a loan, cannot disclaim responsibility for the result by treating that broker as someone else's problem.

186.    The relevant loan chain included transactions involving GreenPoint, WaMu, American Home Mortgage, and others, including the later Deutsche Bank's claimed trust enforcement posture.

187.    Plaintiff alleges that the transactions were not independent clean refinances. They were linked steps in a serial refinance and equity-stripping pattern.

188.    Plaintiff alleges that each successive lender in this refinance chain — WaMu in 2005 and American Brokers Conduit/American Home Mortgage in 2006 — had actual knowledge of the prior loan being refinanced, because that prior loan appeared on Plaintiff's credit report and loan application at the time of underwriting. Each lender therefore knew it was refinancing an existing toxic instrument, not originating an independent, isolated transaction. This actual knowledge defeats any claim that WaMu or ABC/AHM acted as an innocent, unknowing successor; each knowingly continued a serial extraction scheme already visible in Plaintiff's own credit file.

189.    The refinancing sequence included toxic features, including interest-only or negative-amortization structures, unaffordable terms, concealed risk, inflated or fabricated income assumptions, and structures that made it impossible for Plaintiff to understand that her payments were not protecting her equity.

190.    Plaintiff alleges that she paid for fifteen years while the loan structure, servicing conduct, and foreclosure enforcement posture destroyed rather than protected her financial position.

191.    Plaintiff alleges that the financial burden of servicing the subject negative-amortization instrument directly caused the loss of her other properties. As payments on the subject loan consumed an increasing share of Plaintiff's available income while the negative-amortization structure caused the principal balance to grow rather than shrink, Plaintiff was no longer able to maintain payments on her New Jersey and Long Beach Island properties. The loss of those properties was not an independent or coincidental event; it was a direct and foreseeable consequence of the financial strain imposed by the very instrument Deutsche Bank now seeks to enforce.

192.    Deutsche Bank and its predecessors, agents, servicers, brokers, and assignees benefited from the extracted payments, fees, charges, interest, refinancing proceeds, servicing income, and foreclosure leverage generated by this chain.

193.    The yield spread premium was not incidental. It was evidence of lender-side inducement, steering, ratification, agency, and financial incentive to place Plaintiff into a toxic loan product.

194.    Plaintiff alleges that American Home Mortgage or its predecessor paid Shallo an approximately $39,161.50 yield spread premium in connection with the transaction that led to the instrument Deutsche Bank now seeks to enforce.

195.    Shallo had already pleaded guilty to federal bank fraud before this transaction occurred.

196.    Plaintiff alleges that the Shallo/YSP facts also defeat Deutsche Bank's ratification narrative.

197.    Ratification requires knowledge of material facts.

198.     Plaintiff did not knowingly ratify a toxic securitized loan, a criminally compromised broker's involvement, a lender-paid YSP inducement, serial equity stripping, negative amortization, defective trust transfer, missing standing proof, or concealed successor liability.

199.     Plaintiff's continued payments were not ratification. They were the predictable conduct of an elderly victim attempting to save her home and preserve her assets while material facts were concealed.

200.     Deutsche Bank's attempt to convert those payments into ratification is itself part of the fraud and concealment alleged herein.

201.     Plaintiff sets forth this detail because it is the same detail that gave rise to the conduct challenged in this action. The defenses Plaintiff raised in state court — exposing the fabricated income, the phantom cash-out, the criminal and unlicensed broker, and the resulting 2006 instrument's defects — are what Deutsche Bank's escalation to three law firms was a response to, and what the disability/candor attack, the abandonment by Brown, and the empty-record summary judgment were deployed to avoid having tested.

202.     Plaintiff does not ask this Court to determine, as an initial matter, whether the mortgage is enforceable.

203.     Plaintiff alleges that Deutsche Bank's knowledge of these defects — and its choice to respond to them with disability weaponization, fiduciary betrayal, and an empty record rather than adversarial testing — is the motive and mechanism for the federal violations alleged in Counts I through IV, IX, and XIII.

204.     Deutsche Bank's knowledge of defects in loans like this one is not limited to this transaction. AHM 2007-1 — the very trust on whose behalf Deutsche Bank brought this

foreclosure action — is identified by name in Annex 3 of Deutsche Bank's December 2017 settlement agreement with the United States Department of Justice, as one of the residential mortgage-backed securities covered by that agreement. In the accompanying Statement of Facts, Deutsche Bank's own internal records, which Deutsche Bank acknowledged, document that between 2006 and 2007, it securitized over 400,000 subprime and Alt-A loans and made representations to investors and rating agencies about loan quality and underwriting that it knew or recklessly disregarded as false, during a period it understood the housing market was approaching collapse.

205.    Deutsche Bank paid $3.1 billion in civil penalties under the Financial Institutions Reform, Recovery, and Enforcement Act and committed to $4.1 billion in consumer relief, in exchange for release of civil claims the United States itself identified as potentially arising under FIRREA, the False Claims Act, the Program Fraud Civil Remedies Act, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq. — the same federal statute underlying Counts IX and X below.

206.    Plaintiff alleges that Deutsche Bank's institutional knowledge of the conduct it has already admitted to the federal government is relevant to the knowledge and recklessness elements of the fraud and racketeering claims alleged in this Complaint, and to the absence of good faith required of any party seeking equitable foreclosure relief.

## C. Deutsche Bank's "Mortgage Professional" Narrative Was False and Self-Defeating

207.    Deutsche Bank and its counsel argued, in substance, that Plaintiff was a sophisticated mortgage professional who understood or ratified the challenged transactions.

208. Plaintiff alleges that this narrative was false, misleading, and knowingly weaponized.

209. This was not advocacy that overstated a debatable point. It was identity erasure: by falsely labeling Plaintiff a sophisticated industry insider in the very field at issue, Deutsche Bank's counsel sought to strip her of her status as a consumer and insulate Deutsche Bank from the equitable defenses — unconscionability, fraud in the inducement, fraud in the factum — that status would otherwise support. There is no resume, licensing record, employment history, or testimony supporting the characterization. None exists because none could exist.

210. Plaintiff did not knowingly consent to the toxic structure, securitization defects, YSP steering, criminal-broker involvement, or equity-stripping consequences embedded in the loan chain.

211. The "mortgage professional" narrative is also self-defeating.

212. No actual mortgage professional would knowingly place her own multimillion-dollar real-estate portfolio into serial toxic refinances, negative-amortization debt, lender-paid broker steering, and unaffordable structures that could never amortize in her favor.

213. No actual mortgage professional would knowingly pay for years while principal balances increased, equity disappeared, fees accumulated, and an entire real-estate portfolio was destroyed.

214. Those facts do not prove ratification. They prove concealment, predatory abuse, grooming, and lack of informed consent.

215. Plaintiff alleges that Deutsche Bank used the "mortgage professional" narrative for the same reason it used the disability/candor narrative: to turn Plaintiff's victimization into a supposed credibility defect.

216. The narrative allowed Deutsche Bank to argue that Plaintiff was sophisticated enough to lose her rights, but disabled or disorganized enough to be defeated procedurally.

217. Plaintiff alleges that this was deceptive, unfair, abusive, and knowingly false.

218. Plaintiff further alleges that the "mortgage professional" or "mortgage consultant" narrative was a factual fabrication and fraud upon the court. Deutsche Bank and its counsel advanced the narrative explicitly and repeatedly to portray Plaintiff as a sophisticated industry insider who knowingly understood, accepted, ratified, or engineered the complex loan structure at issue.

219. That narrative was false. Plaintiff has never been a mortgage consultant, mortgage broker, lender, underwriter, servicer, originator, loan officer, or participant in the mortgage, banking, lending, underwriting, or loan-servicing industries. No licensing record, employment record, regulatory filing, resume, business record, or testimony supports Deutsche Bank's claim.

220. Plaintiff alleges that Deutsche Bank and its counsel had no good-faith basis to convert a vague or generic reference to "consulting" into a representation that Plaintiff possessed mortgage-industry expertise. Educational, advisory, personal, or unrelated consulting work is not mortgage consulting and did not give Plaintiff knowledge of negative amortization, stated-income fabrication, securitization defects, YSP steering, broker misconduct, trust-transfer defects, or note-possession defects.

221.     Plaintiff alleges that the fabricated professional-identity narrative was material and outcome-directed. It was used to defeat or undermine defenses of fraud in the factum, fraudulent inducement, unconscionability, undue influence, lack of informed consent, predatory lending, equitable tolling, delayed discovery, and lack of ratification.

222.     Plaintiff further alleges that the same false narrative was used to defeat procedural and disability protections. By falsely portraying Plaintiff as sophisticated, Deutsche Bank and its counsel invited the court to disregard Plaintiff's age, disability, pro se vulnerability, need for ADA accommodation, need for counsel protection, and inability to participate in live or high-cognitive-load proceedings.

223.     Plaintiff alleges that this was not ordinary advocacy. It was a strategic identity fabrication designed to recast an elderly disabled consumer victim as an industry insider, suppress evidence of institutional misconduct, conceal the DOJ/RMBS and predatory-origination context, and make the Challenged Liability Posture appear self-inflicted.

224.     Plaintiff alleges that the professional-identity fabrication also proves why Deutsche Bank's standing, possession, agency, ratification, and legitimacy claims cannot be accepted at face value. A party willing to invent sophistication to defeat defenses is also capable of presenting defective note-possession, chain-of-custody, trust-transfer, and foreclosure-enforcement materials as if they were clean proof.

**D. Deutsche Bank's WaMu/Subrogation Theory Put It in Poisoned Predecessor Shoes**

225.     Deutsche Bank did not merely enforce the note and mortgage as if it were a clean assignee.

226.     In the state foreclosure, Deutsche Bank amended its pleadings and invoked equitable mortgage, subrogation, or predecessor theories tied to WaMu.

227.     Plaintiff alleges that by invoking WaMu/subrogation/predecessor rights, Deutsche Bank voluntarily placed itself in predecessor shoes.

228.     Those shoes are poisoned.

229.     Deutsche Bank cannot use WaMu/subrogation as a sword to foreclose while disclaiming the fraud, predatory lending, broker misconduct, YSP steering, toxic refinance structure, and equity-stripping consequences embedded in the predecessor chain.

230.     If Deutsche Bank claims the benefit of WaMu's position, Deutsche Bank also assumes the burdens attached to that position.

231.     Those burdens include unclean hands, fraud in factum, fraud in the inducement, predatory lending, defective payoff, restitutionary liability, disgorgement, recoupment, offset, and all defenses and claims arising from the prior transactions.

232.     Plaintiff alleges that Deutsche Bank's WaMu/subrogation theory is a judicial admission that its direct chain theory was defective, incomplete, or insufficient.

233.     Deutsche Bank cannot simultaneously claim that the predecessor chain gives it equitable foreclosure rights and that the same predecessor chain is irrelevant to liability.

234.     Plaintiff therefore seeks restitution, disgorgement, recoupment, offset, declaratory relief, and damages for the full poisoned chain.

### E. Deutsche Bank's Securitization and Standing Theory Was Defective

235.     Deutsche Bank claims to act as trustee for American Home Mortgage Assets Trust 2007-1 Mortgage-Backed Pass-Through Certificates, Series 2007-1.

236.    Plaintiff alleges that the claimed trust was a 2007 securitized trust governed by closing and transfer requirements.

237.    Plaintiff alleges that Deutsche Bank's claimed enforcement posture depends on defective, impossible, unsupported, or inadequately proven transfers into that trust.

238.    Plaintiff alleges that the record contains or reflects a 2021 assignment into the 2007 trust.

239.    A 2021 assignment into a 2007 securitized trust is facially suspicious and inconsistent with ordinary trust-closing, securitization, and pooling-and-servicing requirements.

240.    Plaintiff alleges that the assignment was void, voidable, ineffective, or insufficient to confer enforcement rights.

241.    Plaintiff further alleges that Deutsche Bank claimed entitlement to enforce the debt and note as of a date in 2022, rather than proving valid note possession, ownership, and enforcement rights at the inception of the foreclosure.

242.    Plaintiff alleges that Deutsche Bank failed to produce competent evidence establishing wet-ink note possession by the proper party at the required time.

243.    Plaintiff alleges that Deutsche Bank did not provide a competent affidavit from the actual person or entity allegedly possessing the original note at the relevant time.

244.    Instead, Deutsche Bank relied on indirect, hearsay, servicer, custodian, or post-hearing materials insufficient to cure standing defects.

245.    At the November 17, 2025 summary-judgment hearing, Deutsche Bank's counsel requested two additional weeks to file a supplemental affidavit concerning possession of the original note. That request was not routine housekeeping. Plaintiff alleges that it was

an open-court admission that Deutsche Bank did not have competent note-possession proof in the summary-judgment record when it asked the state court to enter liability judgment.

246.    Plaintiff alleges that a party with clean commencement standing, competent wet-ink note possession proof, and a reliable chain of custody does not need post-argument time to create or locate proof of possession. Deutsche Bank's request for post-hearing supplementation is therefore probative of defective standing, lack of competent proof, and foreclosure-enforcement fraud.

247.    Plaintiff further alleges that the later Flannigan affidavit did not cure the defect. It was a post-hearing servicer affidavit, not testimony from the actual custodian or law firm allegedly holding the original note, and it did not provide competent chain-of-custody proof establishing possession at commencement.

248.    Plaintiff alleges that the state court allowed Deutsche Bank to supplement standing proof after the November 17, 2025 hearing, while Plaintiff was unrepresented, medically unable to participate, muted or functionally silenced, and denied ADA-access, protection of the existing ADA pause, and the opportunity to oppose or test the new proof.

249.    Deutsche Bank's post-hearing supplementation did not cure the access violation.

250.    It aggravated it.

251.    The court gave Deutsche Bank an additional opportunity to fix its proof after Plaintiff was disabled out of the hearing, but did not give Plaintiff an opportunity to be heard on the merits, protection of the existing ADA pause, meaningful counsel-protective time, or a fair opportunity to oppose liability, present disputed facts and exhibits, test Deutsche Bank's factual assertions, or respond to Deutsche Bank's post-hearing standing proof.

252.    Plaintiff alleges that the resulting standing record is not reliable, adversarially tested, or constitutionally usable as the basis for strict foreclosure.

253.    Plaintiff further alleges that the standing defect was known or obvious to Deutsche Bank, its servicer, and its counsel. Deutsche Bank's later reliance on WaMu/subrogation or predecessor-equity theories, its post-hearing effort to supplement note-possession proof, its reliance on a Texas servicer analyst to testify about an alleged physical note held elsewhere, and its use of Florida-related bailee or custodial materials directed to a different law firm all demonstrate that Deutsche Bank lacked a clean commencement-standing record and attempted to manufacture one after the fact.

254.    Plaintiff alleges that every law firm and attorney who transmitted, filed, argued, relied upon, or ratified those standing materials knew, or was recklessly indifferent to the fact, that the foreclosure record did not contain competent proof of standing at commencement, competent proof of wet-ink note possession by the proper party, or a complete chain of custody sufficient to support strict foreclosure.

## F. Deutsche Bank Concealed or Failed to Disclose Material DOJ/RMBS Settlement Facts

255.    Deutsche Bank entered into a major DOJ/RMBS settlement relating to residential mortgage-backed securities misconduct.

256.    Plaintiff alleges that the DOJ/RMBS settlement and related statements of fact are material because they bear on Deutsche Bank's knowledge, notice, institutional practices, RMBS-related misconduct, securitization risk, trust practices, and the credibility of Deutsche Bank's foreclosure enforcement position.

257.    Plaintiff alleges that Deutsche Bank knew or should have known that the trust, loan, or relevant RMBS structure implicated covered or related conduct because Deutsche

Bank's DOJ/RMBS settlement materials included or encompassed the trust-related RMBS conduct involving the American Home Mortgage Assets Trust 2007-1 enforcement structure Deutsche Bank invokes in this foreclosure action.

258.    Plaintiff alleges that Deutsche Bank failed to disclose material DOJ/RMBS facts in the foreclosure action.

259.    Plaintiff alleges that Deutsche Bank instead prosecuted the foreclosure as if the case involved a clean debt, clean assignment, clean trust, clean note-possession theory, and routine default.

260.    Plaintiff alleges that this omission was material to standing, equitable relief, unclean hands, CUTPA, RICO, fraud, punitive damages, and the court's assessment of Deutsche Bank's credibility.

261.    Plaintiff further alleges that Deutsche Bank's concealment or failure to disclose DOJ/RMBS-related facts was part of a broader scheme to prevent Plaintiff and the court from understanding the institutional risk and misconduct embedded in the claimed enforcement chain.

262.    Plaintiff further alleges that Deutsche Bank withheld or failed to produce the DOJ/RMBS settlement materials in discovery, despite the materials' obvious relevance to Deutsche Bank's knowledge, securitization conduct, RMBS practices, trust-related risk, unclean hands, punitive exposure, and Plaintiff's defenses and counterclaims.

263.    Plaintiff alleges that she learned of the DOJ/RMBS settlement materials only after Deutsche Bank had already pressed summary judgment, after Deutsche Bank had escalated to multiple national law firms, and after the foreclosure record had already been shaped without disclosure of those materials.

67

264.     Plaintiff alleges that the withholding or nondisclosure was not harmless. Deutsche Bank was seeking foreclosure on a trust-related mortgage instrument while concealing or minimizing the fact that Deutsche Bank had already resolved federal RMBS misconduct involving defective mortgage-loan securitization, material misrepresentations to investors, and knowledge of mortgage-loan defects during the same securitization era.

265.     Plaintiff alleges that the DOJ/RMBS settlement is not remote background. It is central to Deutsche Bank's knowledge, intent, recidivism, punitive exposure, and bad faith because Deutsche Bank had already been investigated by the United States Department of Justice for securitizing and selling defective residential mortgage loans.

266.     Plaintiff further alleges that Deutsche Bank cannot fairly characterize the DOJ/RMBS materials as unrelated background while seeking to foreclose in the name of that same AHM 2007-1 trust-related enforcement structure.

267.     Plaintiff alleges that Deutsche Bank's own internal communications, quoted in and acknowledged through the Statement of Facts accompanying its December 2017 DOJ resolution, document that Deutsche Bank's due diligence personnel knew that AHM loans went 'beyond misrepresentation into the fraudulent area'; that elderly fixed-income borrowers on stated-income documentation were internally categorized as ability-to-repay failures; that 'most,(if not all) Stated Wage Earner lans have inflated incomes'; and that AHM-2007-1—the specific trust on whose behalf this foreclosure was brought—was among the RMBS covered by that resolution.

268.     Plaintiff alleges that the prior DOJ/RMBS settlement did not deter Deutsche Bank from seeking value from this trust-related mortgage.

269.    Instead, Deutsche Bank now seeks to obtain Plaintiff's home through a foreclosure record that Plaintiff alleges is built on the same categories of institutional misconduct: defective mortgage-chain proof, defective trust-transfer proof, concealed RMBS/loan-quality knowledge, servicer/custodian paperwork, and representations to a court that Deutsche Bank knew or should have known were materially incomplete or false.

270.    Plaintiff alleges that Deutsche Bank's own internal communications, documented in and acknowledged through the DOJ Statement of Facts, establish that Deutsche Bank securitized defective subprime residential mortgage loans, made false representations or material omissions concerning mortgage-loan characteristics, and resolved federal RMBS conduct during the same era implicated by the trust Deutsche Bank now seeks to enforce against Plaintiff.

271.    Plaintiff alleges that Deutsche Bank's current conduct is therefore not merely standard foreclosure enforcement. It is recidivist institutional conduct: after resolving federal RMBS misconduct involving covered securitization practices, Deutsche Bank continued attempting to monetize and enforce trust-related mortgage instruments while concealing or minimizing the very defects, loan-quality failures, and securitization misconduct that made the DOJ settlement necessary.

272.    Plaintiff alleges that Deutsche Bank's use of the Connecticut court system to enforce this defective and fraud-tainted instrument, while denying Plaintiff meaningful ADA-compliant access and while relying on post-hearing standing supplementation, functioned as a second-stage laundering of toxic mortgage-chain misconduct through a foreclosure judgment.

**G. Plaintiff's State-Court Defenses Exposed Serious Institutional Risk**

273.     Plaintiff filed defenses, counterclaims, motions, and related papers in the Connecticut foreclosure action exposing serious defects in Deutsche Bank's case.

274.     Plaintiff's filings raised, among other things, predatory origination, Shallo/YSP misconduct, toxic loan terms, equity stripping, defective chain of title, standing defects, WaMu/subrogation predecessor liability, DOJ/RMBS concealment, fraud, unfair trade practices, and ADA-access barriers.

275.     Plaintiff alleges that Deutsche Bank and its counsel recognized that these defenses were dangerous.

276.     Deutsche Bank's escalation to three major law firms was not ordinary.

277.     Plaintiff alleges that Deutsche Bank escalated representation to contain the risk created by Plaintiff's defenses and to overwhelm an elderly disabled litigant procedurally.

278.     Deutsche Bank's institutional litigation posture created extreme asymmetry.

279.     On one side stood Deutsche Bank, a global financial institution, represented by multiple major law firms.

280.     On the other side stood an eighty-eight-year-old disabled homeowner, medically unable to participate in live adversarial proceedings, dependent on ADA accommodations, and later abandoned by her own counsel.

281.     Plaintiff alleges that Defendants exploited that asymmetry.

**H. Plaintiff's ADA Accommodations Were Access Protections, Not Capacity Limitations**

282.     Plaintiff is a qualified individual with disabilities under the ADA.

283.     Plaintiff's disabilities substantially limit major life activities and directly affect her ability to access court proceedings, including her ability to process information,

communicate, prepare complex legal submissions under time pressure, participate in live adversarial proceedings, and safely perform high-cognitive-load litigation tasks without accommodation.

284.    Plaintiff submitted medical documentation and sought ADA accommodations from the Connecticut Judicial Branch. By June 2025, the Judicial Branch's ADA process and the trial court had recognized Plaintiff's disability-related limitations and had provided an accommodation pausing proceedings requiring Plaintiff's mental engagement while she was under medical treatment. That accommodation was not a preference for delay. It was the operative access mechanism that allowed Plaintiff to avoid participation-dependent proceedings during a period when her treating provider advised that she lacked the meaningful mental engagement necessary to participate.

285.    That June 2025 accommodation necessarily protected Plaintiff from dispositive litigation events requiring the same mental engagement her medical provider said she lacked, including summary-judgment opposition work, real-time hearing participation, and complex litigation decisions requiring Plaintiff's factual input. Plaintiff's disability did not prevent her from having defenses, rights, evidence, or property interests. It required the court system to provide meaningful access before those rights were adjudicated.

286.    In September 2025, while Plaintiff remained under medical treatment and while the existing ADA accommodation remained operative in substance, Deutsche Bank filed summary judgment. Plaintiff and/or her counsel sought continuation of the existing ADA protection, additional time, and protection from participation-dependent proceedings because Plaintiff remained medically unable to perform the mental-engagement work

71

required to oppose summary judgment. Plaintiff relied upon updated medical documentation confirming that limitation.

287.    After Deutsche Bank and its counsel filed the November 5, 2025 public disability/candor attack, the existing ADA protection was stripped, bypassed, or denied in operative effect. On the same day or in the same immediate sequence, the trial court set summary judgment for November 17, 2025, despite knowing that Plaintiff remained medically unable to respond meaningfully, was seeking ADA protection, and was facing the loss or collapse of counsel protection. Plaintiff filed repeated requests, motions, and pleas for continuation of the existing ADA pause, time to obtain counsel, and a process that would allow meaningful participation. Those requests were denied.

288.    On November 17, 2025, the court proceeded with the summary-judgment hearing while Plaintiff was medically unable to participate meaningfully, while she lacked effective counsel protection, and while she was seeking continuation of the existing ADA accommodation. The court muted, barred, or functionally silenced Plaintiff, refused meaningful time for new counsel or written response, allowed Deutsche Bank to argue, and then allowed Deutsche Bank post-hearing supplementation without giving Plaintiff an equivalent ADA-compliant opportunity to oppose, test, or respond.

289.    Plaintiff's current accommodation posture is different because her current medical condition is different. Plaintiff has regained some ability to communicate through written filings, but she remains medically unable to participate safely in live, real-time adversarial oral proceedings. For current and future proceedings, Plaintiff requires a written-first protocol, protection from compelled live adversarial oral participation, sufficient time to submit written materials, and safe handling of ADA communications.

72

That current written-first/no-live-adversarial protocol is not a retroactive recharacterization of the November 2025 accommodation. In November 2025, the violation was the stripping, bypassing, or denial of an existing mental-engagement pause during a period of documented cognitive impairment and medically documented inability to perform litigation tasks safely. Today, written participation is the only safe and meaningful access method still medically available.

290.    At all relevant times, Plaintiff's need for accommodation was an access issue, not a capacity issue. Defendants and the state-court process treated disability-related limitations as if they were credibility problems, delay tactics, or evidence that Plaintiff could be discounted. That was wrong. Plaintiff's documented limitations affected her ability to perform high-cognitive-load legal work under deadline pressure, participate in real-time adversarial proceedings, and communicate safely in formats her medical condition could not tolerate. They did not strip her of the ability to understand her case, make decisions, assert claims, direct counsel, challenge foreclosure, or seek federal relief.

291.    Plaintiff does not seek exemption from adversarial process. She seeks a medically safe, ADA-compliant alternative to a live, real-time format that her treating providers have prohibited and that previously caused life-threatening medical consequences. Connecticut courts already possess mechanisms for deciding matters on the papers, receiving written submissions, taking affidavits, considering documentary evidence, and managing proceedings without live oral participation where appropriate. Plaintiff's requested written-access protocol therefore does not eliminate adjudication or prevent Defendants from presenting evidence or argument. It provides Plaintiff the only medically possible means of meaningful participation.

292. Plaintiff requested, among other accommodations, the written access, stays or continuances of participation-dependent proceedings, protection from live adversarial proceedings, and meaningful time to secure counsel or submit written materials.

293. Plaintiff alleges that the Judicial Branch knew of her disability and accommodation needs.

294. Plaintiff alleges that the Judicial Branch had already recognized, granted, or acknowledged accommodation needs before the summary-judgment process accelerated.

295. Plaintiff's disability did not prevent her from having defenses, rights, evidence, or property interests.

296. Her disability required the court system to provide meaningful access.

297. Plaintiff repeatedly warned that she could not safely perform the work required to oppose summary judgment or participate live.

298. Plaintiff repeatedly sought help. Plaintiff filed motions for accommodation, continuance, stay, written access, emergency protection, and reconsideration.

299. Those requests were denied, ignored, deferred, or bypassed at critical moments.

300. Plaintiff alleges that the denial or bypassing of accommodations prevented her from presenting her defenses and counterclaims.

301. Because Plaintiff is medically restricted from live, real-time adversarial presentation, written filings are not merely Plaintiff's preferred method of communication. They are her necessary access method. Plaintiff must be permitted to present the record in writing with sufficient factual detail to compensate for the oral presentation, live clarification, spontaneous explanation, and real-time advocacy she cannot safely perform.

302.     Plaintiff alleges that a court cannot deny live access because of disability, deny or fail to provide effective written-access accommodation, and then fault Plaintiff for using a detailed written pleading to present the information the court needs to understand the case. Treating necessary written detail as a defect would convert Plaintiff's disability accommodation into a litigation penalty.

303.     Plaintiff therefore alleges that her detailed written submissions must be evaluated as an ADA accommodation and meaningful-access substitute for live oral presentation, not as obstruction, prolixity, bad faith, or failure to comply.

304.     As set forth above, Plaintiff's ADA-access claim is not a generalized objection to adverse rulings. It is directed to the specific conduct by the foreclosure plaintiff and its counsel that attacked Plaintiff's qualified disability status despite medical documentation and an operative ADA accommodation, caused the court to treat protected disability access as deceit, and produced an "unopposed" liability posture after Plaintiff was denied meaningful access to respond.

## I. Deutsche Bank and Its Lawyers Weaponized Plaintiff's Disability Record

305.     Deutsche Bank and its counsel did not merely oppose Plaintiff's ADA requests.

306.     They weaponized her disability record.

307.     They filed public papers accusing Plaintiff of lack of candor regarding her disability and ability to participate.

308.     That accusation was false.

309.     Plaintiff had documented disabilities.

310.     Plaintiff had sought accommodations through the Judicial Branch ADA process.

75

311. Plaintiff had medical support for her inability to participate meaningfully in live adversarial or high-cognitive-load proceedings.

312. Deutsche Bank and its lawyers nevertheless used New Jersey filings out of context to imply that Plaintiff was dishonest about disability.

313. Plaintiff further alleges that the New Jersey protective-relief certifications did not state that Plaintiff was medically able to be deposed or medically able to undergo live adversarial examination. They stated, in substance, the opposite: that Plaintiff was disabled, medically restricted, and unable to undergo compelled deposition or live adversarial examination. Plaintiff alleges that Deutsche Bank and its counsel knowingly inverted those certifications, using documents that supported disability protection as if they proved disability dishonesty. Plaintiff further alleges, on information and belief, that the false inversion materially affected the foreclosure proceedings, including the court's treatment of Plaintiff's disability record, accommodation requests, and compelled-participation obligations.

314. The specific document Deutsche Bank submitted as Exhibit B to its November 5, 2025 objection was a certification filed by Plaintiff on October 27, 2025, in a separate New Jersey proceeding, in which Plaintiff stated: 'I am 88 years old and disabled. The details of my incapacitation have been medically documented and confidentially shared with the Court's ADA office.' That certification was filed specifically to oppose a court order compelling Plaintiff's in-person deposition and to seek reasonable ADA accommodations. Deutsche Bank and its counsel extracted that document — one submitted in the name of disability protection in another forum — and submitted it to the Connecticut court as "evidence" that Plaintiff was misrepresenting her disability in this

76

case. The inversion is complete and deliberate: the document says 'I am disabled and have documented my incapacitation with the ADA office'; Deutsche Bank used it to argue 'she is not really disabled.'

315.    The false nature of the disability/candor accusation is further established by institutional context the November 5, 2025 filing deliberately concealed: Deutsche Bank's own internal communications, documented in the Statement of Facts accompanying its 2017 DOJ resolution, establish that its personnel characterized AHM's origination practices as going 'beyond misrepresentation into the fraudulent area' and had flagged elderly fixed-income borrowers on stated-income documentation as ability-to-repay failures. Deutsche Bank filed the disability/candor accusation against Plaintiff — an elderly fixed-income borrower whose loan was originated on exactly that documentation type — not as good-faith advocacy about a legitimately contested claim, but as a tactic designed to prevent Plaintiff from raising origination defenses that Deutsche Bank's own internal record shows it knew were well-founded. A defamatory accusation filed to eliminate an opposing party's capacity to present defenses the accused party's own documents acknowledge are grounded is not protected litigation advocacy. It is litigation weaponization. The DOJ-documented institutional knowledge is direct evidence of the actual malice with which the November 5, 2025 filing was made.

316.    The New Jersey filings were lawyer-drafted certifications submitted in support of protective relief to prevent compelled deposition and live adversarial testimony because Plaintiff lacked the medical engagement necessary for that process.

317.    Those filings did not prove that Plaintiff could safely oppose summary judgment in Connecticut.

77

318. Those filings did not prove that Plaintiff could participate in live proceedings.

319. Those filings did not prove that Plaintiff was faking, exaggerating, or lying about disability.

320. Deutsche Bank and its attorneys knew, or had no reasonable basis not to know, the difference between low-load, lawyer-assisted protective filings and high-load, live, adversarial litigation participation.

321. Deutsche Bank and its attorneys nevertheless placed the false disability/candor narrative on the public docket.

322. Plaintiff alleges that the defamatory disability/candor filing was drafted, signed, filed, joined, served, authorized, relied upon, or republished by Defendants Swanson, Mahabamunuge, Milne, and Fredericks.

323. Plaintiff alleges that Deutsche Bank and the law-firm defendants are liable for the acts of those attorneys and for their own authorization, ratification, and use of the defamatory filing.

324. The public accusation caused reputational harm.

325. The public accusation caused dignitary harm.

326. The public accusation interfered with Plaintiff's ADA rights.

327. The public accusation chilled Plaintiff's access to accommodations.

328. The public accusation impaired Plaintiff's ability to obtain counsel.

329. The public accusation poisoned the court's view of Plaintiff's credibility.

330. The public accusation helped convert Plaintiff's disability from an access issue into a supposed litigation misconduct issue.

331.    Plaintiff alleges that the false disability/candor narrative had the intended effect. After Deutsche Bank and its counsel placed the false narrative before the court, Plaintiff's ADA requests, stay requests, written-access requests, continuance requests, reconsideration requests, and emergency filings were repeatedly denied, disregarded, or treated as obstruction rather than as access requests from a documented disabled litigant. Plaintiff alleges that the court's later refusal to meaningfully engage with her motions was not isolated error. It reflected a contaminated record in which Plaintiff's disability had been recast as dishonesty, delay, or litigation misconduct.

332.    Plaintiff alleges that this was ADA interference, retaliation, coercion, defamation, fraud, unfair trade practice, and litigation abuse.

## J. The Individual Attorney Defendants Personally Participated in the Disability/Candor Defamation

333.    Plaintiff alleges that the disability/candor attack was not simply an abstract act by Deutsche Bank.

334.    It was a professional act by identifiable lawyers.

335.    Defendants Adam M. Swanson, Bhanuka Y. Mahabamunuge, Geoffrey K. Milne, and Aaron A. Fredericks were attorneys of record or participating counsel for Deutsche Bank.

336.    Plaintiff alleges that each personally signed, filed, joined, authorized, served, relied upon, advocated, or republished public-docket filings attacking Plaintiff's disability candor.

337.    Those attorneys were trained lawyers.

338.    They knew or should have known that ADA accommodations and medical limitations cannot be defeated by selectively misusing lawyer-drafted protective-relief certifications.

339.    They knew or should have known that an elderly disabled litigant's ability to sign or submit lawyer-assisted protective filings is not equivalent to the ability to endure live adversarial proceedings, oppose summary judgment, or litigate complex foreclosure defenses unaided.

340.    They knew or should have known that publicly accusing an eighty-eight-year-old disabled woman of dishonesty about her disabilities would cause extraordinary reputational, medical, litigation, and access harm.

341.    They nevertheless filed or joined the accusation.

342.    Plaintiff seeks damages jointly and severally against Deutsche Bank, the law-firm defendants, and each individual attorney defendant for their respective roles.

## K. Brown Had Plaintiff's Medical Information and Then Deepened the Disability Attack

343.    Plaintiff retained Defendant Christopher Brown and Brown Law LLC to defend her in the Connecticut foreclosure action.

344.    Plaintiff paid Brown a $30,000 flat-fee retainer intended to take her through trial or substantial trial-level defense.

345.    Brown had Plaintiff's medical information.

346.    Brown knew, based on the medical documentation Plaintiff provided directly to him, that Plaintiff suffered from serious medical and cognitive limitations.

347.    Brown knew Plaintiff could not safely perform the high-cognitive-load work required to oppose summary judgment without accommodations.

348. Brown knew Plaintiff was the primary witness for many facts underlying her special defenses and counterclaims.

349. Brown knew Plaintiff was facing a dispositive motion in a foreclosure case threatening her home.

350. Brown nevertheless failed to protect Plaintiff at the critical stage.

351. Brown withdrew, abandoned, or failed to maintain meaningful opposition to summary judgment.

352. Brown moved to withdraw days before the dispositive hearing.

353. Brown ceased meaningful communication and protection when Plaintiff most needed counsel.

354. Brown publicly adopted, repeated, or amplified the bank's false disability/candor narrative by accusing his own disabled client of being untruthful.

355. Brown's accusation was made despite his possession or knowledge of Plaintiff's medical documentation and accommodation needs.

356. Brown's conduct caused independent harm.

357. Brown's conduct also synergized with Deutsche Bank's strategy.

358. Deutsche Bank had three institutional law firms.

359. Plaintiff had a disabled body, an inaccessible court process, and a lawyer who abandoned her at the critical stage.

360. Brown's conduct created a representation vacuum.

361. Brown's conduct impaired Plaintiff's ability to oppose summary judgment.

362. Brown's conduct impaired Plaintiff's ability to obtain replacement counsel.

363.    Brown's conduct caused reputational, dignitary, economic, medical, and litigation harm.

364.    Brown and Brown Law LLC are liable for legal malpractice, breach of fiduciary duty, breach of contract, unjust enrichment, defamation, and related misconduct.

## L. The November 17, 2025 Summary-Judgment Hearing Should Not Have Occurred

365.    On or about November 17, 2025, the trial court held a summary-judgment hearing in the Connecticut foreclosure action.

366.    That hearing should not have occurred.

367.    Plaintiff was medically unable to participate meaningfully in a live adversarial summary-judgment hearing.

368.    Plaintiff had sought ADA accommodations, stay, continuance, written access, and time to secure counsel.

369.    Plaintiff was unrepresented or functionally unprotected because Brown had withdrawn, abandoned, or failed to protect her.

370.    Plaintiff was attempting to explain that she needed counsel, time, and accommodation.

371.    The court muted, barred, cut off, or functionally silenced Plaintiff.

372.    Deutsche Bank was allowed to argue the merits.

373.    Deutsche Bank was allowed to proceed live.

374.    Deutsche Bank received additional time after the hearing to supplement standing proof.

375.    At the November 17, 2025 hearing, Deutsche Bank's counsel materially mischaracterized the record and the nature of Plaintiff's defenses. Counsel represented to

the court that there was "no affidavit or evidence" filed in opposition to summary judgment, then singled out the undue-influence and predatory-abuse defenses, that there was no evidence of agency, and that there was no evidence of unconscionability.

376.    Plaintiff alleges that those representations were false or materially misleading because Deutsche Bank and its counsel had already received, or had access to, evidence and pleadings showing Plaintiff's status as a victim of predatory financial abuse, including the pending New Jersey litigation, the forged $1.133 million mortgage recorded against Plaintiff's oceanfront property and allegations that Plaintiff's mail, financial documents, bill payment, refinance decisions, and access to loan materials were diverted away from her and controlled by others.

377.    Plaintiff further alleges that those representations did not erase the documentary and litigation evidence already provided to Deutsche Bank. Deutsche Bank used the absence of a deposition to invite the court to treat Plaintiff's predatory-abuse defenses as unsupported, even though Deutsche Bank had actual notice of the New Jersey litigation, the forged LBI mortgage issue, and Plaintiff's pleaded evidence of Conrad-related financial exploitation.

378.    The "access to evidence" Deutsche Bank possessed by the time of the November 17, 2025 hearing was not a matter of inference or constructive notice. It was the product of Deutsche Bank's own discovery requests in this very action, answered under oath. In Interrogatory No. 9 and Interrogatory No. 12 of its First Set of Interrogatories to Plaintiff, Deutsche Bank itself asked Plaintiff to identify, among other things, the documentation supporting her claims of undue influence and yield-spread-premium-driven broker misconduct, and "the finding from the IRS that [Plaintiff was] a victim of identity theft for

the tax fraud." Plaintiff's certified responses, sworn and notarized on January 17, 2024, identified and produced precisely that documentation, bates-stamped RONCATI DOWDEN 000113 (the IRS identity-theft finding) and RONCATI DOWDEN 000114-127 (the New Jersey Superior Court litigation documents concerning the forged $1,133,607.17 Loveladies mortgage). Deutsche Bank's Second Request for Production, served in March 2024, again referenced "the finding from the IRS that defendant was a victim of identity theft for the tax fraud" by that same description and again sought the forgery-related documents, to which Plaintiff again pointed to the same already-produced bates range. By the time of the November 17, 2025 hearing, Deutsche Bank had therefore held this documentation, in its own counsel's possession, for nearly two years. When Deutsche Bank's counsel told the court there was "no affidavit or evidence" supporting Plaintiff's predatory-abuse defenses, counsel was describing the absence of a filing made at that specific hearing, not the absence of evidence Deutsche Bank had ever received. Deutsche Bank's own discovery record establishes that the predicate evidence existed, had been produced to Deutsche Bank under oath, and had been in Deutsche Bank's possession since January 2024 — independent of, and well before, the November 5, 2025 filing and Brown's resulting withdrawal that produced the empty record at the hearing itself.

379.     Plaintiff had already submitted written motions and documentation demonstrating her disability, counsel-abandonment crisis, predatory-abuse allegations, related predatory elder exploitation, Shallo/YSP broker misconduct, negative-amortization structure, lack of meaningful access, and need for a stay and written proceedings. Plaintiff also had pleaded defenses and counterclaims based on predatory origination, undue influence, fraud, unconscionability, lack of ratification, and related misconduct.

380. The transcript confirms that Plaintiff was muted and unable to be heard during argument, then unmuted and informed the court that she was unrepresented, had cognitive and verbal limitations, significant difficulty speaking and organizing her thoughts, and that the motions filed the prior week contained the full explanation of her position and medical situation. Plaintiff specifically asked the court to read those documents, explained that she was not capable of addressing the attorneys' argument live, and requested a stay to obtain counsel.

381. Plaintiff identified the defamation in real time. When the trial court raised that Brown had filed something that day, Plaintiff responded on the record: "He has just defamed me. He's just said that I'm untruthful in regard to my medical condition and my ADA assistance, that there was a disparity between what the ADA office said in New Jersey and what it says in Connecticut and that… I misrepresented to the Court, which is completely outrageous and egregious. I'm a person of integrity. I don't lie." The trial court responded "That's okay," and proceeded: it nevertheless indicated that the court would be ruling, and that it would wait two weeks for Attorney Milne's supplemental filing. Plaintiff's contemporaneous, on-the-record identification of the defamatory disability/candor narrative — at the moment it was used against her — was met with acknowledgment and no action. Plaintiff was muted again.

382. Deutsche Bank's counsel therefore obtained the benefit of live oral argument, mischaracterized Plaintiff's evidentiary record, and received additional time to submit supplemental standing proof, while Plaintiff was medically unable to answer the mischaracterization in real time and was prohibited from being heard on the merits and

from the opportunity to correct the record, test Deutsche Bank's factual assertions or respond to post-hearing standing proof before liability judgment entered.

383. Plaintiff was prohibited from being heard on the merits and denied existing ADA pause on proceedings, a meaningful opportunity to retain replacement counsel, and the opportunity to present disputed facts, test Deutsche Bank's factual allegations, or respond to Deutsche Bank's post hearing standing proof.

384. Plaintiff did not receive equivalent time.

385. Plaintiff did not receive equivalent access.

386. Plaintiff did not receive equivalent opportunity to oppose the post-hearing affidavit.

387. Plaintiff did not receive equivalent opportunity to test Deutsche Bank's note-possession, standing, chain, or entitlement proof.

388. The court's handling of the hearing converted Plaintiff's disability into default.

389. The hearing did not produce a fair adversarial record. The hearing produced an empty record manufactured by disability exclusion.

390. The transcript shows that Plaintiff was not given an opportunity to be heard before the court ruled, and the record of her audio difficulties confirms the problem did not originate with her.

391. The transcript also shows the precise mechanism by which Plaintiff was prevented from being heard. When Plaintiff joined the remote hearing, she was placed in a waiting room, where a court staff member spoke with her, asked which case she was there for, and had no difficulty hearing her. Once the hearing itself began, Plaintiff became inaudible to the court and to counsel. Plaintiff did not touch any control on her end and took no action to mute herself. Her voice was muted once the hearing started. Plaintiff remained inaudible

while the hearing proceeded and while Deutsche Bank's counsel argued the merits of summary judgment, the court entered a ruling and declared the hearing adjourned. Plaintiff had to affirmatively interrupt the adjournment to be recognized.

392.    Before Plaintiff was able to be heard at all, Deutsche Bank's counsel objected preemptively, telling the court that Plaintiff should not be permitted to offer what he called a 'soliloquy of testimony.' The court accepted that framing, thanked counsel, and told Plaintiff that the matter was a motion for liability only and that counsel would provide a brief synopsis of Deutsche Bank's filings.

393.    The transcript shows that the limitation was not neutral. Deutsche Bank's counsel then proceeded to argue factual and evidentiary matters central to liability, including repeated assertions that there was "no affidavit or evidence" opposing summary judgment, "no evidence of agency," "no evidence" supporting unconscionability, no timely defenses or counterclaims, and that Plaintiff had knowledge of the note, mortgage, and closing terms. Those assertions went directly to whether material facts were disputed.

394.    Plaintiff, by contrast, was not afforded any opportunity to identify the facts, exhibits, filings, medical limitations, counsel crisis, ADA accommodation record, or evidentiary disputes that defeated liability or continuation of the existing ADA pause in the proceedings that Plaintiff remained medically unable to perform. The same hearing in which Plaintiff was restricted from factual presentation allowed Deutsche Bank to present the absence of facts as the reason liability should enter.

395.    The asymmetry continued on standing proof. Deutsche Bank requested two weeks to submit a supplemental affidavit concerning possession of the original note. Attorney Knickerbocker represented that his office had possession of the note in 2022 and that the

case began in 2023. The court granted Deutsche Bank's request, stated it would take the matter on the papers, and announced, "Okay, we are adjourned," before Plaintiff had been heard.

396. Plaintiff had to interrupt the adjournment to be recognized and physically gesticulate for attention because she her microphone had been muted by the court, asking, "Your Honor? May I? Hello?" and then, "Can I please speak on my behalf?" By that point, Deutsche Bank had already argued its factual/evidentiary narrative, obtained additional time to supplement standing proof, and secured the court's statement that the matter would be taken on the papers.

397. When Plaintiff tried to explain, the court did not accommodate her medical barrier, continue the matter, protect the existing ADA pause, or ensure that her access objections were considered before liability was decided. Instead, the court cut off Plaintiff's attempt to participate, told her that summary judgment involved "no factual testimony" and accepting the one-sided record Deutsche Bank had just presented.

398. As a result, the hearing did not test whether facts were disputed. It used Plaintiff's disability, lack of counsel protection, inability to participate in real time, and medical inability to verbalize her position as the basis for treating the record as uncontested.

399. That framing excluded the very matters Plaintiff needed to present: her medical inability to proceed, the operative ADA accommodation need, the counsel-abandonment crisis, her need for a stay, and the disputed facts and exhibits that Deutsche Bank had just characterized as nonexistent.

400. Plaintiff was not muted by technical failure. The transcript shows that she was functionally silenced until after Deutsche Bank had argued, obtained additional

supplementation, and the court had attempted to adjourn. Plaintiff alleges that the hearing did not test whether facts were disputed; it used Plaintiff's disability, lack of counsel protection, and inability to participate live as the basis for treating the record as uncontested.

401.     When Plaintiff attempted to explain her medical situation, her need for a stay, and her inability to proceed without counsel, the court redirected her to the question of whether she was still represented, rather than to the substance of what she way saying.  She was not permitted to be heard on what mattered: that she required her existing ADA accommodation and that she could not meaningfully participate in the proceeding the court was conducting due to medical prohibition and lack of legal counsel.

402.     The court's stated basis for limiting Plaintiff to 'legal argument' was internally inconsistent with the nature of the motion before it. Summary judgment is entirely about whether facts are in genuine dispute. Summary judgment may be granted only where no genuine issue of material fact exists. Plaintiff was prevented by the court from putting any facts on the record.

403.     Deutsche Bank's own counsel nevertheless spent the bulk of the hearing making factual representations — regarding agency, deposition history, disclosure, and the existence or absence of evidence as to each of Plaintiff's defenses. Having permitted Deutsche Bank's counsel to argue the absence of facts at length, the court could not coherently tell Plaintiff, in the same hearing, that the proceeding 'doesn't involve factual testimony.'

404.     If the facts truly were not in dispute, Deutsche Bank's own lengthy factual recitation was unnecessary. Plaintiff alleges the facts were in dispute and that given the evidence

described below that Deutsche Bank's counsel did not disclose, summary judgment could not properly be granted at all. Plaintiff's exclusion from offering the very facts the motion turned on was not a neutral evidentiary ruling. It was the mechanism by which a disputed record was made to look undisputed.

405.     When Plaintiff was eventually able to speak and attempted to explain her medical situation, her need for a stay, and her inability to proceed without counsel, the court redirected her to the question of whether she was still represented, rather than to the substance of what she was saying.

406.     The hearing centered on argument only from Deutsche Bank's counsel, including the representation regarding note possession and the request for a two-week extension to supply counsel's affidavit. Before Plaintiff was given any opportunity to speak, the court granted the two-week extension, stated it would take the matter on the papers, and announced, 'Okay, we are adjourned.'

407.     After the court indicated its adjournment, Plaintiff had to affirmatively interrupt that adjournment — 'Your Honor? May I? Hello?'" Can I please speak on my behalf?"— to be heard at all. By that point, the relief Deutsche Bank sought had already been granted.

408.     When the court finally did allow Plaintiff to speak, it had already told her, before she spoke, that the proceeding involved 'no factual testimony' and would permit only 'legal argument' — a framing that excluded the explanation of her medical situation, her need for a stay, and her counsel crisis, which was the entire substance of what she needed the court to hear.

90

409.    Plaintiff was not muted by technical failure. She was not permitted to speak until the court had already ruled and defined the only category of speech it would consider in a way the foreclosed the reason she needed to speak.

410.    Plaintiff explained that she was appearing pro se only on a temporary basis, that she had no lawyer, and that she had submitted motions explaining her situation and requesting a 60-day stay. The court did not rule on the stay at that time. Plaintiff was not permitted, by the format the court itself defined for the hearing, to be heard on the disability, representation, and stay issues that were the entire reason she needed to speak.

411.    The asymmetry was not merely procedural. While Plaintiff was told the hearing permitted "no factual testimony," Deutsche Bank's counsel was permitted, in the same hearing, to assert the absence of evidence as to every one of Plaintiff's special defenses and counterclaims without challenge or correction.

412.    The same rule the court applied to exclude Plaintiff—that the hearing involved no factual testimony—was not applied to Deutsche Bank's counsel, who was permitted to assert dispute and, Plaintiff alleges false factual claims without correction, while Plaintiff was simultaneously told that the format of the hearing did not permit her to respond in kind.

413.    Deutsche Bank's Attorney Milne alleged repeatedly, one for each of Plaintiff's special defenses and counterclaims: "there is no affidavit or evidence," "there is no evidence of agency," "no evidence of unconscionability," and that Plaintiff "had the terms of the note. " Those same words, repeated across each of Plaintiff's defenses and counterclaims and directly contradicted by her pleadings.  Plaintiff was not permitted to

challenge any of Deutsche Bank's counsels' specific, false-or-misleading representations of fact.

414. Deutsche Bank's counsel further alleged no evidence of agency as to Conrad Roncati's undue influence; no evidence of agency as to Shallo's unclean hands; no evidence of agency as to fraudulent nondisclosure; and no evidence of either procedural or substantive unconscionability.

415. The record demonstrates that these representations were false or materially incomplete and Deutsche Bank's counsel had access to evidence demonstrating the contrary was true.

416. Deutsche Bank's counsel did not disclose, in making these representations, that American Home Mortgage paid Shallo a $39,161.50 yield spread premium — direct documentary evidence of the agency relationship Deutsche Bank's counsel told the court did not exist as to Shallo.

417. Deutsche Bank did not disclose that a New Jersey court had already found that a $1.133 million mortgage Conrad Roncati had recorded against Plaintiff's oceanfront property was void, in litigation alleging a pattern of forged instruments and predatory abuse—a judicial finding, not a bare allegation, directly bearing on Conrad's pattern of exercising financial control over Plaintiff's assets that Plaintiff's undue-influence defense alleged here. Deutsche Bank's counsel did not disclose this finding when representing to the court that there was "no evidence of agency in the record at all as to Conrad."

418. Deutsche Bank's counsel made the identical representation as to Shallo to defeat Plaintiff's unclean-hands defense. Deutsche Bank's counsel did not disclose that Shallo's

92

guilty plea to federal bank fraud. Plaintiff provided this direct documentary evidence that Deutsche Bank's counsel told the court did not exist as to Shallo.

419.   Deutsche Bank's counsel made the same 'no evidence of agency' representation a third time to defeat Plaintiff's fraudulent-nondisclosure defense. By that date, the record already contained evidence of the nondisclosure Plaintiff alleged: the $50,000 monthly stated-income figure fabricated on the November 3, 2006 American Brokers Conduit refinance, which Plaintiff never saw or approved and which Conrad Roncati controlled the mail and closing packets necessary to conceal; and the $93,479.79 cash-out disbursement from that same refinance that Plaintiff never received. Deutsche Bank's counsel did not disclose either fact to the court when representing that no evidence supported Plaintiff's fraudulent-nondisclosure defense.

420.   Deutsche Bank's counsel also represented that there was 'no evidence' of either procedural or substantive unconscionability, and that Plaintiff was required to prove both.

421.   Procedural unconscionability concerns unfairness in the formation of a transaction, including stated-income fraud, lack of disclosure, and exploitation of age — each of which the record already reflected as to the 2006 refinance described above. Substantive unconscionability concerns terms so one-sided as to shock the conscience, including negative amortization in which the debt grows despite performance — the precise structure Plaintiff alleges this loan chain imposed on her for nearly twenty years.

422.   Plaintiff further alleges that where, as here, a transaction is infected by the self-interest of a broker engaged in a criminal scheme, Connecticut law shifts the burden to the party seeking to enforce the instrument to prove, by clear and convincing evidence, that the transaction was fair and equitable. See *Oakhill Associates v. D'Addario*, 268 Conn. 441

(2004). Deutsche Bank's counsel did not disclose this evidence or this burden-shifting standard to the court when representing that "no evidence" of unconscionability existed.

423.    Plaintiff alleges that the court's handling of the note-possession issue further compounds the access violation described above.

424.    By the time Attorney Milne requested two weeks to supplement proof of possession, Deutsche Bank had already conceded, in open court, that it could not establish its standing to foreclose.

425.    Plaintiff alleges that a foreclosure plaintiff's inability to establish possession of the note at the time it asks a court to rule is a jurisdictional and substantive defect, not a curable formality, and that the court's decision to grant two additional weeks rather than denying the motion outright compounded, rather than cured, the prejudice of proceeding while Plaintiff could not be heard.

426.    Plaintiff was not permitted to argue this point at the time it mattered most — when the court was deciding whether to grant the extension at all.

427.    Plaintiff alleges that the same rule the court applied to exclude her explanation — that the hearing involved no factual testimony — was not applied to Deutsche Bank's counsel, who was permitted to assert a blanket absence of evidence across every defense Plaintiff had raised and obtain a two week extension to submit proof, while Plaintiff was simultaneously told that the format of the hearing did not permit her to respond in kind.

428.    Plaintiff further alleges that Attorney Milne's "no evidence" presentation was materially false or misleading because it was contradicted by documents, pleadings, exhibits, and written submissions already before the court. Plaintiff had already placed before the court evidence and allegations concerning predatory origination, the Shallo

94

yield-spread-premium steering scheme, negative amortization, stated-income abuse, disputed agency and successor-liability issues, unconscionability, Deutsche Bank's deficient standing proof, and the need for ADA-protected written participation. Deutsche Bank's counsel nevertheless presented the case as if Plaintiff had no evidence, no viable defenses, no agency theory, no unconscionability theory, no timely claims, and no meaningful challenge to enforcement.

429.     The prejudice from that presentation was magnified by the disability/candor attack already placed on the public docket. Once Plaintiff had been branded as untruthful about her medical condition and ADA need, Deutsche Bank's broader narrative was accepted as credible while Plaintiff's written evidence was ignored, discounted, or procedurally unreachable. The "no evidence" narrative did not merely answer Plaintiff's defenses; it exploited the empty-record posture created by ADA exclusion and counsel abandonment, then used that manufactured emptiness as the reason to enter liability.

430.     At the hearing itself, Plaintiff told the court she had cognitive and verbal limitations, could not address what Deutsche Bank's attorneys had just said, needed counsel and accommodation, and had filed written motions explaining her position and medical situation. The court did not pause the proceeding to read and adjudicate those materials before allowing Deutsche Bank's version of the record to control. Instead, Deutsche Bank was permitted to argue, obtain two additional weeks for standing proof, and later convert that one-sided presentation into a summary-judgment liability posture.

## M. Deutsche Bank Received a Post-Hearing Opportunity to Patch Its Standing Proof

431.     After the November 17 hearing, Deutsche Bank was permitted additional time to submit supplemental materials.

432.     Deutsche Bank then submitted a supplemental affidavit or other post-hearing material from Kevin Flannigan or related witness.

433.     Plaintiff alleges that the Flannigan material was a post-hearing patch to standing or enforcement proof.

434.     Plaintiff alleges that the affidavit was not competent to cure the defects in Deutsche Bank's case.

435.     At the November 17, 2025 hearing, Deutsche Bank's counsel, Attorney Milne, requested two weeks to file a supplemental affidavit regarding possession of the original note, and offered, in lieu of producing it, a representation from Attorney Knickerbocker as to physical possession. On the record, Attorney Knickerbocker stated: "we have the note in 2022 and this case was started in 2023" — representing that his office had held physical possession of the original note since before this action commenced. The trial court did not require the note to be produced for inspection, accepted the representation, and granted the requested two weeks.

436.     What Deutsche Bank submitted two weeks later was not an affidavit from Attorney Knickerbocker or anyone at his office confirming the possession just represented to the court. It was the Flannigan affidavit, from a Texas-based servicer employee with no connection to the possession Attorney Knickerbocker had described. The representation that secured the two-week extension and the proof ultimately filed concerned two different people, in two different states, describing two different custodial histories. Deutsche Bank's counsel invoked *Equity One, Inc. v. Shivers* as the basis for accepting a representation in lieu of immediate production — but a representation under Shivers that goes unconfirmed by the very attorney and office that made it, and is instead replaced by an unrelated affidavit

from a different state, satisfies neither *Shivers* nor the purpose the two-week accommodation was granted for.

437.     The Flannigan affidavit was submitted in response to the two week extension the court granted based on Attorney Knickerbocker's representation that his office held physical possession of the note since 2022. Deutsche Bank did not produce confirming testimony from Knickerbocker or his office, nor did it ever produce the note or testimony from the person or entity in actual physical custody of it. Instead, it offered an affidavit from a servicer employee asserting that someone, somewhere, possessed the instrument — the same kind of proxy assertion the court's order was meant to foreclose. An accommodation granted in lieu of immediate production is not satisfied by an affidavit saying the instrument exists; it is satisfied by producing the instrument, or it is not satisfied at all. Deutsche Bank's response to the accommodation that was given was non-compliance dressed as compliance.

438.     Plaintiff alleges that it was based on indirect knowledge, servicer records, custodian assertions, or hearsay rather than competent proof from the actual entity or person possessing the original note at the relevant time.

439.     Plaintiff alleges that the Flannigan affidavit was not based on Flannigan's own personal knowledge of the note's custody, but rather on records, statements, or representations Flannigan received from others — hearsay upon hearsay, several layers removed from any person with actual, firsthand knowledge of physical possession of the original note.

440.     Plaintiff alleges that the trial court accepted this multiply-hearsay affidavit as the basis for its standing determination and summary judgment ruling without requiring

testimony from any person with direct personal knowledge of the note's custody, and without Plaintiff having a meaningful, ADA-compliant opportunity to challenge the affidavit's evidentiary basis before judgment entered.

441.    Plaintiff alleges that no competent affidavit from the actual alleged holder, custodian, or attorney possessing the wet-ink note at inception was provided.

442.    Plaintiff further alleges that even if Deutsche Bank's post-hearing materials could have been contested, Plaintiff was denied meaningful access to contest them.

443.    Deutsche Bank received the benefit of additional proof after the hearing.

444.    Plaintiff did not receive the benefit of an accessible written opposition period.

445.    Plaintiff did not receive counsel protection.

446.    Plaintiff did not receive a meaningful opportunity to test the new proof.

447.    Plaintiff alleges that the standing record was therefore procedurally and constitutionally defective.

448.    Deutsche Bank's counsel did not disclose any of this — including the admissions described above regarding AHM 2007-1 itself — when representing to the court that no evidence supported Plaintiff's defenses.

## N. The December 1, 2025 Summary Judgment Was Entered on a Manufactured Empty Record

449.    On or about December 1, 2025, the trial court entered summary judgment against Plaintiff.

450.    The court treated the record as if Plaintiff had failed to oppose.

451.    Plaintiff did not fail to oppose in any ordinary sense.

452. Plaintiff was disabled, medically unable to participate meaningfully, denied effective accommodation, unrepresented or abandoned by counsel, muted or functionally silenced, and deprived of an accessible written process.

453. Plaintiff alleges that the state court's summary judgment converted disability-caused inability into procedural default.

454. Plaintiff further alleges that the court entered contradictory or improper summary-judgment relief on two separate motions.

455. One motion was directed to an earlier pleading that had been superseded or rendered moot by amendment.

456. Another motion related to the amended pleading.

457. Plaintiff alleges that granting summary judgment on both created an internally defective, contradictory, and unreliable liability posture.

458. The liability posture did not result from a valid adversarial adjudication.

459. It resulted from disability exclusion, counsel abandonment, asymmetric access, and post-hearing evidentiary patching.

460. Plaintiff alleges that the liability posture cannot lawfully serve as the predicate for strict foreclosure without first providing Plaintiff meaningful ADA-compliant access and adjudicating the federal defects.

461. The record establishes more than an isolated error. By November 17, 2025, the trial court had before it Plaintiff's Yale Neurology documentation, the New Jersey protective-relief certifications, and Plaintiff's written motions setting out her disability, her counsel-abandonment crisis, and her need for accommodation.

462.    At the hearing itself, when the court noted that Brown had filed something that day, Plaintiff stated on the record that Brown's filing defamed her and that it inverted the relationship between her New Jersey and Connecticut disability records. The court responded "That's okay" and proceeded to treat Brown's filing as requiring no further inquiry.

463.    Two weeks later, the court received, in lieu of the note-possession proof represented to it at the hearing, an affidavit from a different person in a different state, addressing a different custodial history than the one represented — and accepted it as the basis for summary judgment.

464.    On December 1, 2025, the court entered summary judgment on two separate motions, one of which was directed to a pleading already superseded or rendered moot by amendment, producing a liability posture that was internally contradictory on its face.

465.    Plaintiff alleges that the summary judgment entered against her is invalid on numerous independent and overlapping grounds, including but not limited to the following, each sufficient standing alone: (1) Plaintiff was excluded from meaningful participation in the dispositive hearing due to her disability; (2) Plaintiff was left without any functioning legal representation at the most critical stage of the litigation; (3) the court entered two internally contradictory summary judgment orders on the same day, one directed at pleadings already superseded by amendment; (4) Plaintiff filed her reply closing the pleadings on the amended complaint on September 3, 2025 (Entry 156), and Deutsche Bank filed its Motion for Summary Judgment just six days later, on September 9, 2025 (Entry 157), without any discovery conducted on the amended pleadings, without any Certificate of Closed Pleadings ever filed, and while Deutsche Bank knew Plaintiff was

subject to a Court-recognized ADA accommodation pausing her participation and was medically unable to respond; (5) Deutsche Bank failed to establish possession of the wet-ink note or a valid chain of title; (6) Deutsche Bank's proof of standing rested on a multiply-hearsay affidavit from a servicer employee with no personal knowledge of the note's physical custody; (7) the 2021 assignment purports to convey an interest into a trust that had been closed since 2007; (8) the endorsement purporting to transfer the note is undated and executed in the name of an entity that had been dissolved since 2007; (9) the lender paid an undisclosed $39,161.50 yield spread premium to an unlicensed criminal broker who had already pleaded guilty to federal bank fraud; (10) Deutsche Bank's own internal records, documented in its 2017 DOJ resolution, establish institutional knowledge that loans of this type and origin were frequently fraudulent, before its 2021 acquisition of this loan; (11) Deutsche Bank itself elected to invoke its predecessor WaMu's subrogated rights to establish its enforcement position, while disclaiming the liabilities that traveled with those same rights; (12) Deutsche Bank publicly accused Plaintiff of dishonesty regarding her disability using documents that had been filed to protect that same disability; (13) Deutsche Bank represented to the court that Plaintiff had operated her own mortgage consulting business, a claim with no support anywhere in the record; (14) each successive lender in the refinance chain had actual knowledge of the prior toxic loan being refinanced, because that loan appeared on Plaintiff's credit file at the time of underwriting; (15) the financial burden of the subject instrument directly and foreseeably caused the loss of Plaintiff's other real estate holdings; and (16) the subject loan was one installment in a serial, multi-property equity-stripping scheme using the same predatory broker and the same negative-amortization structure. Plaintiff alleges that no single one of these defects

is dispositive of itself, but that their cumulative effect establishes a summary judgment process so thoroughly compromised that it cannot stand as the predicate for strict foreclosure.

466.    Plaintiff alleges that Deutsche Bank's resort to defaming Plaintiff's disability credibility, rather than litigating these threshold defects on their merits, was not incidental. It was necessary: Deutsche Bank could not prevail against a genuinely adversarial test of its standing, its possession of the note, or the closed status of the pleadings, and the only path to the judgment it obtained was to ensure no such test ever occurred.

467.    Plaintiff alleges that the timing of this sequence was not coincidental, and that the public docket establishes it. Deutsche Bank filed its Motion for Judgment of Strict Foreclosure, Entry 107.00, on February 17, 2023, six weeks after commencing this action. After Plaintiff filed her Answer, Special Defenses, and Counterclaims on May 2, 2023 (Entry 110), Deutsche Bank did not respond for over four months, during which it filed three successive motions for extension of time (Entries 112, 113, and 114, filed May 31, July 6, and August 7, 2023). On February 4, 2025, Deutsche Bank filed its first Motion for Summary Judgment, Entry 133.00. Five weeks later, on March 14, 2025, Deutsche Bank filed its own Motion to Amend its pleading, Entry 139.00, granted April 2, 2025. Deutsche Bank then filed a second Motion for Summary Judgment, Entry 157.00, on September 9, 2025, addressed to its own amended pleading, without ever withdrawing Entry 133.00. The public docket reflects that both Entry 133.10 and Entry 157.10 carry the identical result: 'Granted 12/1/2025.' Only after securing this dual, internally contradictory liability posture did Deutsche Bank move its long-dormant Entry 107.00 forward, which was finally marked off the inactive list on March 2, 2026 — three years after it was filed. Plaintiff alleges that

102

Deutsche Bank controlled the pace and structure of this litigation at every stage material to this Complaint, while the negative-amortization instrument it sought to enforce continued to extract approximately $148.69 in interest from Plaintiff every day this litigation remained pending, regardless of which party's filings were before the court in a given month.

468.     On February 25, 2026, with strict-foreclosure consequences still pending, the court denied the accommodation Plaintiff's treating providers had made medically necessary, characterized that accommodation as a "fundamental alteration," and on the same day issued an order warning that Plaintiff's non-appearance at a live proceeding "shall result in an immediate judgment" — despite the medical restriction the court had just acknowledged.

469.     Plaintiff does not allege that any single one of these rulings, standing alone, establishes a federal violation. Plaintiff alleges that, taken together, they establish a court that had the documentation, had the explanation, had contemporaneous notice, and ruled the same way regardless.

470.     A public entity acts with the knowledge required for relief under Title II where it has actual notice that a federally protected right is substantially likely to be violated and proceeds without addressing that likelihood. The pattern above — not any single ruling — is what Plaintiff alleges satisfies that standard.

## O. The Trial Court Denied the Required ADA Accommodation as a "Fundamental Alteration" While Strict Foreclosure Remained Pending

471.     After summary judgment entered, Deutsche Bank continued pressing toward strict-foreclosure consequences while Plaintiff remained medically unable to participate in live,

real-time adversarial proceedings and while her ADA access objections remained unresolved.

472.     Plaintiff continued seeking accommodation, relief, stay, reconsideration, medically safe ADA access, and protection from strict foreclosure consequences.

473.     Plaintiff filed motions to open, vacate, stay, reconsider, continue, and obtain ADA accommodation.

474.     On February 20, 2026, Plaintiff filed a consolidated motion to open and vacate the summary-judgment posture, object to strict foreclosure, and seek continuance and accommodation relief.

475.     Plaintiff requested written proceedings because her treating providers had medically restricted live, real-time adversarial oral participation.

476.     The trial court denied, ignored, deferred, or failed to meaningfully adjudicate those requests. On February 25, 2026, the trial court denied Plaintiff's request for an ADA stay and mandatory accommodation, stating that the requested accommodation "would cause a fundamental alteration of our process."

477.     The same notice stated that there was "no right to immediate appellate review" and that any challenge could be raised in an appeal from final judgment, even though strict-foreclosure consequences remained pending and threatened to make later review meaningless.

478.     Also on February 25, 2026, the trial court entered a "FINAL" continuance order noting Plaintiff's absence from the strict-foreclosure hearing, ordering all parties to be present on March 2, 2026, and warning that failure to appear "shall result in an immediate judgment."

479. The trial court continued to conduct proceedings in a manner that allowed Deutsche Bank to appear, argue, or influence foreclosure scheduling while Plaintiff remained medically unable to participate live and had requested written-only proceedings.

480. Plaintiff alleges that this order compounded the ADA violation because her treating-provider restrictions prohibited live, real-time adversarial participation, and the threatened consequence of nonappearance was immediate strict-foreclosure judgment.

481. Plaintiff alleges that the court conducted, marked, or permitted proceedings that were effectively ex parte or asymmetric because Deutsche Bank had live or real-time access while Plaintiff did not.

482. On March 2, 2026, Plaintiff again notified the court that she was medically unable to attend or participate in live oral or remote adversarial proceedings and requested written proceedings as a mandatory ADA accommodation.

483. Plaintiff alleges that a later "papers only" gesture did not cure the violation since the dispositive liability posture had already been entered without meaningful ADA-compliant access.

484. The court stated that it would take the matter on the papers, but subsequently allowed Deutsche Bank to be heard on filing an objection to Plaintiff's motion before ruling.

485. Deutsche Bank filed the objection, the objection was sustained, and Plaintiff's motion was denied, leaving the foreclosure liability posture intact without meaningful ADA-compliant access.

486. Deutsche Bank had already obtained the benefit of live advocacy, post-hearing supplementation, and an empty record.

487.    Plaintiff alleges that the trial court's later handling preserved asymmetry rather than curing it.

488.    Plaintiff further alleges that the court threatened or moved toward strict foreclosure consequences despite Plaintiff's unresolved ADA-access claims.

**P. The Connecticut Judicial Branch Denied Meaningful ADA Access**

489.    The Connecticut Judicial Branch is a public entity subject to Title II of the ADA.

490.    Court proceedings, court filings, hearings, ADA accommodation processes, appellate filings, docketing systems, and judicial case-management functions are services, programs, or activities of the Judicial Branch.

491.    Plaintiff is a qualified individual with disabilities.

492.    Plaintiff was entitled to meaningful access to those services, programs, and activities.

493.    Plaintiff alleges that the Judicial Branch denied meaningful access through multiple interlocking failures.

494.    First, the Judicial Branch failed to protect Plaintiff from live adversarial proceedings she could not medically endure.

495.    Second, the Judicial Branch failed to pause or adjust participation-dependent proceedings while Plaintiff was medically unable to perform.

496.    Third, the Judicial Branch allowed a dispositive summary-judgment hearing to occur while Plaintiff was unrepresented, medically unable to participate, and seeking accommodation.

497.    Fourth, the Judicial Branch allowed Plaintiff to be muted, cut off, or functionally silenced while Deutsche Bank argued.

106

498.      Fifth, the Judicial Branch allowed Deutsche Bank additional time to supplement proof without affording Plaintiff equivalent ADA-compliant access.

499.      Sixth, the Judicial Branch permitted private defendants to weaponize Plaintiff's disability record and then treated the resulting record as if Plaintiff had simply failed to oppose.

500.      Seventh, the Judicial Branch allowed appellate filing and ADA-process barriers to compound the injury.

501.      Eighth, the Judicial Branch allowed private ADA communications to be placed on the public docket without authorization.

502.      Plaintiff alleges that these failures denied her meaningful access to the courts.

## Q. Keane and the Appellate ADA Process Made Accommodation Unsafe

503.      Peter D. Keane was identified by the Connecticut Judicial Branch as an ADA contact for the Supreme/Appellate Court/State Library.

504.      Plaintiff submitted private ADA communications to the appellate/Supreme Court ADA contact process for accommodation purposes.

505.      Plaintiff did not submit those communications as public pleadings.

506.      Plaintiff did not authorize their public docketing.

507.      Nevertheless, at least one private ADA communication was placed on the public docket.

508.      Plaintiff alleges that Keane personally participated in, authorized, directed, permitted, failed to prevent, or failed to correct the public docketing of private ADA communications.

107

509.    Plaintiff's April 13, 2026 ADA request specifically advised the Judicial Branch that, because of cognitive disability, written submissions were Plaintiff's primary reliable means of communicating with the Court, and that the appellate e-filing system's categories and routing options were confusing, inconsistent, and not reasonably navigable for her without assistance.

510.    Plaintiff requested a designated contact person or procedural point of contact, flexibility so filings would not be rejected based on category ambiguity, assistance or guidance to route filings correctly, and recognition that disability prevented her from navigating the appellate e-filing interface as an unimpaired filer would.

511.    The filing-category barrier existed only because Plaintiff was forced to use an electronic filing interface with limited, incomplete, and mismatched event-code categories. If Plaintiff had been physically able to file in person at the clerk's counter in Hartford, the clerk could have accepted the filing without requiring Plaintiff to choose from a limited electronic category list that did not match the specific motion or application being submitted.

512.    The "Other Document" category was the only available electronic category among the limited options that reasonably fit filings for motions, supervisory, ADA-accommodation, reconsideration or other relief. "Other Document" was therefore not merely the best available option, it was the only category that could be selected for a filing that did not fit the system's narrow, predefined list. No category existed in the appellate e-filing system that accurately described the motion she needed to file, and that the system provided no mechanism, alternative process, or human assistance by which Plaintiff could submit such filings.

513.     Instead of providing safe, consistent, disability-access assistance, the appellate process repeatedly imposed technical rejection, recategorization, refiling, and docketing burdens on Plaintiff. Each rejection or return required Plaintiff to re-read, rework, recaption, refile, re-explain, and resubmit emergency materials under severe cognitive and medical limitations.

514.     Marking a filing as "returned" or "rejected" and posting such remarks on the docket for clearly titled, timely tendered filings does not enforce a filing rule. It defeated the purpose of Plaintiff's ADA accommodations and imposed an access barrier that an unimpaired in-person filer would not face.

515.     The public docket in the appellate and Supreme Court proceedings now reflects approximately twelve rejected or returned filings between March and June 2026 attributable to this category defect. On June 15, 2026, Plaintiff's Motion for Reconsideration En Banc addressed to the Connecticut Supreme Court—docketed as SC 250444—was returned with notice that it had been 'E-filed using an incorrect document type or path' and must be 'filed as a new pre appeal motion for reconsideration en banc in the Supreme Court.' That motion was filed as 'Other Document,' the only available category that reasonably fit the filing, under the same accommodation guidance that permits Plaintiff to use that category. The return was not a ruling on the merits of the constitutional and ADA-access issues the motion presented. It was a category-selection barrier imposed on a disabled litigant days prior to the filing of this Complaint—the same barrier this Complaint challenges throughout this Section. Plaintiff alleges that this docket history is itself a harm, independent of the burden of having to refile.

516.    A docket showing twelve rejected filings creates the appearance, to any judge, clerk, opposing party, or member of the public who reviews it, that Plaintiff's filings were defective or frivolous. Plaintiff alleges that this appearance is false and is reflective of an access barrier in the workable filing categories, not of any defect in the substance of what she sought to file.

517.    Plaintiff alleges that a docket record created by an inaccessible filing system, which then creates the false appearance that a disabled litigant's filings were defective to every future reader of that docket, is itself a form of disability-based harm distinct from, and in addition to, the burden of having to repeatedly resubmit the same filings.

518.    Those repeated filing barriers caused extreme stress, exacerbated Plaintiff's disabilities, increased cognitive overload, contributed to medical crash and medical deterioration, chilled her ability to seek further accommodation, and impaired her ability to pursue emergency review before strict-foreclosure consequences could attach.

519.    Plaintiff further alleges that the filing rejections continued even after Plaintiff had sought and/or received accommodation guidance permitting use of "Other Document" where no specific appellate e-filing category matched the filing being submitted.

520.    The appellate e-filing system did not provide a complete list of event categories corresponding to Plaintiff's emergency filings, ADA filings, supervisory filings, reconsideration papers, motions, applications, and related submissions. The limited menu forced Plaintiff to choose from categories that did not fit, even though a physically able filer could tender a clearly titled filing at the Hartford clerk's counter without being required to select from incomplete electronic event codes.

110

521.     Plaintiff alleges that Keane and/or appellate case-management personnel nevertheless continued to reject, return, redirect, or require resubmission of filings based on category selection, including filings submitted under "Other Document," even though that category was the only available category that reasonably fit certain filings.

522.     Those repeated rejections imposed a disability-specific burden. Each rejection required Plaintiff to re-read, rework, recaption, refile, re-explain, and resubmit emergency materials under severe cognitive and medical limitations; some filings required multiple attempts to choose a category acceptable to the appellate e-filing system.

523.     Plaintiff alleges that this was not a neutral filing inconvenience. It was an ADA access barrier because the electronic system imposed a technical category burden that Plaintiff could not safely navigate because of disability and that would not have existed had Plaintiff been medically able to file in person at the clerk's counter. Plaintiff alleges that the appellate ADA process was structurally non-neutral because the same official channel that was supposed to assist Plaintiff in obtaining disability access was intertwined with, or functionally indistinguishable from, the filing-gatekeeping process that rejected, returned, redirected, or publicly docketed the very disability-related filings and communications for which Plaintiff sought accommodation. An ADA access process cannot provide meaningful access where the person or office expected to help a disabled litigant safely file and communicate is also connected to the process that systematically rejects those filings, records the rejections on the public docket, and exposes private ADA communications to adverse parties and the public.

524.     The public docketing and filing barriers exposed Plaintiff's disability-access communications to adverse parties and the public.

111

525.     The public docketing compounded the existing defamatory public narrative that Plaintiff was dishonest about disability.

526.     The public docketing chilled Plaintiff's willingness and ability to seek further accommodations candidly.

527.     The public docketing and filing barriers caused concrete harm, including medical crash or aggravation, extreme stress, fear of compounded public exposure, reputational harm, strategic litigation harm, privacy injury, dignitary injury, chilling of future ADA communications, and impaired ability to seek accommodation candidly in an adversarial foreclosure case where Plaintiff's disability record had already been weaponized.

528.     The appellate ADA process thereby became unsafe.

529.     Plaintiff alleges that an ADA process that publicly exposes private accommodation communications is not meaningful access.

530.     It is an access barrier.

## R. Appellate Gatekeeping Failed to Adjudicate the Federal Access Question

531.     Plaintiff repeatedly sought emergency appellate and Supreme Court relief before strict foreclosure consequences could attach.

532.     Plaintiff sought supervisory intervention, stays, reconsideration, certification, and review of the threshold ADA-access and due-process breakdown.

533.     Those efforts did not produce a substantive adjudication of whether the foreclosure liability posture was ADA-compliant, adversarially valid, or constitutionally accessible.

534.     Plaintiff alleges that the Appellate Court dismissed or rejected filings on procedural grounds that did not answer the federal access question.

112

535.     The Appellate Court dismissed Plaintiff's supervisory petition on March 25, 2026, citing only *Essex Savings Bank v. Frimberger*, 26 Conn. App. 80 (1991). On April 30, 2026, it dismissed the appeal from the denial of the motion to open, again on *Frimberger* grounds, adding that 'the defendant may challenge the interlocutory summary judgment order and the denial of her motion to open the summary judgment in an appeal from the final judgment.' That language is itself significant: by acknowledging the motion-to-open denial would be reviewable later, the Appellate Court confirmed it understood that ruling had substantive content — yet declined to reach it. Plaintiff alleges that *Frimberger* is a finality rule for ordinary interlocutory foreclosure appeals, not a bar to supervisory authority under Practice Book § 60-2, which exists precisely to address structural breakdowns before they become irreversible. Plaintiff further alleges that an appeal from the denial of a motion to open a judgment is itself a final, appealable order, not an interlocutory one, making *Frimberger*'s application to that appeal legally incorrect. No state court addressed either of these threshold questions on the merits.

536.     Plaintiff further alleges that the motion-to-open appeal was especially important because the motion to open was the procedural vehicle through which Plaintiff sought review of rulings entered after she was denied meaningful ADA-compliant access, counsel protection, and an opportunity to be heard on the merits. Plaintiff alleges that this sequence made meaningful appellate review urgent, yet the appellate process disposed of the issue through Frimberger without adjudicating the ADA-access, written-access, counsel-protection, or due-process defects on the merits.

537.     Plaintiff also alleges that appellate gatekeeping repeatedly imposed technical burdens on an eighty-eight-year-old disabled litigant despite her accommodation needs.

113

538.    Plaintiff alleges that filings were rejected, redirected, or mishandled despite her disability and despite instructions or understandings that disability-related filings could be submitted under nonstandard categories such as "Other Document."

539.    Each rejection imposed additional cognitive, physical, medical, and litigation burden.

540.    Plaintiff had to rework, refile, recaption, reexplain, and resubmit emergency materials under severe disability limitations.

541.    Those burdens were not neutral inconveniences.

542.    They were access barriers.

543.    Plaintiff alleges that the state appellate process did not cure the trial-court violation.

544.    It perpetuated it.

545.    Plaintiff remains in a constitutional Catch-22: she is told to wait for later review, but the injury is the loss of meaningful ADA-compliant participation before foreclosure consequences attach.

546.    Once title vests or strict foreclosure consequences occur, the lost opportunity to oppose liability cannot be reconstructed.

547.    A later appeal cannot recreate counsel, medical capacity, written access, adversarial testing, note-possession discovery, or a meaningful summary-judgment opposition.

**S. The Strict-Foreclosure Threat Is Imminent and Irreparable**

548.    Plaintiff faces imminent strict foreclosure consequences based on the Challenged Liability Posture described above.

549.    Plaintiff's home is unique.

550.    Loss of title through strict foreclosure would be irreparable.

114

551.    Strict foreclosure would convert the Challenged Liability Posture and empty-record liability posture into irreversible property loss.

552.    Plaintiff alleges that Defendants seek to use the state-court summary judgment as a predicate for strict foreclosure despite knowing the liability posture was produced through disability exclusion and untested standing proof.

553.    Plaintiff alleges that absent federal relief, Defendants will succeed in converting Plaintiff's inability to access the court into loss of her home.

554.    Monetary damages alone cannot remedy the loss of a home, the destruction of meaningful access, the public disability defamation, the loss of adversarial testing, or the violation of federal rights.

555.    Plaintiff therefore seeks emergency injunctive relief preserving the status quo before strict foreclosure consequences attach.

## T. The Empty Record Was the Product of Coordinated Asymmetry, Not Plaintiff's Failure

556.    Defendants will likely argue that Plaintiff failed to oppose summary judgment or failed to present evidence.

557.    That argument is false and inequitable.

558.    Plaintiff did not create the untested liability record.

559.    Deutsche Bank and its counsel created extreme institutional asymmetry by escalating to three major law firms, attacking Plaintiff's disability credibility, and pressing summary judgment during a protected medical access crisis.

560.    Brown created a representation vacuum by abandoning Plaintiff at the critical stage despite having her medical information and a $30,000 retainer.

561.    The trial court created procedural asymmetry by allowing Deutsche Bank to argue, supplement, and proceed while Plaintiff was muted, unrepresented, medically unable, and seeking accommodation.

562.    The appellate process failed to cure the defect.

563.    The untested liability record was the intended and foreseeable product of disability weaponization, fiduciary betrayal, asymmetric court access, post-hearing evidentiary supplementation, and institutional foreclosure pressure.

564.    Plaintiff alleges that Defendants are jointly and severally responsible to the extent permitted by law for the harms caused by that manufactured and untested liability record.

## U. Plaintiff's Injuries

565.    Plaintiff has suffered and continues to suffer severe injuries.

566.    Plaintiff faces imminent loss of her home.

567.    Plaintiff has suffered loss of meaningful access to court.

568.    Plaintiff has suffered loss of a meaningful opportunity to oppose summary judgment.

569.    Plaintiff has suffered loss of adversarial testing of Deutsche Bank's standing and enforcement proof.

570.    Plaintiff has suffered loss of counsel protection at the critical stage.

571.    Plaintiff has suffered reputational injury from public disability/candor accusations.

572.    Plaintiff has suffered dignitary injury, humiliation, and emotional distress.

573.    Plaintiff has suffered medical aggravation, cognitive overload, physical strain, and severe stress from repeated inaccessible filing and hearing burdens.

574. Plaintiff has suffered privacy and confidentiality injury from public docketing of private ADA communications.

575. Plaintiff has suffered financial injury from payments, fees, charges, costs, escrow misconduct, per-diem interest, litigation expenses, and foreclosure enforcement.

576. Plaintiff has suffered injury to property and equity.

577. Plaintiff has suffered injury from Brown's retention of fees, abandonment, and fiduciary breach.

578. Plaintiff has suffered injury from Deutsche Bank's concealment, fraud, unfair trade practices, and predatory mortgage enforcement.

579. Plaintiff seeks full compensatory, consequential, restitutionary, statutory, treble, punitive, equitable, injunctive, declaratory, fee-shifting, interest, and other relief as permitted by law.

## VI. CONTINUING CONDUCT AND NEED FOR FEDERAL RELIEF

580. The specific instances of misconduct alleged herein are not pleaded as an exhaustive list or isolated events. Rather, they represent a continuous, uniform, and systemic pattern and practice by Defendants and other participants during the relevant period. The full scope of those practices, including additional communications, filings, docketing acts, custody records, servicing records, and other documents, is presently within Defendants' possession or control and will be further developed through discovery. Upon

information and belief, Defendants utilized these methods during the relevant period, the full scope of which will be uncovered during discovery.

581.     The violations alleged herein are ongoing.

582.     Deutsche Bank continues to seek foreclosure consequences based on the Challenged Liability Posture.

583.     The law-firm and attorney defendants continue to benefit from the public-docket disability/candor narrative unless it is corrected, retracted, sealed, or adjudicated.

584.     Brown and Brown Law LLC continue to retain or benefit from fees paid for representation Plaintiff alleges was abandoned or betrayed.

585.     The Judicial Branch has not provided a meaningful remedy for the access violations.

586.     The appellate ADA process has not provided safe, confidential, effective access.

587.     No state court has adjudicated the threshold federal question whether the liability posture was produced through ADA-compliant and constitutionally meaningful access.

588.     Plaintiff has presented this precise federal question — whether the proceedings that produced the foreclosure liability posture were conducted in a manner accessible to a qualified disabled litigant under Title II and consistent with due process — to the Connecticut state court system at every level available to her, and at no point has any state court addressed that question on its merits. The supervisory petition raising this question was dismissed on Frimberger finality grounds without reaching it. On April 30, 2026, the Appellate Court accepted the certified transcript documenting the access failure into the record and dismissed the related appeal on finality grounds the same day, without

118

examining what the transcript showed. The Supreme Court denied certification without addressing the ADA question the petition presented.

589.     A state court judgment obtained through the violation of a litigant's rights under Title II of the Americans with Disabilities Act and the Due Process Clause of the Fourteenth Amendment is not insulated from federal scrutiny merely because a state court rendered it. Plaintiff alleges that no aspect of the foreclosure proceeding against her — not liability, not standing, not the debt calculation — has ever been adversarially tested. Summary judgment entered on a record Plaintiff was barred from opposing, through the access denial and disability-targeted defamation alleged throughout this Complaint; the debt calculation has never been the subject of any evidentiary hearing; and the appellate and Supreme Court proceedings that followed were dismissed on finality grounds without reaching any of these questions.

590.     Plaintiff does not ask this Court to sit in appellate review of a judgment that resulted from a tested, adversarial process, because no such process has ever occurred. Plaintiff asks this Court to adjudicate independent federal claims, never decided by any state court, arising from the denial of Plaintiff's federal rights throughout that untested process.

591.     The June 2, 2026 denial of Plaintiff's petition for certification to the Connecticut Supreme Court did not resolve the threshold ADA-access and due-process issues presented — the court denied certification without reaching those questions on the merits.

592.     A Motion for Reconsideration En Banc directed to the same issues was filed thereafter and returned on June 15, 2026 on a filing-category error (Docket SC 250444) — an additional instance of the ADA barrier described in Section Q — without adjudication of its substance. That motion was refiled within the seven-day period permitted by the

119

return notice. The state forum has therefore not provided, and on this record will not provide, a merits adjudication of the threshold federal claims asserted in this action.

593.     Every available avenue has been procedurally closed — on *Frimberger* finality grounds, on supervisory jurisdiction grounds, or on ADA filing-category grounds — without any court reaching the substance of Plaintiff's federal ADA and due-process arguments.

594.     Plaintiff has not failed to exhaust; the state system has refused to adjudicate. Further reliance on the state process would not merely delay relief — it would allow the very liability posture produced by the access denial Plaintiff challenges here to ripen into the irreversible loss of her home before any court reaches the underlying federal question.

595.     Plaintiff therefore seeks relief from this Court to prevent irreversible loss, vindicate federal rights, and award damages for independent misconduct.

596.     Plaintiff factual allegations above inform each count below, with each count's specific incorporation stated within that count.

597.     Plaintiff does not ask this Court to decide the ultimate validity of the mortgage, the amount of the debt, or the merits of any foreclosure defense. This action requires only a determination whether Plaintiff was denied meaningful disability-accessible process and whether Defendants may continue using the resulting non-adversarial liability posture before those federal access issues are adjudicated.

## VII. CAUSES OF ACTION

### COUNT I
### TITLE II OF THE AMERICANS WITH DISABILITIES ACT
Against Defendant Connecticut Judicial Branch

598.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

599.    Defendant Connecticut Judicial Branch is a public entity within the meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134.

600.    Plaintiff is a qualified individual with disabilities within the meaning of the ADA.

601.    Plaintiff's disabilities include cognitive, visual, auditory, and medical impairments that substantially limit major life activities, including communicating, processing information, participating in live adversarial proceedings, preparing complex legal submissions under time pressure, and safely accessing court services without accommodation.

602.    The Connecticut Judicial Branch operates the trial courts, appellate courts, Supreme Court filing systems, docketing systems, ADA accommodation process, court hearings, motion practice, foreclosure proceedings, appellate-review procedures, and related services, programs, and activities.

603.    Plaintiff was entitled to meaningful access to those services, programs, and activities.

604.    This Title II claim is pleaded as an access-to-courts claim arising from the denial, removal, or bypassing of disability accommodations at the time Plaintiff needed them. As of the November 17, 2025 summary-judgment hearing, Plaintiff's access need was not

121

merely a preference for written presentation. Plaintiff had already been qualified through the Judicial Branch ADA process, had already received an accommodation pausing proceedings requiring mental engagement, and had submitted medical documentation stating that she lacked the meaningful mental engagement necessary to participate in the work required to oppose summary judgment. Deutsche Bank filed and pursued summary judgment while that accommodation remained operative, then used a public disability/candor attack to undermine the very medical condition the ADA process had already recognized.

605.    The Title II violation is that the Judicial Branch and court process stripped, bypassed, or failed to honor that existing accommodation, proceeded with a dispositive hearing Plaintiff could not meaningfully access, refused meaningful counsel-protective time, muted or functionally silenced Plaintiff, allowed Deutsche Bank to argue and supplement, and entered a liability posture characterized as "unopposed" while Plaintiff was prohibited from being heard on the merits and denied any fair opportunity to oppose liability, identify disputed facts, test evidence, or respond to Deutsche Bank's post-hearing proof.

606.    The November 17, 2025 transcript confirms the mechanism of exclusion. Before the court unmuted Plaintiff's microphone, Deutsche Bank objected that Plaintiff should not be permitted to give what counsel called a "soliloquy of testimony." The court accepted that framing and limited Plaintiff's participation, but then permitted Deutsche Bank to argue factual and evidentiary matters central to liability, including the alleged absence of evidence as to Plaintiff's defenses and counterclaims, agency, unconscionability, limitations, rescission, note terms, and note possession. Deutsche Bank was also granted

post-hearing time to supplement standing proof. Plaintiff, by contrast, was prohibited from being heard on the merits, stripped of the practical benefit of the existing ADA pause on proceedings, cut off when she attempted to explain the access problem, and denied an opportunity to participate in the dispositive process, identify evidentiary disputes necessary to oppose liability, respond to the factual assertions, correct the record, test note-possession proof, address the counsel-abandonment emergency, or present the ADA access circumstances necessary to meaningful access. The court denied any meaningful opportunity to present the facts, exhibits, ADA-access circumstances, counsel-collapse facts, and evidentiary disputes necessary to oppose liability.

607.    The access injury was not limited to Plaintiff's inability to speak at one hearing. The Judicial Branch process allowed Deutsche Bank's disability/candor attack to destroy Plaintiff's credibility globally and then treated Deutsche Bank's narrative as if it were the only credible record. At the November 17, 2025 hearing, Deutsche Bank's counsel was permitted to represent that Plaintiff had no evidence supporting her defenses and counterclaims, no agency evidence, no unconscionability evidence, no timely claims, and no meaningful challenge to enforcement, even though those assertions were contradicted by pleadings, exhibits, and written submissions already before the court. Plaintiff, by contrast, was medically unable to respond in real time, asked the court to read her written materials, and sought time, counsel, and accommodation. The failure to honor or replace the existing ADA pause with an equivalent process allowed Deutsche Bank's false or misleading record narrative to become the court's liability posture.

608.    For the same reason, Plaintiff alleges that later denials of ADA-related overlength, written-access, motion-to-open, appellate, supervisory, and certification relief did not cure

123

the violation. Those later rulings proceeded from the same tainted credibility posture and did not provide a merits adjudication of whether the liability posture had been created through meaningful ADA-compliant access. The state process therefore did not merely make an adverse legal ruling; it allowed an exclusion-produced record to harden into foreclosure leverage while Plaintiff's contrary evidence remained untested.

609.    Plaintiff separately alleges that her current access needs are different from, but continuous with, the same disability-access injury. Plaintiff has since regained some capacity for mental engagement and written legal communication, but remains medically unable to participate safely in live, real-time adversarial oral proceedings. For present and future proceedings, a written-first protocol, protection from compelled live adversarial oral participation, and sufficient time to submit written materials are not preferences or tactical delays; they are the only medically safe means by which Plaintiff can obtain meaningful access to court.

610.    Connecticut courts already decide matters on the papers, receive written submissions, take affidavits, consider documentary evidence, and manage proceedings without live oral participation where appropriate.

611.    Plaintiff repeatedly requested accommodations, including continuation of her existing ADA pause for proceedings requiring mental engagement, stays or continuances of participation-dependent proceedings, time to obtain counsel, protection from live adversarial hearings, and as her medical condition evolved, a written-only access process that would allow her to submit materials in the only medically safe form available. Plaintiff sought equivalent access through existing procedural mechanisms, not a fundamental alteration of the court system.

612. The Judicial Branch knew of Plaintiff's disabilities and accommodation needs through Plaintiff's ADA requests, medical submissions, motions, emergency filings, and repeated statements that she could not safely participate in live or high-cognitive-load proceedings.

613. The Judicial Branch nevertheless failed to provide meaningful access.

614. Plaintiff alleges that the Judicial branch violated Title II in multiple, specific ways. Plaintiff requested disability accommodation; was qualified through the ADA process; had already received an accommodation pausing proceedings requiring mental engagement; and had submitted medical documentation confirming the disability-related limitations that made participation-dependent summary-judgment proceedings unsafe and inaccessible.

615. The Judicial Branch then stripped, bypassed, or failed to honor that accommodation after Defendants attacked Plaintiff's disability candor, without a hearing, without individualized analysis, without testing whether the existing accommodation remained necessary, without offering an equally effective alternative modification, without protecting Plaintiff from live-adversarial asymmetry, and without articulating why written access or a continued pause would fundamentally alter the court's service, program, or activity. Plaintiff alleges that this was especially unreasonable because courts regularly decide motions on written submissions, receive affidavits and exhibits, manage cases on the papers, and use written procedures without eliminating adjudication or preventing any party from presenting evidence or argument.

616. The Judicial Branch allowed summary-judgment proceedings to proceed while Plaintiff was medically unable to participate meaningfully, unrepresented or functionally abandoned by counsel, and actively seeking accommodation.

617.     By November 17, 2025, the Judicial Branch had actual, contemporaneous knowledge of why Plaintiff appeared unrepresented. Deutsche Bank's November 5 filing, Brown's November 10 promise and November 11 reversal, and the unauthorized brief filed and withdrawn on November 14 and 15 were all matters of record before the court by the time of the hearing, through Plaintiff's own emergency filings seeking a continuance and accommodation in the days immediately preceding it. The Judicial Branch therefore did not merely fail to anticipate that Plaintiff would be unrepresented — it proceeded with full knowledge of the specific sequence that produced that result, and with Plaintiff's own contemporaneous request for the time and accommodation that sequence made necessary.

618.     The Judicial Branch allowed Plaintiff to be muted, barred, cut off, or functionally silenced while Deutsche Bank and its counsel were permitted to argue and later supplement their proof.

619.     The Judicial Branch failed to provide Plaintiff a meaningful ADA-compliant opportunity to be heard before liability was entered; failed to protect the existing ADA pause for proceedings requiring Plaintiff's mental engagement; failed to continue the matter when Plaintiff appeared without effective counsel protection; failed to allow Plaintiff to present the facts, exhibits, ADA-access circumstances, counsel-collapse facts, and evidentiary disputes necessary to oppose liability; and failed to give Plaintiff any fair opportunity to test or respond to Deutsche Bank's post-hearing standing proof.

620.     The Judicial Branch treated the resulting empty record as if Plaintiff had simply failed to oppose, although the emptiness of the record was caused by the denial or failure of accommodation.

621.    The Judicial Branch further denied meaningful access when the trial court denied Plaintiff's request for an ADA stay and mandatory accommodation as a "fundamental alteration" of its process while strict foreclosure remained pending.

622.    That ruling did not merely deny a scheduling request. It treated the accommodation Plaintiff required for meaningful access as structurally unavailable, while simultaneously directing Plaintiff to seek review only after final judgment.

623.    Plaintiff alleges that this placed her in an impossible position: the court denied the accommodation necessary for participation, preserved the foreclosure posture against her, and left strict-foreclosure consequences available before any court adjudicated the threshold federal ADA-access question.

624.    The Judicial Branch permitted foreclosure liability to be entered and strict-foreclosure consequences to advance based on a record produced through disability exclusion.

625.    The Judicial Branch further denied meaningful access by failing to provide a safe, confidential ADA process at the appellate/Supreme Court level.

626.    Plaintiff submitted private ADA communications for accommodation purposes. Those communications were not intended as public pleadings and were not authorized by Plaintiff for public docketing.

627.    The public docketing of private ADA communications exposed disability-access communications to adverse parties and the public, compounded the disability/candor defamation, and chilled Plaintiff's ability to seek further accommodations candidly.

628.    The Judicial Branch also denied meaningful appellate access through filing barriers, rejection or redirection of disability-related filings, and procedural gatekeeping

that imposed severe cognitive and physical burdens on an eighty-eight-year-old disabled litigant.

629.     The Judicial Branch also denied meaningful access by maintaining or permitting an appellate ADA process in which Plaintiff's disability-access communications, e-filing category problems, routing requests, and accommodation needs were handled through a process intertwined with filing gatekeeping, docket rejection, and public docketing. Plaintiff requested disability-related routing assistance and flexibility because the appellate e-filing categories were incomplete, confusing, and not safely navigable for her. Instead of providing a safe and neutral access channel, the process repeatedly returned, rejected, redirected, or publicly docketed disability-related materials, including materials submitted under "Other Document," thereby burdening Plaintiff's access, chilling candid ADA communications, and preventing meaningful appellate review before strict-foreclosure consequences could attach.

630.     Those filing barriers were especially harmful because Plaintiff had specifically notified the Judicial Branch that the appellate e-filing categories and routing options were inaccessible to her because of disability and that she needed a designated contact, flexibility, and routing assistance to prevent disability-caused filing errors from defeating access. Plaintiff alleges that the limited electronic event-code system imposed a barrier that would not exist for an in-person filer at the clerk's counter, where a clearly titled filing could be accepted without forcing the filer to choose from incomplete electronic categories.

631.     These failures were not isolated clerical inconveniences. They were access barriers.

632.     Plaintiff was excluded from participation in, denied the benefits of, and subjected to discrimination in the Judicial Branch's services, programs, and activities by reason of disability.

633.     The Judicial Branch's acts and omissions caused Plaintiff concrete access-to-courts injury before strict foreclosure entered. Plaintiff lost meaningful litigation opportunity, lost disability-accessible participation in the summary judgment process, lost the opportunity to oppose summary judgment, lost adversarial testing of Deutsche Bank's standing and foreclosure proof, lost the opportunity to present and preserve defenses, counterclaims, recoupment, setoff, and evidentiary objections, and was forced into a foreclosure liability posture characterized as "unopposed" because the access process failed.

634.     As a direct and proximate result, Plaintiff suffered compensable injury, including the lost value of the litigation opportunity denied by disability-based exclusion; the lost value of defenses, counterclaims, recoupment, setoff, and foreclosure-avoidance claims Plaintiff was denied a meaningful opportunity to present; litigation prejudice; expenses incurred attempting to obtain access and prevent foreclosure enforcement; foreclosure-enforcement exposure created by the access-denied record; dignitary injury; reputational harm; medical aggravation; privacy injury; litigation prejudice, and imminent loss of her home equity, possession, title, property rights if that record is converted to strict foreclosure.

635.     The lost litigation opportunity has measurable economic value. Plaintiff alleges that the defenses, counterclaims, standing challenges, recoupment, setoff, accounting disputes, predatory-origination defenses, and foreclosure-avoidance claims she was denied a meaningful opportunity to litigate were not speculative. They concerned enforcement of a

mortgage against high-value real property, substantial claimed equity, disputed standing and chain-of-title issues, alleged predatory origination and servicing misconduct, and the threatened conversion of an access-denied liability posture into strict-foreclosure relief. Plaintiff seeks damages for the economic value of the opportunity lost through disability-based exclusion, together with additional consequential property, equity, possession, and litigation losses if strict foreclosure proceeds before meaningful access is restored.

636.     Plaintiff's lost litigation opportunity satisfies the access-to-courts injury requirement because Plaintiff had documented disability-related limitations, the Connecticut Judicial Branch knew of those limitations, the courts continued participation-dependent procedures without meaningful written-first access, and that barrier and exclusion impaired or destroyed Plaintiff's ability to litigate nonfrivolous and arguable defenses, counterclaims, recoupment, setoff, standing challenges, debt objections, appraisal and valuation objections, equity arguments, and foreclosure-avoidance claims before the Challenged Liability Posture could be converted into strict foreclosure.

637.     Plaintiff seeks compensatory damages to the extent permitted by Title II, declaratory relief, injunctive relief, sealing and correction of unauthorized public ADA docketing, accessible written procedures, preservation of the status quo, and all other relief available by law or equity.

**COUNT II**
**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT**
**29 U.S.C. § 794**
Against Defendant Connecticut Judicial Branch

638.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI and Count I above as if fully set forth herein.

639.    Defendant Connecticut Judicial Branch receives federal financial assistance, including federal grant funding administered through state court improvement programs, and is therefore a "program or activity" within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).

640.    Plaintiff is a qualified individual with a disability within the meaning of 29 U.S.C. § 705(20), for the same reasons and based on the same documented cognitive, visual, auditory, and medical impairments alleged in Count I.

641.    Section 504 provides that no qualified individual with a disability shall, solely by reason of her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. Plaintiff was excluded from participation in the dispositive summary judgment proceeding, denied the benefit of the accommodations previously recognized by the Trial Court, and subjected to discrimination in the form of accelerated proceedings timed to coincide with the withdrawal of those accommodations, solely by reason of her disability.

642.    Plaintiff's Section 504 injury has already occurred even though strict foreclosure has not yet entered. The injury is the disability-based exclusion from meaningful participation in the adjudicative process that fixed the foreclosure liability posture against

Plaintiff. Plaintiff lost the opportunity to oppose summary judgment in an accessible process, test Deutsche Bank's standing and foreclosure proof, present and preserve defenses and counterclaims, preserve recoupment and setoff rights, respond to post-hearing supplementation, and prevent the creation of an "unopposed" foreclosure liability posture.

643.  Plaintiff alleges that the Judicial Branch acted with deliberate indifference to Plaintiff's federally protected rights under Section 504. The Judicial Branch had actual notice of Plaintiff's disability, medical limitations, accommodation needs, existing ADA accommodation history, counsel-collapse circumstances, and inability to participate meaningfully in the live or high-cognitive-load proceedings required to oppose summary judgment. Despite that notice, the Judicial Branch allowed the participation-dependent dispositive process to proceed, failed to provide an equivalent written or otherwise accessible opportunity to respond, permitted Deutsche Bank to argue and supplement its proof without comparable accessible response access, and treated the resulting access-denied record as a failure to oppose.

644.  As a direct and proximate result, Plaintiff suffered compensable injury under Section 504, including the lost value of the litigation opportunity denied by disability-based exclusion; the lost value of defenses, counterclaims, recoupment, setoff, standing challenges, and foreclosure-avoidance claims Plaintiff was denied a meaningful opportunity to present; litigation prejudice; expenses incurred attempting to obtain access and prevent foreclosure enforcement; foreclosure-enforcement exposure created by the access-denied record; and imminent loss of home equity, possession, title, and property rights if that record is converted into strict foreclosure. If strict-foreclosure consequences proceed before meaningful access is restored, Plaintiff seeks damages for the additional

132

property, equity, possession, litigation, and consequential economic losses proximately caused by converting the access-denied record into foreclosure enforcement.

645.    The conduct alleged throughout this Complaint — denial of accommodations, exclusion from the dispositive hearing, and the manufactured "unopposed" liability record — independently violates Section 504, in addition to and on the same factual basis as the Title II violations alleged in Counts I through V.

646.    The November 17, 2025 transcript confirms that the exclusion was not theoretical. Before Plaintiff was heard on the merits, Deutsche Bank objected that Plaintiff should not be permitted to give what counsel called a "soliloquy of testimony." The court accepted that framing, limited Plaintiff's participation, and then allowed Deutsche Bank to argue factual and evidentiary matters central to liability, including the alleged absence of evidence as to Plaintiff's defenses and counterclaims, agency, unconscionability, limitations, rescission, Plaintiff's knowledge, note terms, and note possession. Deutsche Bank was also granted post-hearing time to supplement standing proof. Plaintiff, by contrast, was prohibited from being heard on the merits, stripped of the practical benefit of the existing ADA pause, cut off when she attempted to explain the access problem, and denied any meaningful opportunity to present the facts, exhibits, ADA-access circumstances, counsel-collapse facts, and evidentiary disputes necessary to oppose liability.

647.    The exclusion alleged here is not incidental to some other, non-disability-related cause; the Trial Court's own orders and the timeline alleged throughout this Complaint establish that disability status was the direct and proximate cause of Plaintiff's exclusion from meaningful participation and meaningful litigation opportunity.

648.     Section 504 and Title II of the ADA impose materially identical substantive standards, and Plaintiff pleads this count independently of Counts I through III because Section 504 provides an independent statutory basis for relief, with its own remedial framework, that does not depend on Title II's "public entity" analysis and is not subject to the same potential defenses.

649.     The economic harm caused by the Section 504 exclusion is not speculative. The foreclosure proceedings concern high-value real-property interests, claimed home equity, disputed foreclosure liability, disputed standing and enforcement proof, defenses and counterclaims, recoupment and setoff rights, accounting disputes, and foreclosure-avoidance relief. Plaintiff seeks compensatory damages for the lost value of the meaningful litigation opportunity denied by disability-based exclusion and, if strict foreclosure proceeds before meaningful access is restored, for additional property, equity, possession, litigation, and consequential economic losses proximately caused by converting the access-denied record into foreclosure enforcement.

650.     As a direct and proximate result of Defendant's violation of Section 504, Plaintiff suffered exclusion from merits participation at the dispositive hearing, loss of the practical benefit of the existing ADA pause, entry and ongoing use of the resulting liability posture, loss of adversarial testing, litigation prejudice, medical aggravation, reputational and dignitary harm, privacy injury, imminent property loss, and all consequential harm flowing from that posture, as alleged throughout this Complaint.

651.     Plaintiff seeks compensatory damages to the extent permitted by Section 504, declaratory relief, injunctive relief, sealing and correction of unauthorized public ADA docketing, safe and confidential ADA procedures, a written/no-live adversarial oral

participation access protocol, preservation of the status quo, and all other relief available under 29 U.S.C. § 794a and governing law.

**COUNT III**
**ADA INTERFERENCE, RETALIATION, COERCION, AND INTIMIDATION**
**42 U.S.C. § 12203**
Against Deutsche Bank, McCarter, Hinshaw, Brock & Scott, Swanson, Mahabamunuge, Milne, Fredericks, Brown, Brown Law LLC, Keane, and John Doe Defendants as Applicable

652.     Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

653.     Plaintiff engaged in protected activity under the ADA by requesting accommodation, submitting disability-related medical information to the court/ADA process, relying on the existing ADA pause for proceedings requiring her mental engagement, and seeking continuation of that protection while summary-judgment opposition and other participation-dependent proceedings were pending.

654.     Defendants knew Plaintiff had invoked ADA rights.

655.     Deutsche Bank, Brock, McCarter, Hinshaw, Swanson, Mahabamunuge, Milne, Fredericks, and other participating counsel interfered with Plaintiff's ADA rights by publicly attacking her disability candor and using protective disability-related filings from New Jersey as purported evidence that Plaintiff was dishonest and lacked candor to the court.

656.     That attack materially misrepresented the record.

657.    The New Jersey certifications were lawyer-drafted protective filings seeking relief from compelled deposition and live adversarial testimony because Plaintiff lacked the medical engagement necessary for that process.

658.    Plaintiff's execution of those certifications was not evidence that Plaintiff could safely oppose summary judgment, participate in live hearings, or proceed without ADA accommodation in Connecticut.

659.    The interference succeeded. Plaintiff alleges that Defendants' false disability/candor narrative foreseeably caused or contributed to the court's denial, disregard, or hostile treatment of Plaintiff's later ADA requests, written-access requests, stay requests, continuance requests, reconsideration requests, and emergency filings. By converting documented disability into a credibility attack, Defendants impaired Plaintiff's ability to obtain meaningful accommodations and caused the court process to treat access requests as suspect litigation conduct.

660.    The interference was successful because it destroyed Plaintiff's credibility globally. Defendants did not merely disagree with an accommodation request; they transformed protected disability-access activity into a public accusation that Plaintiff was dishonest. That accusation then interacted with Deutsche Bank's false professional-identity narrative, which portrayed Plaintiff as a sophisticated mortgage insider rather than an elderly disabled consumer victim of predatory origination and financial exploitation. Together, those narratives made Plaintiff's ADA requests, submissions, motion-to-open evidence, emergency filings, and foreclosure defenses appear suspect before they were ever adjudicated on the merits. Plaintiff alleges that this credibility destruction caused or contributed to the denial, discounting, or hostile treatment of later ADA requests, written-

access requests, overlength requests, motion-to-open submissions, appellate filings, and emergency supervisory filings.

661. The November 17, 2025 hearing shows the practical effect of the interference. Once Plaintiff's disability candor had been publicly attacked and her counsel protection had collapsed, Deutsche Bank was permitted to frame the hearing as a record with "no evidence," while Plaintiff was prohibited from being heard on the merits and stripped of the practical benefit of her existing ADA protection. Plaintiff alleges that the disability/candor attack therefore did not merely injure her reputation; it materially changed how the court processed her ADA accommodation need, treated her request for protection from participation-dependent proceedings, restricted her ability to oppose liability, and accepted Deutsche Bank's one-sided factual narrative.

662. The success of the interference is not speculative. The record sequence shows that after Defendants publicly branded Plaintiff's disability-access filings as dishonest, Plaintiff's previously recognized ADA protection was eliminated or denied in operative effect; Plaintiff was required to face a dispositive liability-judgment hearing while medically unable to participate safely, unrepresented, and seeking continuation of her existing ADA accommodation pause on proceedings; Plaintiff was prohibited from being heard on the merits and denied any fair opportunity to oppose or respond; and Deutsche Bank obtained a liability posture characterized as "unopposed." The disability/candor attack therefore functioned exactly as an ADA-interference device: it converted protected accommodation activity into supposed misconduct and then used that false premise to defeat the access rights the ADA protected.

137

663.    Defendants cannot avoid ADA-interference liability by labeling the disability/candor attack as litigation advocacy. Plaintiff alleges that Defendants intentionally weaponized public court filings as the mechanism of interference: they took protected ADA-access activity and disability-protective filings, maliciously inverted it into an accusation of dishonesty, placed that fabrication on the public docket, and used it to defeat accommodation, destroy personal and medical credibility, foreclose counsel access, and eliminate meaningful participation.  The litigation privilege does not protect a targeted campaign to strip a disabled litigant of federal civil protections.

664.    To whatever extent Connecticut's litigation privilege doctrine might otherwise be invoked, a state-created evidentiary or litigation privilege cannot be applied in a manner that defeats a federally created right of action or frustrates the purpose of the federal statute creating it. Congress enacted 42 U.S.C. § 12203 specifically to prohibit interference with and retaliation against individuals exercising rights protected by the ADA. Plaintiff alleges that applying a state common-law privilege to immunize the precise conduct Congress identified as prohibited interference would subordinate the federal right to a state-law doctrine never intended to reach it, and that no rule of state law can be applied so as to extinguish a federal cause of action Congress created for the very harm alleged here.

665.    The use of a court filing as the vehicle for interference does not transform disability retaliation or coercion into protected conduct.

666.    By converting Plaintiff's protected disability-access materials into a public accusation of dishonesty, these Defendants interfered with, coerced, intimidated, and retaliated against Plaintiff in the exercise of ADA rights.

667.    Brown and Brown Law LLC further interfered with Plaintiff's ADA rights by adopting, repeating, amplifying, or validating the disability/candor attack despite Brown's possession or knowledge of Plaintiff's medical records and accommodation needs.

668.    Brown's conduct was especially harmful because he was Plaintiff's attorney, owed Plaintiff fiduciary duties, and knew the disability/candor attack was being used to strip or bypass Plaintiff's access protections.

669.    Deutsche Bank's counsel knew, or had explicit reason to know, that publicly branding an 88-year-old disabled litigant of dishonesty regarding her own medical realities on a public docket would not merely affect this proceeding — it would act as a toxic deterrent, effectively foreclosing Plaintiff's ability to obtain any substitute legal representation. An accusation of dishonesty toward the court, signed by four separate officers of the court and her own counsel, once on the public docket, follows a litigant and deters competent counsel from accepting representation, particularly on short notice before a dispositive hearing. Deutsche Bank's counsel had every incentive to secure this consequence: an unrepresented, disabled, 88-year-old litigant facing a dispositive hearing alone is the exact scenario required to maximize the likelihood of a manufactured, uncontested judgment. This was not a collateral consequence of advocacy. It was an intentional structural layout designed to win by default.

670.    Keane and/or John Doe appellate ADA or docketing personnel interfered with Plaintiff's ADA rights by placing private ADA communications on the public docket without authorization and by imposing filing barriers that chilled and burdened Plaintiff's access to appellate ADA review.

139

671. Each Defendant is liable under this count only for the ADA-interference, retaliation, coercion, intimidation, authorization, ratification, republication, implementation, filing, docketing, or substantial-assistance acts personally committed, authorized, ratified, adopted, implemented, filed, docketed, republished, or substantially assisted by that Defendant, as alleged above and as discovery will further show.

672. Defendants' conduct would deter a reasonable disabled litigant from invoking ADA rights, seeking accommodation, communicating candidly with ADA personnel, filing disability-related emergency papers, or continuing to pursue accessible court review.

673. Plaintiff was especially vulnerable to deterrence and harm because she was eighty-eight years old, medically fragile, cognitively impaired, and facing foreclosure of her home.

674. Defendants' conduct caused Plaintiff severe injury, including loss of meaningful accommodation, loss of counsel protection, loss of the ability to oppose summary judgment, reputational harm, dignitary harm, emotional distress, physical and cognitive strain, privacy injury, litigation prejudice, and imminent property loss.

675. Plaintiff seeks compensatory damages, punitive damages where available, declaratory relief, injunctive relief, sealing/correction relief, public retraction or correction of the disability/candor narrative, attorney's fees, costs, and all other relief available by law or equity.

**COUNT IV**
**DENIAL OF PROCEDURAL DUE PROCESS AND ACCESS TO COURTS**
**42 U.S.C. § 1983 / FOURTEENTH AMENDMENT**
For Prospective Declaratory and Injunctive Relief Against Official-Capacity Defendants
Including Judge Regan and Keane, and Against John Doe Officials as Applicable

676.     Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

677.     Plaintiff has constitutionally protected property interests in her home, equity, redemption rights, property rights, her right to be heard, and her right to a meaningful opportunity to present defenses and claims before foreclosure consequences attach.

678.     Plaintiff also has constitutional rights to due process and meaningful access to the courts.

679.     The state-court process deprived Plaintiff of meaningful access before entering and advancing a foreclosure liability posture.

680.     Plaintiff repeatedly requested accommodation, stay, continuance, counsel-protective time, preservation of the existing ADA pause, and protection from participation-dependent proceedings requiring mental engagement she could not safely perform. Those requests were denied, ignored, deferred, or bypassed at critical stages.

681.     The trial court proceeded with liability-only summary judgment despite the existing ADA pause, despite Plaintiff's request for accommodation and counsel-protective time, and despite the fact that Plaintiff had been stripped of the protection necessary to be heard before liability was entered.

682.     By the time of the November 17, 2025 hearing, the trial court had before it Plaintiff's own emergency filings describing the sequence that had left her unrepresented:

Deutsche Bank's November 5 filing attacking her disability candor, Brown's November 10 promise of a neutral withdrawal followed by his November 11 filing branding her untruthful, and the unauthorized brief filed and withdrawn on November 14 and 15. The court therefore did not proceed in ignorance of why the record was empty. It proceeded with that sequence on the record, and with Plaintiff's own contemporaneous request for the time and accommodation the sequence had made necessary, and entered summary judgment regardless.

683.    Plaintiff was muted, barred, cut off, or functionally silenced while Deutsche Bank argued.

684.    Deutsche Bank was allowed to supplement its proof after the hearing.

685.    Plaintiff was not afforded a meaningful opportunity to be heard on the merits, to preserve the existing ADA pause, to obtain protection from the counsel-collapse emergency, to present her access objections, to identify disputed facts and exhibits, or to respond to Deutsche Bank's factual and evidentiary narrative before liability was entered.

686.    The resulting "unopposed" label was therefore not a neutral consequence of ordinary litigation default. It was the product of the very access failure challenged here: Plaintiff had requested accommodation and counsel-protective time, had an existing ADA pause for participation-dependent proceedings, was muted or functionally silenced, and was prohibited from merits participation while Deutsche Bank was permitted to argue facts, argue the alleged absence of facts, and supplement standing proof. Treating that posture as a valid adversarial liability determination would convert the denial of access into the basis for extinguishing Plaintiff's property rights.

687.    The court then treated the one-sided record as if Plaintiff had failed to oppose on the merits.

688.    Plaintiff alleges that this converted disability into default.

689.    The trial court also entered summary-judgment relief on two separate motions, including one based on a superseded or moot pleading, creating contradictory or defective liability orders.

690.    The appellate process did not cure the deprivation because Plaintiff's emergency supervisory, appellate, and Supreme Court filings were rejected, dismissed, or procedurally disposed of without adjudication of the threshold federal access issue.

691.    Plaintiff alleges that continued use of the Challenged Liability Posture to impose strict foreclosure would deprive her of property without due process of law.

692.    The February 25, 2026 order compounded the due-process injury by denying the accommodation necessary for Plaintiff to participate, characterizing that accommodation as a "fundamental alteration" of the court's process, and directing Plaintiff to seek review only after final judgment, while strict-foreclosure consequences remained available.

693.    That structure deprived Plaintiff of a meaningful pre-deprivation opportunity to be heard because it preserved the liability posture and foreclosure threat while denying the only participation method her disabilities permitted.

694.    Plaintiff's denial of access was not limited to the November 17, 2025 hearing. Following entry of summary judgment as to liability, Plaintiff opposed Deutsche Bank's motion for strict foreclosure in a filing that exceeded the court's standard page limit because Plaintiff's disability prevented her from condensing her defenses into the standard format, and Plaintiff included within that filing an explicit request for accommodation on that basis.

143

The trial court denied the filing for exceeding the page limit, without reaching its substance, including evidence Plaintiff had presented that Deutsche Bank's sworn debt calculation included tax advances that the official municipal record showed had not been paid. Plaintiff thereafter timely moved to open the judgment within the statutory period and attached her overlength opposition as an exhibit, specifically to ensure the substance would be considered. The trial court denied that motion as well, without ever reaching the evidence within it. Plaintiff appealed that denial, giving rise to the appellate-level access failures described in Section V above. Strict foreclosure has not yet entered. Plaintiff alleges that being denied any meaningful opportunity to test Deutsche Bank's debt calculation before strict foreclosure may enter is itself a denial of meaningful access, independent of what that evidence might ultimately show.

695.    No court has ever held an evidentiary hearing on the accuracy of Deutsche Bank's debt calculation, including the tax-advance discrepancy described above, the per diem interest figure, or the underlying principal and escrow amounts. The summary judgment entered as to liability did not adjudicate, and was not required to adjudicate, the specific dollar amount Deutsche Bank claims or the reliability of the sworn calculations underlying it. Plaintiff seeks only the opportunity to have that calculation tested through a fair, ADA-compliant process before any further consequence attaches to it; Plaintiff does not ask this Court to determine, in the first instance, what the correct debt amount is or whether Deutsche Bank is entitled to foreclose.

696.    A later appeal cannot recreate the lost opportunity to oppose summary judgment through an accessible written process, test post-hearing standing evidence, obtain counsel protection, or prevent strict-foreclosure consequences before they attach.

144

697.    Plaintiff seeks prospective declaratory and injunctive relief preventing enforcement of the Challenged Liability Posture as a predicate for strict foreclosure, title transfer, law-day enforcement, possession, debt calculation, preclusion, adverse inference, or any further enforcement consequence because it was produced without meaningful ADA-compliant access, without counsel protection, and without adversarial testing. Plaintiff is entitled to meaningful ADA-compliant access, written procedures, time to obtain counsel, and a fair opportunity to test Deutsche Bank's standing, chain, and enforcement proof.

698.    Plaintiff does not seek damages from Judge Regan for judicial acts in this count.

699.    Plaintiff seeks prospective relief only against appropriate official-capacity defendants and all relief permitted under federal law.


**COUNT V**
**DECLARATORY AND INJUNCTIVE RELIEF**
**28 U.S.C. §§ 2201–2202 AND FED. R. CIV. P. 57 AND 65,**

Against All Defendants as Applicable

700.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI, and the violations alleged in Counts I through IV, above, as if fully set forth herein.

701.    Declaratory relief alone would not provide Plaintiff an adequate remedy as to the conduct described above. The same court that produced the Challenged Liability Posture retains ongoing authority over the proceeding in which strict foreclosure is sought.

702.    A declaration that the Challenged Liability Posture was produced without meaningful ADA-compliant access would not, by itself, prevent that same court from continuing to rely on it, advance it, or enter further orders giving it effect.

145

703. Plaintiff alleges that injunctive relief — an order restraining further reliance on, or enforcement of, the Challenged Liability Posture — is necessary because declaratory relief standing alone would be inadequate to prevent the ongoing harm described in this Complaint.

704. To the extent any limitation on injunctive relief against judicial officers for acts taken in a judicial capacity applies, Plaintiff alleges that declaratory relief is, for the reasons stated above, an inadequate remedy, and that injunctive relief is therefore available under the recognized exception to that limitation.

705. An actual controversy exists between Plaintiff and Defendants concerning the legality, enforceability, and constitutional usability of the state-court foreclosure liability posture.

706. Deutsche Bank seeks to use that liability posture to obtain strict foreclosure and title-transfer consequences.

707. Plaintiff alleges that the liability posture was produced through disability exclusion, denial of ADA access, counsel abandonment, public disability defamation, post-hearing evidentiary patching, and lack of meaningful adversarial testing.

708. Plaintiff further alleges that Deutsche Bank's claimed enforcement rights are defective, void, voidable, equitably barred, or subject to restitution, disgorgement, offset, recoupment, and other defenses arising from the poisoned mortgage chain.

709. Plaintiff seeks a declaration that Defendants may not use the Challenged Liability Posture as a predicate for strict foreclosure title transfer, law-day enforcement, possession, debt calculation, preclusion, adverse inference, or any further enforcement consequence

because it was produced without meaningful ADA-compliant access, without counsel protection, and without adversarial testing.

710.    Plaintiff does not ask this Court, through this count, to calculate any alleged debt, determine the ultimate merits of foreclosure, decide who is entitled to prevail on the mortgage, or substitute its judgment for valid state-court adversarial adjudication. Plaintiff seeks only prospective, status-preserving relief barring further reliance on a liability posture that was created without meaningful ADA-compliant access, without counsel protection, without an equivalent opportunity to oppose or respond, and without adversarial testing of Deutsche Bank's standing, chain, alleged debt, and enforcement proof.

711.    Plaintiff seeks a declaration that public docketing of private ADA communications without authorization violated Plaintiff's rights and must be sealed, corrected, or remedied.

712.    Plaintiff seeks a declaration that the public disability/candor narrative was false, materially misleading, and unlawfully interfered with Plaintiff's ADA access.

713.    Plaintiff seeks a temporary restraining order, preliminary injunction, and permanent injunction preserving the status quo, preventing strict foreclosure consequences, preventing transfer of title, preventing enforcement of law days, and barring further use of the Challenged Liability Posture until this Court adjudicates Plaintiff's federal rights.

714.    Plaintiff has no adequate remedy at law because loss of her home, loss of meaningful access, and foreclosure based on the Challenged Liability Posture cannot be fully remedied by money damages alone.

715.    Plaintiff is likely to suffer irreparable harm absent immediate relief.

716.    The balance of equities favors Plaintiff because Defendants seek to profit from a record produced through denial of meaningful access.

147

717.     The public interest favors enforcement of ADA access, due process, accurate foreclosure records, honest court filings, and protection of disabled litigants from public disability defamation.

## COUNT VI
## FRAUD, FRAUDULENT CONCEALMENT, AND FRAUDULENT FORECLOSURE ENFORCEMENT
Against Deutsche Bank, McCarter, Hinshaw, Brock & Scott, Swanson, Mahabamunuge, Milne, Fredericks, Knickerbocker, and John Doe Defendants as Applicable

718.     Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

719.     Plaintiff pleads fraud and fraudulent concealment with particularity to the extent the facts are presently available before discovery. The fraudulent conduct alleged in this Count falls into four categories: (1) origination-chain fraud, including the fabricated $50,000 monthly income figure, phantom cash-out proceeds, negative-amortization structure, lender-paid broker steering, and concealment of Shallo/YSP misconduct; (2) acquisition and enforcement fraud, including Deutsche Bank's 2021 acquisition and enforcement of the AHM 2007-1 instrument while possessing institutional knowledge from its own 2017 DOJ materials concerning AHM stated-income defects, elderly fixed-income borrower red flags, and the specific AHM 2007-1 trust; (3) foreclosure-proof fraud, including the note-possession, chain-of-custody, assignment, debt-calculation, tax-advance, and post-hearing evidentiary-patching allegations; and (4) access-related fraud, including the public disability/candor narrative used to disable Plaintiff's ability to oppose summary judgment and create a non-adversarial record. The dates, documents,

148

actors, filings, statements, and omissions supporting these categories are identified throughout Sections I through VI and in the paragraphs of this Count; additional internal communications, servicing records, custodial records, law-firm communications, trust records, and assignment records are within Defendants' possession and will be obtained through discovery.

720.    Plaintiff pleads this count against each Defendant only for the fraudulent statements, omissions, filings, affidavits, representations, concealments, republications, transmissions, or foreclosure-enforcement acts that Defendant personally made, signed, filed, served, transmitted, authorized, ratified, adopted, relied upon, or substantially assisted, as alleged in Sections I through VI above. Plaintiff does not allege that every Defendant committed every fraudulent act. Rather, Plaintiff alleges separate but related categories of fraudulent misconduct, including Deutsche Bank's alleged concealment and enforcement of a poisoned mortgage chain despite knowledge or notice of origination, trust-transfer, standing, predecessor-liability, and DOJ/RMBS defects; the law-firm and attorney Defendants' alleged filing, transmission, ratification, reliance upon, or republication of materially false or misleading foreclosure-enforcement representations; the disability/candor and professional-identity narratives allegedly used to make Plaintiff's inability to participate appear self-inflicted; the post-hearing standing and note-possession representations, including Defendant Knickerbocker's alleged November 17, 2025 representation concerning physical possession of the original note; and the continued effort to use the resulting Challenged Liability Posture for strict-foreclosure leverage.

721.    Deutsche Bank and its counsel represented, expressly or impliedly, that Deutsche Bank had clean, enforceable foreclosure rights.

149

722.    This count does not rest on the mere fact that Defendants took legal positions adverse to Plaintiff in foreclosure litigation. Plaintiff alleges fraud because Defendants used specific false or materially misleading factual representations and omissions to create a false picture of enforceability, standing, disability candor, professional identity, note possession, debt reliability, and Deutsche Bank's own institutional knowledge of the trust and loan category it was enforcing. Those representations and omissions were material because they caused or contributed to the denial of meaningful access, the absence of an adversarial opposition record, the post-hearing supplementation procedure, the entry of a liability posture characterized as "unopposed," and the ongoing attempt to convert that posture into strict-foreclosure consequences.

723.    Deutsche Bank and its counsel represented, expressly or impliedly, that Deutsche Bank's standing, note-possession, assignment, trust, predecessor, and enforcement proof were sufficient and reliable.

724.    Deutsche Bank and its counsel concealed, omitted, or minimized material facts concerning the poisoned origination chain, Shallo/YSP broker inducement, defective trust-transfer theory, 2021 assignment into a 2007 securitized trust, WaMu/subrogation predecessor exposure, and missing competent wet-ink note-possession proof. Among the facts concealed: AHM 2007-1 — the very trust on whose behalf this foreclosure was brought — is named in Annex 3 of Deutsche Bank's own December 2017 settlement agreement with the United States Department of Justice, which Deutsche Bank acknowledged and which documents that Deutsche Bank securitized over 400,000 subprime and Alt-A loans through knowing or reckless misrepresentation to investors and rating agencies, paid $3.1 billion in civil penalties under the Financial Institutions Reform,

Recovery, and Enforcement Act, and committed to $4.1 billion in consumer relief, in exchange for release of claims the United States itself identified as potentially arising under FIRREA, the False Claims Act, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq. — the same statute underlying Counts IX and X below.

725.    The Statement of Facts accompanying that settlement — which Deutsche Bank acknowledged — contains specific admissions that American Home Mortgage Corp. ('AHM') was one of Deutsche Bank's primary loan pool originators; that Deutsche Bank's own internal due diligence personnel documented that AHM's 'variances on our AVM analyses are some of the highest of all Sellers' and that AHM loans went 'beyond misrepresentation into the fraudulent area'; that Deutsche Bank internally applied an 'Ability to Repay' overlay specifically flagging as EV3 defects loans made to 'Elderly (65+) borrowers on fixed income with stated income documentation' — exactly the category into which Plaintiff falls; and that Deutsche Bank's own personnel admitted that 'most (if not all) Stated Wage Earner loans have inflated incomes,' the precise loan documentation category on which Plaintiff's stated $50,000/month income figure was based. Deutsche Bank acknowledged the underlying conduct documented in these internal communications to the United States government in December 2017. It then acquired Plaintiff's specific AHM 2007-1 loan in November 2021 and commenced this enforcement action, without disclosing any of the foregoing to the state court or to Plaintiff.

726.    Plaintiff cites the settlement, Statement of Facts, and Annex 3 as evidence of Deutsche Bank's institutional knowledge, notice, due-diligence history, internal risk classifications, awareness of AHM 2007-1 stated-income defects, and knowledge of elderly fixed-income borrower red flags before Deutsche Bank acquired and enforced

Plaintiff's AHM 2007-1 instrument in 2021. Plaintiff will prove the specific fraud, acquisition notice, enforcement misconduct, damages, restitution, and causation through the loan file, servicing records, foreclosure filings, trust records, assignment materials, discovery, expert proof, and the facts alleged herein.

727. Plaintiff alleges that the originating lender's relationship with Shallo was not a case of inadvertent reliance on an unknown bad actor. Shallo had already pleaded guilty to federal bank fraud on October 29, 2003 — a matter of public record — before any transaction in this loan chain occurred. A lender does not pay a five-figure yield spread premium, $39,161.50, to a broker by accident; that scale of payment reflects a deliberate business decision to use that specific broker's services. Shallo's documented pattern of placing borrowers into fraudulent transactions, including his identification by name in a co-conspirator's federal sentencing memorandum for conduct of the same character alleged here, supports the inference that the originating lender either knew of Shallo's criminal history and conduct pattern or was willfully blind to facts a reasonably prudent lender paying that scale of inducement would have discovered. Plaintiff does not concede that this was a case of an unwitting lender relying on a hidden bad actor; Plaintiff alleges the lender's continued use of Shallo reflects knowing or recklessly indifferent participation in his scheme.

728. Deutsche Bank and its counsel further represented, expressly or impliedly, that Plaintiff had failed to oppose summary judgment in an ordinary way.

729. That representation was false and misleading because Plaintiff's inability to oppose was caused by disability exclusion, denial of meaningful access, counsel abandonment, muting or functional silencing, and lack of an ADA-compliant process.

730. Deutsche Bank and its counsel also represented, expressly or impliedly, that Plaintiff lacked candor about her disability.

731. That representation was false and misleading.

732. Plaintiff had documented disabilities, had submitted medical materials, had sought ADA accommodations, and had a medically grounded inability to participate in live adversarial or high-cognitive-load proceedings.

733. Defendants knew, or recklessly disregarded, that their representations and omissions were false or misleading. The false and misleading representations and omissions alleged in this count were made through foreclosure pleadings, amended pleadings, summary-judgment briefs, public-docket filings, service and transmission of those filings, hearing argument, post-hearing standing materials, affidavit submissions, debt and enforcement communications, and related foreclosure-enforcement acts, including but not limited to the representations that Deutsche Bank had clean enforceable rights, that Plaintiff had failed to oppose in an ordinary manner, that Plaintiff lacked candor regarding disability, and that Deutsche Bank's standing, note-possession, trust-transfer, predecessor, and debt proof were sufficient and reliable.

734. This knowledge is not merely alleged in the abstract. Deutsche Bank's own September 2025 summary-judgment filing pivoted to a WaMu/subrogation predecessor theory rather than relying on Deutsche Bank's own direct chain of title — an institution confident in its own standing and note-possession proof would have no occasion to invoke a predecessor's subrogated rights instead.

735. At the same time, Deutsche Bank submitted the Flannigan affidavit, sworn by a Texas-based servicer employee with no personal knowledge of the physical note, its

custody, or its endorsement history. Flannigan had no personal knowledge of the facts surrounding the original 2006 loan closing, having not been present for or employed by any party to that transaction, and his affidavit did not purport to establish such knowledge.

736.    Deutsche Bank and its counsel cannot simultaneously submit an affidavit purporting to address note possession and pivot to a predecessor's rights because their own possession proof is insufficient, without knowing — at the time both were submitted — that the representation of "clean enforceable rights" was false.

737.    Deutsche Bank's misrepresentations were not limited to note possession. On February 4, 2025, and again on September 9, 2025, Deutsche Bank represented to the court that no evidence existed of predatory financial abuse concerning Plaintiff's loan. Plaintiff had provided Deutsche Bank with detailed documentation of that abuse years before this action was filed. Plaintiff alleges that Deutsche Bank's repetition of this representation, more than seven months apart, in the face of documentation already in its possession, was knowing and not merely careless.

738.    Deutsche Bank's reliability problems were not limited to note possession. A debt calculation submitted in this action and signed by attorney Dominick Neveux represented an additional $7,302.53 in tax advances as part of the total debt claimed through January 14, 2026, building on a December 2, 2025 sworn Affidavit of Debt, signed by Flora V. Rashtchy of PHH Mortgage Corporation under penalty of perjury, attesting personal knowledge of the underlying servicing records. Plaintiff alleges that the official tax payment history maintained by the Town of Easton showed no such payment had been made as of the date that additional amount was represented to the court, and that the payment was made only after Plaintiff brought the discrepancy to the court's attention.

Plaintiff alleges that representing an unpaid tax advance as part of a sworn debt calculation, attested to under penalty of perjury and relied upon to increase the amount Deutsche Bank sought to recover, is further evidence of the same pattern alleged throughout this Complaint: representations made to the court that did not survive scrutiny against the underlying facts.

739.     Plaintiff further alleges that Deutsche Bank's own January 15, 2026 Foreclosure Worksheet, filed with the state court, admits $108,316.21 in equity in the subject property — Fair Market Value of $1,284,000.00 against a claimed total debt of $1,175,683.79. Under Connecticut law, strict foreclosure is appropriate only where there is no equity in the property; where equity exists, foreclosure by sale, not strict foreclosure, is the proper remedy. Deutsche Bank's own sworn filing admits the precondition for the relief it seeks does not exist, while it simultaneously represented an inflated and partially unsupported debt figure to this same worksheet.

740.     Deutsche Bank's knowledge of the defects described above was not unique to this transaction and was not hidden from Deutsche Bank's own personnel. The Statement of Facts accompanying Deutsche Bank's 2017 DOJ settlement — a document Deutsche Bank acknowledged — documents in detail how Deutsche Bank's internal Diligence Supervisor warned, repeatedly and in writing, that AHM's origination practices went "beyond misrepresentation into the fraudulent area," that "most (if not all) Stated Wage Earner loans have inflated incomes," and that elderly fixed-income borrowers with stated-income documentation were internally categorized as presenting ability-to-repay defects that Deutsche Bank's own team characterized as EV3 failures. AHM 2007-1 — the trust on whose behalf this foreclosure was brought — is specifically named in Annex 3 of that

155

settlement, which Deutsche Bank acknowledged, and which documents that Deutsche Bank securitized over 400,000 subprime and Alt-A residential mortgages with knowing or reckless disregard of their quality, knowing or reckless disregard of the falsity of representations made about loans securitized through trusts of this kind, and through which the United States identified RICO, 18 U.S.C. §§ 1961 et seq., as among the federal statutes potentially implicated by that conduct. Plaintiff alleges that Deutsche Bank therefore was not merely aware of generalized RMBS-era misconduct; it had acknowledged to the United States government specific internal findings concerning AHM 2007-1, stated-income inflation, elderly fixed-income borrower risk, and the very trust through which it now seeks to enforce Plaintiff's loan.

741.     Plaintiff alleges that the pattern of racketeering activity alleged in this count — the mailings, wire transmissions, and interstate communications among Deutsche Bank, McCarter & English, Hinshaw & Culbertson, and Brock & Scott—is also separately pled as a pattern of racketeering activity in Counts IX and X below. That coordination is independent evidence of the knowledge and intent required for fraud: each attorney defendant's transmission of pleadings, affidavits, and representations asserting clean and reliable proof of standing, possession, and enforceability was made with Deutsche Bank, the central institutional defendant, already possessing knowledge — admitted to the federal government — that representations of this kind regarding loans of this kind were unreliable

742.     Plaintiff alleges, upon information and belief, that Defendants intended the court, Plaintiff, opposing parties, and the public docket to rely on the false narrative.

743. The court did rely on the incomplete and misleading record by proceeding with summary judgment, allowing post-hearing supplementation, and entering foreclosure liability.

744. Plaintiff's reliance injury is not limited to personal belief in Defendants' representations. Plaintiff alleges that the false and concealed facts were deployed in a proceeding in which she was medically unable to participate safely, had lost counsel protection at the dispositive stage, and was Plaintiff was prohibited from being heard on the merits, denied protection of the existing ADA pause, denied meaningful counsel-protective time, and denied any fair opportunity to oppose liability, present disputed facts and exhibits, test Deutsche Bank's factual assertions, or respond to Deutsche Bank's post-hearing standing proof. The fraud therefore operated through procedural reliance as well as personal reliance: Defendants induced the court process to treat an inaccessible and untested record as sufficient, and Plaintiff was prohibited from being heard on the merits before she could expose the falsity, identify disputed facts, or challenge Deutsche Bank's post-hearing proof before liability entered.

745. Plaintiff was harmed by the false and concealed facts, including loss of meaningful access, loss of opportunity to oppose, foreclosure liability, reputational harm, economic injury, litigation costs, medical harm, and imminent loss of home.

746. Plaintiff's fraud and fraudulent-concealment damages also include portfolio-wide property injury caused by Defendants' concealment, ratification, acquisition, and enforcement of the poisoned mortgage chain. Plaintiff alleges that the concealed facts were not limited to a single foreclosure ledger: they concealed the structure by which serial predatory refinances, broker-paid steering, fabricated borrower-capacity narratives,

phantom cash-out proceeds, negative amortization, and institutional RMBS/AHM knowledge depleted Plaintiff's broader real-estate portfolio. By concealing those facts while acquiring and enforcing the AHM 2007-1 instrument, invoking predecessor rights, and presenting the resulting debt as a routine borrower default, Deutsche Bank and the participating Defendants caused or contributed to the loss of portfolio equity, financing capacity, appreciation, rental/income opportunities, investment value, and other property losses alleged herein, including the estimated $18 million portfolio loss.

747.    Plaintiff affirmatively alleges that any statute of limitations applicable to the fraud alleged in this count is tolled. Connecticut recognizes that a fraud claim does not accrue until the fraud is, or reasonably should have been, discovered. The origination-stage fraud was actively concealed through control of Plaintiff's mail and closing documents, and Plaintiff did not learn its full scope until this litigation and the related New Jersey proceedings. The enforcement-stage fraud alleged in this count — including Deutsche Bank's concealment of its own institutional knowledge documented in its 2017 DOJ resolution — could not have been discovered by Plaintiff until after she began independently researching this matter following Brown's November 2025 abandonment, well within any applicable limitations period measured from that discovery. Plaintiff further alleges that Deutsche Bank's affirmative foreclosure filings, claimed clean enforcement rights, debt calculations, standing assertions, and strict-foreclosure requests were materially misleading because they omitted the institutional knowledge, origination defects, acquisition notice, assignment defects, and enforcement-proof defects alleged in this Complaint while asking the state court to treat the instrument as an ordinary enforceable residential mortgage.

748.    Plaintiff seeks compensatory damages, consequential damages, punitive damages, restitution, disgorgement, equitable relief, attorney's fees where available, costs, interest, and all other relief permitted by law.

**COUNT VII**
**FRAUD ON THE COURT / DECLARATORY AND EQUITABLE RELIEF**
**FROM USE OF FRAUD-TAINTED RECORD**
Against Deutsche Bank, McCarter, Hinshaw, Brock & Scott, Swanson, Mahabamunuge, Milne, Fredericks, Knickerbocker, Brown, Brown Law LLC, and John Doe Defendants as Applicable

749.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through V above as if fully set forth herein.

750.    This count seeks a remedy as serious as any in this Complaint: an order from this Court barring Deutsche Bank from using, in any further proceeding, a foreclosure record that Plaintiff alleges was obtained by corrupting the integrity of the adjudicative process—not a request for money damages, but a request that the federal courts refuse to permit state-court machinery to be used as the instrument of the very misconduct alleged here, a remedy distinct from, and unavailable through other counts.

751.    Fraud on the court is distinct from the fraud alleged in Count VI: it concerns not whether Defendants deceived Plaintiff, but whether their conduct corrupted the integrity of the judicial process itself, rendering the resulting record unfit to serve as the predicate for further judicial action.

752.    This count does not ask the Court to treat ordinary litigation advocacy, disputed evidence, or an adverse ruling as fraud on the court. Plaintiff alleges fraud on the court because Defendants used false and concealed facts to disable the adversarial process itself: Plaintiff's disability-access filings were branded as dishonest, her counsel adopted or

159

amplified that branding and abandoned the opposition, the dispositive hearing proceeded without meaningful ADA-compliant access, Deutsche Bank received post-hearing supplementation time, and Plaintiff received no equivalent written opportunity to expose the falsity before liability entered. The injury is therefore not merely that the state court reached an adverse result; it is that Defendants procured a record the court itself was never permitted to test.

753. The November 17, 2025 hearing was the point at which Defendants converted a disability-tainted empty record into a foreclosure-enforcement posture. Attorney Milne's "no evidence," statute-of-limitations, no-agency, no-unconscionability, rescission, and knowledge arguments were presented after Plaintiff's disability/candor had been attacked, while Plaintiff was prohibited from being heard on the merits and stripped of the practical benefit of the existing ADA pause, and while her written evidentiary materials remained unread, discounted, or procedurally unreachable. Plaintiff alleges that those statements were materially false or misleading because they ignored and contradicted documents, pleadings, exhibits, and submissions already before the court. Their effect was to make the manufactured empty record appear legitimate, secure liability, and create strict-foreclosure leverage from a disputed and fraud-tainted mortgage chain.

754. This was not merely a dispute over how to characterize evidence. Plaintiff alleges that Defendants used the credibility destruction created by the disability/candor attack and false professional-identity narrative to make the court accept Deutsche Bank's record narrative wholesale. Once Plaintiff was branded as dishonest about disability and sophisticated enough to have knowingly accepted the predatory loan structure, her written

160

evidence was treated as non-evidence and Deutsche Bank's assertions were treated as fact. That corruption of the adversarial process is the injury pleaded in this count.

755.      The concealment alleged in this count has a dimension beyond the individual misrepresentations addressed in Count VI. Deutsche Bank came into the Connecticut Superior Court seeking to enforce an instrument it represented as a clean, enforceable debt obligation while concealing that it had already signed a Statement of Facts, acknowledged to the United States government, that AHM — the originating lender on Plaintiff's loan — routinely produced fraudulent loans; that elderly fixed-income borrowers on stated-income documentation were internally categorized by Deutsche Bank's own due diligence personnel as presenting ability-to-repay failures; and that AHM 2007-1, the specific trust on whose behalf it prosecuted this foreclosure, was named in Deutsche Bank's own DOJ settlement, which Deutsche Bank acknowledged, as among the RMBS whose origination conduct Deutsche Bank acknowledged. Presenting an instrument to a court as entitled to enforcement while concealing the enforcing party's own government-acknowledgement of AHM's fraudulent origination practices, the stated-income and elderly fixed-income red flags, and the specific AHM 2007-1 trust through which the instrument was being enforced is not ordinary litigation advocacy. It is the submission of a false picture of the fundamental character of the claim being prosecuted — the precise conduct that distinguishes fraud on the court from ordinary adversarial overstatement. Plaintiff does not allege fraud on the court merely because Deutsche Bank failed to volunteer background information in an ordinary adversarial proceeding. Plaintiff alleges fraud on the court because Deutsche Bank affirmatively sought judicial enforcement of the instrument as a clean foreclosure obligation while omitting directly material institutional knowledge and enforcement

defects, then obtained the Challenged Liability Posture through a process in which Plaintiff was disabled from presenting the very facts that would have exposed those omissions.

756. Plaintiff alleges that Defendants engaged in conduct that corrupted the integrity of the foreclosure process and produced a fraud-tainted record.

757. The conduct alleged above and in Count VI — the false disability/candor narrative used to disable Plaintiff from participation, Brown's adoption of that narrative, the resulting absence of any opposition at the dispositive hearing, and Deutsche Bank's receipt of post-hearing supplementation time that Plaintiff was denied an equivalent opportunity to match — did not merely produce an incorrect outcome. It produced a record the court itself was never permitted to test.

758. This is a record obtained through a sequence of material misrepresentations that corrupted the integrity of the tribunal. Deutsche Bank's counsel represented on the record that his office had held the original wet-ink note since 2022, inducing the court to grant a two-week post-hearing supplementation window based entirely on that representation. However, what Deutsche Bank filed two weeks later did not come from that attorney, that office, or any custodian matching the history just described to the court. A material misrepresentation made directly to a court to secure additional time to patch an empty record, followed by a submission detailing an entirely unaligned chain of custody, is not a harmless shift in proof—it is a fraud on the tribunal itself, addressed in Count VI, that renders the entire resulting summary-judgment record structurally corrupted and unfit for equitable enforcement.

759. Deutsche Bank's reliability problems extended beyond note possession to its debt calculations, as detailed in Count VI.

760.    Defendants made direct, public assertions that an eighty-eight-year-old disabled woman could not be trusted to tell the court the truth about her own medical condition. On November 5, 2025, Deutsche Bank's counsel filed an objection stating: 'Ms. Roncati's representations to this Court that she lacks the "mental engagement" required to oppose summary judgment are surprising and the Court should also examine Ms. Roncati's candor to the Court.' That accusation was built entirely on two New Jersey filings that said the opposite of what they were used to imply: the certifications stated, in substance, that Plaintiff was disabled, medically restricted, and unable to undergo compelled deposition or live adversarial examination. Deutsche Bank's counsel possessed both documents, necessarily read them before citing them, and used them anyway to manufacture the appearance of a contradiction that did not exist. Four attorneys — Swanson, Mahabamunuge, Milne, and Fredericks — signed or are listed as counsel on the filing containing this accusation.

761.    Once Deutsche Bank and its counsel characterized Plaintiff as having lied to the court about her own disability, the trial court evaluated every later request against that false premise rather than on its own merits. Plaintiff's opposition to Brown's withdrawal motion specifically demanded that the false statements be stricken from the public record; that demand was denied. Plaintiff attempted to retain substitute counsel and contacted multiple attorneys, each of whom declined representation. Every subsequent motion Plaintiff filed seeking accommodation, stay, or reconsideration was denied, without exception. Plaintiff alleges that this was not coincidence: the false accusation was the mechanism by which the proceeding was structurally tilted before any of Plaintiff's genuine, material, and unresolved factual disputes — concerning agency, fraud, unconscionability, and the

validity of the underlying debt, as detailed in Section V above — were ever tested. Summary judgment was entered on a record left untested because the false accusation, not the absence of a real dispute, had already disabled Plaintiff's ability to oppose it.

762.    Plaintiff's disability and credibility were never an element of any claim or defense properly before the court in this foreclosure action. No fact about Plaintiff's honesty regarding her own medical condition was relevant to whether the note was valid, whether the mortgage was enforceable, or whether Deutsche Bank held standing to foreclose. Defendants introduced that subject into the case themselves, for no purpose the foreclosure demanded — confirming that the false accusation served no legitimate adjudicative function and existed only to corrupt the process by which the underlying dispute would otherwise have been tested.

763.    Deutsche Bank and its counsel advanced a defective or incomplete enforcement record while concealing or minimizing material standing, securitization, predecessor, DOJ/RMBS, and origination defects. Deutsche Bank and its counsel used both a false disability/candor narrative and false mortgage professional claim to undermine Plaintiff's access and credibility.

764.    Brown and Brown Law LLC amplified or adopted the disability/candor narrative despite knowledge of Plaintiff's medical condition and accommodation needs.

765.    These acts contributed to a proceeding in which Plaintiff was disabled out of participation, muted or functionally silenced, unrepresented at the critical stage, and denied equivalent written access.

766.    Deutsche Bank then received additional time to supplement proof while Plaintiff received no equivalent ADA-compliant opportunity to respond.

767.     Plaintiff alleges that the resulting summary-judgment record was not merely wrong. It was structurally corrupted.

768.     Plaintiff seeks declaratory and equitable relief barring any Defendant from using the Challenged Liability Posture as the predicate for strict foreclosure, title transfer, or any further enforcement consequence, together with declaratory and injunctive relief and correction of the public docket to prevent Defendants from profiting from a record produced in this manner.

769.     Plaintiff seeks declaratory relief, injunctive relief, and equitable relief to the extent permitted, sealing/correction of false public-docket materials, and all other relief necessary to prevent Defendants from profiting from a fraud-tainted record.

## COUNT VIII
## CONNECTICUT UNFAIR TRADE PRACTICES ACT
### Conn. Gen. Stat. § 42-110a et seq.
Against Deutsche Bank, McCarter, Hinshaw, Brock & Scott, Swanson, Mahabamunuge, Milne, Fredericks, Knickerbocker, Brown, Brown Law LLC, and John Doe Defendants as Applicable

770.     Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

771.     Defendants at all times relevant herein engaged in conduct constituting trade or commerce, within the meaning of Conn. Gen. Stat. § 42-110a(1), including but not limited to mortgage acquisition, mortgage servicing, foreclosure enforcement, debt enforcement, retentional and billing of legal services, consumer-financial enforcement, servicing communications, foreclosure-processing activity, debt-calculation activity, and related commercial conduct.

772. This count does not treat ordinary litigation advocacy, standing alone, as a CUTPA violation. Plaintiff alleges CUTPA liability because Defendants used foreclosure-enforcement, debt-enforcement, mortgage-servicing, and commercial legal-services conduct to create and monetize an unfair and deceptive foreclosure posture: concealing material origination, standing, securitization, predecessor-liability, and DOJ/RMBS facts; falsely branding protected disability-access activity as dishonesty; presenting or relying upon defective note-possession and enforcement materials; exploiting Plaintiff's loss of counsel and lack of ADA-compliant access; and attempting to convert the resulting "unopposed" liability posture into strict-foreclosure leverage, title transfer, fees, interest, and other commercial benefit. Plaintiff alleges that the disability/candor attack and ADA-access interference are pleaded under CUTPA only because they were used as instruments of commercial debt enforcement and foreclosure leverage: they helped Defendants convert a contested, fraud-tainted mortgage chain into an "unopposed" liability posture capable of producing fees, interest, debt enforcement, title pressure, and strict-foreclosure consequences.

773. Defendants' unfair or deceptive conduct included presenting a materially misleading "no evidence" narrative after Defendants had helped create the empty record through disability weaponization, counsel destabilization, and denial of meaningful ADA-compliant access. Plaintiff alleges that Deutsche Bank's counsel represented that Plaintiff had no evidence of agency, unconscionability, fraud, predatory abuse, or timely defenses while documents and pleadings already before the court contradicted that narrative. Using a disability-tainted empty record as foreclosure leverage against an elderly disabled

homeowner was not ordinary advocacy; it was commercial foreclosure enforcement by unfair, immoral, oppressive, unscrupulous, and caused substantial injury to Plaintiff.

774.     Defendants' joint and several conduct was and continues to be unfair, deceptive, immoral, oppressive, unscrupulous, and substantially injurious to consumers, to the public interest, and directly to Plaintiff. Defendants' conduct offends deeply carved public policies regarding consumer protection, elder abuse prevention, and Americans with Disabilities Act (ADA) protections, creating an unconscionable injury that consumers themselves could not reasonably avoid.

775.     Deutsche Bank's unfair and deceptive acts included, but are not limited to: knowingly enforcing a poisoned mortgage chain; actively concealing and minimizing predatory origination; actively concealing and minimizing predatory loan originations, interest-only negative amortization terms, hidden Yield Spread Premium broker steering and criminal-broker misconduct; deliberately concealing Deutsche Bank's own 2017 DOJ/RMBS Statement of Facts concerning AHM's fraudulent origination practices, stated-income inflation, elderly fixed-income borrower red flags, and the AHM 2007-1 trust specifically identified in Annex 3 as the trust through which Deutsche Bank now seeks to enforce Plaintiff's alleged obligation; institutional knowledge regarding securitization defects, the 2017 DOJ/RMBS facts, which directly exposed the toxic nature of the pool containing Plaintiff's alleged obligation; defective standing and predecessor-liability exposure; and escalating to brutal, institutional litigation pressure and manufacturing a Challenged Liability Posture specifically to extract illicit foreclosure leverage over an 88-year-old disabled widow.

776.    The law-firm and individual attorney defendants' unfair and deceptive acts in the conduct of their commercial legal services included, but are not limited to: launching a public, malicious disability/candor defamation campaign designed to brand a documented, disabled elderly consumer as a liar before a court of equity; executing a material, bad-faith inversion and misuse of out-of-state protective ADA-accommodation-related filings to mislead the tribunal; pivoting to an unsupported subrogation theory because they possessed actual knowledge that their direct assignment chain was entirely broken; engineering an asymmetric post-hearing evidentiary patch to insert fabricated note custody into the record while simultaneously ensuring Plaintiff received no equivalent, ADA compliant opportunity to respond; utilizing these systemic deceptive maneuvers for the explicit commercial purpose of defeating a vulnerable consumer's physical and procedural court access, thereby securing an uncontested liability judgment; and continuing foreclosure enforcement based on the empty record, post-hearing evidentiary patching, and unfair litigation tactics aimed at defeating an elderly disabled homeowner's access.

777.    The conduct alleged in this count is not ordinary litigation advocacy later characterized as unfair. To the extent any privilege doctrine has been extended to litigation-related statements in other contexts, Plaintiff alleges that doctrine has no application here because the conduct challenged was not advocacy within a functioning adversarial process — it was the act of disabling that process altogether. The disability/candor narrative was deployed not to advance a contested argument about the foreclosure's merits, but to eliminate Plaintiff's capacity to contest anything at all, as alleged in detail above.

778.    CUTPA's unfair-trade-practices standard reaches deceptive and unscrupulous conduct in trade or commerce regardless of the forum in which it occurs; the law-firm and

individual attorney Defendants were engaged in trade or commerce — the commercial provision of legal and foreclosure-enforcement services — when they deployed this narrative, and the fact that the deception was filed in a courtroom rather than communicated in a contract or advertisement does not convert commercial deception into protected litigation advocacy.

779.    Brown and Brown Law LLC engaged in egregious, unfair, and deceptive consumer trade practices by soliciting and accepting a substantial financial retainer under the consumer representation agreement to protect Plaintiff's rights; failing to provide the promised, contractually obligated, and reasonably expected representation; abandoning and structurally undermining Plaintiff at the critical, dispositive stage of foreclosure action; adopting, repeating and validating the foreclosing bank's false disability/candor narrative against their own disabled client, despite possessing her confidential medical records proving her profound impairment; and retaining thousands of dollars in unearned fees despite failure to perform meaningful service, leaving Plaintiff unrepresented and defamed, and directly profiting from her manufactured nonparticipation.

780.    The conduct alleged in this count is rendered additionally unfair and deceptive under the public-policy prong of § 42-110b because Deutsche Bank commenced and prosecuted this foreclosure while concealing its own prior government admission — in the Statement of Facts accompanying its December 2017 DOJ settlement — that AHM, the originator of Plaintiff's loan, routinely originated fraudulent loans and that elderly fixed-income borrowers on stated-income documentation were internally characterized by Deutsche Bank's own personnel as presenting ability-to-repay defects. Enforcing an instrument in Connecticut commerce while concealing an institutional admission of that

instrument's fraudulent origination is conduct that violates established public policy, offends the FTC Act standards incorporated into CUTPA analysis, and is the kind of deception that no consumer could reasonably anticipate or guard against. This concealment is not merely background; it is itself an unfair and deceptive act committed in the course of Deutsche Bank's foreclosure-enforcement trade or commerce in Connecticut.

781.    Deutsche Bank knew, through the same institutional channels that produced its 2017 DOJ resolution, that loans bearing Plaintiff's loan profile were frequently the product of fraudulent origination, and knew or should have known that enforcement of such an instrument against an elderly homeowner risked the loss of her entire remaining real estate holdings, given the documented financial strain such instruments place on fixed-income borrowers. Deutsche Bank proceeded to acquire and enforce this instrument anyway, intentionally, with that knowledge and that risk fully apparent.

782.    Plaintiff's ascertainable loss under CUTPA includes portfolio-wide property injury caused by the unfair and deceptive practice alleged throughout this Complaint: using predatory origination, broker-paid steering, fabricated borrower-capacity narratives, phantom cash-out proceeds, negative-amortization structures, concealment of institutional RMBS/AHM knowledge, and foreclosure-enforcement machinery to extract equity and then present the resulting debt as an ordinary borrower default. Plaintiff alleges that the same practice damaged her broader real-estate portfolio, impaired her financing capacity, consumed equity that should have remained available to protect her properties, and enabled Defendants to pursue foreclosure leverage from a debt chain they knew or should have known was materially suspect.

783.     As a direct and proximate result of Defendants' unfair, deceptive, and unconscionable acts, Plaintiff has suffered a profound, multifaceted and ascertainable loss, of money and property under Conn. Gen. Stat. § 42-110g(a), including but not limited to: the imminent, unconstitutional deprivation of her unique home, real property rights, and accumulated home equity; the forced expenditure of extensive financial outlays, emergency legal costs, and litigation expenses to battle a corrupted record; the loss of thousands of dollars in unearned, retained retainers paid to counsel who actively damaged her posture; severe reputational and dignitary destruction within her community, financial markets, and insurance institutions due to being publicly branded as untruthful; severe acute physical and emotional distress, profound cognitive strain and direct medical costs resulting from the physical and neurological crash engineered by Defendants' structural lockout; and other economic and noneconomic injury.

784.     Plaintiff affirmatively alleges that the three-year limitations period under Conn. Gen. Stat. § 42-110g(f) is tolled as to any conduct predating that period, because the deceptive acts alleged in this count — including Deutsche Bank's concealment of its own institutional knowledge and the fraudulent debt-calculation representations — were not reasonably discoverable by Plaintiff until she began independently researching this matter after Brown's November 2025 abandonment. Plaintiff further alleges that Deutsche Bank's enforcement-stage conduct is a continuing violation, with each act of enforcement, debt collection, and foreclosure prosecution constituting an independently timely unfair or deceptive act regardless of when the underlying instrument originated.

785.     Plaintiff seeks the full, maximum application of remedies available under law and equity pursuant to Conn. Gen. Stat. § 42-110g, including: actual damages to compensate

171

for all economic, property and medical losses; punitive damages to punish and deter the Defendants' reprehensible, malicious, and predatory conduct toward an elderly disabled litigant; reasonable attorney's fees and costs; full restitution and disgorgement of all fees, interest, and profits illicitly stripped from Plaintiff and retained by counsel; comprehensive injunctive and declaratory relief ; restitution, disgorgement, and all other relief available under CUTPA.

**COUNT IX**
**CIVIL RICO**
**18 U.S.C. § 1962(c)**
Against Deutsche Bank, McCarter & English LLP, Hinshaw & Culbertson LLP, Brock & Scott, PLLC, Adam M. Swanson, Bhanuka Y. Mahabamunuge, Geoffrey K. Milne, Aaron A. Fredericks, Jeffrey Marks Knickerbocker, and John Doe Defendants as Applicable

786.    Plaintiff incorporates by reference the factual allegations set forth above as if fully set forth herein.

**A. This Is Not Ordinary Foreclosure Litigation, Debt Collection, or Advocacy "Without More"**

787.    Plaintiff does not allege RICO merely because Deutsche Bank pursued foreclosure, because an alleged mortgage default is disputed, because a servicer collected payments, or because attorneys made adverse arguments. This is not a RICO claim based on routine foreclosure proceedings, mortgage servicing, ordinary debt collection, or aggressive advocacy without more.

788.    The "more" is the racketeering conduct alleged here: Defendants used interstate mail and wire communications, electronic filing systems, service transmissions, affidavits, document-chain materials, servicer records, public disability/candor accusations, post-hearing evidentiary supplementation, and strict-foreclosure filings to convert a fraud-

172

tainted RMBS mortgage chain into judicially enforceable money, fees, equity, title leverage, and property value, while preventing the disabled homeowner exposing those defects from obtaining meaningful ADA-compliant adversarial testing.

789. Plaintiff alleges that this foreclosure-enforcement scheme was economically material because the loan chain began with an approximately $700,000 GreenPoint loan, was refinanced through WaMu/American Home instruments, and ultimately produced a substantially larger claimed foreclosure obligation despite approximately fifteen years of payments totaling approximately $1.15 million. That payment history makes Plaintiff's accounting, recoupment, setoff, predatory-origination, refinancing, servicing, standing, and enforceability defenses economically material, and it explains why preventing meaningful adversarial testing of those issues had direct property value for the enterprise.

790. Plaintiff alleges that the scheme was not invented solely for Plaintiff's case; Plaintiff's case exposed it. The enterprise's method was capable of being used, and Plaintiff alleges has been used, to convert defective securitized mortgage-chain assets into enforceable foreclosure value whenever borrowers lack the resources, access, counsel protection, or disability accommodations necessary to force meaningful testing of standing, custody, debt, assignment, payment, recoupment, setoff, and enforceability defects.

791. Defendants knew the Challenged Liability Posture was not meaningfully tested. They knew because they created, exploited, or knowingly benefited from the exclusion that made testing impossible: public disability/candor accusations, use of protected ADA filings as supposed evidence of dishonesty, opposition to or benefit from denial of meaningful ADA access and counsel protection, summary judgment treated as effectively unopposed while Plaintiff was medically unable to participate meaningfully, post-hearing

supplementation Plaintiff could not equivalently test, and strict-foreclosure pressure based on the resulting one-sided record.

792.     Plaintiff further alleges that Defendants treated Plaintiff's disability, reputation, dignity, and federally protected court access as obstacles to the enterprise's property objective. The public disability/candor attack was not collateral rhetoric. It was an operative device in the scheme: it recast documented disability as dishonesty, destroyed Plaintiff's credibility when her access protections were most critical, contributed to the collapse of counsel protection, and allowed Defendants to preserve a one-sided liability posture that could be converted into money, fees, equity, title leverage, and strict-foreclosure consequences before the defects could be meaningfully tested.

793.     Plaintiff alleges that the disability/candor attack was not an isolated statement by one lawyer in ordinary advocacy. It was a coordinated public filing position advanced by multiple attorneys and law firms acting across state lines, including Connecticut and out-of-state counsel. The multi-signature, multi-firm character of the filing supports the plausible inference that the disability/candor narrative was reviewed, authorized, adopted, and used as an enterprise litigation device, not an accidental or stray statement.

794.     The malicious and intentional character of the disability/candor attack is shown by Defendants' failure to retract, correct, withdraw, or disavow the false narrative after repeated notice of its falsity. Plaintiff filed motions and submissions explaining that she had not been deposed in New Jersey; that the New Jersey materials were protective certifications consistent with documented disability; that the ability to sign written filings did not establish the medical ability to sit for deposition, oppose summary judgment, or participate in live adversarial proceedings; that Plaintiff's disability restrictions were

supported by Yale Neurology and other medical records; and that Plaintiff could not safely respond to summary judgment without counsel protection and ADA accommodation. Defendants did not correct the public disability/candor accusation. They allowed it to remain on the docket and continued to benefit from the credibility damage it caused.

795.    The failure to retract after repeated correction is probative of knowledge, malice, reckless disregard, deliberate avoidance, and coordinated participation. Plaintiff alleges that Defendants did not merely make a litigation mistake. They used Plaintiff's protected disability-access activity as a public credibility weapon, allowed the falsehood to stand after notice of its falsity, and then used the resulting credibility destruction to support a one-sided liability posture.

**B. The Scheme to Convert a Fraud-Tainted RMBS Chain Into Judicially Enforceable Value**

796.    Plaintiff alleges that Defendants converted judicial process into enforcement machinery for a fraud-tainted RMBS asset while disabling the party exposing the defects from meaningful participation. The misconduct alleged here is therefore more severe than an ordinary servicing, escrow, notice, or foreclosure dispute: Defendants used court filings, attorney representations, electronic service, affidavit materials, public disability/candor attacks, post-hearing evidentiary supplementation, and ADA-access interference for purposes of concealing the broader institutional mortgage-enforcement scheme through which fraud-tainted DOJ/RMBS-listed trust assets are sanitized through court process.

797.    The pattern of racketeering activity alleged in this count was conducted through an enterprise whose central member, Deutsche Bank, already possessed institutional knowledge, admitted to the federal government, that representations of this kind regarding

loans of this kind were unreliable. Each attorney Defendant's transmission of pleadings, affidavits, and representations asserting clean and reliable proof of standing, possession, debt, and enforceability was made in service of that same enterprise, with Deutsche Bank as the member positioned to know, and have communicated to its retained counsel, the unreliability of the categories of proof being offered to the court.

798.    Plaintiff alleges that the enterprise's objective became apparent once Deutsche Bank brought in additional counsel, including McCarter & English LLP and Hinshaw & Culbertson LLP, after seeing Plaintiff's defenses and counterclaims. Plaintiff had raised claims and defenses exposing predatory origination, Shallo/YSP broker misconduct, fabricated borrower-capacity narratives, defective assignment and standing issues, WaMu/subrogation predecessor-liability issues, securitization defects, DOJ/RMBS institutional knowledge, and equity stripping. Plaintiff alleges that the enterprise's response was not to allow those issues to be exposed or adjudicated through a fair, accessible merits process, but to silence Plaintiff by destroying her credibility and dignity, neutralizing her ADA access, and collapsing her counsel protection.

799.    Deutsche Bank had actual or constructive knowledge from its own RMBS/DOJ settlement history, securitization records, trustee role, servicing records, and institutional files that the American Home Mortgage Assets Trust 2007-1 chain was defective, fraud-tainted, or materially suspect. Deutsche Bank nevertheless allowed the foreclosure to be prosecuted as if it involved a clean debt, clean trust transfer, clean note-possession history, and routine default.

800.    Deutsche Bank and its foreclosure-enforcement counsel knew, were at a minimum on notice, or were deliberately indifferent to the fact that AHM 2007-1 containing

176

Plaintiff's instrument was not an ordinary clean mortgage asset. Deutsche Bank's own DOJ/RMBS settlement materials identified the AHM 2007-1 trust materials. Deutsche Bank's own 2017 settlement with the United States government acknowledged institutional misconduct; Deutsche Bank acknowledged the underlying Statement of Facts; AHM 2007-1 was specifically identified and implicated; and the settlement concerned Deutsche Bank's public RMBS conduct, including false representations, material omissions, defective mortgage loans, borrower ability-to-repay issues, underwriting-guideline failures, inflated collateral values, and concealment of loan-quality risk.

801.    The Statement of Facts accompanying Deutsche Bank's 2017 DOJ settlement confirms independently that the enforcement conduct described in this Complaint is not an isolated deviation from otherwise lawful practice but a recurrence of an institutional pattern. Deutsche Bank's own internal communications, documented in and acknowledged through that Statement of Facts, establish that it securitized loans from American Home Mortgage Corp., including through the specific AHM 2007-1 trust on whose behalf this foreclosure was brought, with actual knowledge that stated-income loans like Plaintiff's frequently contained inflated income figures, that elderly fixed-income borrowers on stated-income documentation were internally flagged for ability-to-repay failures, and that AHM's valuation practices went "beyond misrepresentation into the fraudulent area."

802.    An institution whose own internal records, acknowledged to the United States government in December 2017, documented those facts, and that then acquired and enforced a specific AHM 2007-1 stated-income loan originated to an elderly borrower in November 2021, was not making a good-faith judgment about an isolated loan. Plaintiff alleges it was applying the same institutional calculation alleged throughout this

Complaint: that enforcement value can be extracted from a defective instrument if the enforcement process can be completed before the defects are exposed or meaningfully adjudicated.

803.    Plaintiff alleges that the current foreclosure enforcement is a continuation or recurrence of the same institutional pattern: defective mortgage-chain assets are converted into value through legal and financial machinery, first by sale to investors and later by foreclosure enforcement against homeowners, while Deutsche Bank and its agents use paperwork, servicing records, trustee status, law-firm transmissions, and court filings to obscure defects in loan quality, trust transfer, standing, possession, and chain of custody.

804.    Deutsche Bank was not an innocent trustee surprised by a defective mortgage chain. It was an institution already investigated for RMBS misconduct, already aware of systemic defects in the 2006–2007 securitization market, already aware that defective loans and misrepresentations had infected RMBS structures, and already financially penalized for conduct that ordinary damages failed to deter.

805.    The attorneys and law firms deployed against Plaintiff were seasoned foreclosure, consumer-finance, real-estate, lender-enforcement, RMBS, and contested-litigation counsel. Plaintiff alleges that the public and institutional character of the DOJ settlement, the direct identification of AHM 2007-1 in Annex 3, counsel's specialized mortgage-enforcement roles, Plaintiff's repeated filings raising predatory-origination issues, Defendants' refusal to retract the disability/candor attack after notice, their use of the false professional-identity narrative, their post-hearing standing supplementation, and their continued enforcement of the instrument support a plausible inference of knowledge, notice, reckless disregard, deliberate avoidance, and coordinated participation.

806.    The enterprise's objective was not limited to collecting a single disputed foreclosure balance. Plaintiff alleges that the enterprise preserved, concealed, ratified, and monetized a broader equity-stripping chain that had already damaged Plaintiff's real-estate portfolio through serial predatory refinances, fabricated borrower-capacity narratives, lender-paid broker steering, phantom cash-out proceeds, negative amortization, and securitized-trust enforcement. Deutsche Bank's 2021 acquisition and 2023–2026 enforcement of the AHM 2007-1 instrument continued that enterprise by converting the product of the earlier equity-stripping chain into foreclosure leverage, fees, interest, title pressure, and strict-foreclosure consequences.

807.    Plaintiff's portfolio-wide losses, including the estimated $18 million in lost real-estate portfolio value alleged herein, are pleaded as injury to business or property proximately caused by the same racketeering enterprise, not merely as distress or consequential harm from a foreclosure judgment.

808.    Plaintiff does not allege that every Deutsche Bank trustee foreclosure case is fraudulent or that the existence of other foreclosure litigation proves racketeering. Plaintiff cites recurring Deutsche Bank trustee foreclosure disputes only as context showing that standing, holder status, note-possession proof, debt proof, special defenses, and foreclosure-enforcement machinery are recurring issues in securitized-trust foreclosure litigation. The RICO claim here rests on the specific enterprise conduct, predicate communications, DOJ/RMBS institutional knowledge, AHM 2007-1 connection, disability/candor attack, post-hearing standing supplementation, and property injuries pleaded in this Complaint.

809. Plaintiff alleges, on information and belief, that discovery is necessary to determine whether Deutsche Bank, the trust, servicers, custodians, investors, insurers, counterparties, or other participants have already received charge-off, loss-recognition, insurance, credit-enhancement, settlement, tax or accounting, investor, servicer-advance, or other financial benefits connected to the same loan or mortgage-chain losses now being enforced against Plaintiff. To the extent Defendants or related entities have already recognized, recovered, credited, insured, reimbursed, deducted, charged off, or otherwise monetized the same alleged loss, any further foreclosure recovery against Plaintiff would constitute unjust enrichment, double recovery, disgorgement injury, CUTPA unfairness, restitutionary injury, and evidence of the enterprise's property objective.

## C. RICO Persons and Association-in-Fact Enterprise

810. This count is pleaded against the private foreclosure-enforcement Defendants who conducted, participated in, directed, managed, authorized, or knowingly furthered the affairs of an association-in-fact enterprise through a pattern of racketeering activity.

811. The RICO "persons" include Deutsche Bank, McCarter & English LLP, Hinshaw & Culbertson LLP, Brock & Scott, PLLC, Adam M. Swanson, Bhanuka Y. Mahabamunuge, Geoffrey K. Milne, Aaron A. Fredericks, Jeffrey Marks Knickerbocker, and John Doe participants to be identified through discovery, including servicers, custodians, foreclosure processors, document personnel, and other actors who knowingly participated in the scheme.

812. The RICO enterprise is an association-in-fact foreclosure-enforcement enterprise consisting of Deutsche Bank, its foreclosure counsel, servicers, custodians, document

processors, filing agents, and other known and unknown participants. The enterprise is not Deutsche Bank alone, not any law firm alone, and not the attorney-client relationship itself; it is the broader association-in-fact structure through which trustee, counsel, servicer, custodial, document, and filing actors allegedly coordinated the interstate enforcement conduct described in this count.

813.     The enterprise was distinct from any single Defendant because it depended on coordinated, role-specific conduct by separate participants. Deutsche Bank could not alone create the foreclosure-enforcement record, transmit the challenged filings, supply or procure post-hearing standing materials, maintain debt and payment figures, assert note-possession claims, pursue strict-foreclosure leverage, and weaponize Plaintiff's disability-access record. The enterprise functioned through coordinated roles among Deutsche Bank, foreclosure counsel, individual attorneys, servicers, custodians, document processors, filing agents, and other participants pursuing the shared foreclosure-enforcement objective.

814.     The enterprise existed for the common purposes of enforcing a defective, fraud-tainted, and poisoned mortgage chain against Plaintiff's home; concealing or minimizing standing, trust-transfer, predecessor-liability, securitization, criminal broker Shallo/YSP, DOJ/RMBS, and note-possession defects; defeating Plaintiff's credibility and ability to expose the scheme; extinguishing or disabling her defenses, counterclaims, ADA access requests, and ability to obtain adversarial review; weaponizing Plaintiff's disability record to neutralize ADA access; manufacturing a foreclosure liability posture created without meaningful ADA-compliant adversarial access; and converting that untested record into strict foreclosure and title-transfer leverage.

181

815.    The enterprise had relationships among its participants. Deutsche Bank supplied the claimed foreclosure objective and institutional beneficiary. Its law firms and attorneys supplied litigation strategy, filings, service, advocacy, public-docket submissions, and foreclosure-enforcement pressure. Servicers, custodians, and document actors supplied or purported to supply debt figures, affidavit materials, note-possession claims, standing materials, payment records, escrow records, and post-hearing evidentiary support.

816.    The enterprise had longevity sufficient to pursue its purpose. The foreclosure action began in 2023 and continued through amended pleadings, special defenses, summary-judgment practice, disability-access disputes, post-hearing supplementation, appellate activity, strict-foreclosure efforts, and continuing enforcement.

817.    The enterprise was not merely an ordinary attorney-client relationship or a single entity acting through its agents. Plaintiff alleges a role-based association-in-fact enterprise in which separate participants performed separate functions necessary to the scheme: Deutsche Bank supplied the claimed beneficiary and foreclosure objective; law-firm Defendants supplied litigation strategy, public filings, disability/candor branding, service, and foreclosure pressure; servicers and custodians supplied debt, payment, note-possession, and affidavit materials; and document or filing actors supplied the records, transmissions, certifications, and post-hearing evidentiary support used to advance the Challenged Liability Posture through accelerated proceedings before Plaintiff could expose the scheme.

**D. Operation or Management of the Enterprise**

818.     Plaintiff alleges that each RICO Defendant did not merely provide routine professional services. Each participated in the operation or management of the enterprise's affairs by knowingly advancing, transmitting, adopting, ratifying, or relying upon materially misleading foreclosure, standing, disability-candor, accommodation, debt, affidavit, or strict-foreclosure communications necessary to the enterprise's objective.

819.     Defendants conducted or participated in the conduct of the enterprise's affairs by making strategic decisions, drafting and filing pleadings, serving papers, transmitting court filings, advancing defective standing theories, relying on post-hearing affidavit materials, attacking Plaintiff's disability candor, opposing accommodations, pressing summary judgment, seeking strict foreclosure, and using the public docket to further the enforcement scheme.

820.     The law-firm and individual attorney Defendants did not merely execute ministerial instructions from Deutsche Bank. The decision to attack Plaintiff's disability candor, the decision to characterize the New Jersey certifications as proof of dishonesty rather than confirmation of her disability, the decision to rely on the Flannigan affidavit rather than produce a custodian with personal knowledge, and the decision to time these filings immediately before the dispositive hearing were litigation-strategy decisions within the professional judgment and discretion of the attorneys who made them. These were not merely clerical acts or ministerial transmissions. By exercising professional judgment to select and deploy the specific tactics that advanced the enterprise's objective, the law-firm and individual attorney Defendants participated in the operation and management of the enterprise's affairs, not merely in providing legal services incidental to it.

183

**E. Predicate Racketeering Activity: Mail Fraud and Wire Fraud**

821.    The racketeering activity alleged in this case consists primarily of repeated acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. The fraudulent scheme was not simply that Defendants mailed or electronically filed foreclosure papers. The scheme was that Defendants used those mailed and wired communications — including interstate electronic filings, e-service, emails, affidavit transmissions, document-custody communications, assignment and standing materials, foreclosure notices, public disability/candor filings, and post-hearing supplementation — as the instruments for false and misleading representations, material omissions, disability-based credibility destruction, post-hearing proof patching, and concealment of known mortgage-chain defects, all for the purpose of concealing and executing a scheme to obtain money or property by false or misleading representations and omissions.

822.    Defendants used the mails, interstate wires, electronic filing systems, email, electronic service, court-filing transmissions, correspondence, affidavits, certifications, debt communications, servicing communications, and foreclosure-related transmissions to advance the scheme.

823.    The use of the mails and wires was not incidental to litigation. It was the means by which the enterprise protected its scheme and converted an inaccessible, untested, and exclusion-produced liability posture into enforceable property value. The object of the scheme was to preserve, monetize, and enforce a fraud-tainted mortgage chain; conceal, minimize, or avoid adjudication of standing, assignment, RMBS, predatory-origination, payment, recoupment, and enforceability defects; destroy Plaintiff's ADA-protected

184

credibility; manufacture an untested "unopposed" liability posture; and convert that posture into strict-foreclosure, title, equity, interest, fees, and property leverage.

824.     Plaintiff does not allege that ordinary foreclosure filings, service, or advocacy constitute racketeering activity merely because they were transmitted by mail, wire, or electronic filing. Plaintiff alleges predicate acts because Defendants used those transmissions as vehicles for material falsehoods, concealments, and deceptive foreclosure-enforcement acts directed toward protecting a coordinated scheme to obtain money, fees, interest, equity, title leverage, and possession of Plaintiff's home. The alleged racketeering communications were not incidental to litigation; they were the means by which Defendants advanced a fraud-tainted enforcement scheme and converted an inaccessible record into property leverage.

825.     The disability/candor attack is not pleaded as a standalone RICO predicate merely because it was defamatory, retaliatory, or discriminatory. It is pleaded as part of the mail-and-wire-fraud scheme because Defendants used electronically filed and served public-docket communications to make Plaintiff's protected ADA activity appear dishonest, to destroy the credibility of the borrower exposing the mortgage-chain defects, to manufacture the appearance of an unopposed record, and to obtain money, fees, equity, title leverage, and strict-foreclosure consequences through a process Defendants knew or recklessly disregarded was not meaningfully adversarial.

## F. Predicate Acts: Who, What, When, Where, and How

826.     Plaintiff alleges that the interstate character of the enterprise was not incidental. The scheme operated through a Connecticut foreclosure action prosecuted by national and

185

multi-state financial and legal actors, including Deutsche Bank and/or trust actors operating from outside Connecticut, Massachusetts-based counsel, Connecticut foreclosure counsel, a Texas-based servicer affiant, Florida bailee/custodial communications or records, South Carolina service communications to Plaintiff, electronic filing and electronic service systems, interstate email and correspondence, interstate attorney communications, servicer records, custodian transmissions, affidavit materials, mortgage-chain documents, and public-docket filings transmitted across state lines.

827.    Plaintiff alleges a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), consisting of multiple related predicate acts occurring within ten years of each other, including: on November 12, 2021, the execution and interstate transmission of an Assignment of Mortgage by Mackenzie Eichen in Pinellas County, Florida, purporting to convey an interest in a trust closed since 2007; on September 9, 2025, the interstate transmission and filing of Deutsche Bank's second Motion for Summary Judgment, invoking WaMu's subrogated rights while disclaiming the liabilities attached to them; on November 5, 2025, the electronic filing and service of the disability/candor attack mischaracterizing Plaintiff's New Jersey ADA-protective certifications; and on or about November 18–21, 2025, the drafting in Connecticut, interstate transmission to Texas for signature, and filing of the Flannigan affidavit, sworn by a servicer employee with no personal knowledge of the matters attested to.

828.    The fraudulent and misleading communications included, without limitation, foreclosure pleadings asserting Deutsche Bank's entitlement to enforce; amended pleadings invoking WaMu/subrogation/predecessor rights while concealing the poisoned predecessor chain; summary-judgment filings asserting entitlement to judgment; public-

docket filings attacking Plaintiff's disability candor; service and electronic transmission of those filings; post-hearing affidavit materials offered to patch standing proof after Plaintiff was denied meaningful access; debt, escrow, fee, payment, and foreclosure-amount communications; and communications seeking to convert the Challenged Liability Posture into strict foreclosure.

829.     The material misrepresentations and omissions included, without limitation: that Deutsche Bank possessed clean enforceable rights; that Deutsche Bank's trust, assignment, note-possession, and standing proof were sufficient; that the 2021 assignment into a 2007 trust created enforceable rights; that Deutsche Bank could invoke WaMu/subrogation benefits while avoiding predecessor liability; that Plaintiff's failure to oppose summary judgment was ordinary rather than disability-caused and court-created; that Plaintiff lacked candor about her disabilities; that New Jersey protective-relief certifications proved Plaintiff could litigate live or oppose summary judgment in Connecticut; and that post-hearing affidavit materials could cure standing defects without affording Plaintiff an equivalent ADA-compliant opportunity to respond.

830.     Defendants knew, or acted with reckless disregard, that the communications were false, misleading, incomplete, or materially deceptive. Plaintiff alleges, on information and belief, that Defendants knowingly used interstate communications, court filings, attorney transmissions, servicer records, affidavit materials, electronic filing, and electronic service to perpetuate a false standing and enforcement narrative.

831.     Among these predicate communications, Deutsche Bank's November 5, 2025 filing warrants particular attention. That filing — transmitted to the court and to Plaintiff through the electronic filing system in interstate commerce — asserted that Plaintiff was a

187

"seasoned mortgage professional" who lacked candor regarding her disabilities, an assertion built on the inverted characterization of the New Jersey certifications described elsewhere in this Complaint. This was not a neutral procedural filing. Its foreseeable and intended effect set in motion the sequence by which Plaintiff lost her counsel four days later, lost any opposition to summary judgment nine days later, and faced the dispositive hearing alone twelve days later — directly producing the empty record the enterprise then used to obtain the liability posture at issue in this action. The November 5 filing is therefore not background to the scheme; it is one of its operative acts.

832.     These misrepresentations and omissions were material because they affected standing, enforceability, equitable foreclosure relief, credibility, ADA access, summary judgment, strict foreclosure, debt calculation, recoupment, restitution, and Plaintiff's ability to preserve her home.

833.     Plaintiff alleges that the assignment Deutsche Bank relies upon to claim its position in the mortgage chain is dated November 11, 2021, and was executed by Mackenzie Eichen in Pinellas County, Florida. Plaintiff alleges that the trust on whose behalf Deutsche Bank claims to hold the mortgage reached its closing date under its own governing pooling and servicing agreement in 2007, fourteen years before that assignment was executed. Plaintiff alleges that the assignment recites good and valuable consideration, but that no evidence in the record establishes that any funds were actually exchanged in 2021 for this loan.

834.     The absence of wet-ink possession proof was acknowledged again on the record at the November 17, 2025 hearing. Plaintiff alleges that Deutsche Bank and its counsel pursued, transmitted, and relied upon the Flannigan affidavit and the WaMu/subrogation

theory simultaneously and in full knowledge that neither, alone, supplied what the other was being used to paper over.

835.     Plaintiff alleges that the Flannigan affidavit was part of the same fraudulent standing package. Defendants used a Texas-based servicer analyst to make assertions about a physical original note allegedly held by counsel in Connecticut, without producing sworn testimony from the actual custodian, without producing the wet-ink instrument for inspection, without establishing a complete chain of custody, and while relying on Florida-related bailee or custodial materials directed to a different law firm.

836.     Plaintiff alleges that Deutsche Bank, its servicer, its counsel, and participating law firms knew that a Texas servicer employee could not supply personal knowledge of the physical custody, condition, endorsements, allonges, vault history, transfer history, and current possession of an original negotiable instrument allegedly held by a different entity in another state.

837.     Plaintiff alleges, based on the timing, content, filing context, and counsel's use of the affidavit to supply the post-hearing proof the court allowed Deutsche Bank to submit, that the Flannigan affidavit was prepared through coordination between counsel, Deutsche Bank, and/or the servicer rather than independently authored by an affiant with personal custody knowledge. Plaintiff further alleges that the affidavit functioned as an interstate evidentiary patch: it was generated after the court allowed Deutsche Bank to supplement proof while Plaintiff was prohibited from responding, and it supplied assertions about note possession, custody, and enforceability that the actual custodian or person with firsthand custody history did not provide.

838.     Plaintiff alleges that Defendants did not merely make legal arguments about standing. Plaintiff alleges that Deutsche Bank and its counsel knew, or were recklessly indifferent to the fact, that Deutsche Bank had not established standing at the commencement of the foreclosure action as required by Connecticut law, and that the later post-hearing effort to supplement proof did not cure the commencement defect.

839.     Plaintiff alleges that this was not a harmless evidentiary shortcut. It was part of the enterprise's method: use interstate records, law-firm transmissions, servicer assertions, affidavit practice, and post-hearing supplementation to substitute layered hearsay and institutional paperwork for competent proof of standing, chain of custody, note possession, trust transfer, and foreclosure entitlement.

840.     Plaintiff alleges that the Flannigan affidavit illustrates the interstate and layered nature of the scheme. Instead of producing sworn testimony from the actual person or entity allegedly possessing the wet-ink note, Defendants relied on a Texas-based servicer analyst who did not personally possess the note, did not attest from the alleged Connecticut vault or current counsel's physical custody, and relied on records or communications including Florida-related bailee materials addressed to a different law firm.

841.     Plaintiff alleges that Deutsche Bank and its counsel knew, at the time the Flannigan affidavit was drafted and submitted, that Deutsche Bank could not produce the wet-ink note establishing its possession at the time required by Connecticut law. This was not a later-discovered defect. Deutsche Bank's own September 2025 summary-judgment filing reveals this knowledge: rather than rely on its own direct chain of title, Deutsche Bank's filing sought to invoke WaMu's predecessor rights — the "poisoned shoes" Deutsche Bank

now asks this Court to recognize it assumed along with whatever liability accompanies them.

842.    An institution that already possessed sufficient proof of its own standing would have no occasion to fall back on a predecessor's subrogated rights. The choice to do so, in the same filing cycle in which the Flannigan affidavit was offered, demonstrates that Deutsche Bank and its counsel knew their direct standing and note-possession proof was insufficient at the moment they submitted both.

843.    Plaintiff also alleges that Deutsche Bank's WaMu/subrogation theory was not a harmless alternative pleading. It was an admission that Deutsche Bank's direct chain and standing theory was defective, incomplete, or insufficient, and that Deutsche Bank was attempting to obtain foreclosure relief through predecessor shoes while disclaiming the poisoned predecessor chain.

844.    Plaintiff alleges that the second summary-judgment posture itself further exposed the defect because Deutsche Bank sought to rely on WaMu/subrogation or predecessor-equity theories years into the case rather than a clean, complete, commencement-standing record.

845.    Plaintiff further alleges that the same RICO enterprise used the November 17, 2025 hearing to convert an ADA-created empty record into foreclosure leverage. Attorney Milne's "no evidence," limitations, no-agency, no-unconscionability, rescission, and knowledge narrative was transmitted and deployed after Defendants had publicly attacked Plaintiff's disability candor and while Plaintiff was medically unable to respond in real time. Plaintiff alleges that the narrative was materially false or misleading because it ignored and contradicted pleadings, exhibits, and written submissions already before the

191

court. Its function within the enterprise was to make the manufactured empty record appear legitimate, obtain summary-judgment liability, and create strict-foreclosure leverage from a disputed and fraud-tainted mortgage chain.

846.     Plaintiff pleads the mail-fraud and wire-fraud predicate acts with particularity to the extent the facts are presently known before discovery. The Complaint identifies the participants, approximate dates, filing events, communications, affidavits, electronic transmissions, public-docket acts, and foreclosure-enforcement materials used to advance the enterprise, including the November 5, 2025 disability/candor filing, the September 2025 summary-judgment and WaMu/subrogation materials, the post-hearing Flannigan affidavit package, the 2021 Florida assignment, the debt and tax-advance representations, the service and electronic transmission of those materials, and the strict-foreclosure filings seeking to convert the Challenged Liability Posture into title leverage. Additional internal communications, servicer transmissions, custodial records, trust records, law-firm communications, and electronic-service records are within Defendants' possession and control and will be identified through discovery.

847.     Plaintiff alleges, on information and belief, that Defendants intended that the court, Plaintiff, court personnel, adverse parties, and the public docket rely on the communications.

848.     Reliance occurred because the foreclosure proceedings advanced, summary judgment entered, Deutsche Bank was permitted to supplement proof, Plaintiff's disability credibility was attacked, the record was treated as unopposed, and strict-foreclosure consequences were pursued.

849.     Plaintiff alleges that the use of the Flannigan affidavit, the Florida-related bailee materials, the post-hearing supplementation, the 2021 assignment posture, the WaMu/subrogation theory, the DOJ/RMBS concealment, and the disability/candor attack were not isolated acts. They were related acts in a coordinated foreclosure-enforcement enterprise designed to obtain property and money by presenting a defective standing record as valid, suppressing meaningful adversarial testing, and converting Plaintiff's disability-caused nonparticipation into foreclosure leverage.

## G. Pattern, Continuity, Injury, Causation, and Relief

850.     The predicate acts were related because they had the same or similar purposes, participants, victims, methods, and results. They were directed toward preserving and enforcing a fraud-tainted mortgage chain; concealing or minimizing standing, assignment, trust-transfer, debt, note-possession, predatory-origination, payment, recoupment, and enforceability defects; destroying Plaintiff's ADA-protected credibility; manufacturing an unopposed liability posture; and converting that posture into money, fees, interest, equity, title leverage, and strict-foreclosure consequences.

851.     The predicate acts show both closed-ended and open-ended continuity. They occurred over multiple years, including the 2021 assignment, the 2023–2026 foreclosure prosecution, the 2025 summary-judgment and disability/candor filings, the post-hearing affidavit package, the 2026 strict-foreclosure efforts, and continuing enforcement activity. The enterprise's method also presents a threat of continued racketeering activity because the same foreclosure-enforcement machinery can be used to convert other defective securitized mortgage-chain assets into enforceable foreclosure value where borrowers lack

the resources, access, counsel protection, or accommodations necessary to force meaningful testing.

852.    Plaintiff suffered injury to business or property within the meaning of 18 U.S.C. § 1964(c) by reason of Defendants' violation of 18 U.S.C. § 1962(c). Those injuries include, without limitation, payments extracted through the fraud-tainted mortgage chain; fees, interest, escrow, tax, servicing, foreclosure, and litigation charges imposed or increased through the challenged enforcement scheme; loss of home equity; impairment of title and property value; strict-foreclosure and title-transfer leverage; loss of the economic value of defenses, counterclaims, recoupment, setoff, and valuation objections; loss of litigation and settlement leverage; and portfolio-wide real-estate losses caused by the same predatory refinance and enforcement chain.

853.    Defendants' RICO violations directly and proximately caused Plaintiff's business and property injuries. The predicate communications were not remote background events. They were the means by which Defendants advanced the foreclosure, obtained or preserved the Challenged Liability Posture, destroyed Plaintiff's credibility and access at the dispositive stage, supplemented standing proof after the hearing, imposed or increased debt, fee, interest, escrow, tax, litigation, and foreclosure charges, impaired Plaintiff's title and equity, and pursued strict-foreclosure consequences from a record Plaintiff was not permitted to test meaningfully.

854.    Plaintiff seeks all relief available under 18 U.S.C. § 1964(c), including treble damages, costs, attorney's fees where applicable, and all other relief available by law. Plaintiff also seeks equitable, restitutionary, disgorgement, declaratory, corrective, sealing, status-preserving, and injunctive relief to the extent available under RICO, other federal

194

statutes, this Court's equitable authority, and the independent non-RICO counts pleaded in this Complaint. Nothing in this RICO count waives, narrows, or limits Plaintiff's request for damages, restitution, disgorgement, punitive damages where available against non-governmental Defendants, injunctive relief, declaratory relief, correction or retraction relief, sealing or confidentiality relief, ADA-access relief, status-quo relief, or any other relief requested elsewhere in this Complaint.

## COUNT X
## RICO CONSPIRACY
### 18 U.S.C. § 1962(d)
Against Deutsche Bank, McCarter & English LLP, Hinshaw & Culbertson LLP, Brock & Scott, PLLC, Adam M. Swanson, Bhanuka Y. Mahabamunuge, Geoffrey K. Milne, Aaron A. Fredericks, Knickerbocker, and John Doe Defendants as Applicable

855.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

856.    Plaintiff incorporates the RICO enterprise, predicate-act, pattern, injury, and causation allegations pleaded in Count IX. Plaintiff alleges that the RICO Conspiracy Defendants violated 18 U.S.C. § 1962(d) by agreeing, expressly or tacitly, that one or more members of the association-in-fact foreclosure-enforcement enterprise would conduct or participate in the conduct of the enterprise's affairs through the pattern of racketeering activity alleged above.

857.    The agreement may be inferred from Defendants' coordinated roles and conduct, including the 2021 assignment posture, the September 2025 WaMu/subrogation summary-judgment theory, the November 5, 2025 public disability/candor filing, the post-hearing

Flannigan affidavit package, the use of interstate filings and service transmissions, the refusal to correct the disability/candor narrative after notice, the use of Plaintiff's disability-caused nonparticipation to characterize the record as unopposed, and the continued pursuit of strict-foreclosure leverage from the Challenged Liability Posture.

858. Plaintiff does not allege conspiracy merely because Deutsche Bank retained counsel or because counsel represented a client in foreclosure litigation. Plaintiff alleges conspiracy because the private RICO Defendants knowingly agreed to further, adopted, ratified, or continued coordinated conduct whose objective was to preserve and enforce a fraud-tainted mortgage chain; conceal or avoid meaningful testing of standing, assignment, trust-transfer, note-possession, debt, payment, recoupment, and enforceability defects; destroy Plaintiff's ADA-protected credibility; manufacture a one-sided liability posture; and convert that posture into money, fees, interest, equity, title leverage, and strict-foreclosure consequences.

859. The RICO claim is based on a distinct multi-actor enterprise that used interstate assignments, foreclosure-enforcement communications, electronic filings, public disability/candor attacks, servicer affidavits, document-custody representations, and post-hearing evidentiary supplementation to enforce a fraud-tainted mortgage chain, conceal or patch standing and predecessor-liability defects, destroy Plaintiff's ADA-protected credibility, manufacture an apparently "unopposed" record, and obtain money, title leverage, fees, equity, and property value through the Challenged Liability Posture. Foreclosure was the enforcement vehicle through which the enterprise sought property and money; it is not the racketeering theory itself.

860. Defendants knowingly agreed, expressly or tacitly, that the enterprise would conduct or participate in its affairs through a pattern of racketeering activity.

861. Each Defendant knew the general nature of the foreclosure-enforcement enterprise and knew that the enterprise extended beyond that Defendant's individual role.

862. Deutsche Bank's knowledge of the enterprise's fraudulent character is not merely alleged by inference from circumstantial conduct. The Statement of Facts accompanying Deutsche Bank's 2017 DOJ settlement — a document Deutsche Bank acknowledged — documents that Deutsche Bank had actual institutional knowledge, documented in writing by its own internal due diligence personnel, that AHM's origination practices went 'beyond misrepresentation into the fraudulent area,' that elderly fixed-income borrowers on stated-income documentation were internally flagged as ability-to-repay failures, and that stated-income loans like Plaintiff's were known internally to involve inflated incomes in the great majority of cases. AHM 2007-1, the specific trust through which Deutsche Bank brought the foreclosure against Plaintiff, was also identified by name in Annex 3 of the DOJ settlement. Deutsche Bank's agreement to participate in the foreclosure-enforcement enterprise described in Count X was therefore not made in ignorance of the instrument's fraudulent character. It was made with full institutional awareness of that character, four years after paying $7.2 billion to resolve the government's claims arising from precisely that awareness.

863. Deutsche Bank knew that foreclosure counsel, servicers, custodians, document actors, and filing participants were necessary to enforce the poisoned mortgage chain, advance standing theories, transmit filings, serve papers, support debt calculations, and obtain strict-foreclosure consequences.

864.    McCarter, Hinshaw, Brock & Scott, and the individual attorney defendants knew that Deutsche Bank was not pursuing a routine uncontested default, but a heavily contested foreclosure involving predatory origination, Shallo/YSP misconduct, defective assignment/trust issues, WaMu/subrogation predecessor exposure, DOJ/RMBS concealment, ADA access, disability accommodation, and standing defects.

865.    Defendants nevertheless agreed to further the foreclosure-enforcement objective through filings, transmissions, public-docket submissions, service, affidavit materials, disability-candor attacks, summary-judgment advocacy, post-hearing supplementation, and strict-foreclosure pressure.

866.    Plaintiff alleges, on information and belief, that Defendants agreed that at least two predicate acts of mail or wire fraud would be committed by one or more enterprise participants in furtherance of the enterprise.

867.    Defendants need not have personally committed each predicate act to be liable for RICO conspiracy. It is sufficient that they knowingly agreed to participate in the enterprise's fraudulent foreclosure-enforcement objective and that predicate acts were committed in furtherance of that objective.

868.    Plaintiff alleges that the Flannigan affidavit is an overt act and coordinated evidentiary product of the enterprise, not merely parallel conduct. It supplied the post-hearing standing proof Deutsche Bank was allowed to submit after Plaintiff had been denied an equivalent ADA-compliant opportunity to respond, and it reflected coordinated action among Deutsche Bank, foreclosure counsel, the servicer, and/or document-custody participants to patch a standing defect and advance the Challenged Liability Posture.

869.     The affidavit concerned a Connecticut foreclosure, was sworn by a Texas-based servicer employee, was prepared for use by foreclosure counsel, and was filed by Connecticut foreclosure counsel to supply post-hearing standing proof after Attorney Knickerbocker had represented that his office possessed the original note. Plaintiff alleges that the affidavit could not have been produced, transmitted, signed, and deployed in that manner without coordination among Deutsche Bank, its servicer, document-custody participants, and the law-firm Defendants regarding its content, timing, purpose, and intended use.

870.     Plaintiff further alleges that the affidavit did not honestly establish what it was offered to establish: competent, inception-to-judgment note-possession proof consistent with the representation that secured Deutsche Bank's two-week extension. The coordinated production and use of that affidavit supports a plausible inference of agreement under § 1962(d), and also constitutes an overt act in furtherance of the enterprise's § 1962(c) objective: to preserve and enforce the Challenged Liability Posture by using interstate foreclosure-enforcement materials to convert a disputed, ADA-excluded record into strict-foreclosure leverage.

871.     Overt acts in furtherance of the conspiracy included foreclosure filings, amended pleadings, summary-judgment filings, service by mail or electronic means, public filing of the disability/candor attack, transmission of post-hearing standing materials, debt and fee communications, and strict-foreclosure efforts.

872.     Plaintiff was injured in her property and money by acts taken in furtherance of the conspiracy, including loss of equity, foreclosure exposure, improper fees and charges,

payments extracted through the poisoned chain, litigation costs, title impairment, and costs incurred responding to fraudulent or misleading foreclosure-enforcement materials.

873. Plaintiff seeks treble damages, attorney's fees, costs, and all relief available under 18 U.S.C. §§ 1962(d) and 1964(c).

## COUNT XI
## DEFAMATION/LIBEL/FALSE LIGHT AND RELATED REPUTATIONAL TORTS
Against Deutsche Bank, McCarter, Hinshaw, Swanson, Mahabamunuge, Milne, Fredericks, Brown, Brown Law LLC, and John Doe Defendants as Applicable

874. Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

875. This count does not allege ordinary litigation advocacy that later proved exaggerated, mistaken, or overzealous. The litigation privilege is designed to protect statements made within a functioning, intact adversarial process, where the opposing party retains a meaningful, ongoing opportunity to cross-examine and contest them. Plaintiff alleges that no such process existed here, and that this case presents the question of whether that privilege extends to a statement whose specific function was not to advocate within a contested proceeding, but to manufacture the conditions preventing the proceeding from being contested at all.

876. Plaintiff brings this count not only to be made whole, but because a rule of law that lets institutional litigants manufacture a disabled litigant's silence and then claim immunity for having done so is a rule that protects the wrongdoer at the exact moment the victim is least able to object.

200

877.    Plaintiff recognizes that Connecticut courts have extended litigation privilege broadly, including to claims of fraud arising from statements made during judicial proceedings. Plaintiff alleges that this case presents a materially different question than those the privilege doctrine has previously addressed: not whether a litigant may recover for a false statement made within a fair fight, but whether a privilege built on the premise of a functioning adversarial process can be invoked by parties who used a knowingly false accusation to ensure no such process existed for an elderly, disabled litigant to contest it. Plaintiff respectfully submits that the answer should be no, and that the same reasoning Connecticut courts have applied to except claims for the improper use of the judicial system from absolute immunity — because such claims do not involve advocacy for the purpose for which the courts were designed — applies with equal or greater force where the improper use is the elimination of the disabled litigant's capacity to participate altogether. Plaintiff pleads this distinction expressly and at the outset of this count because it presents squarely the question this Court is asked to resolve.

878.    This conclusion is supported by Connecticut defamation and privilege law. Under *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620 (2009), a showing of actual malice — knowledge of falsity — or malice in fact — reckless disregard for the truth — defeats a qualified privilege defense in a defamation case. Plaintiff alleges both. Defendants possessed actual or constructive notice of the Trial Court's prior order recognizing Plaintiff's ADA accommodations and the protective purpose of the disability filings before publicly branding Plaintiff as untruthful regarding the same disabilities. Those facts support a plausible inference of knowledge of falsity, reckless disregard for the truth, malice in fact, and improper motive. Plaintiff further alleges, in the alternative, that the

statements at issue fall outside the scope of litigation because Connecticut's litigation privilege protects only statements legitimate merits advocacy. Here, the statements were not pertinent to the subject of the controversy actually before the court. The genuine, disputed issue properly before the Trial Court was the validity and enforceability of the foreclosure claim. The genuine controversy before the Trial Court was whether Deutsche Bank could prove and enforce its foreclosure claim through a valid, accessible adversarial process. Defendants' disability/candor accusation addressed no element of the mortgage debt or foreclosure accounting and was used instead to weaponize protected ADA activity, defeat accommodation, deter counsel, and manufacture a non-adversarial record. To the extent any Defendant invokes absolute litigation privilege for such conduct, Plaintiff pleads this defamation/false-light count to the fullest extent permitted as this particular defamation falls outside what the privilege was designed to protect even under a generous reading of the pertinency requirement.

879.     Plaintiff further seeks punitive damages for defamation under Connecticut common law, available upon a showing of actual malice, malice in fact, or an improper or unjustifiable motive. Defendants' use of a known falsehood to induce the Trial Court to silence Plaintiff and obtain a purportedly "unopposed" liability judgment constitutes exactly such improper and unjustifiable motive.

880.     On November 5, 2025, Deutsche Bank, McCarter, Hinshaw, Swanson, Mahabamunuge, Milne, and Fredericks published and caused to be published to the public docket statements directly implying and asserting that the eighty-eight year old disabled Plaintiff lacked honesty, integrity, and candor regarding her documented medical disabilities, her administrative accommodation needs, and her capacity to participate in

proceedings. Four separate attorneys—Swanson, Mahabamunuge, Milne, and Fredericks—personally signed the fraudulent, exclusionary filing containing these bad-faith accusations, which were subsequently argued before the court.

881. Plaintiff's medical disability, credibility, and physical capacity were never elements of any claim or defense properly before the court in this foreclosure action. No fact concerning Plaintiff's honesty regarding her own medical condition was relevant to whether the note was valid, whether the mortgage was enforceable, or whether Deutsche Bank held standing to foreclose. Defendants introduced this highly sensitive, collateral subject into the case entirely on their own initiative, for an improper purpose completely divorced from what the foreclosure merits demanded.

882. In her nearly 89 years of life, the disabled Plaintiff has had no history of any prior court sanction, ethical violation, or adverse judicial finding concerning her credibility, honesty or personal integrity. The defamatory statements were completely false and resulted directly in Plaintiff being denied meaningful access to the courts of her state.

883. Defendants made these direct, public assertions to ensure Plaintiff could not be trusted by the court. These defamatory statements were not merely untrue; they were the precise legal weapon designed and deployed to destroy Plaintiff's credibility overall and her ADA-protected access to contest Deutsche Bank's claims, preserve accommodation, obtain counsel protection, and present her defenses and counterclaims in a meaningful and medically safe forum.

884. As a direct result of this intentional subversion, Defendants then successfully engineered a structural lockout, procuring an unconstitutional, "unopposed" summary judgment victory in the forced, medically fragile absence of Plaintiff.

885.	Once Deutsche Bank and its counsel successfully branded Plaintiff as a liar who lacked candor about disabilities, the trial court evaluated her subsequent requests against that false, highly prejudicial premise rather than individual merits. Summary judgment as to liability was entered on a record left completely untested because the defendants' fraudulent misrepresentations had already destroyed Plaintiff's physical and procedural ability to oppose the judgment.

886.	Plaintiff's special defenses and counterclaims, detailed in Section V above, raised genuine, material, and unresolved factual disputes concerning agency, fraud, unconscionability, lack of valid chain of title, and validity of the underlying debt. Deutsche Bank obtained a liability judgment only because the underlying facts were never tested.

887.	In truth and in fact, Plaintiff is a qualified person with multiple, severe disabilities. Comprehensive medical documentation of her disabilities was provided to directly to the judicial ADA Coordinator and the court. Acknowledging this medical reality, the court explicitly granted ADA accommodations to Plaintiff on June 17, 2025, ordering a strict pause on case all proceedings that required mental engagement while she received medical treatment.

888.	Defendants knew that Plaintiff's disability status was not a contested matter requiring their own independent medical assessment. The Judicial ADA Coordinator had already qualified Plaintiff as a person with disabilities, and the court had already granted accommodations on that basis on June 17, 2025. That qualification was a matter of record in this very case, known to Defendants before they filed the November 5, 2025 accusation. Defendants argued the opposite and that Plaintiff lacked candor — directly contradicting a qualification the court's own ADA process had already made. Defendants did not merely

lack evidence supporting their accusation. They affirmatively contradicted an official determination they already knew existed.

889.     In September 2025, while Plaintiff was still undergoing active medical treatment and while her court-ordered ADA accommodations remained in full force and effect, Deutsche Bank nevertheless filed for summary judgment. Plaintiff's treating physician reported that she remained medically unable to participate in activities requiring mental engagement. When Plaintiff's counsel filed a motion for an extension of time to safely respond to summary judgment, the defendants opposed, accusing Plaintiff of faking or misleading the court about her medical realities.

890.     Deutsche Bank's signed filings included the following fraudulent, bad-faith and damaging words about Plaintiff: "Ms. Roncati's representations to this Court that she lacks the 'mental engagement' required to oppose summary judgment are surprising and the Court should also examine Ms. Roncati's candor to the Court."

891.     The accusation was built entirely on two New Jersey filings in an unrelated matter that said the opposite of what the defendants used them to imply to the Connecticut court.

892.     The New Jersey certifications actually stated, in substance and text, the absolute opposite of the defendants' representations: that Plaintiff was disabled, medically restricted, and unable to undergo compelled deposition or live adversarial examination.

893.     Plaintiff did not lack candor by submitting lawyer-drafted protective filings in New Jersey or by seeking accommodations in Connecticut. In truth, the New Jersey protective-relief certifications and the Connecticut filings harmoniously stated that Plaintiff was disabled, unable to be deposed, and medically barred from participating.

205

894.     Deutsche Bank's counsel possessed both documents, necessarily read them before citing them, and used them anyway to manufacture the appearance of a contradiction that did not exist.

895.     Defendants' use of those certifications to imply that Plaintiff was dishonest about disability, exaggerating her impairment, or capable of participating in Connecticut summary-judgment proceedings and deposition was therefore not fair comment, was not protected opinion, and not a reasonable litigation inference. It was a calculated, materially false factual inversion of the documents Defendants chose to place before the court.

896.     This inversion is not merely false; it constitutes strong evidence of actual malice and reckless disregard for the truth. Having read certifications in support of protective motions that stated that Plaintiff was medically restricted from participation, Deutsche Bank's counsel knowingly represented to the Connecticut court that those same certifications proved she was lying.

897.     Four distinct attorneys read documents saying one thing, and then represented to the court that it says the opposite, willfully violating the Connecticut rules of practice to execute a fraudulent scheme to strip an elderly disabled woman of her property and her voice.

898.     The fraudulent accusation did not remain contained to a single filing. It systematically infected the entire subsequent procedural history of the docket.

899.     Once accused and branded as a dishonest litigant, every subsequent motion Plaintiff filed seeking reinstatement of her ADA accommodation, emergency stay, or judicial reconsideration were denied or ignored over twenty separate times in the trial court alone, without a single exception.

900.    Attorney Christopher Brown and Brown Law LLC subsequently published, adopted, repeated, or amplified statements implying that Plaintiff was untruthful with the court, despite Brown's firsthand knowledge of Plaintiff's medical condition and ADA needs.

901.    Plaintiff's formal opposition to Brown's withdrawal motion specifically demanded that the false statements be stricken from the public record; that demand was flatly denied.

902.    Plaintiff attempted to retain substitute counsel following Brown's withdrawal and contacted multiple attorneys, each of whom declined representation.

903.    This defamatory accusation foreseeably foreclosed Plaintiff's ability to obtain substitute counsel. Plaintiff attempted to retain substitute counsel and contacted multiple attorneys, each of whom declined representation. The public accusation left Plaintiff entirely unrepresented, functionally silenced at the dispositive summary-judgment hearing that followed, and forced to face three institutional law firms without counsel while medically unable to participate safely in the live adversarial process.

904.    Plaintiff's inability to participate in live adversarial or high-cognitive-load proceedings was genuine, medically grounded, and documented by physicians. Plaintiff had never claimed that she could not perform the physical act of placing her signature on a written document.

905.    Brown's adoption of this narrative on November 11, 2025 is an independent, egregious, and bad-faith breach of the duty of candor. Brown possessed Plaintiff's medical documentation — records entrusted to him for the purpose of securing her ADA accommodations — at the time he filed the withdrawal motion stating that Plaintiff had not been truthful with the court.

906. Unlike Deutsche Bank's counsel, who at least faced an adversary's claims, Brown was Plaintiff's own attorney, in possession of her own medical records, which directly established the truth of the disability he then characterized as a falsehood. A statement that a litigant has been untruthful with the court, made by that litigant's own counsel — who holds the very medical evidence disproving the statement — carries a credibility no adversary's statement could match, and Brown's republication of Deutsche Bank's narrative therefore independently establishes an intentional intent to defraud the tribunal as to Brown.

907. The statements were published to the public docket, the court, adverse parties, counsel, court personnel, and the public at large.

908. The statements constituted an intentional fraud on the court because they accused an elderly disabled litigant of dishonesty, malingering, or lack of candor in connection with core issues of court access and federal civil rights protections.

909. Defendants' false NJ-certification narrative affected the court's compelled-participation analysis, including the court's treatment of Plaintiff as medically able to undergo deposition and live adversarial participation. The false disability/candor narrative infected the court's treatment of every later ADA request, ensuring Plaintiff's motions were no longer treated as access requests from a documented disabled litigant, but rather as suspect filings from someone the court had been induced to view as dishonest or obstructive.

910. The fraudulent disability/candor narrative caused independent litigation injury in addition to structural injury. After the false narrative was placed before the court, her accommodation motions and emergency filings were repeatedly denied, disregarded, or

208

viewed through the lens of alleged dishonesty. The publication therefore did not merely harm Plaintiff's personal standing in the abstract; it impaired her access to the court, destroyed her credibility before the tribunal, and directly manufactured the Challenged Liability Posture.

911.    Plaintiff's medical condition, disability status, and treating-provider restrictions were not substantive foreclosure-merits issues. This was not a personal-injury case, medical-malpractice case, disability-benefits case, capacity proceeding, or damages action in which Plaintiff placed her medical condition at issue as an element of liability or damages.

912.    Plaintiff disclosed disability information for the limited and protected purpose of obtaining ADA access to court proceedings. Defendants were not entitled to transform that protected access request into a public merits weapon, a credibility attack, or a defamatory accusation that Plaintiff was dishonest about her health.

913.    The disability/candor narrative was therefore not reasonably necessary to adjudicate Deutsche Bank's standing, note possession, trust-transfer, debt, default, or foreclosure issues. It was entirely collateral to the foreclosure merits and was used for the improper purpose of destroying Plaintiff's credibility, defeating ADA accommodation, impairing counsel access, and manufacturing an appearance of non-participation.

914.    Plaintiff alleges that any litigation-privilege or absolute-immunity defense fails and cannot dispose of the pleaded misconduct at the pleading stage because Defendants did not merely make an adversarial argument about foreclosure merits; they knowingly made and published materially false factual assertions and implications concerning Plaintiff's honesty, candor, disability status, medical restrictions, and ADA-access needs, and alleged

209

misuse of accommodation procedures. Those statements inverted the very protective-relief certifications on which Defendants purported to rely; were collateral to Deutsche Bank's standing, note-possession, trust-transfer, debt, default, and foreclosure proof; and were used for the improper collateral purpose of defeating ADA accommodation, impairing Plaintiff's access to counsel, poisoning the public docket, damaging credibility, and manufacturing the Challenged Liability Posture.

915.    The same conduct described above also supports Plaintiff's independently pleaded ADA interference, abuse-of-process, fraud, CUTPA, public-docket, and equitable-correction claims, regardless of whether any communication-based defamation remedy is narrowed by privilege doctrine.

916.    Deutsche Bank and its counsel also published and relied upon a false professional-identity narrative, including statements or arguments that Plaintiff was a "mortgage consultant," "mortgage professional," "seasoned mortgage professional," or sophisticated mortgage-industry participant. Those statements were entirely false. Plaintiff has never been a mortgage professional of any kind.

917.    Plaintiff alleges that the professional-identity fabrication constitutes a separate fraud and placed her in a false light because it falsely portrayed her as a sophisticated mortgage insider who knowingly understood, accepted, ratified, or engineered the toxic loan structure, rather than as an elderly disabled consumer victim of predatory lending, stated-income fraud, YSP steering, criminal-broker misconduct, familial financial exploitation, and concealed securitization defects.

918.    Plaintiff alleges that Defendants used the professional-identity fabrication for multiple litigation advantages: to neutralize Plaintiff's predatory-lending, fraud,

210

unconscionability, tolling, delayed-discovery, and lack-of-ratification defenses; to conceal Deutsche Bank's own DOJ/RMBS and institutional knowledge exposure; and to undermine Plaintiff's ADA accommodation and access requests by implying that she was sophisticated enough not to need the procedural protections she sought.

919.    Plaintiff alleges that the professional-identity fabrication was not true, was not a fair inference from any record, and was not protected opinion. It was a materially false factual assertion about Plaintiff's identity, experience, professional background, vulnerability, and capacity.

920.    Plaintiff further alleges that Deutsche Bank and its counsel compounded the false professional-identity narrative by mischaracterizing the evidentiary record concerning her history as a victim of predatory financial abuse. Deutsche Bank had notice of Plaintiff's predatory-abuse allegations, the New Jersey litigation, the forged $1.133 million LBI mortgage issue, the Shallo/YSP broker allegations, and the pleaded facts showing Conrad's control over Plaintiff's finances, mail, documents, refinance decisions, and access to loan materials. Defendants nevertheless used summary-judgment briefing and hearing argument to suggest that Plaintiff's predatory-abuse defenses lacked evidentiary support.

921.    Plaintiff alleges that those statements and implications constituted defamation and false-light statements because they falsely portrayed Plaintiff as an informed mortgage insider asserting unsupported excuses after default, rather than as an elderly disabled victim who had pleaded and disclosed substantial evidence of predatory financial abuse, forged instruments, criminal-broker involvement, negative-amortization harm, and concealed institutional misconduct.

922.    Plaintiff alleges that litigation privilege does not bar this count for the reasons stated at the outset of this count and that no state-law privilege can authorize private parties or their counsel to interfere with rights protected by federal disability law, retaliate against protected accommodation activity, or preserve the benefit of a liability posture obtained through that interference.

923.    The statements injured Plaintiff's standing, dignity, credibility, ability to obtain counsel, ability to obtain accommodation, standing before the court, and her emotional and physical well-being, triggering severe medical distress.

924.    Plaintiff alleges that the statements were made negligently, recklessly, maliciously, and/or with actual knowledge of their absolute falsity.

925.    To the extent Defendants assert any litigation privilege, absolute privilege, qualified privilege, Noerr-Pennington, attorney-immunity, or advocacy-based defense, Plaintiff pleads in the alternative that the same conduct is independently actionable and independently relevant as ADA interference, retaliation, coercion, intimidation, denial of meaningful access, abuse of process, fraud, fraudulent foreclosure enforcement, CUTPA misconduct, privacy/confidentiality injury, public-docket misuse, fiduciary breach, punitive-damages aggravation, and equitable-access injury.

926.    Plaintiff does not rely solely on a state-law defamation label. Defendants' public disability/candor attack was intentionally deployed as an instrument to defeat Plaintiff's federally protected ADA access, poison the court record, deter accommodation activity, impair counsel access, and manufacture an entirely unopposed foreclosure posture.

927.    Plaintiff further alleges that the relief sought for this conduct is not limited to defamation damages. Plaintiff seeks all available ADA, civil-rights, CUTPA, fraud, abuse-

212

of-process, privacy, fiduciary, punitive, declaratory, injunctive, sealing, correction, retraction, and public-record remedies arising from the same conduct, whether or not any portion of the state-law defamation claim is later limited by privilege defenses.

928.    Plaintiff seeks compensatory damages, presumed damages where available, special damages, reputational damages, emotional-distress damages, punitive damages, retraction, correction, sealing, declaratory relief, and all other relief permitted by law.

**COUNT XII**
**INVASION OF PRIVACY / PUBLIC DISCLOSURE OF PRIVATE FACTS /**
**UNAUTHORIZED PUBLIC DOCKETING OF ADA COMMUNICATIONS**
Against Connecticut Judicial Branch, Keane, and John Doe Defendants as Applicable

929.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

930.    Plaintiff submitted private ADA communications to the appellate/Supreme Court ADA process for accommodation purposes.

931.    Plaintiff's April 13, 2026 ADA communication was submitted to the Judicial Branch's ADA accommodation channel, ADAprogram@jud.ct.gov, for the limited administrative purpose of obtaining disability accommodation and safe access to the appellate e-filing process. It was not submitted as evidence, merits briefing, public advocacy, a public pleading, or adversarial litigation material.

932.    The Judicial Branch's own ADA form instructed requesters not to submit the form through E-Services and directed submission to the ADA program, the ADA office, or the clerk. Plaintiff therefore reasonably understood that her ADA access communication was

being submitted through an accommodation process, not being placed into the public adversarial docket as litigation material.

933.    Nevertheless, the appellate docket reflected a "Clerk Uploaded ADA Request" entry in the same appellate matter in which Peter D. Keane was identified as case manager. Plaintiff alleges that Keane, the Clerk, and/or Judicial Branch personnel acting within that appellate case-management and ADA-access process caused, permitted, failed to prevent, or failed to correct the public docketing of Plaintiff's ADA communication.

934.    The public docketing exposed the entirety of Plaintiff's private ADA access communication to the public, not merely to Deutsche Bank or counsel. The public could see it on the docket. That exposure occurred in a case where adverse parties had already used Plaintiff's disability and accommodation record to attack her candor, credibility, and participation rights.

935.    The disclosure caused concrete harm. It triggered or aggravated a medical crash, extreme stress, created fear of compounded public exposure, reputational harm, created strategic litigation harm, privacy injury, dignitary injury, chilling of future ADA communications, and impaired ability to seek accommodation candidly in an adversarial foreclosure case where Plaintiff's disability record had already been weaponized.

936.    Plaintiff alleges that this was not a neutral docketing error. It converted an ADA access request into public litigation material, exposed disability-related communications in an adversarial foreclosure case, and compounded the very disability/candor narrative that Plaintiff sought accommodation to survive.

937.    The communications concerned disability access and were submitted to an ADA contact channel, not as public pleadings.

214

938. Plaintiff did not authorize those communications to be placed on the public docket.

939. Keane was identified as the ADA contact for the Supreme/Appellate Court/State Library.

940. Keane and/or John Doe personnel placed, caused to be placed, permitted, or failed to prevent Plaintiff's private ADA communication from being publicly docketed.

941. The public docketing disclosed private disability-access communications to adverse parties and the public.

942. The disclosure would be highly offensive to a reasonable person, particularly an elderly disabled litigant already being publicly accused of lack of candor about disability.

943. The disclosure was not necessary to adjudicate the merits of the foreclosure and was not authorized by Plaintiff.

944. The disclosure caused humiliation, distress, privacy injury, medical aggravation, reputational harm, and access injury.

945. Independent of the disclosure described above, Plaintiff alleges a related but distinct privacy and reputational injury: between March and June 2026, approximately ten of Plaintiff's appellate filings were rejected or returned because no appellate e-filing category other than 'Other Document' existed for the relief she sought.

946. Plaintiff alleges that this resulting docket history creates a false public impression that Plaintiff's filings were defective or frivolous, when the rejections were in fact caused by the absence of any workable filing category and were not attributable to any defect in the substance of what Plaintiff sought to file.

947. Plaintiff alleges that this docket-created false impression is itself a privacy and reputational harm, distinct from the single docketing disclosure described above, arising from the same disability-access failures and the same defendant's case-management role.

948. Plaintiff seeks, against the Connecticut Judicial Branch and official capacity or Doe Defendants only to the extent permitted by law, declaratory relief, prospective injunctive relief, sealing, correction, removal of unauthorized public docket entries, a protected ADA protocol to prevent recurrence, and all other non-damages relief permitted against official-capacity or governmental Defendants. Plaintiff seeks damages for this count only against Defendants against whom damages are legally available and supported by proof.

## COUNT XIII
## ABUSE OF PROCESS AND CIVIL CONSPIRACY
Against Deutsche Bank, McCarter, Hinshaw, Brock & Scott, Swanson, Mahabamunuge, Milne, Fredericks, Knickerbocker, Brown, Brown Law LLC, and John Doe Defendants as Applicable

949. Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

950. Defendants used legal process against Plaintiff primarily to accomplish improper collateral purposes not justified by the legitimate ends of foreclosure litigation, alleged debt enforcement, attorney withdrawal, or ordinary motion practice.

951. Plaintiff alleges, in the alternative to and independent of the RICO conspiracy alleged in Count X, and the civil conspiracy/aiding and abetting claim alleged in Count XXIV, that Defendants conspired among themselves to employ this abuse of legal process for an improper purpose, and that each Defendant who knowingly participated in, ratified, or substantially assisted that misuse of process is liable for the resulting harm.

952.     Connecticut law does not treat abuse of process as merely another label for defamation, fraud, CUTPA, or ordinary litigation-advocacy claims. In *Simms v. Seaman*, 308 Conn. 523, 546–48 (2013), discussing *Mozzochi v. Beck*, 204 Conn. 490 (1987), the Connecticut Supreme Court recognized that absolute immunity may bar certain claims based on litigation communications, but does not bar abuse-of-process claims directed at the improper use of litigation process for an unlawful collateral purpose. That distinction controls here. Plaintiff does not plead abuse of process merely because Defendants made an adverse argument in foreclosure litigation. Plaintiff pleads abuse of process because Defendants used summary-judgment procedure, disability-protective filings, public docket filings, attorney-withdrawal timing, post-hearing supplementation, and strict-foreclosure leverage for a collateral purpose: destroying Plaintiff's ADA-protected access to oppose summary judgment, obtain counsel protection, preserve accommodation, test Deutsche Bank's proof, and prevent adjudication of the mortgage-chain defects before Defendants converted the Challenged Liability Posture into foreclosure leverage. That is not advocacy within the normal contemplation of adversarial litigation.

953.     The November 17, 2025 summary-judgment process was used for a collateral purpose: to transform a disability-produced participation barrier into an apparent merits default. Deutsche Bank's counsel used the hearing to present Plaintiff as having no evidence and no viable defenses while Plaintiff was medically unable to respond in real time and while her written submissions for ADA relief and protection remained unadjudicated. Plaintiff alleges that the "no evidence" narrative was materially false or misleading because it contradicted documents, pleadings, exhibits, and written submissions already before the court. The process was then used to obtain additional standing proof

from Deutsche Bank, deny Plaintiff a response opportunity, and convert the resulting posture into strict-foreclosure leverage. Plaintiff alleges that this was not ordinary adversarial use of summary-judgment procedure, but an improper use of process to manufacture and monetize a non-adversarial record.

954.    Plaintiff therefore pleads this count independently of, and as a backstop to, the defamation, fraud, and CUTPA claims alleged elsewhere in this Complaint. Litigation privilege or absolute immunity defense does not reach the misuse of process alleged here.

955.    Deutsche Bank's counsel's strategic misuse of the New Jersey certifications from an unrelated matter further illustrates this improper collateral purpose. Those certifications were submitted in New Jersey to protect an elderly, disabled litigant from live depositions precisely because of her documented medical restrictions—filings that confirmed, rather than contradicted, the cognitive limitations underlying her Connecticut accommodations. Deutsche Bank's counsel knew that Plaintiff held an active Connecticut accommodation order limiting her to participation.

956.    Rather than presenting the New Jersey certifications accurately — as confirmation that Plaintiff cannot safely participate in live proceedings, consistent with her Connecticut accommodation — Deutsche Bank's counsel executed a bad-faith factual inversion: arguing that because Plaintiff could sign a written certification drafted by counsel, she was fully capable of all participation and had therefore been untruthful with the Connecticut court in seeking disability accommodation. Defendants deployed this defamatory narrative in a filing deliberately timed to accelerate dispositive hearing at the precise moment its effect on Plaintiff's accommodations and ability to retain substitute counsel would be most destructive and least correctable.

957. Deutsche Bank and its counsel used summary-judgment procedure, public-docket filings, post-hearing supplementation, foreclosure scheduling, and strict-foreclosure leverage not merely to adjudicate a clean alleged debt, but to exploit Plaintiff's disability, overwhelm her procedurally, defeat and bypass accommodation, conceal defects in standing and enforcement proof, and convert a Challenged Liability Posture into strict foreclosure leverage.

958. Deutsche Bank and its counsel used Plaintiff's disability-related protective filings from another venue for the improper purpose of attacking her candor, undermining her ADA accommodation requests, poisoning the court record, and transforming protected-disability access activity into purported evidence of dishonesty, obstruction, or self-inflicted nonparticipation.

959. Plaintiff's disability-access materials were not foreclosure merits evidence. They did not concern default, note ownership, trust transfer, standing, payment history, debt amount, equitable foreclosure, or the validity of Deutsche Bank's lien. Defendants used those materials because they served a collateral purpose: to brand Plaintiff as dishonest, neutralize her ADA requests, impair her ability to participate, and make a liability record created through disability exclusion and asymmetric process appear self-inflicted.

960. Deutsche Bank and its counsel also used the false "mortgage professional" or "mortgage consultant" narrative for an improper collateral purpose. That narrative was used not merely to argue foreclosure merits, but to distort Plaintiff's identity, strip her of consumer-victim status, defeat fraud and unconscionability defenses, defeat tolling and delayed-discovery arguments, undermine ADA and counsel-protection requests, and make disability-caused nonparticipation appear strategic or self-inflicted.

961.    Deutsche Bank and its counsel further used summary-judgment briefing and hearing argument to mischaracterize the predatory-abuse evidence. Plaintiff alleges that Deutsche Bank had notice of the New Jersey litigation, the forged $1.133 million LBI mortgage issue, the Shallo/YSP allegations, and Plaintiff's pleaded evidence that Plaintiff's mail, finances, documents, refinance decisions, and access to loan materials were controlled by others. Defendants nevertheless used the process to suggest that Plaintiff's defenses lacked evidentiary support, while ignoring or minimizing the evidence already provided.

962.    Plaintiff alleges that this was a perversion of process because Defendants used summary-judgment briefing, public court filings, foreclosure procedure, and strict-foreclosure leverage to suppress and mischaracterize evidence of predatory abuse, impose a fabricated professional identity on an elderly disabled homeowner, use that fabrication to defeat defenses and accommodation, damage Plaintiff's credibility, suppress meaningful access and equitable protection, and convert a liability record created without meaningful ADA-compliant access into foreclosure leverage.

963.    Brown and Brown Law LLC used withdrawal process and public filings not merely to end representation, but in a manner that foreseeably injured Plaintiff's credibility, validated Deutsche Bank's disability/candor attack, impaired Plaintiff's ability to obtain substitute counsel, and abandoned Plaintiff at the dispositive stage despite known medical vulnerability.

964.    The misuse of process achieved the improper collateral result Defendants sought or foreseeably caused: Plaintiff was left medically unable to participate, without counsel

protection, publicly branded as dishonest, denied meaningful written access, and exposed to strict-foreclosure consequences based on a Challenged Liability Posture.

965.     Defendants' misuse of process caused Plaintiff injury, including foreclosure exposure, litigation prejudice, reputational harm, loss of counsel, loss of meaningful access, emotional distress, economic injury, emergency litigation costs, and imminent property loss.

966.     The injury caused by the misuse of process also includes the preservation, concealment, and monetization of portfolio-wide equity-stripping harm. Defendants used foreclosure process not merely to collect a claimed debt, but to convert a fraud-tainted mortgage chain into judicial leverage while avoiding adjudication of the broader predatory-refinance structure that depleted Plaintiff's real-estate portfolio. Plaintiff alleges that the same misuse of process helped launder portfolio-wide equity loss into what Defendants presented as a routine single-loan default, thereby causing or preserving injury to Plaintiff's property, equity, financing capacity, investment value, and restitutionary rights, including the estimated $18 million portfolio loss alleged herein.

967.     Plaintiff seeks compensatory damages, consequential damages, punitive damages, declaratory relief that Defendants' use of process constituted an improper collateral purpose, injunctive relief barring further reliance on or use of the resulting Challenged Liability Posture, restitution and disgorgement of any benefit obtained through the misuse of process alleged herein, attorney's fees, costs, interest, and all other relief permitted by law or equity.

## COUNT XIV
## UNJUST ENRICHMENT, RESTITUTION, AND DISGORGEMENT
Against Deutsche Bank, Brown, Brown Law LLC, and Other Defendants as Applicable

968.  Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

969.  Defendants have been unjustly enriched at Plaintiff's expense.

970.  Defendants knew of the benefits conferred upon them as described below, and accepted and retained those benefits without paying Plaintiff their reasonable value, under circumstances making it unjust for Defendants to retain them.

971.  Deutsche Bank and related mortgage-enforcement participants have benefited from payments, fees, charges, interest, escrow amounts, foreclosure leverage, and claimed enforcement rights arising from the poisoned mortgage chain.

972.  Deutsche Bank seeks further unjust enrichment by obtaining strict foreclosure based on a Challenged Liability Posture.

973.  Deutsche Bank's enrichment is unjust because it arises from predatory origination, Shallo/YSP steering, defective trust-transfer and standing proof, WaMu/subrogation poisoned shoes, concealment, and disability-exclusion-based foreclosure enforcement.

974.  The unjustness of Deutsche Bank's enrichment is established with particular force by its own admissions in the Statement of Facts accompanying its 2017 DOJ settlement, in which it acknowledged that AHM — the originator of Plaintiff's loan — routinely produced fraudulent loans; that AHM's origination practices in Deutsche Bank's own assessment went 'beyond misrepresentation into the fraudulent area'; and that elderly fixed-income borrowers on stated-income documentation were internally identified as presenting ability-

to-repay failures. A party that collects approximately $1.15 million in payments, interest, and fees on an instrument it acquired with actual, government-admitted knowledge of its fraudulent origination — and that continues to seek title to Plaintiff's home on that basis — cannot claim that retention of those payments and enforcement of those rights is just under any equitable standard.

975.    Plaintiff alleges that Deutsche Bank and its predecessors-in-interest have collected approximately $1.15 million in payments, interest, fees, charges, escrow amounts, and servicing income from Plaintiff over the approximately fifteen-year payment history on the instrument at issue — a negative-amortization, equity-stripping product that Plaintiff alleges was void from inception due to fraud in the factum, fabricated income, predatory inducement by a convicted felon operating an unlicensed brokerage, and failure of consideration as to the $93,479.79 in undisbursed cash-out proceeds. Plaintiff further alleges that Deutsche Bank acquired the instrument in November 2021 with actual or constructive knowledge of the origination fraud and chain defects described herein, and that it has continued to collect interest, fees, and foreclosure enforcement costs from and against Plaintiff since acquisition. A party may not retain payments received on a void or voidable instrument under the doctrine of unjust enrichment; the measure of recovery is the full amount extracted, with interest, less any value Plaintiff actually received — and Plaintiff disputes that the net value received, after accounting for the equity stripped through serial negative-amortization refinances, is positive.

976.    Plaintiff further alleges that restitution and disgorgement are not limited to the approximately $1.15 million extracted on the single instrument now being foreclosed. Deutsche Bank and its predecessors, agents, servicers, and enforcement participants

223

benefited from a broader equity-stripping practice that depleted Plaintiff's real-estate portfolio through serial toxic refinances, broker-paid steering, phantom cash-out proceeds, negative amortization, and foreclosure-enforcement leverage. Because Deutsche Bank elected to acquire, ratify, and enforce the AHM 2007-1 instrument with institutional knowledge of the trust and loan category, and because it invoked predecessor rights through WaMu/subrogation while disclaiming predecessor liability, Plaintiff seeks restitution, disgorgement, constructive trust, accounting, equitable offset, recoupment, and all available restitutionary remedies for the portfolio value extracted or destroyed through the poisoned mortgage chain, including the estimated $18 million in portfolio loss alleged herein.

977.     Brown and Brown Law LLC were unjustly enriched by accepting and retaining a $30,000 retainer despite abandoning, undermining, or failing to provide the representation for which the retainer was paid.

978.     Other Defendants were unjustly enriched to the extent they received fees, payments, foreclosure proceeds, legal fees, servicing income, or other benefits from the misconduct alleged herein.

979.     Each law-firm Defendant received compensation for foreclosure-enforcement services directed at enforcing an instrument containing origination fraud apparent on its face — a $50,000 monthly stated income for an elderly retiree — that Plaintiff alleges they knew or had reason to know was fraudulent. Fees earned for enforcing a void or fraud-tainted instrument through a disability-exclusion process are not legitimate litigation fees protected by professional immunities; they are proceeds of the unjust-enrichment scheme itself, subject to disgorgement regardless of whether any individual attorney acted with

224

actual knowledge of the fraud or merely with willful blindness to facts available in the loan file they received and reviewed.

980.     To the extent any law-firm or attorney Defendant received fees, compensation, or other benefit specifically attributable to the conduct alleged in this Complaint — including the drafting, filing, signing, or service of the disability/candor narrative described in Sections V.I and V.L above, the representation described in Count VI, or the post-hearing supplementation described in Section V.M above — Plaintiff alleges that retention of those fees is unjust, because a party should not be permitted to profit from compensation earned specifically for conduct that caused the harm alleged in this action. Plaintiff seeks disgorgement of any such fees as part of the equitable relief requested in this count.

981.     Plaintiff seeks restitution, disgorgement, fee return, accounting, constructive trust, equitable lien, offset, recoupment, and all other equitable remedies available, or in the alternative, compensatory damages in the amount of the benefit unjustly retained.

## COUNT XV
## LEGAL MALPRACTICE / PROFESSIONAL NEGLIGENCE
Against Brown and Brown Law LLC

982.     Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

983.     Brown and Brown Law LLC owed Plaintiff duties of a reasonably competent foreclosure attorney.

984.     Those duties included preservation of defenses, competent opposition to dispositive motions, and protection of her ADA accommodations through the dispositive stage.

225

985.    Brown breached those duties: he possessed PACER access and had reviewed the criminal docket establishing James Shallo's federal bank fraud conviction as early as March 20, 2023, yet never properly developed its connection between YSP-agency and Deutsche Bank's liability; and failed to defend summary judgment or Plaintiff with defenses including standing and agency arguments Plaintiff had specifically directed him to include.

986.    Brown's breach is measured against the standard of care he held himself out as possessing. Brown's own public attorney profile represents him as an experienced foreclosure defense attorney with appellate and Connecticut Supreme Court experience — not a general practitioner working outside his area of competence. An attorney who markets himself as a foreclosure specialist with appellate-level experience is held to the standard of care of a specialist in that field, not merely that of a reasonably competent general practitioner, and Brown's failure to develop defenses squarely within that claimed specialty is to be judged accordingly.

987.    Brown accepted a substantial retainer while knowing the case involved complex foreclosure defenses, predatory lending, standing issues, ADA access, and imminent risk to Plaintiff's home.

988.    Brown knew Plaintiff had medical limitations and was unable to perform high-cognitive-load litigation tasks without accommodation.

989.    Brown did not merely have general awareness of Plaintiff's disability. He possessed her actual medical documentation, provided to him for the specific purpose of securing her ADA accommodations. He knew what that documentation established. He nonetheless told

the court he had come to reasonably believe Plaintiff had not been truthful with it —
branding her as dishonest about the very disability his own client file proved true.

990.     An attorney who holds the medical proof of his client's condition cannot reasonably
claim to believe she lied about that condition, and Brown's decision to make that claim
regardless is not a judgment call protected by professional discretion. It is a breach of the
basic duty of competence and honesty Brown owed his client.

991.     Brown knew Plaintiff was the primary witness for many facts underlying her
defenses and counterclaims.

992.     Brown nevertheless failed to provide competent and diligent representation at the
critical summary-judgment stage.

993.     Brown withdrew, abandoned, or failed to maintain meaningful opposition to
summary judgment.

994.     Brown failed to protect Plaintiff's ADA rights and failed to prevent the court from
proceeding while Plaintiff was medically unable to participate.

995.     Brown moved to withdraw days before the dispositive hearing.

996.     Brown publicly adopted, repeated, or amplified a false narrative that Plaintiff was
untruthful despite his knowledge of her medical condition.

997.     Brown's breaches caused Plaintiff injury, including loss of meaningful opposition,
loss of counsel at the critical stage, foreclosure liability, reputational harm, emotional
distress, medical aggravation, litigation prejudice, economic loss, and imminent property
loss.

998.     Plaintiff does not allege merely that Brown failed to obtain a favorable result.
Plaintiff alleges that Brown's breaches caused the loss of the process itself: loss of counsel

227

protection at the dispositive stage, loss of meaningful opposition to summary judgment, loss of ADA protection, loss of a fair opportunity to present and test evidence, loss of the ability to correct Deutsche Bank's mischaracterizations before judgment, and exposure to strict foreclosure based on a liability posture created while Plaintiff was medically unable to participate meaningfully. Brown's conduct was a substantial factor in producing those injuries, separate from and in combination with Deutsche Bank's and the Judicial Branch's conduct.

999.     Brown knew, or as an attorney of decades of experience should have known, that a withdrawal motion publicly branding a client as dishonest to the court functions as a warning to the legal community generally, and that no competent attorney could be expected to undertake representation of a client whose own outgoing counsel has placed such a characterization on the record four days before the most consequential hearing of the case. The foreseeable and actual consequence was that Plaintiff — 88 years old, disabled, and now publicly branded as dishonest by her own former attorney — was left to face the November 17, 2025 summary judgment hearing entirely without counsel and without any realistic prospect of obtaining substitute counsel on four days' notice.

1000.    Plaintiff seeks compensatory damages, consequential damages, return of fees, punitive damages where available, costs, interest, and all other relief permitted by law.

**COUNT XVI**
**BREACH OF FIDUCIARY DUTY**
Against Brown and Brown Law LLC

1001.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1002.    Brown and Brown Law LLC owed Plaintiff fiduciary duties of loyalty, candor, and confidentiality, independent of and in addition to the duty of competent representation addressed in Count XV.

1003.    Brown breached his duty of loyalty by adopting and amplifying, in his own withdrawal filing, the characterization of Plaintiff advanced by opposing counsel—that she lacked candor regarding her disability. An attorney's duty of loyalty forecloses taking a position aligned with the adversary against his own client in the matter of representation. Brown did precisely that.

1004.    Brown breached his duty of candor to his client during a November 10, 2025 telephone call with Plaintiff. On that call, Brown told Plaintiff that he would characterize his withdrawal as resulting from a breakdown in communication — a neutral framing. Plaintiff relied on that representation in deciding how, and whether, to respond before the withdrawal was filed. The following day, Brown filed the opposite: a withdrawal motion accusing Plaintiff of having not been truthful with the court.

1005.    Brown breached his duty of confidentiality by using information entrusted to him in the attorney-client relationship — Plaintiff's medical documentation, provided to him for the purpose of securing her ADA accommodations — as the backdrop against which

he then publicly branded her as dishonest about the very disability that documentation established.

1006.   Brown breached his duty to avoid self-dealing. Brown's fee agreement was hourly, capped at $30,000, not a flat fee. Brown confirmed to Plaintiff in September 2024 that she had paid the full $30,000 cap, telling her she would 'not have to pay any more fees for the rest of the case.'

1007.   Brown's own invoices confirm he continued logging and writing off hours under the cap through at least January 2025, more than a year before his withdrawal — conduct that confirms his own understanding that the scope of representation continued regardless of further fees owed. Continuing representation through the dispositive hearing and beyond required no further compensation from Plaintiff, since the cap had already been reached and paid; it required only that Brown perform the representation he had agreed to provide.

1008.   Brown withdrew in November 2025, more than a year after being paid in full, four days before the dispositive hearing, having abandoned the very representation his own conduct confirmed he understood himself still obligated to provide.

1009.   Plaintiff alleges on information and belief that Brown's decision not to develop, assert, or preserve Plaintiff's predatory-origination, Shallo/YSP, and standing defenses was inconsistent with undivided loyalty to Plaintiff and may reflect an undisclosed conflict of interest or other incentive adverse to Plaintiff's interests. Discovery is required to investigate the full scope of Brown's fiduciary breach.

1010.   Brown's fiduciary breach was aggravated by Plaintiff's age, disability, medical vulnerability, reliance, and the imminent risk of losing her home.

1011. The consequences of these breaches extend beyond this litigation. An attorney's public characterization of his own client as dishonest to a court is not a private matter between attorney and client — it follows the client. Brown, the person bound above all others to protect Plaintiff's interests and reputation, instead inflicted reputational harm that no other party to this case was positioned to inflict in the same way.

1012. Plaintiff seeks compensatory damages, disgorgement of fees, punitive damages where available, equitable relief, costs, interest, and all other relief permitted by law as an equitable remedy for breach of fiduciary duty, pled in the alternative to, and not duplicative of, the remedy sought in Count XX, together with all other relief permitted by law.

## COUNT XVII
## BREACH OF CONTRACT
Against Brown and Brown Law LLC

1013. Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1014. Plaintiff and Brown/Brown Law LLC entered into an attorney-client fee agreement.

1015. Plaintiff and Brown's fee agreement was an hourly arrangement, billed at $500 per hour, capped at a maximum of $30,000 in Legal Fees provided Plaintiff's retainer replenishments were fully and timely paid. Plaintiff fully and timely paid all required replenishments, reaching the $30,000 cap by no later than September 2024 after which point Plaintiff would not have to pay any more fees for the rest of the case.

1016. Under the agreement's express terms, reaching the Fee Cap did not relieve Brown of the scope of services he had agreed to provide—defending Plaintiff in the foreclosure

231

action, including prosecuting appropriate special defenses and counterclaims, through trial. It only capped what he could charge for doing so.

1017.    Brown and Brown Law LLC were obligated to provide competent, diligent, loyal, and meaningful representation consistent with the agreement and the implied covenant of good faith and fair dealing.

1018.    Brown and Brown Law LLC breached the agreement by failing to provide the promised or reasonably expected representation, abandoning or undermining Plaintiff at the critical stage, failing to protect Plaintiff's ADA rights, and failing to carry Plaintiff through the summary-judgment crisis and trial-level defense for which Plaintiff paid.

1019.    This breach does not depend on any assessment of the quality of Brown's representation while he provided it. The agreement's scope term — representation through trial or substantial foreclosure defense — was not satisfied by withdrawal four days before the dispositive hearing that resolved the case, regardless of how that withdrawal was characterized or what work preceded it.

1020.    An agreement capping fees at $30,000 fully paid for more than a year before Brown's withdrawal, obligated Brown to continue the scope of representation defined in the agreement regardless of further fees owed. Representation that ends before trial-level proceedings occur, more than a year after the fee cap was satisfied and after Brown continued performing and billing under that cap for many months afterward, cannot be squared with the scope of services Brown agreed to provide. This is a failure of the bargained-for scope of representation itself, independent of and in addition to the breaches of professional duty alleged in Counts XV and XVI.

232

1021. Brown's own invoices confirm this failure of scope. Those invoices show the $30,000 cap was reached by September 2024, and show Brown continuing to log hours and write off the excess under the cap through at least January 2025. Brown therefore continued performing, and continued confirming his own ongoing obligation to perform, for many months after being compensated in full—and then withdrew before the scope of representation he had agreed to provide. Brown was therefore compensated in full for representation he did not provide, under an agreement whose entire premise was representation through trial.

1022. Plaintiff performed her obligations by paying the retainer.

1023. Plaintiff suffered damages, including the retainer amount, substitute-counsel costs, litigation prejudice, loss of defenses, foreclosure exposure, and consequential damages.

1024. Plaintiff seeks contract damages, return of fees, consequential damages, interest, costs, and all other relief permitted by law.

## COUNT XVIII
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
Against Brown and Brown Law LLC

1025. Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1026. The attorney-client fee agreement carried an implied covenant of good faith and fair dealing in its performance, including in the manner of its termination.

1027. Brown's breach of this covenant is distinct from the failure of performance addressed in Count XVII. Brown represented to Plaintiff that he would characterize his withdrawal in neutral terms, inducing Plaintiff's reliance on that representation, and the following day did the opposite.

233

1028.    A termination effected through an affirmative misrepresentation to the client about how that termination would be characterized is bad faith in the performance of the contract, independent of whether the underlying scope of work was completed.

1029.    Brown and Brown Law LLC acted in bad faith by accepting a substantial retainer, knowing Plaintiff's medical vulnerability, then abandoning or undermining Plaintiff at the dispositive stage and adopting or amplifying a false narrative harmful to Plaintiff.

1030.    Brown's conduct deprived Plaintiff of the benefit of the agreement.

1031.    Plaintiff seeks damages flowing from this bad-faith conduct — including the loss of the opportunity to respond to the accusation she had been told would not be made — distinct from the failure-of-performance damages sought in Count XV, together with fee disgorgement, punitive damages where available, interest, costs, and all other relief permitted by law.

## COUNT XIX
## CONVERSION / CIVIL THEFT / WRONGFUL RETENTION OF FUNDS
Against Brown and Brown Law LLC

1032.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1033.    Plaintiff and Brown's fee agreement was hourly, capped at $30,000. Plaintiff fully paid the $30,000 cap by no later than September 2024. Brown's own invoices confirm that he continued billing and that his own billing system continued automatically writing off hours in excess of the cap through at least January 2025, confirming his understanding that

the scope of representation — defending Plaintiff through trial — continued regardless of the cap having been reached.

1034.    On November 11, 2025, more than a year after being paid in full, Brown terminated the representation four days before the dispositive summary judgment hearing, without having completed the scope of services he had agreed to provide and had continued to perform and confirm for over a year after the cap was satisfied.

1035.    Plaintiff alleges that Brown accepted full and final payment under an agreement requiring him to complete a defined scope of representation through trial, continued to act consistently with that obligation for more than a year after payment was completed, and then withdrew at the most damaging possible moment without completing that scope. Plaintiff alleges that retaining the full benefit of payment while abandoning the bargained-for performance under these circumstances constitutes a wrongful exercise of dominion over funds paid for services not rendered, within the meaning of Connecticut's civil theft statute, Conn. Gen. Stat. § 52-564, and the definition of larceny incorporated therein at Conn. Gen. Stat. § 53a-119(a).

1036.    Plaintiff seeks compensatory damages, including but not limited to the return of the wrongfully retained funds and treble damages under Conn. Gen. Stat § 52-564, or in the alternative compensatory and punitive damages for conversion, together with attorney's fees where available under § 52-564, interest, costs, and all other relief permitted by law.

## COUNT XX
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
Against Deutsche Bank, McCarter, Hinshaw, Swanson, Mahabamunuge, Milne, Fredericks, Brown, Brown Law LLC, and John Doe Defendants as Applicable

1037.   Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1038.   Defendants knew or should have known that Plaintiff was elderly, disabled, medically fragile, and facing loss of her home.

1039.   Defendants' conduct—falsely accusing Plaintiff of disability dishonesty on the public docket, exposing her private ADA communications without authorization, abandoning her at the dispositive stage, denying meaningful accommodation, and pressing strict foreclosure based on a liability posture obtained through that conduct—was extreme and outrageous, exceeding all bounds usually tolerated by a civilized community.

1040.   Defendants intended to cause Plaintiff severe emotional distress, or knew or should have known that severe emotional distress was the likely result of their conduct, given Plaintiff's documented disability, her age, and her medical fragility.

1041.   Defendants' conduct directly caused of Plaintiff's distress: the public accusations immediately preceded the loss of her counsel, the loss of any opposition to summary judgment, and the dispositive hearing at which she appeared alone, unable to participate— a sequence Plaintiff experienced in real time, while medically unable to protect herself. Plaintiff suffered severe emotional and physical distress as a direct result, including humiliation, fear, medical aggravation, cognitive overload, and the physical and neurological strain documented in the medical records referenced throughout this Complaint.

1042.    Plaintiff suffered severe emotional distress, including humiliation, fear, anxiety, medical aggravation, cognitive overload, and physical strain.

1043.    Plaintiff seeks compensatory damages, punitive damages where available, costs, interest, and all other relief permitted by law.

## COUNT XXI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
Against Deutsche Bank, McCarter, Hinshaw, Swanson, Mahabamunuge, Milne, Fredericks, Brown, Brown Law LLC, and John Doe Defendants as Applicable

1044.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1045.    Plaintiff pleads this count in the alternative to Count XX. To the extent any portion of Defendants' conduct described above is found not to rise to the level of extreme and outrageous conduct required for intentional infliction of emotional distress, Plaintiff alleges that the same conduct independently satisfies the elements of negligent infliction of emotional distress.

1046.    Defendants knew or should have known that Plaintiff was elderly, disabled, medically fragile, and facing loss of her home.

1047.    Defendants' conduct created an unreasonable risk of causing Plaintiff emotional distress, and Defendants knew or should have known that their conduct involved that unreasonable risk.

1048.    Defendants' conduct was unreasonable under the circumstances, including their knowledge of Plaintiff's age, disability, and medical fragility.

1049. Plaintiff's distress was severe enough that it might result in illness or bodily harm, and in fact did contribute to medical aggravation and physical strain as alleged above.

1050. Plaintiff seeks compensatory damages, costs, interest and all other relief permitted by law.

**COUNT XXII**
**DECLARATORY JUDGMENT--EQUITABLE RECOUPMENT AND SETOFF**
**AGAINST CLAIMED ENFORCEMENT RIGHTS**
Against Deutsche Bank and Mortgage-Chain Defendants as Applicable

1051. Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1052. This count concerns the amount, if any, properly owed: Plaintiff seeks a declaratory judgment that any debt Deutsche Bank claims must be reduced, offset, or eliminated by recoupment and setoff arising from the same poisoned origination chain described herein regardless of whether Deutsche Bank's underlying right to enforce that debt is ultimately found to be valid.

1053. Plaintiff asserts equitable recoupment, setoff, restitution, disgorgement, and related equitable remedies against Deutsche Bank's claimed mortgage debt and foreclosure enforcement rights.

1054. Plaintiff's recoupment and setoff rights arise from the same transaction or series of transactions Deutsche Bank seeks to enforce, including the origination chain, refinancing sequence, WaMu/subrogation predecessor theory, Shallo/YSP inducement, toxic loan terms, payments, fees, charges, servicing conduct, and foreclosure enforcement.

1055.    Plaintiff further alleges that the same transaction or series of transactions includes the portfolio-wide equity-stripping structure Deutsche Bank seeks to monetize through the final AHM 2007-1 instrument. To the extent Deutsche Bank claims the benefit of the GreenPoint, WaMu, American Home Mortgage, ABC, Shallo/YSP, and WaMu/subrogation chain, Plaintiff's recoupment, setoff, offset, restitution, disgorgement, accounting, and equitable-reduction rights include all value extracted, preserved, or demanded through that same chain, including portfolio-wide equity loss and financing-capacity injury traceable to the serial predatory refinances alleged herein.

1056.    This is most evident as to Deutsche Bank's invocation of WaMu's predecessor rights. Deutsche Bank cannot claim the benefit of WaMu's position in the chain — the right to enforce as WaMu's successor — while disclaiming the burdens that traveled with that same position. A party that steps into a predecessor's shoes to enforce a debt steps into those shoes entirely: it takes the predecessor's enforcement rights subject to every recoupment, setoff, and restitutionary claim that existed against the predecessor arising from the same loan. By invoking WaMu/subrogation theory as its basis for enforcement, Deutsche Bank has placed the entire WaMu-era transaction — including the fraud, predatory-origination, and Shallo/YSP misconduct embedded in it — within the same transaction or series of transactions from which Plaintiff's recoupment and setoff rights arise, as a matter Deutsche Bank itself put in issue.

1057.    Plaintiff alleges that any claimed debt must be reduced, offset, recouped, or eliminated by damages, payments, fraud, predatory lending, restitution, disgorgement, and equitable defenses.

239

1058. Plaintiff seeks a declaration that Deutsche Bank's foreclosure enforcement is subject to recoupment, setoff, restitution, disgorgement, and all equitable defenses arising from the poisoned chain.

**COUNT XXIII**
**DECLARATORY JUDGMENT REGARDING ENFORCEABILITY OF DEUTSCHE BANK'S CLAIMED RIGHTS- 28 U.S.C. §§ 2201-2202**
Against Deutsche Bank and Mortgage-Chain Defendants as Applicable

1059. Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1060. Plaintiff disputes, as between herself and Deutsche Bank, the enforceability of Deutsche Bank's claimed right to collect on the note and enforce the mortgage.

1061. This count concerns whether Deutsche Bank's claimed right to enforce the note and mortgage exists at all—distinct from Count XXII, which concerns the amount owed if an enforceable right exists, and distinct from Count VI, which concerns the integrity of the process used to obtain the foreclosure record rather than the substance of the underlying debt enforcement right.

1062. Plaintiff further alleges that Deutsche Bank's claimed enforcement rights are infected at their source by the institutional knowledge documented in Deutsche Bank's own internal communications and acknowledged to the United States government. The Statement of Facts accompanying its 2017 DOJ settlement, which Deutsche Bank acknowledged, documents that AHM — the originator of Plaintiff's loan — routinely

originated fraudulent loans, that stated-income loans like Plaintiff's were known internally to involve inflated incomes, and that elderly fixed-income borrowers on stated documentation were flagged internally as presenting ability-to-repay defects. An institution that enforces an instrument it knows was fraudulently originated, after admitting that knowledge to the federal government, does not hold 'clean' enforcement rights within the meaning of any equitable or contractual framework. Plaintiff seeks a declaration that Deutsche Bank's claimed enforcement rights are subject to, and defeated or limited by, its own documented and acknowledged prior knowledge of the instrument's fraudulent origination.

1063.    Plaintiff alleges that Deutsche Bank's claimed enforcement rights are defective due to standing defects, chain-of-title defects, trust-transfer defects, the 2021 assignment defects, missing wet-ink possession proof, WaMu/subrogation poisoned-shoes liability, fraud, unclean hands and predatory origination.

1064.    An actual controversy exists between Plaintiff and Deutsche Bank as to whether Deutsche Bank holds enforceable rights under the note and mortgage, independent of and without requiring this Court to adjudicate title to the property itself.

1065.    Plaintiff seeks a declaration of the parties' respective rights and obligations under the note and mortgage, including a declaration that Deutsche Bank's claim rights are void, voidable, unenforceable, equitably barred, or subject to offset, recoupment, and accounting as set forth herein.

241

**COUNT XXIV**
**CIVIL CONSPIRACY / AIDING AND ABETTING**
Against Deutsche Bank, McCarter, Hinshaw, Brock & Scott, Swanson, Mahabamunuge, Milne, Fredericks, Knickerbocker, Brown, Brown Law LLC, and John Doe Defendants as Applicable

1066.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1067.    Defendants acted in concert, agreed, assisted, ratified, or substantially aided one another in conduct that injured Plaintiff.

1068.    Deutsche Bank and its counsel acted together to enforce the foreclosure, conceal or minimize defects, attack Plaintiff's disability credibility, obtain an empty-record summary judgment, and press strict foreclosure. Brown and Brown Law LLC substantially assisted or amplified the harm by adopting the disability/candor narrative and abandoning Plaintiff at the critical stage. Knickerbocker, appearing on behalf of Brock & Scott as lead counsel, was present at the November 17, 2025 hearing when the disability/candor narrative was advanced and when Plaintiff stated on the record that she had been defamed. Knickerbocker did not object to or disclaim that narrative, and instead proceeded to make the note-possession representation that secured the two-week extension benefiting Deutsche Bank's position at that same hearing. Plaintiff alleges that Brock & Scott's presence, silence, and pursuit of an extension under these circumstances constitutes substantial assistance to the scheme alleged in this count. Judicial Branch appellate ADA or case management personnel, including Keane acting in his official capacity,  contributed to the access injury through the public docketing and filing of Plaintiff's private ADA communications to the public docket without authorization and by the filing-return conduct alleged above, and that conduct  remains relevant to Plaintiff's official-capacity,

prospective, sealing, correction, and access-related claims. Any additional John Doe participants whose roles are identified through discovery substantially aided the same objective.

1069.    Deutsche Bank's participation in the concerted conduct alleged in this count was not that of an innocent party acting on an instrument it had reason to believe was valid. The Statement of Facts accompanying Deutsche Bank's 2017 DOJ settlement establishes that Deutsche Bank had actual, documented, institutional knowledge that AHM's loan origination practices were fraudulent, that elderly fixed-income borrowers on stated-income documentation were a known category of ability-to-repay failure, and that the AHM 2007-1 trust specifically was the product of a securitization process Deutsche Bank had already paid $7.2 billion to resolve. The concerted conduct described in this count — enforcing the instrument while concealing those admissions from the court and from Plaintiff — was therefore carried out with full awareness of the fraudulent character of the underlying claim. That awareness transforms what might otherwise appear to be aggressive but lawful foreclosure advocacy into the knowing, concerted use of the judicial process to enforce a claim Deutsche Bank's own institutional record shows was tainted from inception.

1070.    The conspiracy also included concealment and monetization of portfolio-wide equity-stripping injury. Brown's foreclosure pleadings raised pieces of the predatory-refinance chain, including undue influence, Shallo/YSP conduct, phantom cash-out proceeds, negative amortization, unclean hands, fraudulent nondisclosure, unconscionability, voidness, and quiet-title-type relief, but those pleadings did not expose Deutsche Bank's DOJ/AHM 2007-1 institutional knowledge, did not plead the complete

243

multi-actor enforcement enterprise, did not seek portfolio-wide restitution, and did not include the ADA-access and disability-interference injuries later used to create the Challenged Liability Posture. Plaintiff alleges that Defendants' coordinated conduct concealed, exploited, or failed to disclose the full structure of that injury, enabling the mortgage chain and foreclosure process to launder portfolio-wide equity loss into what Defendants falsely presented as a routine single-loan default.

1071.    Defendants' concerted conduct caused Plaintiff damages.

1072.    Plaintiff seeks compensatory damages, consequential damages, punitive damages where available, declaratory relief, injunctive relief, disgorgement of any benefit obtained through the concerted conduct alleged herein, attorney's fees where available, costs, interest, and all other relief permitted by law. Plaintiff seeks joint and several liability among all Defendants found to have participated in or substantially assisted the conspiracy alleged in this count.

## COUNT XXV
### PREDATORY LENDING / ORIGINATION-SIDE UNFAIR AND DECEPTIVE ACTS AND PRACTICES
### Conn. Gen. Stat. § 42-110b (CUTPA) — Origination Conduct
Against Deutsche Bank as Assignee with Notice, and John Doe Originator/Predecessor Defendants as Applicable

1073.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1074.    This count is distinct from Count VIII, which addresses Deutsche Bank's unfair and deceptive acts in the enforcement of the subject mortgage. This count addresses the unfair

and deceptive acts committed in connection with the origination of the November 3, 2006 American Brokers Conduit refinance — the instrument Deutsche Bank now seeks to enforce — and Deutsche Bank's liability for those origination acts as the party that acquired the instrument with actual or constructive notice of the origination fraud embedded in it.

1075. Connecticut General Statutes § 42-110b prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. A party that acquires a mortgage instrument in the stream of commerce bearing facially apparent evidence of the origination fraud described herein — including a stated-income application representing an elderly retiree's monthly income as $50,000 — and thereafter seeks to enforce it, participates in trade or commerce within the meaning of the statute, and does so with at least constructive notice of the fraudulent origination conduct embedded in the instrument it chose to acquire.

1076. The origination of the November 3, 2006 loan was permeated with unfair and deceptive acts and practices in the conduct of trade or commerce, including: fabrication of Plaintiff's stated monthly income as $50,000 — representing an annual income of $600,000 for an elderly retiree who had no such income; payment of a $39,161.50 yield spread premium, as lender-side inducement to steer Plaintiff into this specific loan instrument, to a criminal, unlicensed mortgage broker with a federal bank fraud guilty plea; placement of Plaintiff into a negative-amortization loan structure in which monthly payments did not reduce principal but instead capitalized unpaid interest into an ever-increasing debt — a feature concealed from Plaintiff and misrepresented as a "miracle mortgage" requiring periodic renewal; diversion of $93,479.79 in cash-out proceeds nominally reflected on the HUD-1 settlement statement but never delivered to Plaintiff; and concealment of the loan's toxic structure, lender-side inducements, and equity-stripping mechanism from Plaintiff at

245

and before closing. Deutsche Bank is liable for this origination-stage conduct as the party that acquired the instrument with actual or constructive notice of these defects and that elected to invoke its predecessor's subrogated rights to enforce it, not as a remote or innocent party to conduct that occurred before its 2021 acquisition.

1077.    Plaintiff alleges that the originating lender's payment of this yield spread premium to Shallo was not a case of an unwitting lender deceived by an unknown broker. Shallo's federal bank fraud guilty plea predated this transaction and was a matter of public record. A $39,161.50 payment is not the kind of sum a lender pays without a deliberate decision to engage that broker's services specifically. Shallo's documented pattern of involvement in fraudulent loan transactions, reflected in federal sentencing materials naming him in conduct of the same character, supports the inference that the lender knew of, or was recklessly indifferent to, Shallo's criminal history and pattern of conduct at the time it compensated him to place Plaintiff into this instrument.

1078.    Each of these acts is independently unfair or deceptive within the meaning of    § 42-110b: the fabricated income was a material misrepresentation of fact; the undisclosed YSP was a lender-side payment structurally designed to incentivize placement of Plaintiff into the most profitable loan for the lender rather than the most suitable loan for Plaintiff; the negative-amortization structure was an unconscionable term rendered more so by its concealment; the missing $93,479.79 represents a complete failure of consideration as to that portion of the instrument; and the "miracle mortgage" representation was a deliberate and materially false inducement.

1079.    Connecticut's CUTPA does not require proof of intent to deceive. The statute applies to conduct that is deceptive in its effect, likely to mislead consumers, or that violates

established public policy. Each of the acts described above independently satisfies those standards.

1080.    The origination chain — from American Brokers Conduit through American Home Mortgage to the AHM 2007-1 trust — was itself part of a pattern of origination misconduct documented by Deutsche Bank's own internal records and acknowledged by Deutsche Bank in its 2017 settlement with the United States Department of Justice. AHM 2007-1 is listed in Annex 3 of that settlement, in which Deutsche Bank paid $3.1 billion in civil penalties and acknowledging internal records documenting that the loans in trusts of this kind were securitized with knowing or reckless disregard of their quality and compliance. That settlement is not background. It is Deutsche Bank's own documented and acknowledged record that the origination conduct producing loans like Plaintiff's was systemic and known.

1081.    Deutsche Bank acquired the subject mortgage in November 2021. Plaintiff alleges that Deutsche Bank either knew of, or could not have conducted reasonable due diligence without discovering, the origination defects described herein — including the facially impossible stated income on the loan file it acquired. Plaintiff further alleges that Deutsche Bank acquired this instrument with actual or constructive notice of the origination fraud, and that its decision to acquire and enforce it despite that notice makes it an assignee liable for the origination-side CUTPA violations under the Connecticut rule that an assignee who takes an instrument with notice of a defense takes subject to that defense.

1082.    Plaintiff further alleges that Deutsche Bank's own enforcement of this instrument in Connecticut courts—demanding payment, filing foreclosure, and seeking title—is itself an independent act in trade or commerce subject to CUTPA, separate from the origination

247

conduct, and that Deutsche Bank's engagement in those enforcement acts with knowledge of the origination defects constitutes an independent unfair and deceptive act within the meaning of § 42-110b.

1083.    Plaintiff suffered ascertainable loss from the origination-side misconduct, including loss of equity, loss of the value of the $93,479.79 in cash-out proceeds never received, payments made over fifteen years on an instrument structured to extract rather than preserve equity, and the impending loss of her home through enforcement of an instrument void or voidable from its inception.

1084.    Plaintiff affirmatively alleges that any limitations period applicable to the origination-side conduct alleged in this count is tolled under the discovery rule and Conn. Gen. Stat. § 52-595 (fraudulent concealment). The origination-stage misrepresentations — the fabricated income, the undisclosed yield spread premium — were actively concealed by predatory control of Plaintiff's closing documents and mail, and could not have been discovered through reasonable diligence at the time. Plaintiff further alleges that Deutsche Bank's own 2021 acquisition of this instrument, with institutional knowledge of its defects, restarted any limitations analysis as to Deutsche Bank specifically, since Deutsche Bank's own unfair and deceptive conduct as an assignee with notice did not begin until that acquisition.

1085.    Plaintiff seeks damages under § 42-110g, including actual damages, punitive damages up to $5,000 per violation where applicable, attorney's fees and costs, equitable relief including rescission and disgorgement of all amounts paid and unjustly retained, and all other relief available under CUTPA.

## COUNT XXVI
## QUIET TITLE — DECLARATORY JUDGMENT AS TO TITLE AND RELEASE OF VOID MORTGAGE INSTRUMENT
### 28 U.S.C. §§ 2201–2202; Conn. Gen. Stat. § 47-31; Supplemental Jurisdiction
Against Deutsche Bank and All Claiming Parties

1086.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1087.    Plaintiff is the owner of the real property known as 165 Old Stonewall Road, Easton, Connecticut 06612, purchased by Warranty Deed recorded on March 17, 2004, in Volume 503, Page 225 of the Easton Land Records.

1088.    An actual controversy exists between Plaintiff and Deutsche Bank concerning the validity and enforceability of the mortgage lien Deutsche Bank claims against Plaintiff's property pursuant to the Open-End Mortgage Deed recorded on November 8, 2006, in Volume 593, Page 91 of the Easton Land Records, and assigned to Deutsche Bank by assignment recorded on November 12, 2021, in Volume 697, Page 672 of the Easton Land Records.

1089.    Plaintiff alleges that the mortgage instrument Deutsche Bank claims is void or voidable from inception on the following independent grounds, each sufficient in itself: (a) the instrument was procured through fraud in the factum, specifically a fabricated stated-income figure of $50,000 per month that Plaintiff never provided, reviewed, or approved, rendering the application — and the instrument predicated on it — void as a matter of contract law; (b) the instrument was induced through the fraudulent and predatory conduct of James Shallo, an unlicensed broker operating an unlicensed vehicle (All American Consulting Services, Ltd.) who had already pleaded guilty to federal bank fraud before originating any loan in this chain, whose yield spread premium created a financial incentive

to steer Plaintiff into the most extractive possible loan instrument; (c) the instrument failed for want of consideration as to $93,479.79 in cash-out proceeds reflected in the HUD-1 but never disbursed to Plaintiff; (d) the 2021 assignment into AHM 2007-1 — a securitized trust whose closing date predates the assignment by approximately fourteen years — is void under the trust's own governing documents and under New York Estates, Powers and Trusts Law §7-2.4, which provides that every act of a trustee in contravention of the trust is void, AHM 2007-1 being a New York trust governed by New York law, meaning Deutsche Bank does not hold a valid assigned interest in the instrument; (e) the instrument falls within a class of loans Deutsche Bank has already acknowledged to the United States Department of Justice were securitized through trusts involving knowing or reckless misrepresentation, making Deutsche Bank's claimed enforcement rights derived from a scheme its own government settlement described in terms consistent with RICO predicate conduct.

1090.   Plaintiff further alleges that the November 12, 2021 Assignment of Mortgage purporting to transfer the subject instrument to Deutsche Bank as Trustee was executed by Mackenzie Eichen in Pinellas County, Florida, for consideration described only as "good and valuable consideration" without specification, and that no evidence in the record establishes that actual consideration was exchanged or that the transfer conformed to the requirements of AHM 2007-1's pooling and servicing agreement, under which the trust's closing date had already passed fourteen years prior.

1091.   Plaintiff is therefore entitled to a judicial declaration establishing that she holds clear title to the property, free of any enforceable lien by Deutsche Bank under the subject mortgage instrument, or, in the alternative, to a judicial declaration identifying precisely

250

what interest, if any, Deutsche Bank holds, on what legal and factual basis, and subject to what defenses, recoupment, and equitable claims — so that Plaintiff's title may be restored, confirmed, and protected from any further enforcement based on defects established by this Complaint.

1092.    No adequate remedy at law exists for the cloud on Plaintiff's title created by Deutsche Bank's claimed lien interest. Only a judicial declaration can settle the parties' competing claims to and against the property and provide Plaintiff a clear, enforceable title.

1093.    Plaintiff affirmatively alleges that any statute of limitations applicable to claims challenging the validity of the subject mortgage instrument is tolled under Connecticut General Statutes § 52-595 (fraudulent concealment) and the discovery rule, because the origination fraud — including the fabricated $50,000 monthly income — was actively concealed by Conrad Roncati's control of Plaintiff's mail and closing documents, and Plaintiff could not, through reasonable diligence, have discovered the fraud until the facts surfaced through this litigation and the New Jersey proceedings. Plaintiff further alleges that the standing and assignment defects she challenges — including the 2021 assignment into a closed 2007 trust — arise from acts occurring in 2021, well within any applicable limitations period measured from that assignment date.

1094.    Plaintiff seeks a judgment declaring that she holds clear and unencumbered title to the property, an order that the subject mortgage be discharged, cancelled, and released of record, costs, attorney's fees where available, and all other relief this Court deems just and proper.

## COUNT XXVII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS AND CONTRACTUAL RELATIONS

Against Deutsche Bank, McCarter, Hinshaw, Swanson, Mahabamunuge, Milne, Fredericks, Brown, Brown Law LLC, and John Doe Defendants as Applicable

1095.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1096.    Plaintiff had a continuing contractual relationship with Brown and Brown Law LLC, established by a $30,000 flat-fee retainer agreement, pursuant to which Brown was retained to provide competent foreclosure defense representation through trial.

1097.    Plaintiff also had a prospective economic relationship with the legal services market: specifically, the ability to retain substitute or additional foreclosure defense counsel with adequate notice and preparation time in advance of any dispositive hearing.

1098.    Deutsche Bank, McCarter & English, Hinshaw & Culbertson, and the individual attorney Defendants tortiously interfered with both of these relations through the November 5, 2025 filing publicly attacking Plaintiff's disability candor. Plaintiff alleges that the filing was made with knowledge that its foreseeable and intended effect was to poison the record against Plaintiff in a manner that would make retention of substitute counsel practically impossible on short notice: no competent attorney, undertaking a new engagement four days before a dispositive hearing in a complex foreclosure case, would accept representation of a client whose own outgoing counsel had publicly branded her as dishonest to the court.

1099.    That precise consequence materialized. Between November 5 and November 17, 2025, Plaintiff had twelve days — after Brown's public abandonment, after the

252

disability/candor attack was published to the public docket, after a dispositive hearing was imminent — in which to find substitute counsel. The disability/candor attack made that impossible. Plaintiff appeared at the November 17, 2025 hearing without counsel as the direct and foreseeable consequence of Defendants' tortious interference.

1100.   Brown tortiously interfered with Plaintiff's prospective contractual relations with the legal services market by his own November 11, 2025 motion to withdraw, which publicly characterized his own client as untruthful about her disability, thereby compounding and amplifying the effect of the November 5 attack. Brown knew that his public accusation would follow Plaintiff in her search for substitute counsel and would make that search impossible in the time available.

1101.   Defendants interfered with these contractual and prospective relations through improper means — specifically, the filing of public pleadings containing knowingly false statements about Plaintiff's credibility, submitted for the improper purpose of ensuring Plaintiff would appear at the dispositive hearing without representation, thereby manufacturing the empty record Deutsche Bank then used to obtain summary judgment. Plaintiff specifically alleges that Defendants employed improper means—the filing of statements Plaintiff alleges were knowingly false and defamatory—not merely improper motive. The improper means element is satisfied independently of Defendants' purpose, because the means themselves were tortious.

1102.   The interference was intentional. Deutsche Bank and its counsel had every reason to understand that making Plaintiff appear dishonest to the court four days before the dispositive hearing would destroy her ability to retain substitute counsel. Brown had every

reason to understand that publicly characterizing his own client as dishonest would do the same.

1103. The interference caused Plaintiff damages directly and proximately, including loss of counsel protection at the summary-judgment hearing, loss of the opportunity to oppose Deutsche Bank's motion through competent counsel, loss of the ability to correct Deutsche Bank's mischaracterizations of the record in real time, foreclosure liability entered on a manufactured empty record, and all consequential damages flowing therefrom.

1104. The interference also caused property and litigation-value injury by depriving Plaintiff of counsel protection at the moment when competent counsel was necessary to preserve, develop, and present the full mortgage-chain, recoupment, portfolio-restitution, DOJ/AHM 2007-1, and standing-defect theories now pleaded in this action. Plaintiff does not allege that the November 2025 interference originally created the entire portfolio loss. Plaintiff alleges that the interference foreseeably prevented timely adversarial presentation of that loss, converted the record into a manufactured "unopposed" posture, impaired Plaintiff's ability to preserve the portfolio-restitution claim in the state proceeding, and forced Plaintiff to incur emergency federal litigation costs to prevent Defendants from using that empty record to extinguish her home.

1105. Plaintiff alleges that this count is timely on its face. The interference alleged occurred on November 5 and November 11, 2025, well within any applicable limitations period as of the filing of this Complaint, and requires no tolling analysis.

1106. Plaintiff seeks compensatory damages, consequential damages, punitive damages where available, attorney's fees where available, costs, interest, and all other relief permitted by law.

**COUNT XXVIII**
**ELDER FINANCIAL EXPLOITATION AND ABUSE**
**Common Law; Conn. Gen. Stat. §§ 17b-450 et seq. and Conn. Gen. Stat. § 17b-461**
Against Deutsche Bank, McCarter, Hinshaw, Swanson, Mahabamunuge, Milne,
Fredericks, Brown, Brown Law LLC, and John Doe Defendants as Applicable

1107.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1108.    Plaintiff, at all relevant times, was and is an elderly person within the meaning of Connecticut General Statutes § 17b-450 and related statutes, being 88 years of age at the time the critical events described in this Complaint occurred and nearly 89 years of age at the time of its filing.

1109.    Connecticut law recognizes the protection of elderly persons from financial exploitation as a matter of express public policy, and Connecticut courts and the legislature have established that conduct constituting financial exploitation of an elderly person is independently actionable, separately from the underlying fraud, predatory lending, or other torts that may also be applicable.

1110.    Plaintiff alleges that the conduct described throughout this Complaint, taken as a whole, constitutes elder financial exploitation within the meaning of applicable law, for the following independent and overlapping reasons:

1111.    First, the origination scheme. Deutsche Bank's predecessors-in-interest enabled and profited from a scheme in that exploited Plaintiff's trust, her lack of sophistication in complex financial instruments, and her age in inducing her to execute a series of serial refinances across multiple properties that stripped her entire real-estate portfolio of equity — losses she estimates at over $18 million across all properties — through instruments structured to extract value rather than preserve it. None of these refinances were

conventional, fixed-amortization loans; each was a negative-amortization, equity-stripping instrument of the same predatory character as the loan at issue in this action. Deutsche Bank is liable for this origination-stage exploitation because its predecessor-in-interest paid Shallo a yield spread premium to place Plaintiff into the instrument now at issue, and because Deutsche Bank itself elected to stand in that predecessor's shoes by invoking WaMu's subrogated rights in the state foreclosure action, as alleged throughout this Complaint. Plaintiff brings this claim against Deutsche Bank because Deutsche Bank knowingly acquired, ratified, and profited from the instrument their scheme produced.

1112. Plaintiff alleges that the predecessor-in-interest's payment to Shallo reflects knowing or recklessly indifferent conduct, not innocent reliance on an unknown broker. Shallo's federal bank fraud guilty plea predated this transaction. The scale of the payment — $39,161.50 — reflects a deliberate decision to engage Shallo's services specifically, and Shallo's documented pattern of involvement in fraudulent transactions, including his identification in federal sentencing materials for conduct of the same character, supports the inference that the predecessor-in-interest knew or was willfully blind to exactly the kind of exploitation of an elderly borrower this count alleges.

1113. Second, the continuing exploitation through enforcement. Deutsche Bank and its counsel, with actual or constructive knowledge that the instrument they acquired in 2021 was the product of this elder financial exploitation — including a facially impossible $50,000/month income fabrication on an elderly retiree's loan application — have continued to extract financial value from Plaintiff by collecting payments, interest, fees, and now seeking to take her home. The continuation of collection activity on a fraud-tainted

instrument directed at an elderly victim, with knowledge of the fraud, constitutes a second, independent form of financial exploitation.

1114.    Third, the litigation exploitation. Deutsche Bank and its counsel used Plaintiff's age, disability, and resulting vulnerability as instruments of litigation strategy: attacking her credibility about disabilities she genuinely suffered, exploiting the medical crisis caused by those disabilities to ensure she appeared without counsel at the dispositive hearing, and using her resulting exclusion from the proceeding to obtain a favorable record that could not have been obtained if she had been granted the meaningful ADA access to which she was entitled. Using a disabled elderly litigant's own protected medical status as a weapon against her in court proceedings is a form of elder exploitation as surely as any financial fraud.

1115.    Fourth, Brown's exploitation of his fiduciary position. Brown accepted a $30,000 retainer from an elderly disabled client, assured her he would protect her through trial, possessed her most sensitive medical information, and then deployed that medical information against her in a public court filing — branding her as dishonest about her own disability — at the moment of maximum vulnerability, four days before the most important hearing in her case. An attorney who exploits his fiduciary access to a client's medical records to harm that client's interests constitutes a particular form of elder exploitation, given the vulnerability that flows from age, disability, and the trust necessarily placed in legal counsel.

1116.    Plaintiff affirmatively alleges that the continuing exploitation and litigation exploitation described in the second and third bases for this count are independently timely, having occurred in 2021 and 2025 respectively, well within any applicable limitations

257

period. As to the origination-scheme exploitation described as the first basis for this count, Plaintiff alleges that any applicable limitations period is tolled under the discovery rule and Conn. Gen. Stat. § 52-595, for the same reasons of active concealment alleged throughout this Complaint.

1117.    Plaintiff seeks all available remedies for elder financial exploitation under Connecticut General Statutes § 17b-461 and Connecticut common law, including compensatory damages for all financial loss attributable to the exploitation described herein, enhanced or treble damages where available, restitution and disgorgement of all value extracted through the exploitation, punitive damages to the extent available under applicable law, costs, attorney's fees where permitted, and all other equitable relief including constructive trust over any property or proceeds unjustly obtained. Plaintiff further alleges that the exploitation described in this count is a factor in aggravation properly considered in connection with the punitive damages requested under all other counts of this Complaint, given that the victim was an 88-year-old disabled homeowner and that the defendants' conduct targeted, exploited, and weaponized both her age and her disability.

### COUNT XXIX
### NEGLIGENCE AND GROSS NEGLIGENCE — ORIGINATION, ACQUISITION, AND SERVICING
Against Deutsche Bank, John Doe Originator/Predecessor Defendants as Applicable

1118.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1119. This count asserts negligence theories that do not require proof of intentional fraud or deliberate deception, and is pleaded in the alternative to Counts VI, XXV, and XXVIII. Plaintiff recognizes that each of those counts pleads conduct that was knowing and deliberate; this count is preserved for the circumstance in which any Defendant argues it lacked subjective knowledge, asserting instead that the failure was the result of recklessness, gross negligence, or failure to observe ordinary care.

1120. **Negligent hiring, retention, and compensation of James Shallo.** The originating lender — American Brokers Conduit and/or American Home Mortgage — owed a duty of reasonable care to Plaintiff in the selection, approval, retention, and compensation of mortgage brokers through whom it originated loans. That duty is grounded in the originating lender's own choice to use broker channels as the mechanism of origination and in the lender's direct financial relationship with the broker through the yield spread premium. An originating lender who pays a five-figure sum to a broker to steer a borrower into a specific loan product creates and assumes a duty to exercise ordinary care in ensuring that broker is fit, licensed, and not subject to known criminal disqualifications that would make the placement foreseeably harmful to the borrower. The originating lender here compensated James Shallo, a criminal — who had an unresolved federal bank fraud guilty plea, was unlicensed, and was operating through an unregistered vehicle — $39,161.50 to place Plaintiff into the subject instrument. A reasonably prudent lender who approved, used, and compensated a broker would have conducted ordinary due diligence sufficient to discover that the broker had already admitted federal bank fraud guilt. The failure to do so was a breach of reasonable care that directly and foreseeably caused Plaintiff to be placed into a loan by a criminal broker acting in his own financial interest, not hers. Deutsche

259

Bank is liable for this negligence as the successor that knowingly assumed the originating lender's position and obligations by invoking that lender's chain of title and subrogated rights to enforce the very instrument this negligence produced.

1121.    **Negligent origination.** The originating lender owed Plaintiff a duty of ordinary care to ensure that the loan application on which the instrument was based was not facially fraudulent before the lender funded the loan. A stated-income figure of $50,000 per month — $600,000 annually — for an elderly retiree is not a minor discrepancy or a plausible underwriting judgment. It is a figure that no responsible underwriter exercising ordinary care could accept without additional verification, because it is inconsistent with any reasonable profile of an elderly borrower who is not the officer or controlling shareholder of a substantial enterprise. The originating lender funded $938,000 to Plaintiff based on that facially impossible figure without verification. Funding a nearly-million-dollar loan on the basis of a stated income that is facially implausible, submitted by a broker with an admitted bank fraud conviction, to a borrower who was an elderly retiree, falls below the standard of ordinary care applicable to residential mortgage origination, regardless of whether the lender knew the figure had been fabricated or merely failed to ask.

1122.    Deutsche Bank's 2021 acquisition of the subject mortgage is addressed in Count VI of this Complaint as knowing and intentional fraud, not as negligence. The Statement of Facts accompanying Deutsche Bank's 2017 settlement with the United States Department of Justice establishes that Deutsche Bank had actual institutional knowledge, documented in writing by its own internal due diligence personnel, that AHM's loan origination practices went 'beyond misrepresentation into the fraudulent area' and that elderly fixed-income borrowers on stated-income documentation were internally categorized as

presenting ability-to-repay failures. An institution with that admitted knowledge cannot characterize its 2021 decision to acquire and enforce Plaintiff's specific AHM 2007-1 stated-income loan to an elderly fixed-income borrower as an exercise of ordinary care that simply fell short. Plaintiff therefore alleges the 2021 acquisition as a knowing and intentional act in Count VI and not as negligence in this count, so that the full weight of Deutsche Bank's documented institutional knowledge is captured where it belongs — as evidence of the deliberate fraud alleged throughout this Complaint.

1123.    **Negligent servicing.** Deutsche Bank, acting through its predecessor and successor servicers which served as Deutsche Bank's authorized agents and servicers under the governing Pooling and Servicing Agreement, owed Plaintiff a duty of ordinary care in the servicing of the subject mortgage, including the obligation to apply payments accurately, maintain escrow accounts lawfully, calculate the debt correctly, and refrain from representing unverified amounts as sworn to in affidavits submitted to courts. Plaintiff alleges that servicing-side negligence is reflected in the debt calculation described in Count VI, specifically the representation of $7,302.53 in tax advances as part of the sworn debt calculation attested to under penalty of perjury before the municipal tax records showed those advances had not been made. A servicer who submits a sworn affidavit of debt that does not match the municipal tax record as of the date of the sworn statement has either not reviewed the underlying records with ordinary care before swearing to them, or has reviewed records that are themselves maintained without ordinary care. Either way, the submission of an inaccurate sworn affidavit of debt in a judicial proceeding falls below the standard of care applicable to mortgage servicers in the conduct of foreclosure proceedings.

1124.    Each of the negligent acts described above was a proximate cause of Plaintiff's damages, including placement into a toxic mortgage instrument; loss of approximately $1.15 million in payments over fifteen years on an instrument structured to extract rather than preserve equity, the $93,479.79 in undisbursed cash-out proceeds never received; the depletion of Plaintiff's broader real-estate portfolio through the same serial predatory-refinance structure, negative-amortization design, broker-paid steering, and equity-stripping mechanism alleged throughout this Complaint; impairment of Plaintiff's financing capacity, appreciation, rents, income, investment value, and property equity; and the imminent loss of Plaintiff's home through enforcement of an instrument that originated from a criminally compromised broker acting without due diligence by the funding lender. Plaintiff alleges that the portfolio-wide loss, including the estimated $18 million in property-related loss alleged herein, was a foreseeable result of negligent origination, negligent broker selection, negligent acquisition, negligent servicing, and negligent enforcement of the poisoned mortgage chain.

1125.    To the extent any Defendant's conduct as described above constituted gross negligence — that is, reckless disregard of Plaintiff's rights and interests, conscious indifference to the known consequences of the conduct, or willful and wanton disregard rising above ordinary negligence — Plaintiff alleges gross negligence and seeks all enhanced remedies available for that standard of conduct under Connecticut law.

1126.    Plaintiff affirmatively alleges that any limitations period applicable to the negligent hiring and negligent origination theories alleged in this count is tolled under the discovery rule, Conn. Gen. Stat. § 52-595, and Conn. Gen. Stat. § 52-584's own discovery-based accrual standard, because the facts establishing these theories — including Shallo's

262

criminal history and the facial defects in the origination file — were concealed and not reasonably discoverable by Plaintiff until this litigation. Plaintiff further alleges that the negligent servicing and negligent acquisition theories are independently timely, arising from conduct occurring in and after 2021.

1127.    Plaintiff seeks compensatory damages, consequential damages, punitive or enhanced damages to the extent available for gross negligence under Connecticut law, costs, interest, and all other relief permitted by law.

**COUNT XXX**
**CIVIL THEFT / STATUTORY THEFT**
**Conn. Gen. Stat. § 52-564**
Against Deutsche Bank

1128.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1129.    Connecticut General Statutes § 52-564 provides that any person who wrongfully takes or withholds the property of another, knowing they have no legal right to do so, shall pay treble damages. This trebling is mandatory upon proof of the statutory elements, not discretionary.

1130.    Plaintiff alleges that the subject mortgage instrument is void or voidable from inception due to fraud in the factum, predatory origination through a criminal broker's yield spread premium inducement, and failure of consideration as to the $93,479.79 in undisbursed cash-out proceeds.

1131.    Deutsche Bank acquired this instrument in November 2021 with actual or constructive knowledge — documented in its own internal communications acknowledged

through its 2017 DOJ resolution — that loans originated in this manner, by this originator, to borrowers of this profile, were frequently fraudulent.

1132. Deutsche Bank has collected, and continues to collect, payments on this instrument despite that knowledge, constituting a continuing wrongful taking and holding of Plaintiff's property without legal right.

1133. Plaintiff further alleges that the wrongful taking and withholding of property was not limited to monthly payments. By knowingly acquiring, enforcing, and collecting on a fraud-tainted instrument while asserting foreclosure leverage against Plaintiff's home, Deutsche Bank wrongfully took, withheld, or attempted to appropriate Plaintiff's property interests, equity, refinancing capacity, redemption value, title security, and portfolio value traceable to the poisoned mortgage chain. To the extent proven, Plaintiff seeks statutory-theft remedies for all property wrongfully taken, withheld, converted, or placed under coercive foreclosure leverage through Deutsche Bank's knowing enforcement of an instrument it had no lawful right to collect or enforce, including portfolio-value losses traceable to that wrongful taking and withholding.

1134. Plaintiff alleges that the wrongful taking and holding of Plaintiff's property described in this count is a continuing violation. Each payment extracted under the void instrument constitutes an independent, separately actionable taking, and Plaintiff seeks treble damages for all sums wrongfully extracted within any applicable limitations period measured from each such taking, without regard to when the underlying instrument originated.

1135.  Plaintiff seeks treble damages on all sums wrongfully extracted, presently estimated at approximately $1.15 million before trebling, together with costs, interest, and all other relief available under § 52-564.

## COUNT XXXI
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
Against Deutsche Bank

1136.  Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1137.  The mortgage note and instrument at issue in this action constitute a contract between Plaintiff and Deutsche Bank, as successor-in-interest and assignee claiming enforcement rights under that instrument.

1138.  Every contract under Connecticut law, including the instrument at issue, carries an implied covenant of good faith and fair dealing in its performance and enforcement. This covenant is violated by conduct involving dishonesty, a design to mislead, or a deliberate neglect of contractual duty not attributable to honest mistake or differing interpretation.

1139.  Deutsche Bank breached this covenant by pursuing foreclosure enforcement through a chain of title it knew or had reason to know was void, while concealing from this Plaintiff and the state court that the loan pool from which the subject instrument derived had been internally flagged and federally acknowledged as toxic in Annex 3 of its own 2017 DOJ resolution.

1140.  Enforcing a contract while concealing known, material defects in the very right being enforced is bad-faith performance under Connecticut law.

1141.    Deutsche Bank breached this covenant in the performance and enforcement of the instrument by: pursuing strict foreclosure while its own January 15, 2026 filing admitted $108,316.21 in equity, a fact inconsistent with the relief sought; representing a debt calculation that included a tax advance not actually paid as of the date sworn to; and prosecuting enforcement of an instrument originated through the predatory chain described throughout this Complaint while possessing institutional knowledge, documented in its own 2017 DOJ resolution, that loans of this type and origin were frequently fraudulent.

1142.    This conduct went beyond ordinary, good-faith contract enforcement or honest legal disagreement; it reflects a deliberate course of dealing designed to extract the maximum value from the instrument while concealing known defects in the very right being enforced.

1143.    As a direct and proximate result of Deutsche Bank's breach of the implied covenant of good faith and fair dealing, Plaintiff suffered the economic and consequential damages alleged throughout this Complaint, including the amounts wrongfully extracted under the instrument, equity impairment, loss of refinancing and redemption opportunity, litigation and emergency-access costs, and, to the extent proven, portfolio-value and financing-capacity losses traceable to Deutsche Bank's bad-faith performance, enforcement, concealment, and monetization of the poisoned mortgage chain.

1144.    Plaintiff seeks compensatory damages, consequential damages, and all other relief available for breach of the implied covenant of good faith and fair dealing.

**COUNT XXXII**
**VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**
**15 U.S.C. § 1691**
Against Deutsche Bank and John Doe Originator/Predecessor Defendants as Applicable

1145.    Plaintiff incorporates by reference the factual allegations set forth in Sections I through VI above as if fully set forth herein.

1146.    The originating lender and its successors-in-interest, including Deutsche Bank, are "creditors" within the meaning of 15 U.S.C. § 1691a(e), having regularly extended, and now claiming the right to enforce, credit in connection with the transaction at issue.

1147.    Plaintiff was an "applicant" within the meaning of 15 U.S.C. § 1691a(b) at the time of the origination conduct alleged in this Complaint.

1148.    The Equal Credit Opportunity Act prohibits discrimination against an applicant with respect to any aspect of a credit transaction on the basis of age, provided the applicant has the capacity to contract. 15 U.S.C. § 1691(a)(1).

1149.    Plaintiff was, at the time of origination, elderly. Plaintiff alleges that her age was a motivating factor in the predatory terms of the credit extended to her, including the fabrication of her stated income, the steering into a negative-amortization, equity-stripping product rather than a conventional loan, and the payment of an undisclosed yield spread premium to induce that steering, each as alleged in detail throughout this Complaint.

1150.    These terms were materially less favorable than the terms a similarly-situated applicant outside the protected class, with comparable creditworthiness, would have received in a conventional transaction, and reflect the kind of "reverse redlining" or age-based predatory targeting that the Equal Credit Opportunity Act exists to prohibit. This is not merely circumstantial. Deutsche Bank's own internal underwriting criteria, documented in and acknowledged through its 2017 DOJ resolution, specifically identified 'Elderly (65+)

267

borrowers on fixed income with stated income documentation' as a named risk category requiring heightened scrutiny. Plaintiff's loan matched this category precisely. An institution that specifically tracked elderly, fixed-income, stated-income borrowers as a distinct risk classification cannot credibly claim ignorance of the age-correlated targeting pattern its own underwriting data reveals.

1151.   Deutsche Bank, as successor-in-interest claiming the benefit of this transaction, is liable for this conduct on the same successor-liability theory pled throughout this Complaint.

1152.   Plaintiff alleges that the predatory targeting described throughout this Complaint — the fabricated income, the undisclosed yield spread premium, the negative-amortization structure steered toward her rather than a conventional loan product — was undertaken with her age as a motivating factor, in violation of 15 U.S.C. § 1691(a), which prohibits credit discrimination on the basis of age.

1153.   Plaintiff seeks all remedies available under ECOA, including actual and punitive damages, equitable and declaratory relief, and costs and attorney's fees, as provided under 15 U.S.C. § 1691e.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Nancy Roncati Dowden brings this action not merely for private compensation for an isolated foreclosure injury, but for redress of institutional misconduct involving disability access, foreclosure enforcement, predatory lending, elder financial exploitation, tortious interference, public disability defamation, public docketing of private ADA communications, and enforcement of a poisoned mortgage chain by a major financial institution

and its agents. Plaintiff's claims arise from distinct legal violations — statutory, constitutional, common-law, and regulatory — that produce legally non-duplicative injuries. Plaintiff seeks cumulative, not duplicative, relief: each category of damages identified below arises from a distinct legal wrong causing distinct harm, and no category is a substitute for another. Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally where permitted by law, and award the following relief:

## A. Emergency, Preliminary, and Permanent Injunctive Relief

1. A temporary restraining order and preliminary injunction immediately preserving the status quo and preventing Deutsche Bank, its counsel, agents, servicers, trustees, custodians, successors, assigns, and all persons acting in concert with any Defendant from taking, enforcing, recording, advancing, or relying upon any strict-foreclosure consequence, law day, title transfer, possession transfer, ejectment, sale, foreclosure completion, debt-enforcement step, or other irreversible property consequence based on the Challenged Liability Posture.

2. A preliminary and permanent injunction barring Defendants from using the inaccessible, ADA-tainted, fraud-tainted, and non-adversarial state-court liability posture challenged herein as a predicate for strict foreclosure, title transfer, possession, debt calculation, preclusion, adverse inference, or any further enforcement consequence unless and until Plaintiff receives meaningful ADA-compliant access and this Court adjudicates the federal access, interference, and due-process issues pleaded in this Complaint.

3. An order preserving or restoring, to the fullest extent permitted by law and equity, Plaintiff's title, possession, occupancy, equity, redemption rights, cure rights, and property

269

rights, and prohibiting Defendants from obtaining or retaining windfall title or property leverage through an inaccessible, ADA exclusion-tainted, fraud-tainted, or untested foreclosure liability posture.

4. An injunction requiring Defendants to maintain the status quo regarding title, possession, occupancy, insurance, taxes, escrow, servicing, debt reporting, collection, and property rights until this Court adjudicates Plaintiff's federal claims or until further order of this Court.

## B. Declaratory Relief

5. A declaration that Plaintiff is a qualified individual with disabilities under the ADA.

6. A declaration that the Connecticut Judicial Branch denied Plaintiff meaningful access to court services, programs, and activities.

7. A declaration that the state-court liability posture was produced through disability exclusion, denial of meaningful access, procedural asymmetry, counsel abandonment, public disability defamation, and lack of meaningful adversarial testing.

8. A declaration that the state-court liability posture cannot constitutionally or equitably be used as the predicate for strict foreclosure.

9. A declaration that public docketing of Plaintiff's private ADA communications without authorization violated her rights and denied meaningful access to a safe accommodation process.

10. A declaration that Defendants' public disability/candor narrative was false, materially misleading, and harmful.

11. A declaration that Deutsche Bank's claimed enforcement rights are subject to all defenses, offsets, recoupment, restitution, disgorgement, predecessor-liability defenses, standing

270

challenges, securitization defects, trust-transfer defects, Shallo/YSP claims, predatory-origination claims, DOJ/RMBS-related defenses, and equitable bars alleged herein.

12. A declaration that Deutsche Bank may not invoke WaMu/subrogation/predecessor rights as a foreclosure sword while disclaiming the fraud, predatory lending, YSP, broker, restitutionary, and equitable consequences embedded in the same predecessor chain.

13. A declaration that Plaintiff is entitled to a forensic accounting before any foreclosure consequence may be enforced.

14. A declaration that Plaintiff is entitled to test, through a meaningful ADA-compliant adversarial process, whether the note and mortgage Deutsche Bank seeks to enforce match the instrument Plaintiff actually executed, and that Defendants may not rely on the Challenged Liability Posture to foreclose.

15. A declaration pursuant to Count XXVI that Plaintiff holds title to 165 Old Stonewall Road, Easton, Connecticut free and clear of any enforceable mortgage lien held by Deutsche Bank under the subject instrument, or in the alternative a declaration establishing precisely what interest, if any, Deutsche Bank holds, on what legal and factual basis, and subject to what defenses, equitable bars, recoupment, and restitution rights, together with an order that the subject mortgage instrument be cancelled, discharged, and released of record.

## C. ADA Access and Confidentiality Relief

16. An order requiring the Connecticut Judicial Branch to provide Plaintiff meaningful ADA-compliant access to any state-court, appellate, Supreme Court, foreclosure, filing, docketing, or accommodation process relating to the foreclosure.

271

17. An order requiring written-/no live adversarial oral participation access protocol for Plaintiff as competent medical evidence establishes that live, real-time participation is medically unsafe and medically contraindicated.

18. An order requiring that Plaintiff not be required to participate in live adversarial hearings, oral argument, deposition, examination, or high-cognitive-load proceedings without medically appropriate accommodations.

19. An order requiring adequate time for Plaintiff to prepare written submissions consistent with her disabilities.

20. An order requiring a safe and confidential ADA communication protocol.

21. An order prohibiting public docketing of Plaintiff's ADA communications, medical information, disability-access communications, or accommodation requests without Plaintiff's consent, prior notice, an opportunity to object, or a specific court order after consideration of confidentiality and disability-access rights.

22. An order sealing, restricting, removing, or correcting any unauthorized public docketing of Plaintiff's private ADA communications.

23. An order requiring the Judicial Branch and/or appropriate official-capacity Defendants to correct the public docket to reflect that Plaintiff's ADA communications were submitted for accommodation purposes and were not public merits pleadings unless Plaintiff so authorized.

24. An order requiring that any future technical deficiency in Plaintiff's ADA-related filing be handled through a cure notice and accessible correction opportunity rather than rejection, dismissal, or forfeiture.

**D. Correction, Retraction, Sealing, and Public-Record Relief**

25. An order requiring Defendants who published, filed, joined, served, authorized, relied upon, or republished the disability/candor narrative to retract, correct, or withdraw any false or misleading assertion that Plaintiff lacked candor regarding her disabilities.

26. An order sealing, restricting, correcting, or otherwise neutralizing public docket entries that falsely accuse Plaintiff of disability dishonesty or expose private ADA communications.

27. An order requiring Defendants to provide written notice to the state court and relevant appellate dockets that Plaintiff disputes and seeks correction of the disability/candor narrative.

28. An order prohibiting Defendants from relying on the disability/candor narrative in any future proceeding.

29. An order declaring that lawyer-drafted protective-relief certifications submitted in New Jersey to prevent compelled deposition or adversarial testimony cannot lawfully be used as evidence that Plaintiff could safely oppose summary judgment or participate live in Connecticut foreclosure proceedings.

**E. Foreclosure, Title, Standing, and Accounting Relief**

30. An order requiring Deutsche Bank to produce the original wet-ink note for inspection under conditions set by this Court.

31. Plaintiff alleges that the state court's acceptance of the Flannigan affidavit as sufficient proof of note possession was itself a product of the access denial alleged throughout this Complaint: Plaintiff was unrepresented, medically unable to participate, and denied an ADA-compliant opportunity to challenge that affidavit's reliability before judgment entered. Plaintiff does not ask this Court to redetermine, as a matter of state foreclosure

273

law, whether the Flannigan affidavit was sufficient proof of standing. Plaintiff alleges that she was never afforded a meaningful, ADA-compliant opportunity to test that affidavit through cross-examination, demand for production of the original instrument, or expert review, and that this denial of meaningful testing is itself part of the access violation underlying Counts I, II, and III above.

32. Because Plaintiff was denied a meaningful, ADA-compliant opportunity to test Deutsche Bank's note-possession proof before judgment entered, Plaintiff seeks, as part of the relief necessary to remedy that denial, an opportunity to inspect the original wet-ink instrument and compare it to the instrument Plaintiff actually executed, under conditions set by this Court, before any further enforcement of the Challenged Liability Posture proceeds.

33. Plaintiff alleges that Deutsche Bank's calculation of the alleged debt, including any appraisal obtained or relied upon by Deutsche Bank or its agents, is unreliable and should not be accepted without independent verification. Plaintiff alleges that an appraisal obtained in connection with this foreclosure valued the property at less than Plaintiff paid for it twenty-two years ago, notwithstanding that comparable properties in the same area have appreciated significantly over the same period. Plaintiff seeks an order requiring Deutsche Bank to produce the appraisal, the appraiser's qualifications, the comparable sales relied upon, and all communications between Deutsche Bank or its agents and the appraiser, and an order subjecting any valuation Deutsche Bank relies upon to independent review before it may be used to calculate any deficiency, surplus, or foreclosure-related amount.

34. An order requiring Deutsche Bank to produce all allonges, assignments, endorsements, bailee letters, custodian records, trustee records, trust schedules, mortgage loan schedules,

pooling-and-servicing documents, servicing boarding records, transfer records, default records, payment histories, payoff records, escrow records, foreclosure fee records, legal fee records, and all documents necessary to determine whether Deutsche Bank had enforceable rights.

35. Because the mortgage chain, payment history, escrow history, servicing records, trust records, note-custody records, assignments, allonges, bailee records, payoff records, fees, charges, legal expenses, insurance charges, and foreclosure amounts are complex and within Defendants' possession or control, and because Plaintiff cannot determine the full amount owed, if any, without independent review, Plaintiff seeks the following accounting and related relief: An order requiring a forensic accounting of the claimed debt, including all payments, interest, principal, default interest, negative amortization, fees, escrow charges, advances, legal fees, servicing fees, inspection fees, preservation fees, title fees, trustee fees, costs, insurance charges, and foreclosure amounts.

36. An order requiring an accounting of all amounts paid to or received by originators, brokers, servicers, trustees, custodians, foreclosure processors, law firms, and other participants in the mortgage chain.

37. An order requiring disgorgement of the yield spread premium, broker compensation, improper fees, excessive interest, foreclosure fees, legal fees, servicing income, trustee income, or other benefits obtained through the misconduct alleged herein.

38. An order declaring that any amount claimed by Deutsche Bank is subject to recoupment, setoff, offset, restitution, disgorgement, and equitable reduction.

39. An order preventing Deutsche Bank from obtaining title windfall where Plaintiff's damages, offsets, recoupment, restitution, and disgorgement claims equal or exceed any claimed debt.

## F. Monetary Relief

40. Compensatory damages in an amount to be proven at trial.

41. Consequential damages in an amount to be proven at trial.

42. Damages for loss of home, loss of equity, loss of title, loss of possession, loss of use, loss of quiet enjoyment, loss of property rights, loss of redemption opportunity, loss of refinancing opportunity, and loss of housing security.

43. Damages, restitution, disgorgement, setoff, recoupment, and equitable monetary relief for portfolio-wide property injury affecting Plaintiff's entire real-estate portfolio, including but not limited to 165 Old Stonewall Road, Easton, Connecticut, and all other properties from which equity was stripped through the serial predatory refinance chain described herein, including but not limited to the GreenPoint, WaMu, and American Home Mortgage refinance sequence, the total value of which Plaintiff alleges exceeds $18,000,000, together with lost appreciation, lost rents, lost income, lost investment value, forced-sale losses at distressed values, carrying costs, and all other property-related losses, to the extent proven and traceable to the predatory refinance chain, poisoned mortgage enforcement, fraudulent concealment, elder-financial-exploitation conduct, CUTPA violations, abuse of process, civil conspiracy, RICO injury to business or property where applicable, and other surviving theories. Plaintiff alleges that the full scope of portfolio loss will be established through discovery and at trial.

276

44. Restitution of all payments, interest, principal, default interest, escrow charges, fees, costs, attorney's fees, servicing fees, foreclosure fees, title fees, preservation fees, inspection fees, and all other sums extracted or demanded through the poisoned mortgage chain.

45. Disgorgement of all profits, compensation, fees, charges, interest, servicing income, trustee income, legal fees, broker compensation, yield spread premium, and foreclosure benefits obtained through Defendants' misconduct.

46. Return, disgorgement, or forfeiture of the $30,000 retainer paid to Brown and Brown Law LLC to the extent unearned, wrongfully retained, or subject to fiduciary forfeiture.

47. Damages for legal malpractice, breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, conversion, civil theft where proven, and wrongful retention of funds.

48. Damages for defamation, libel, false light, reputational injury, dignitary injury, humiliation, loss of credibility, loss of counsel access, and public-record harm.

49. Damages for ADA discrimination, denial of meaningful access, ADA interference, ADA retaliation, coercion, intimidation, disability weaponization, and unsafe accommodation process.

50. Damages for unauthorized public docketing of private ADA communications, privacy invasion, confidentiality breach, humiliation, distress, chilling effect, and access injury.

51. Damages for emotional distress, medical aggravation, physical pain, neurological strain, cognitive overload, anxiety, fear, loss of sleep, loss of dignity, loss of autonomy, loss of enjoyment of life, and severe stress.

52. Damages for due-process and access-to-courts injuries to the fullest extent permitted by law.

53. Damages for fraud, fraudulent concealment, fraud on the court, fraudulent foreclosure enforcement, abuse of process, civil conspiracy, aiding and abetting, and all related misconduct.

54. Damages for CUTPA violations, including actual damages, punitive damages, attorney's fees, costs, and equitable relief.

55. Treble damages under RICO and all other statutes permitting treble or enhanced damages.

56. Treble damages under any applicable civil-theft, consumer-protection, or statutory-damages theory proven by discovery and law.

57. Punitive, exemplary, enhanced, deterrent, and deterrence-calibrated damages against Deutsche Bank, the law-firm defendants, the individual attorney defendants, Brown, Brown Law LLC, and all other non-governmental Defendants against whom such relief is permitted by law, in an amount sufficient to punish and deter intentional, malicious, reckless, oppressive, fraudulent, disability-targeted, access-destroying, or bad-faith misconduct.

58. Punitive damages are warranted against Deutsche Bank specifically because it targeted an elderly disabled homeowner, enforced a poisoned mortgage chain, concealed or minimized institutional RMBS and successor-liability risk while possessing actual or constructive knowledge of its own 2017 DOJ settlement's applicability to Plaintiff's trust, escalated its representation to three major law firms, weaponized Plaintiff's disability record, exploited the counsel abandonment described throughout this Complaint, obtained an empty-record liability posture, and pressed strict foreclosure against an elderly disabled homeowner on that basis. Punitive damages are warranted against the law-firm Defendants and individual attorney Defendants because they placed or joined a false disability/candor narrative on the

278

public docket, interfered with ADA-protected activity, and used litigation process to defeat meaningful access rather than adjudicate the merits.

59. The disparity in size, resources, and institutional power between Defendants and Plaintiff is itself an aggravating factor properly considered in setting the amount of any punitive award. Deutsche Bank is a global financial institution; McCarter & English, Hinshaw & Culbertson, and Brock & Scott are each national or multi-state law firms with foreclosure, financial-institution, and complex-litigation capacity; together, these institutions deployed that combined power against a single eighty-eight-year-old disabled widow, unrepresented for much of the relevant period, proceeding without the resources to match even a fraction of the legal force arrayed against her. A punitive award that fails to account for this imbalance would treat institutional defendants and an individual elderly disabled litigant as if they came to this proceeding on equal footing, when the very escalation to three major law firms, described throughout this Complaint, demonstrates that Defendants themselves did not believe that to be true.

60. Punitive damages are warranted against Brown and Brown Law LLC because Brown breached fiduciary duties owed to Plaintiff, abandoned her at the dispositive stage, retained the full $30,000 retainer despite not completing the representation it was paid to provide, and adopted a false narrative against his own disabled client despite his knowledge of her medical condition.

61. Plaintiff seeks punitive damages calibrated to impose a meaningful institutional sting proportionate to the misconduct, financial resources of the wrongdoers, vulnerability of the victim, harm to public justice, repeated or institutional nature of the conduct, and the need to ensure that the penalty is not treated as a cost of doing business. Plaintiff alleges that

ordinary damages would not meaningfully deter a global financial institution or the national foreclosure-enforcement systems that enabled the conduct, and that the misconduct alleged in this Complaint must be treated as a civil-rights, property, court-access, and public justice violation, not merely a cost of doing business.

62. Plaintiff alleges that a meaningful punitive and deterrent award is necessary because Deutsche Bank has already paid $3.1 billion in civil penalties under the Financial Institutions Reform, Recovery, and Enforcement Act and committed $4.1 billion in consumer relief — a combined $7.2 billion — to resolve federal RMBS misconduct involving AHM 2007-1 by name, the very trust on whose behalf Deutsche Bank now seeks to take Plaintiff's home, and yet continues to seek value from trust-related defective mortgage instruments through foreclosure enforcement. Plaintiff alleges that this prior settlement did not adequately deter the conduct alleged in this Complaint, and that the amount necessary to impose a meaningful sting cannot be determined without discovery into Deutsche Bank's financial resources, global assets, net worth, insurance, indemnity, enforcement revenue, servicing revenue, foreclosure-related revenue, prior regulatory settlements, and the economic benefit obtained from the misconduct alleged herein. In the Statement of Facts accompanying that settlement, which Deutsche Bank acknowledged, Deutsche Bank's own internal records document that it knew AHM's origination practices were fraudulent; that elderly fixed-income borrowers on stated-income documentation were internally categorized as presenting ability-to-repay defects; and that its own personnel described AHM loans as going 'beyond misrepresentation into the fraudulent area.' Despite paying $7.2 billion to resolve those admissions, Deutsche Bank acquired and enforced Plaintiff's AHM 2007-1 loan four years later, without disclosing any of this

institutional history to the state court. A punitive award that fails to account for this prior settlement — and for the fact that the conduct it resolved demonstrably failed to deter Deutsche Bank from enforcing the very type of loan its own records document was fraudulently originated — would not serve the deterrence function that punitive damages are designed to serve.

63. Punitive or exemplary damages against private Defendants, to the extent permitted by law, in an amount sufficient to punish and deter intentional, malicious, reckless, oppressive, fraudulent, or disability-targeted misconduct, taking into account the gravity of the misconduct, the vulnerability of the victim, the public-interest harm, and all legally permissible deterrence factors.

64. Nominal damages for any violation of Plaintiff's rights for which actual damages are difficult to quantify or for which nominal damages are necessary to vindicate the right.

65. Future and continuing damages for ongoing injury, including any future law-day, title, possession, credit, or financial consequences, and the continuing cost of correcting the public record, while this matter remains unresolved.

66. Prejudgment interest.

67. Post-judgment interest.

68. Attorney's fees, expert fees, litigation expenses, taxable costs, nontaxable costs, and all fee-shifting relief available under ADA, RICO, CUTPA, civil-rights law, consumer-protection law, equitable doctrines, and any other applicable authority.

69. All private-attorney-general, public-interest, statutory-award, whistleblower, relator, victim-compensation, restitutionary, enforcement-related, deterrence, or fee-shifting recovery legally available.

281

70. **Election and Cumulation of Remedies.** Plaintiff's claims produce the following distinct, non-duplicative damage categories: (a) **Compensatory/economic damages** arising from the fraudulent origination, equity stripping, and $1.15 million extracted on the poisoned instrument, the $18 million real-estate portfolio losses caused by the serial predatory refinance chain, and the imminent loss of the property itself — these are the baseline compensatory award against which RICO trebling and other multipliers operate; (b) **RICO treble damages** under 18 U.S.C. § 1964(c), which are mandatory upon a jury finding of RICO liability and are calculated as three times the compensatory damages found to arise from the RICO enterprise — this is a statutory multiplier, not a duplicative recovery; (c) **CUTPA punitive damages** under Conn. Gen. Stat. § 42-110g, which are a separate and independent remedy from RICO trebling, aimed specifically at punishing and deterring the institutional bad faith of the Defendants and calibrated to Deutsche Bank's global assets rather than to the compensatory baseline — these are legally distinct from RICO treble damages because they serve deterrence rather than compensation, and both may be awarded; (d) **Dignitary, reputational, and personal-injury damages** for defamation, emotional distress, ADA discrimination, medical aggravation, privacy invasion, and related torts — these arise from distinct wrongs (the false disability/candor accusation, the unauthorized docketing, the disability weaponization) that are separate from the economic/property losses and are not subject to RICO trebling or CUTPA caps; and (e) **Disgorgement and restitution**, which are equitable remedies that operate independently of and cumulatively with the legal damage awards above. Plaintiff does not seek duplicative recovery for the same injury from multiple counts. To the extent any award category would produce duplicative recovery, Plaintiff will elect the greater or most

282

complete remedy at the time of judgment. Plaintiff preserves the right to recover the sum of all non-duplicative awards across all categories.

71. Plaintiff does not seek punitive damages against the Connecticut Judicial Branch, Judge Regan, Keane, or any official-capacity Defendant. Any punitive, exemplary, enhanced, deterrent, or treble relief is sought only against non-governmental Defendants.

## G. RICO and Enterprise Relief

72. Treble damages under 18 U.S.C. § 1964(c).

73. Costs and attorney's fees under RICO.

74. Equitable relief to the extent available to prevent Defendants from continuing to benefit from the alleged enterprise, racketeering activity, fraudulent foreclosure enforcement, or fraud-tainted record.

75. Discovery, accounting, and production sufficient to identify all enterprise participants, predicate acts, mailings, electronic transmissions, foreclosure filings, service events, affidavits, certifications, and communications.

## H. CUTPA Relief

76. Actual damages for all economic and property losses caused by Deutsche Bank's unfair and deceptive acts in both the origination and enforcement of the subject loan.

77. Punitive damages under Conn. Gen. Stat. § 42-110g in an amount sufficient to achieve meaningful institutional deterrence. In December 2017, Deutsche Bank paid $3.1 billion in civil penalties and committed $4.1 billion in consumer relief — a combined $7.2 billion, the largest RMBS resolution against a single entity in the country's history — to resolve federal claims arising from the same category of conduct alleged in this Complaint,

283

including the securitization of loans through trusts that included AHM 2007-1 by name. That penalty was substantial by any measure. Yet four years later, Deutsche Bank acquired Plaintiff's specific loan from that same trust and commenced enforcement, with its own internal records already documenting the fraudulent character of loans originated in the manner Plaintiff's was. The $7.2 billion penalty did not deter this conduct. Plaintiff alleges that this history is directly relevant to the punitive damages analysis: under Lenz v. CNA Assurance Co., 42 Conn. Supp. 514, 515 (1993), a punitive award must be large enough to constitute a genuine 'sting' to the defendant being punished, because 'a sum that might be a sting to an individual of modest means might be a trifling sum to a large corporation.' Deutsche Bank's current global financial position — reported at approximately $1.685 trillion in assets — confirms that an award calibrated only to Plaintiff's individual losses, without regard to Deutsche Bank's capacity to absorb such an award without meaningful consequence, would repeat the same failure that allowed the 2017 settlement to go without deterrent effect. Under Ulbrich v. Groth, 310 Conn. 375 (2013), the degree of reprehensibility of the defendant's conduct and its financial status are both relevant considerations in setting a punitive award. Plaintiff alleges that the reprehensibility here is severe: Deutsche Bank's own documented knowledge of the fraud, its targeting of an elderly disabled homeowner, and its repetition of conduct already once penalized at the highest scale in the industry's history together justify an award substantial enough that Deutsche Bank's leadership and shareholders take genuine notice of it — not as a matter of formula, but as a matter of the deterrent function punitive damages exist to serve. Plaintiff requests that the jury, informed by this history and by evidence of Deutsche Bank's current financial resources to be obtained through discovery, determine an amount sufficient to

284

ensure that conduct of this kind is never again treated as an acceptable cost of doing business. Plaintiff asserts that the CUTPA punitive award is legally distinct from RICO treble damages: RICO trebling is a mandatory statutory multiplier of compensatory losses; CUTPA punitive damages are a discretionary institutional penalty calibrated to conduct and wealth. Both may be awarded simultaneously.

78. Attorney's fees under § 42-110g .

79. Costs.

80. Full restitution of the approximately $1.15 million in payments, interest, and fees extracted from Plaintiff on the subject instrument.

81. Disgorgement of all profits, servicing income, trustee income, broker compensation, yield spread premium, legal fees earned in furtherance of enforcement, and all other benefits obtained through the unfair and deceptive conduct described herein.

82. Injunctive relief and public interest relief.

83. Any additional equitable relief authorized by CUTPA.

## I. Brown-Specific Relief

84. Judgment against Brown and Brown Law LLC for malpractice, breach of fiduciary duty, breach of contract, breach of implied covenant, unjust enrichment, wrongful retention of funds, defamation, emotional distress, and related claims.

85. Return or disgorgement of the $30,000 retainer.

86. Fee forfeiture based on breach of fiduciary duty.

87. Damages for the lost summary-judgment opposition, loss of counsel at the critical stage, loss of opportunity to defend, foreclosure liability consequences, reputational harm, medical harm, and emergency remediation costs caused by Brown's conduct.

285

88. Punitive damages where available.

89. Referral, notice, or other relief as permitted by law concerning professional misconduct, without limiting Plaintiff's private damages claims.

## J. Individual Attorney Defendant Relief

90. Judgment against Swanson, Mahabamunuge, Milne, and Fredericks, for their individual roles in signing, filing, joining, authorizing, serving, relying upon, advocating, or republishing the false disability/candor narrative and related foreclosure-enforcement conduct. Judgment against Knickerbocker for his individual role in making representations to the trial court regarding possession of the original note that were not borne out by the proof Deutsche Bank ultimately submitted, and related foreclosure-enforcement conduct.

91. Separate findings of responsibility as to each individual attorney defendant according to proof.

92. Joint and several liability where permitted.

93. Punitive damages where permitted.

94. Corrective, sealing, retraction, or public-record relief requiring those Defendants to withdraw or correct the disability/candor narrative.

## K. Judicial Branch / Official-Capacity Relief

95. Prospective declaratory and injunctive relief against official-capacity Defendants to prevent ongoing violation of federal rights.

96. Prospective relief requiring meaningful written ADA access and barring compelled live participation.

97. Prospective relief prohibiting use of the Challenged Liability Posture to impose strict foreclosure.

98. Prospective relief requiring safe and confidential ADA procedures.

99. Prospective relief requiring accessible cure opportunities for filing defects.

100. Prospective relief requiring sealing, correction, or restriction of unauthorized public ADA communications.

101. Award compensatory damages against the Connecticut Judicial Branch, to the extent permitted under Title II of the ADA, § 504 of the Rehabilitation Act if applicable, and governing sovereign-immunity law, for concrete injuries already caused by the denial of meaningful disability-accessible court participation, including lost value of the meaningful litigation opportunity, loss of meaningful participation in the summary-judgment process, loss of the opportunity to oppose liability, test Deutsche Bank's proof, present defenses and counterclaims, preserve recoupment and setoff rights, and prevent creation of an "unopposed" foreclosure liability posture; and, if strict-foreclosure consequences proceed before meaningful access is restored, for the additional property, equity, possession, litigation, and consequential economic losses proximately caused by converting the access-denied record into foreclosure enforcement.

102. Compensatory damages against the Connecticut Judicial Branch to the extent permitted under Title II of the ADA, the Rehabilitation Act, if applicable, and governing sovereign-immunity and applicable law for concrete injuries already caused by the denial of meaningful disability-accessible court participation, including loss of meaningful participation in the summary-judgment process, loss of the opportunity to oppose liability, test Deutsche Bank's proof, present defenses and counterclaims, preserve recoupment and

287

setoff rights, and prevent creation of an "unopposed" foreclosure liability posture; and, if strict-foreclosure consequences proceed before meaningful access is restored, for the additional property, equity, possession, litigation, and consequential economic losses proximately caused by converting the access-denied record into foreclosure enforcement.

## L. Other Relief

103.    Appointment of a special master, forensic accountant, or neutral reviewer to review the mortgage chain, accounting, ADA docketing, and foreclosure record as appropriate.

104.    Leave to amend to add additional defendants, claims, predicate acts, damages, documents, and allegations revealed by discovery.

105.    Preservation orders requiring Defendants to preserve all relevant documents, emails, texts, case-management records, ADA communications, docketing records, note-custody records, trust records, servicing records, law-firm files, billing records, and foreclosure records.

106.    Expedited discovery concerning imminent foreclosure harm, ADA docketing, note possession, standing, trust transfer, Shallo/YSP origination, Brown's retainer and withdrawal, and the disability/candor filing.

107.    A determination that Plaintiff's claims are pleaded in the alternative and cumulatively and that no damages category is waived by the pleading of another, and that Plaintiff does not seek duplicative recovery for the same injury.

108.    Plaintiff does not waive, assign, share, or relinquish any portion of her own damages, punitive damages, statutory damages, treble damages, restitution, disgorgement, attorney-fee recovery, or any separate legally available award arising from government, regulatory, derivative, or public enforcement triggered by the facts exposed in this action.

109.    Such other and further relief as the Court deems just, equitable, and proper.

## IX. REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

110.    Plaintiff separately moves, or will separately move, for temporary restraining order and preliminary injunction relief under Federal Rule of Civil Procedure 65.

111.    Plaintiff incorporates this Complaint into her request for emergency relief.

112.    Plaintiff is likely to succeed on the merits because the record establishes serious federal questions concerning ADA access, due process, foreclosure enforcement fraud, standing defects, disability interference, public disability defamation, fiduciary abandonment, and unauthorized public docketing of ADA communications.

113.    Plaintiff will suffer irreparable harm without emergency relief because strict foreclosure, title transfer, loss of possession, and loss of home cannot be fully remedied after the fact.

114.    Plaintiff will also suffer irreparable harm because the loss of meaningful ADA access, the public exposure of private ADA communications, and the enforcement of a Challenged Liability Posture cannot be cured by a later appeal after title vests.

115.    The balance of equities favors Plaintiff because Defendants seek to use a record produced by disability exclusion and procedural asymmetry to obtain irreversible property consequences.

116.    The public interest favors emergency relief because federal law protects disabled litigants' access to courts, honest foreclosure records, fair process, safe ADA accommodations, and protection against public disability retaliation.

117.    Plaintiff requests that the Court issue immediate relief preserving the status quo while the Court decides the temporary-restraining-order request on the papers and sets any preliminary-injunction response, reply, supplemental submission, or emergency schedule in a written-first format for all parties, unless the Court first determines that a live proceeding is unavoidable and establishes a medically safe, procedurally equal ADA protocol.

## X. JURY DEMAND

118.    Plaintiff demands a trial by jury on all claims and issues so triable.

## XI. RESERVATION OF RIGHTS

119.    Plaintiff reserves the right to amend this Complaint after discovery, as additional facts, defendants, predicate acts, damages, documents, docket entries, communications, servicing records, trust records, custodial records, ADA records, and law-firm records are obtained through discovery, including to add defendants, correct capacities, add predicate acts, add damages, identify John Doe defendants, add exhibits, refine claim labels, supplement RICO allegations, and conform the pleadings to proof.

120.    Plaintiff does not attach exhibits to this Complaint and instead pleads the facts based on the record, documents, docket entries, communications, and materials described herein. Plaintiff will submit necessary evidentiary materials with her emergency motion for temporary restraining order and preliminary injunction, and will produce or identify additional materials in discovery or as directed by the Court.

121.    Plaintiff reserves the right to seek temporary, preliminary, emergency and permanent injunctive relief; declaratory relief; equitable relief; damages; restitution; disgorgement; fees; costs; interest; and all other relief permitted by law or equity at any

291

time, including if Defendants attempt to advance strict foreclosure, law days, title transfer, possession transfer, ejectment, sale, collection, recording, or other foreclosure consequences.

122.     Plaintiff reserves all rights to seek sealing, correction, retraction, sanctions, referrals, disciplinary notice, forensic accounting, special-master relief, and all other appropriate relief.

Respectfully submitted,

/s/ Nancy Roncati Dowden
165 Old Stonewall Road
Easton, CT  06612
(203) 814-7218
nrondowden@gmail.com
Dated: June 29, 2026

## DECLARATION AND VERIFICATION

I, Nancy Roncati Dowden, declare as follows:

1.   I am the Plaintiff in the above-captioned matter. I am representing myself pro se, am over the age of 18, and make this declaration based upon my personal knowledge, review of records, and the documents and proceedings described in the Complaint.

2.   I have read the foregoing Verified Complaint and know the contents thereof.

3. The factual allegations contained therein based on my own personal experiences and observations are true and correct; as to those allegations based on hidden facts or the actions of others, they are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this 29th day of June, 2026, in the City of Easton, State of Connecticut.

Nancy Roncati Dowden
165 Old Stonewall Road
Easton, CT  06612
(203) 814-7218
nrondowden@gmail.com